## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CONVERGEONE HOLDINGS, INC., *et al.*,[1] | ) | Case No. 24-90194 (CML) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF SALVATORE LOMBARDI IN SUPPORT OF
## THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Salvatore Lombardi, pursuant to section 1746 of title 28 of the United States Code, hereby declare as follows:

1.       I am the Chief Financial Officer of ConvergeOne Holdings Inc., together with its affiliated debtors and debtors in possession (the "**Debtors**")[2] and non-Debtor subsidiaries ("**C1**" or the "**Company**").[3]  I have served as Chief Financial Officer since January 2023.  I have more than 20 years of experience in a variety of leadership roles at companies in the technology, financial services, pharmaceutical, and other industries, including in senior management as a senior vice president, executive vice president, managing director, deputy chief financial officer,

---

[1]     The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654).  The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

[2]     Terms used but not defined in this Declaration have the meanings ascribed in the Restructuring Support Agreement attached as **Exhibit B** and its exhibits, as applicable.

[3]     I am the Chief Financial Officer of each Debtor except for ConvergeOne Government Solutions, LLC.  I am also Chief Financial Officer of SPS Providea Limited (UK).

and chief financial officer.  In my capacity as Chief Financial Officer, I am generally familiar with C1's day-to-day operations, business and financial affairs, and books and records.

2.      Except as otherwise indicated, all statements set forth in this declaration (this "**Declaration**") are based upon (a) my personal knowledge and familiarity with the Debtors' operations, finances, and restructuring efforts, (b) my review of relevant documents and information provided to me by employees of or advisors to the Debtors, and (c) my opinion based upon my experience and knowledge concerning C1's operational, financial, and business affairs, including my general knowledge of the industry in which C1 operates.  I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3.      Today (the "**Petition Date**"), the Debtors filed the above-captioned prepackaged cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Court**").  The Debtors are requesting various forms of relief through several "first day" motions and applications (collectively, the "**First Day Motions**").  The Debtors are requesting, among other things, that the Court: (a) approve the Debtors' entry into debtor-in-possession financing facilities and consensual use of cash collateral, which will provide the liquidity necessary for the Debtors to continue operating their business during the Chapter 11 Cases and to successfully administer these Chapter 11 Cases; (b) conditionally approve the Debtors' Disclosure Statement, schedule a combined hearing for final approval of the Disclosure Statement and Plan, and grant related relief; (c) authorize the Debtors to pay in full certain prepetition claims, including employee wage, benefit, and expense reimbursement claims; (d) authorize the Debtors to continue their prepetition business practices, pay related claims in the ordinary course of business on a

postpetition basis, and grant other related relief; (e) authorize the Debtors to continue using their existing cash management system, including their existing bank accounts; (f) authorize the Debtors to continue operating under their shared services arrangements with their foreign, non-Debtor affiliates; and (g) provide other administrative relief to streamline these Chapter 11 Cases for the benefit of the Debtors' estates and creditors.

4.  I submit this Declaration to provide an overview of the Debtors and their business and to provide information in support of the Debtors' chapter 11 petitions and the First Day Motions. Part I of this Declaration provides a general overview of the Debtors and these Chapter 11 Cases. Part II further describes several features of C1's business. Part III describes C1's prepetition corporate and capital structure. Part IV further discusses the events and circumstances leading to the commencement of these Chapter 11 Cases, including an overview of the Debtors' prepetition restructuring efforts. Part V discusses the relief requested in the First Day Motions.

## PART I

5.  C1 is a leading global information technology ("**IT**") services company. C1 provides connected human experiences by working with its channel partners, delivering IT services, and developing and commercializing its own technology products. C1 invites its customers to reimagine customer interactions, enables the future of work and collaboration, and builds cyber-resilient enterprises in an ever-evolving IT landscape. The Company designs, implements, and supports thousands of state-of-the-art IT solutions across its core technology markets: pure and hybrid cloud solutions, business applications, customer experiences, contact center design and enablement, modern workplace infrastructure, cyber security, and enterprise networking. C1 is supported by a dynamic global workforce of more than 3,000 employees and independent contractors. C1 serves more than 6,000 private and public sector customers worldwide across a range of industries, including education, energy, financial services,

government, healthcare, manufacturing, media and communications, retail, and transportation. C1's customers include many of the companies listed on the Fortune 100, some of the largest school districts in the country, other large municipal entities, the federal government, the largest healthcare providers in the country, and a variety of leading global companies.

6.     C1's industry-leading ability to deliver sophisticated IT solutions and rapidly respond to its customers' needs in a complex, cloud-enabled, and artificial intelligence-supported environment is reflected in its unparalleled customer satisfaction metrics, long-term partnerships with industry leading suppliers, and strong business fundamentals.   Recently, however, the Company has faced liquidity challenges due to a highly leveraged capital structure that has become unsustainable in the current interest rate environment.   The significant interest expense on the Company's funded debt—which increased by approximately $55 million on an annual basis from 2022 to 2023—combined with increased working capital needs over the same time period, has depleted the Company's liquidity and impaired its ability to operate in the ordinary course.   In particular, the Company was unable to secure amendments to its first and second lien term loan agreements that would have transitioned the LIBOR benchmark rate to the Secured Overnight Financing Rate ("**SOFR**"), resulting in the conversion of the benchmark interest rates on these facilities from LIBOR to prime interest rates and a corresponding significant increase in the Company's interest expense.   C1 has also faced ongoing customer delays, resulting in shorter contract lengths and staggered and diversified purchasing of product and software, due to the financial challenges of one of the Company's largest technology partners and an overall industry-wide slow-down in capital spending due to recessionary concerns, which have further exacerbated the Company's liquidity challenges.   These issues, in turn, have fueled rating agency downgrades,

and led to supplier pressures including credit reductions and other restrictive trade terms that have resulted in a further drain on the Company's liquidity.

7.       C1's management team and professionals have worked diligently to develop a comprehensive strategy that will allow the Company to access necessary funding and restructure its funded debt, enabling the Company to de-lever its balance sheet and position itself for future growth.  The Debtors commenced these Chapter 11 Cases on a prepackaged basis with the support, pursuant to the terms of a Restructuring Support Agreement (the "**RSA**"), of creditors holding approximately 81% of the Debtors' first lien debt and 81% of the Debtors' second lien term loan debt (the "**Consenting Lenders**").  The RSA contemplates the equitization or cancellation of approximately $1.6 billion of the Debtors' funded debt.   The Debtors have also secured commitments for two debtor-in-possession financing facilities, and the consensual use of cash collateral, which will permit the Debtors to continue accessing their prepetition revolving credit facility with maximum availability of $250 million and draw on a $215 million new money multi-draw term loan facility during these Chapter 11 Cases.  The Debtors are also negotiating the terms of an exit revolving credit facility to fund the Debtors' post-chapter 11 operations and obligations, which exit facility will be provided either by the Debtors' existing asset-based revolving lender or a third-party financing provider.

8.       Other significant components of the RSA include:

- The Company will (i) conduct a $159.25 million fully-backstopped equity rights offering and (ii) receive a $85.75 million direct investment commitment from the backstop parties for the new equity interests in reorganized C1 (both subject to increase with the consent of the Debtors and the Required Consenting Lenders).  As part of these transactions, 95.625% of the new equity interests will be distributed to holders of first lien claims and the backstop parties.  As part of the equity rights offering, 65% of the 95.625% of new equity interests will be offered to all holders of first lien claims on a pro rata basis, subject to a 10% put option premium owed to the backstop parties and subject to dilution by the management incentive plan.  As part of the direct investment commitment, the backstop parties have committed to purchase 35% of the

95.625% of new equity interests, subject to a 10% put option premium owed to the backstop parties and subject to dilution by the management incentive plan. The proceeds of the equity rights offering and direct equity investment will be used to repay the debtor-in-possession term loan facility and provide reorganized C1 with working capital.

- Holders of certain first lien claims may elect to receive (a) takeback term loans issued under an exit term loan facility in a principal amount equal to such holders' first lien claims multiplied by 20%, or (b) takeback term loans in a principal amount equal to such holders' first lien claims multiplied by 15% and rights to purchase, through the rights offering, new equity interests in reorganized C1, subject to dilution, including on account of the management incentive plan and fees owed to the backstop parties. As set forth in the RSA, these elections will be adjusted on a pro rata basis, based on oversubscription, so that participation in each option is capped at 50% of the first lien claims eligible to participate.

- Holders of second lien claims will receive 4.375% of the new equity interests in reorganized C1, also subject to dilution by the management incentive plan.

- General unsecured creditors will receive either reinstatement of their general unsecured claims pursuant to section 1124 of the Bankruptcy Code, or payment in full in cash either on the Effective Date or the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to the unsecured claim.

- All prepetition equity interests in the Debtors will be cancelled and no distributions will be made on account of such interests.

- Pursuant to a global settlement of all disputes related to the allowance of claims arising from the Prepetition PVKG Note Purchase Agreement (as defined below), PVKG Lender (as defined below), the other Consenting Lenders, and the Debtors have agreed that PVKG Lender's claims on account of the Prepetition PVKG Notes will be allowed in the amount of $213 million.[4]

9.    The Debtors believe it is imperative that the Chapter 11 Cases proceed swiftly to confirmation of the Plan, allowing the Debtors to emerge from bankruptcy as soon as practicable while maintaining the stability of their business operations and preserving customer and vendor relationships and goodwill. Expeditious confirmation of a Plan and consummation of the restructuring transactions is in the best interests of the Debtors, their estates, and their stakeholders. To that end, the Debtors have agreed to several case milestones under the RSA requiring, among

---

[4]    PVKG Lender is a non-Debtor affiliate controlled by the Debtors' private equity sponsor.

other things, that the Plan be confirmed within 45 days of the Petition Date and that the Debtors emerge from these Chapter 11 Cases within 60 days of the Petition Date (subject to certain conditions discussed below).  Critically, the Debtors expect to continue operating in the ordinary course throughout the Chapter 11 Cases and will remain focused on serving their customers with continued exceptional and dedicated service.

<div align="center">**PART II**</div>

**A.    C1's Business**

10.    C1 designs and supports customer experience, infrastructure and networking, and security technology services and solutions for corporate enterprises and public sector entities spanning a wide variety of industries.  C1 utilizes its own engineering and design expertise, proprietary intellectual property, and partnerships with leading suppliers and original equipment manufacturers ("**OEMs**") to produce and implement custom-built IT designs and solutions for its customers, including pure and hybrid cloud solutions, business applications, customer experiences, contact center design and enablement, modern workplace infrastructure, cyber security, and enterprise networking.

**B.    Corporate History**

11.    C1 was founded in Minnesota in 1993, initially specializing in communications hardware and software design, integration, and refurbishing.  C1 was among the first IT service providers to offer hosted voice and messaging services and high-speed Internet access in the mid-1990s.  From there, through several acquisitions and mergers, C1 expanded to serve global clients ranging from sole proprietors to Fortune 100 companies and local, state, and federal governmental units and other public sector entities.  C1 expanded its operations over the next two decades, building out its customer base and developing innovative technology solutions to meet the ever-evolving needs of its customers.

<div align="center">7</div>

12.     In June 2014, affiliates of Clearlake Capital Group, L.P. ("**Clearlake**"), a private investment firm, acquired C1.   In December 2017, C1 and Clearlake entered into a merger agreement with Forum Merger Corporation, a special purpose acquisition company, that took ConvergeOne Holdings Inc. ("**C1 Holdings**") public in February 2018 (NASDAQ: CVONW). Following the closing of that transaction, Clearlake remained the largest shareholder of C1.

13.     In January 2019, affiliates of CVC Capital Partners ("**CVC**"), a global private equity and investment advisory firm with more than €118 billion in assets under management, completed an acquisition of C1 that took the Company private through an all-cash tender offer for all outstanding shares of C1 Holdings valued at approximately $1.8 billion.

14.     Following the CVC acquisition, C1 has completed several strategic acquisitions and investments to expand its technical capabilities and add customer and vendor relationships. The following chart illustrates C1's material acquisitions from 2019 to the present and the capabilities of each acquired company:

| Date | Target | Capabilities |
| --- | --- | --- |
| January 2019 | Venture Technologies | IT solutions provider to private and public organizations |
| August 2020 | Altivon | Premier contact center solutions |
| March 2021 | AAA Network Solutions, Inc. | Innovative education solutions provider to public sector customers |
| June 2021 | NuAge | Service provider to Salesforce |
| November 2021 | WrightCore, Inc. | Managed and professional services capabilities |
| December 2021 | Prime TSR | Cloud-focused software and data platforms capabilities |
| January 2022 | Integration Partners Corporation | Collaboration and digital infrastructure solutions in New England and the Midwest |

C.     **Business Operations**

15.     C1's suite of innovative product and service solutions are supported by more than 1,000 engineers who collectively hold thousands of industry certifications and can rapidly deploy to provide support for C1's thousands of customers all over the globe.

16.    To design and implement IT solutions for its customers, C1 maintains partnerships with more than 140 global technology leaders, including software publishers, wholesale distributors, and OEMs such as Avaya, AWS, Cisco, Dell Technologies, Genesys, IBM, Juniper, Microsoft, Palo Alto, Extreme Networks and Google Cloud.  C1 purchases a variety of hardware and software for resale from these technology partners and utilizes their products in the IT designs and solutions it provides to its customers.  C1 is product agnostic and can act as a conduit between its customers and global partners, providing one point of contact to deliver optimal product and service solutions to its customers, optimizing IT investments and minimizing the cost, complexity, and time to implement solutions.

17.    The Company reported revenues of approximately $1.525 billion for the twelve months ended December 31, 2023, compared to approximately $1.456 billion in revenues for the twelve months ended December 31, 2022.

18.    C1's operations are divided into two distinct revenue segments: (a) the "**Services Segment**" and (b) the "**Product Segment**." The Services Segment contains three offerings: "**Professional Services**," "**Managed Services**," and "**Resale Services**." Each of these offerings can be sold separately or bundled together to form various holistic offerings based on each customer's specific needs and desired outcomes.  The Services Segment accounted for approximately 45% of the Company's total revenues in 2023.

- The Professional Services offering provides customers with consultation, design, integration and implementation, application development, program management, and maintenance services for customized collaboration, enterprise networking, data center, cloud, and security offerings.  Customers retain C1's engineers to create custom-designed, complex IT solutions which are then produced, sold, and implemented as standalone offerings or combined with OEM products and software and C1's own intellectual property to facilitate bespoke solutions for C1's customers.

- Through the Managed Services offering, C1 administers and maintains customers' mission critical IT infrastructure, typically over long-term contracts with high renewal rates.  Through C1's relationships with leading and next-generation technology

9

partners, and through the utilization of C1's own proprietary intellectual property, C1's engineers maintain and enhance customers' existing IT infrastructure. The engineers monitor performance and troubleshoot and support rapid resolutions for their customers' IT data center portfolios. Additionally, they provide IT helpdesk support, maintenance services, and technological infrastructure enhancements, including upgrades or modifications to software.

- The Resale Services offering consists of selling products and software subscriptions developed by C1's third-party OEM partners. C1 actively markets products purchased from leading technology vendors in response to its customers' specifications. C1's engineers utilize these products and software subscriptions to develop bespoke solutions to support the customers' IT infrastructure requirements and to augment their capabilities.

19.     The Product Segment procures hardware products and software services from C1's OEM and distribution partners and sells those products to C1's customers. Sales through the Product Segment may consist of standalone products, including products improved by C1's proprietary intellectual property, or may be included in a more holistic technology solution that is combined with C1's Professional Services expertise. The Product Segment accounted for approximately 55% of the Company's total revenues in 2023.

**D.     Intellectual Property**

20.     The Company's intellectual property portfolio enables unique services provided by C1's engineers to deliver superior outcomes for customers and to support its customers' applications, customer experience, cyber security, and collaboration capabilities, whether using in premise or cloud-based infrastructure.

21.     The Company deploys its proprietary intellectual property through software-as-a-service ("**SaaS**") offerings on its cloud platform, including:

- **C1 OnGuard**, which is an award-winning observability and telemetry service offering that provides continual monitoring and proactive incident detection and prevention of customer environments, inclusive of collaboration, contact center, cybersecurity, and infrastructure protection support to the Company's customers.

- **C1CX**, which is C1's flagship "Connected Experience (CX)" platform that provides customers with an enterprise-grade Contact Center as a Service and/or Unified Communications as a Service offering. It includes core hybrid SaaS services powered

10

by industry-leading vendors as well as C1 proprietary offerings enhanced with value-added services to deliver a holistic experience. C1CX is a platform that can be maintained at C1's data centers, customers' premises, or a third-party data center.

- **C1 Analytics**, which enables customers to leverage their enterprise-wide data through C1's methodologies on data collection and storage that enables advanced levels of analytics, AI, and machine learning. Beyond reporting, C1 Analytics creates customer-specific data lakes, dashboards, and visualizations that leverage various data sources across the enterprise to uncover new insights and metrics for their customers.

- **C1CX Fabric**, the most unique Integration Platform as a Service of its kind, adds the needed functions to customer environments that create a data, integration, and orchestration fabric. Fabric is delivered as a service, de-risks current investments as it becomes the common platform that integrates enterprise systems and data, and de-risks future investments by integrating SaaS to quickly trial new services.

- **C1 Elly** is a generative AI virtual assistant designed to work across any vendor. It enables organizations to activate the potential of all enterprise data, including voice and digital information previously siloed across business systems, such as customer relationship management, enterprise risk management, IT service management systems, and other systems. By leveraging C1's intellectual property, Elly enables authentic interactions, by integrating data across all touchpoints and endpoints to streamline conversations without making customers repeat themselves. Elly is enhanced by the Human Experience Quality Index (HXQi), a proprietary scoring system used to measure the quality and accuracy of each interaction to mitigate hallucinations, toxicity, and irrelevance and ensure each conversation was completed successfully.

22.     In addition, the Company has a patent pending to protect its ongoing investments in research and development of systems and methods for managing and analyzing customer interactions and holds numerous U.S. and foreign trademarks and copyrights. The Company also holds various licenses permitting the use and resale of its global partners' products and software.

### E.      Employees

23.     As of the Petition Date, the Company's workforce of more than 3,000 individuals spans across 15 countries and consists of approximately 2,500 employees and 530 independent contractors. The Company currently employs approximately 2,240 individuals in the United States (the "**U.S. Employees**"), approximately 230 employees in India (the "**India Employees**"), and approximately 30 employees in Canada (the "**Canada Employees**" and, together with the U.S. Employees and India Employees, the "**Employees**"). The U.S. Employees work across 49 states,

with main hubs in Minnesota, New Jersey, California, and Texas. Most of the Company's workforce works remotely. Additionally, most of the U.S. and Canada-based workforce is employed by or contracts with ConvergeOne, Inc. ("**C1 Inc.**") as the Company's main operating entity.

24.     While the majority of C1's employees are not represented by a labor union, Debtor AAA Network Solutions, Inc. ("**AAA**") and Debtor ConvergeOne Dedicated Services, LLC ("**C1DS**") are party to two collective bargaining agreements (each, a "**CBA**") with respect to approximately 85 unionized employees. Of the represented employees, approximately 20 employees of C1DS are employed under a CBA with the Communication Workers of America, and the remainder of the represented employees at AAA and C1DS are employed under a CBA with various bargaining units of the International Brotherhood of Electrical Workers.[5]

25.     The Company utilizes its independent contractors based primarily in the United States and India for administrative, sales, technical, and research and development support roles. Although a small number of these contractors based in the United States contract with C1 directly, most of the contractors in the United States and India are contracted through third-party vendors. Contractors in India are contracted through an agreement between C1 Inc. and third-party managed service providers, including Seismic LLC (together with its affiliate, Inspiredge IT Solutions Provider Limited, "**Seismic**"), along with several other third-party vendors. The relationship between C1 Inc. and non-Debtor affiliate ConvergeOne India Private Limited ("**C1 India**") is also governed by a Master Services Agreement, through which C1 India provides

---

[5]     C1 also signs project-specific subscription agreements with other local units of the International Brotherhood of Electrical Workers to the extent required by the applicable CBA or customer agreement.

technology and support services to C1 Inc. (the "**Shared Services Agreement**"), as discussed more below.

<div align="center">

**PART III**

</div>

A.    **Corporate Structure**

26.    As set forth on the organizational structure chart attached as **Exhibit A**, non-debtor ConvergeOne Investment LP, a Delaware limited partnership controlled by CVC, is C1's ultimate parent through its indirect 100% ownership of Debtor PVKG Intermediate Holdings Inc. ("**PVKG Intermediate**"), a Delaware corporation.

27.    PVKG Intermediate is the direct or indirect parent of each of the other Debtors, including C1 Holdings and C1 Inc.  ConvergeOne Texas, LLC, which is directly wholly-owned by C1 Inc., was formed under the laws of the State of Texas on January 12, 2024.

28.    In addition to various domestic subsidiaries, which are Debtors in these Chapter 11 Cases, C1 also has two international non-debtor subsidiaries discussed more below.[6]

B.    **Capital Structure**

1.    **The Debtors' Prepetition Indebtedness**

29.    As of the Petition Date, the Debtors have approximately $21.4 million in cash on hand, $155 million in accounts payable, and $1,821 billion in aggregate outstanding principal amount of funded debt obligations, detailed below.

---

[6]    Non-Debtor SPS – Providea Limited's parent, Debtor Providea Conferencing, LLC, has pledged 65% of SPS – Providea Limited's equity as collateral under the Debtors' prepetition funded debt obligations.  SPS – Providea Limited is not otherwise an obligor or guarantor under those facilities.  Non-Debtor C1 India's parent, Debtor C1 Inc., has pledged 65% of C1 India's equity as collateral under the Debtors' prepetition funded debt obligations. C1 India is not otherwise an obligor or guarantor under those facilities.

| Funded Debt | Maturity | Principal Amount Outstanding ($ millions) |
|---|---|---|
| **Prepetition ABL Credit Agreement** | April 2025 | $190 |
| **Prepetition First Lien Term Loan Credit Agreement** | January 2026 | $1,061 |
| **Prepetition KL Note Purchase Agreement** | January 2026 | $75 |
| **Prepetition PVKG Note Purchase Agreement** | June 2028 | $220 |
| **Prepetition Second Lien Term Loan Credit Agreement** | January 2027 | $275 |
| **TOTAL** | | **$1,821** |

### i.       Prepetition ABL Credit Agreement

30.     Under its Amended and Restated ABL Credit Agreement dated as of January 4, 2019 (as amended by Amendment No. 1 dated as of July 10, 2022, Amendment No. 2 dated as of September 14, 2022, Amendment No. 3 dated as of January 23, 2023, and Amendment No. 4 dated as of August 29, 2023, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition ABL Credit Agreement**") by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, Wells Fargo Commercial Distribution Finance, LLC, as administrative agent, collateral agent, and floorplan funding agent (in such capacities, the "**Prepetition ABL Agent**"), and as swing line lender, and the lenders from time to time party thereto (together with the Prepetition ABL Agent and other secured parties under the Prepetition ABL Credit Agreement, the "**Prepetition ABL Secured Parties**"), the Prepetition ABL Secured Parties agreed to provide C1 Holdings with a secured revolving credit loan with aggregate availability of $250 million, subject to compliance with a borrowing base, various sublimits applicable to swingline loans, letters of credit, and floorplan advances otherwise authorized under the Prepetition ABL Credit Agreement, and various reserves that may be

established in accordance with the Prepetition ABL Credit Agreement (the "**Prepetition ABL Facility**").

31.     As of the Petition Date, an aggregate balance of approximately $190 million, including revolving loans, floorplan obligations, and accrued and unpaid interest, remains outstanding under the Prepetition ABL Facility.  The Company is unable to access the remaining availability under the Prepetition ABL Facility due to the Prepetition ABL Credit Agreement's borrowing base limitations, reserves and sublimits, and minimum availability requirements.  The obligations under the Prepetition ABL Facility are secured by a first priority security interest in substantially all of the Debtors' assets, subject to the intercreditor agreements described below. The Prepetition ABL Facility matures in April 2025.

### ii.     Prepetition First Lien Term Loan Credit Agreement

32.     Under the terms of a certain First Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by Amendment No. 1 dated as of March 14, 2019 and Amendment No. 2 dated as of December 17, 2021, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition First Lien Term Loan Credit Agreement**") by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, Deutsche Bank AG New York Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien Term Loan Agent**"), and certain lenders from time to time party thereto (together with the First Lien Term Loan Agent, the "**Prepetition First Lien Term Loan Secured Parties**"), the Prepetition First Lien Term Loan Secured Parties agreed to provide C1 Holdings with initial term loans in the principal amount of $960 million and incremental term loans in the principal amount of $150 million, resulting in aggregate borrowings under the Prepetition First Lien Term Loan Credit Agreement of $1.110 billion in principal (the "**Prepetition First Lien Term Loan Facility**").

33.     As of the Petition Date, approximately $1.1 billion of obligations, including accrued and unpaid interest and OID, are outstanding under the Prepetition First Lien Term Loan Facility.  C1 Holdings' obligations under the Prepetition First Lien Term Loan Facility are guaranteed by each of its Debtor subsidiaries and PVKG Intermediate.  The Debtors' obligations under the Prepetition First Lien Term Loan Facility are secured by a first priority security interest in substantially all assets of the Debtors, subject to the intercreditor agreements described below. The Prepetition First Lien Term Loan Facility matures in January 2026.

### iii.     Prepetition KL Note Purchase Agreement

34.     Under the terms of a First Lien Secured Note Purchase Agreement dated as of July 10, 2020 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition KL Note Purchase Agreement**") by and among C1 Holdings, as issuer, PVKG Intermediate, as holdings, Deutsche Bank Trust Company, as administrative agent and collateral agent (the "**Prepetition KL Notes Agent**"), certain affiliates of Kennedy Lewis Investment Management LLC as holders party thereto ("**Kennedy Lewis**"), and any other holder from time to time party thereto (together with the Prepetition KL Notes Agent, the "**Prepetition KL Notes Secured Parties**"), C1 Holdings issued senior secured notes to Kennedy Lewis in the aggregate principal amount of $75 million (the "**Prepetition KL Notes**").

35.     As of the Petition Date, approximately $78.8 million of obligations, including accrued and unpaid interest and OID, are outstanding under the Prepetition KL Notes.  C1 Holdings' obligations under the Prepetition KL Notes are guaranteed by each of its Debtor subsidiaries and PVKG Intermediate.  The obligations under the Prepetition KL Notes are secured by a first priority security interest in substantially all of the Debtors' assets, subject to the intercreditor agreements described below.  The Prepetition KL Notes mature in January 2026.

### iv.      Prepetition PVKG Note Purchase Agreement

36.      Under the terms of the Third Amendment and Restatement to Promissory Note and Purchase and Cashless Exchange Agreement dated as of July 6, 2023 (the "**Prepetition PVKG Note Purchase Agreement**")[7] by and among parties including C1 Holdings, as issuer, and PVKG Investment Holdings Inc. (an entity controlled by CVC), as holder (in such capacity, "**PVKG Lender**") and as administrative agent and collateral agent (in such capacities, the "**Prepetition PVKG Notes Agent,**" and in its capacities as holder, administrative agent, and collateral agent, the "**Prepetition PVKG Notes Secured Parties**"), C1 Holdings issued senior secured notes to PVKG Lender in the principal amount of approximately $160 million, and rolled up approximately $33 million of notes previously issued to PVKG Lender, resulting in a total principal balance of approximately $193 million (the "**Prepetition PVKG Notes**").  The Prepetition PVKG Notes Secured Parties, together with the Prepetition First Lien Term Loan Secured Parties and the Prepetition KL Note Secured Parties are referred to as the "**Prepetition First Lien Secured Parties**."

37.      As of the Petition Date, pursuant to a settlement of claims related to the Prepetition PVKG Notes, PVKG Lender, the other Consenting Lenders, and the Debtors have agreed that $213 million of obligations, including paid-in-kind interest added to principal and amortized OID, but excluding prepayment premiums and unamortized OID, remain outstanding under the Prepetition PVKG Notes.  C1 Holdings' obligations under the Prepetition PVKG Notes are guaranteed by each of its Debtor subsidiaries and PVKG Intermediate.  The obligations under the Prepetition PVKG Notes are secured by a first priority security interest in substantially all of the

---

[7]      The Prepetition PVKG Note Purchase Agreement is further discussed in Part IV below.

Debtors' assets, subject to the intercreditor agreements described below.  The Prepetition PVKG Notes mature in June 2028.

### v.      Prepetition Second Lien Term Loan Credit Agreement

38.      Under the terms of a Second Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by Amendment No. 1 dated as of July 10, 2022, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition Second Lien Credit Agreement**") by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, UBS AG, Stamford Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition Second Lien Agent**"), and certain lenders from time to time party thereto (together with the Prepetition Second Lien Agent, the "**Prepetition Second Lien Secured Parties**"), the Prepetition Second Lien Secured Parties provided C1 Holdings with a single-draw secured term loan in the aggregate principal amount of $275 million (the "**Prepetition Second Lien Facility**").

39.      As of the Petition Date, approximately $287 million of obligations, including accrued and unpaid interest but excluding unamortized OID, are outstanding under the Prepetition Second Lien Facility.  C1 Holdings' obligations under the Prepetition Second Lien Facility are guaranteed by each of its Debtor subsidiaries and PVKG Intermediate.  The obligations under the Prepetition Second Lien Facility are secured by a second priority security interest in substantially all assets of the Debtors.  The Prepetition Second Lien Facility matures in January 2027.

### vi.      Prepetition Intercreditor Agreements

40.      A series of intercreditor agreements govern the relative lien and payment priorities of the Prepetition ABL Secured Parties, the Prepetition First Lien Secured Parties, and the Prepetition Second Lien Secured Parties (together, the "**Prepetition Secured Parties**").

41.     Under an ABL Intercreditor Agreement dated as of January 4, 2019 (as amended by that certain ABL Intercreditor Agreement Joinder dated as of May 15, 2023 and as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition ABL Intercreditor Agreement**") by and among the Prepetition ABL Agent, the Prepetition First Lien Term Loan Agent, Prepetition KL Notes Agent, and the Prepetition PVKG Notes Agent, the liens held by the Prepetition ABL Secured Parties on specified collateral, including the Debtors' cash, accounts receivable, and inventory, have priority over the liens held by the Prepetition First Lien Secured Parties on that collateral.  Conversely, the liens held by the Prepetition First Lien Secured Parties on certain collateral other than the Debtors' cash, accounts receivable, and inventory have priority over the liens on that collateral held by the Prepetition ABL Secured Parties.

42.     Under the terms of a First Lien Pari Passu Intercreditor Agreement dated as of January 10, 2020 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among the Prepetition First Lien Term Loan Agent, Prepetition KL Notes Agent, and the Prepetition PVKG Notes Agent, the parties agreed that they would be *pari passu* with respect to the priority of their liens on common collateral and that any payments in respect of their common collateral would be made pro rata, subject to the provisions of the Prepetition ABL Intercreditor Agreement.

43.     Finally, under the terms of a certain Intercreditor Agreement dated as of January 4, 2019 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date) governing the respective rights, interest, obligations, priority, and positions of the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties, the liens securing the Prepetition ABL Credit Facility, Prepetition First Lien Term Loan Facility,

Prepetition KL Notes, and Prepetition PVKG Notes have priority over the liens securing the Prepetition Second Lien Facility.

<p style="text-align:center"><strong>vii.      Prepetition Unsecured Trade Debt</strong></p>

44.      As of the Petition Date, the Debtors estimate that their unsecured trade debt totals approximately $155 million.  The Debtors have filed a motion seeking the authority to pay the undisputed prepetition claims of certain critical vendors, foreign vendors, lien claimants, and vendors holding claims entitled to priority under section 503(b)(9) of the Bankruptcy Code, in order to preserve the Debtors' partnerships with these vendors and the Debtors' ability to continue operating in the ordinary course during the pendency of these Chapter 11 Cases.  Because C1 Inc. is the Company's main operating entity, a substantial majority of the Debtors' total prepetition trade debt is owed by C1 Inc.

<p style="text-align:center"><strong>C.      Intercompany Relationships and Obligations</strong></p>

45.      As is customary for a sophisticated company with global operations and enterprise-level management, the Debtors maintain business relationships with each other and their non-Debtor affiliates and routinely engage in ordinary course transactions through various intercompany service arrangements (the "**Intercompany Transactions**").  These Intercompany Transactions include the provision of various services to Debtors and non-Debtor affiliates pursuant to intercompany accounts receivables and payables, intercompany contracts, and intercompany loans.

<p style="text-align:center"><strong>1.      ConvergeOne Government Solutions, LLC</strong></p>

46.      Debtor ConvergeOne Government Solutions, LLC ("**C1GS**") is a wholly-owned subsidiary of C1 Inc. that operates largely independently of C1 Inc. and the other Debtors.  C1GS provides technology services to the federal government.  In order to maintain C1GS's eligibility to obtain classified contract work and to provide sensitive technology services for federal agencies

<p style="text-align:center">20</p>

and to other government contractors, C1GS, C1 Inc., and other affiliates are party to a proxy agreement with the Department of Defense.  Among other things, the proxy agreement requires that the management of C1GS operate independently of C1 Inc. and that certain proxy holders agreed to by the Department of Defense serve as the directors of C1GS.  C1 Inc. provides certain shared services to C1GS pursuant to an affiliated operations plan, which authorizes C1 Inc. to provide human resources, legal, and marketing services, and payroll processing, among other services, to C1GS.  Finally, the proxy agreement requires C1 Inc. to adequately capitalize C1GS. To that end, C1 Inc. and C1GS are party to a funding agreement authorizing C1GS to submit written borrowing requests to C1 Inc. for liquidity necessary to fund C1GS's operations on a quarterly basis.

### 2.    Foreign Subsidiaries

47.    C1's foreign subsidiaries provide various services to C1, including providing shared administrative services and technical support to the Company and a majority of its customers and managing services and tax matters for certain foreign customers.

#### i.    C1 India

48.    Under the terms of the Shared Services Agreement, dated July 7, 2023, between C1 India and C1 Inc., C1 India provides technological and support solutions as part of the Company's delivery of IT support and technology services and solutions to its customers across domains such as customer experience, cybersecurity, enterprise networking, and unified communications.  C1 India's operations are based in Hyderabad, India.  C1 India operates the C1 Global Innovation & Capability Center located in Hyderabad, India, which provides administrative, sales, technical, and research and development support to the Company.   C1 India's workforce consists of approximately 510 employees and independent contractors.  The Shared Services Agreement has

led to economies of scale for C1, providing for the efficient administration of necessary services across C1's entire corporate structure.

49.     C1 India operates as a service entity for C1 and does not generate any of its own revenue.  In consideration for the shared services, C1 Inc. makes monthly payments to C1 India for its operating costs derived at a cost-plus arm's length mark-up basis calculated pursuant to the Shared Services Agreement, based upon the funding requirements of C1 India, along with engaging in annual true-up or true-down adjustments.

50.     C1 India utilizes independent contractors in its workforce to help provide the shared services to C1 through agreements between C1 Inc. and third-party managed service providers, including Seismic.  The remaining contractors that provide services to C1 India are engaged by C1 Inc. through other third-party vendors.

### ii.     SPS-Providea Limited

51.     SPS-Providea Limited ("**SPS**") is a private limited company organized under the laws of England and Wales.  SPS operates as a procurement arm for C1 to perform under legacy contracts with global partners with foreign affiliates.  SPS sustains some of its own operations through customer receipts that it receives directly, but also receives periodic funding from C1 Inc. to make limited third-party vendor and other operational payments.  In 2023, SPS received approximately $5 million in total from C1 Inc.  C1 also uses SPS to facilitate purchases of technology hardware and maintain software solutions for customers based in the United Kingdom and Europe to comply with foreign privacy and other laws and regulations.

### PART IV

### A.     Prepetition Challenges Faced by the Company

52.     C1 has a long history of generating significant cash flows and working in conjunction with its channel partners to deliver IT services and bring its own technology products

to market.  C1's core business model, operating as an innovative, global IT services company, remains sound.  However, three recent challenges have created an immediate need for additional liquidity: (i) the Company's highly leveraged capital structure has resulted in significantly higher cash interest costs in the current interest rate environment, (ii) the Company faced customer delays resulting from the financial distress of one of its leading technology partners in the second half of 2022 and the first half of 2023, resulting in staggered and diversified customer contracts and product and software purchasing patterns, and (iii) downgrades of the Company's credit rating have resulted in supplier pressures, including credit reductions and other restrictive trade terms. These challenges, along with other macroeconomic headwinds, have impacted C1's operations and its liquidity position.

53.     The Company has been forced to divert an increasing amount of cash for rising interest payments on its funded debt.  The Federal Reserve increased interest rates by approximately 5.00% between March 2022 and August 2023, resulting in the interest costs on C1's funded debt increasing by approximately $55 million on an annualized basis.

54.     Also beginning in 2022, concerns over the financial health of one of the Company's leading OEM partners began to grow and accelerated with the OEM's latest bankruptcy filing in February 2023.  This led to customers staggering their contract renewals and purchasing throughout C1's services and product operating segments.  The OEM's liquidity issues also slowed the development of its next generation of products and solutions, limiting what C1 could sell to its customers and requiring the Company to try to source other solutions from its partners.  As a result, this substantially depressed C1's 2022 and 2023 earnings, due to the OEM's position as one of C1's top global partners.  With the OEM's bankruptcy filing now twelve months behind, market confidence in its products and services is on the rise.

55.     Simultaneously, lower than forecasted revenues in 2023 required the Company to stretch payment terms with its vendors, driving up its accounts payable balance.  Although the Company ultimately returned its vendors to normal payment terms after raising additional capital in July 2023, a downgrade by the rating agencies caused some vendors to impose more onerous payment and credit terms, which further strained the Company's liquidity.

**B.     Prepetition Initiatives Pursued by the Company**

56.     C1 launched several operational and other strategic efforts over the last year to counteract these challenges and stabilize its business.

**1.     Operational Initiatives**

57.     C1 pursued various operational initiatives designed to improve operating efficiency and performance, reduce costs, increase liquidity, and improve the Company's overall balance sheet profile.

**i.     Cost-Cutting Initiatives**

58.     In the first quarter of 2023, the Company began implementing cost-cutting measures primarily impacting the Company's headcount, sales expenses, general and administrative expenses, and discretionary spending.  By the fourth quarter of 2023, these initiatives had already generated approximately $86 million in run-rate savings for the Company and are expected to total more than $100 million in savings when all initiatives are fully executed.

59.     These cost-saving measures included the following initiatives, among others: (a) reducing the Company's employee headcount and its use of domestic independent contractors by moving certain positions to C1 India and finding more cost-effective third-party alternatives for certain in-house departments; (b) automating various employee functions, including customer payment, contract renewal, and work order scheduling processes; (c) exiting unnecessary third-party IT, software maintenance, and support contracts; (d) delayering sales management teams;

(e) unifying its presales and sales engineering groups that were unnecessarily spread across the business; (f) simplifying the review and approval processes for new sales and customer contracts; (g) streamlining the sales function by consolidating seventeen separate sales regions into four sales segments; (h) exiting various real estate leases and decreasing discretionary maintenance spending; (i) reducing advertising and marketing spending by emphasizing the Company's own talent in-house and working directly with vendors on paid and sponsored media; and (j) minimizing redundant third-party spending, as well as travel and entertainment expenses.  The Company will continue to evaluate its cost-saving initiatives during the Chapter 11 Cases and may implement additional measures that are consistent with its go-forward business plan.

### ii.   New Management Team

60.     In January 2023, the Company appointed Jeffrey S. Russell to serve as its Chief Executive Officer.  Mr. Russell has over 35 years of technology services and business advisory experience, including most recently serving as the President and Chief Executive Officer of Accenture Canada.  During his tenure as Chief Executive Officer of Accenture Canada, Mr. Russell led the company through three years of strong cross-industry market share growth and significantly increased top-line revenue and profitability.

61.     In addition, the Company filled four other key executive leadership positions beginning around that time.  In December 2022, I began consulting with the Company, and in January 2023 I was appointed Chief Financial Officer.  I have over 20 years of experience in global finance and operations, including my most recent experience as Chief Financial Officer and Managing Director of cxLoyalty, a leading provider of loyalty and travel solutions that was recently acquired by JPMorgan Chase.  In June 2023, Amrit Chaudhuri was appointed Chief Growth Officer.  Mr. Chaudhuri has over 15 years of technology marketing experience and most recently served as Executive Vice President and Chief Marketing Officer at 8x8 and RingCentral.

In August 2023, Meghan Keough was appointed Chief Marketing Officer. Ms. Keough has more than 20 years of experience in corporate and product marketing, product management, alliances, and business development, and most recently served as Senior Vice President at 8x8. Finally, in September 2023, John DeLozier was appointed Chief Revenue Officer. Mr. DeLozier has over 30 years of experience as an executive in the technology industry, including serving as President of Intelisys and Senior Vice President at 8x8 and CenturyLink.

### 2. Strategic Initiatives

62.     In addition to the operational efforts detailed above, C1 undertook various strategic initiatives to address the challenges facing the Company. These measures included: raising liquidity through the Prepetition PVKG Notes, appointing two independent and disinterested directors to the boards of PVKG Intermediate and C1 Holdings, creating a special committee of those boards (the "**Special Committee**") to consider strategic alternatives (including potential financing or recapitalization transactions), and engaging with key creditor constituencies regarding the terms of potential comprehensive restructuring transactions. In connection with these measures, C1 engaged experienced advisors including White & Case LLP as counsel, AlixPartners, LLP as financial advisor, and Evercore Group L.L.C. as investment banker.

### i. Prepetition PVKG Note Purchase Agreement and Out-of-Court Restructuring Efforts

63.     By March 2023, the Company's liquidity was becoming strained as its working capital declined and its accounts payable balance grew. To help address these liquidity pressures, on March 24, 2023, PVKG Lender (an entity controlled by CVC) advanced approximately $30 million to C1 Inc. under an unsecured promissory note (the "**Original PVKG Lender Note**"). The Company used the loan proceeds to pay down its accounts payable balance.

64.     On May 14, 2023, the Original PVKG Lender Note was assigned to C1 Holdings from C1 Inc. under the terms of an Issuer Assignment and Assumption Agreement.  On May 15, 2023, PVKG Lender and C1 Holdings, along with various of its affiliates, agreed to amend and secure the Original PVKG Lender Note on a first lien basis in exchange for a reduction in the interest rate on the Original PVKG Lender Note.  As part of this amendment, PVKG Intermediate, C1 Holdings, and their domestic subsidiaries executed the First Lien Promissory Note Guarantee and Collateral Agreement.

65.     Meanwhile, despite the much-needed liquidity provided by the Original PVKG Lender Note, the Company's accounts payable balance had continued to climb in April and May 2023.  On June 1, 2023, PVKG Lender advanced an additional approximately $3.2 million to the Company through an increase to the Original PVKG Lender Note.  The Company again used the proceeds to address its growing accounts payable balance.

66.     Unfortunately, the Company's liquidity then continued to worsen through June 2023 and the Company projected an approximately $160 million liquidity need to address outstanding accounts payable and interest costs by July 2023.  To address this shortfall, the Company and its advisors considered various potential financing and other strategic alternatives that might be available to the Company.

67.     In April and May 2023, the Company, with the assistance of its advisors, explored several potential options.  Then, beginning in May 2023, the Company initiated discussions with an ad hoc group of lenders holding first lien term loan debt (the "**First Lien Ad Hoc Group**") and an ad hoc group of lenders holding second lien term loan debt (the "**Second Lien Ad Hoc Group**") regarding the terms of a potential financing transaction.  In June 2023, the Company engaged in discussions with CVC regarding a potential alternative financing transaction.  The Company

engaged in several rounds of negotiations with these parties on the terms of various proposals, and management and directors met regularly and extensively, including with the Company's advisors, to discuss the proposals and the Company's funding needs.

68.     Ultimately, after exploring various options and repeatedly pressing for the best available terms, the Company decided to move forward with a financing transaction with PVKG Lender, determining that it provided the most favorable terms for the Company, including greater access to liquidity, lowest execution risk, and the quickest timing to close.  By this time, the Company was on the brink of failure and immediate access to capital was crucial.  On July 6, 2023, after multiple rounds of negotiations with PVKG Lender, the disinterested directors of ConvergeOne Investment LP and C1 Holdings approved the terms of the transaction.

69.     Under the terms of the Prepetition PVKG Note Purchase Agreement, PVKG Lender rolled up the Original PVKG Lender Note and provided approximately $160 million in face value of new money financing to the Company in three payments of approximately: (a) $32 million on July 6, 2023, (b) $84 million on July 13, 2023, and (c) $44 million on August 30, 2023.  As a result, the total principal amount of the Prepetition PVKG Notes includes both the amounts under the Original PVKG Lender Note and the new money investment.  The PVKG Lender Amended Notes provide for an interest rate of 21.75% per annum payable in kind, were issued with a 7.0% OID on the new money portion, and include a "Prepayment Premium" provision, triggered by, among other events, a chapter 11 filing.

70.     Although the proceeds of the Prepetition PVKG Notes immediately eased the Company's liquidity needs, they did not ultimately solve fundamental issues facing the Company, including rising interest rates and the fact that some vendors, even after receiving payment from the Company, refused to extend credit terms to the Company going forward.  Among other

challenges, the Company was unable to secure consents to replace the LIBOR benchmark rate with the SOFR rate following the discontinuation of LIBOR.  The Company had approached the First Lien Ad Hoc Group and Second Lien Ad Hoc Group seeking to amend the Prepetition First Lien Term Loan Credit Agreement and the Prepetition Second Lien Term Loan Credit Agreement and proposed certain SOFR transition provisions, but ultimately the Company did not reach agreement with the First Lien Ad Hoc Group and the Second Lien Ad Hoc Group.  By November 2023, the Company began re-engaging with its advisors to evaluate additional alternatives and assist with contingency planning efforts.

### ii.  Enhanced Corporate Governance Measures and Discussions of a Comprehensive In-Court Restructuring

71.     In connection with its contingency planning efforts, Larry J. Nyhan and Sherman K. Edmiston III were appointed to the boards of directors for PVKG Intermediate and C1 Holdings as independent and disinterested directors.  Then, in January 2024, the Special Committee was formed to review, evaluate, and approve strategic and financial alternatives, including the possibility of seeking additional financing or undertaking a recapitalization transaction or other reorganization or restructuring.  The Special Committee is comprised of Mr. Russell, Mr. Nyhan, and Mr. Edmiston.  Mr. Nyhan has served on the boards of several distressed companies and has extensive experience in corporate restructuring having served as co-chairman of Sidley Austin LLP's corporate restructuring and bankruptcy group.  Mr. Edmiston currently serves on the boards of several companies and as a managing member of HI CapM Advisors, a consulting group that provides advisory services to corporations, hedge funds, and asset managers.

72.     In January 2024, the Debtors engaged with the First Lien Ad Hoc Group, PVKG Lender (in its capacities as both a secured lender and equity holder), and the Prepetition ABL Secured Parties to discuss the terms of a potential in-court restructuring.  In February 2024, the

Debtors likewise engaged with the Second Lien Ad Hoc Group to discuss the terms of a comprehensive restructuring transaction.  As a result of these negotiations, the Special Committee concluded that the restructuring transactions contemplated by the RSA would provide the Debtors with immediate access to much-needed liquidity and a path to delever their capital structure in a meaningful way that would not be possible out of court.

### iii.    Entry Into the RSA

73.    Following extended arm's-length negotiations between the Debtors, the First Lien Ad Hoc Group, the Prepetition ABL Secured Parties, PVKG Lender, and the Second Lien Ad Hoc Group regarding the optimal path forward, on April 3, 2024, the Debtors entered into the RSA, a copy of which is attached to this Declaration as **Exhibit B**.  The RSA provides that members of the First Lien Ad Hoc Group and PVKG Lender holding more than 81% of the first lien claims, as well as members of the Second Lien Ad Hoc Group holding 81% of the second lien term loan claims, will support and vote in favor of a Plan that will implement a significant deleveraging of the Debtors' balance sheet.  In addition, pursuant to the RSA, the claims of PVKG Lender are deemed allowed under the Plan at $213 million, and the parties to the RSA (including the First Lien Ad Hoc Group whose claims are *pari passu* with PVKG Lender) have agreed to such allowance.

74.    Following careful consideration, including an investigation into surrounding circumstances, on April 2, 2024, the Special Committee approved the Debtors' entry into the RSA and the filing of the Chapter 11 Cases.  The Debtors believe that the comprehensive restructuring contemplated by the RSA provides the Company with a value-maximizing path forward and will right-size the Company's capital structure in a manner that will ensure the viability of the Company's business as a going concern.

**C.**     **Proposed Timeline for These Chapter 11 Cases**

75.     The Debtors have agreed to several milestones in the RSA to ensure an orderly and timely implementation of the restructuring transactions set forth in the RSA.  It is imperative that the Debtors proceed swiftly to confirmation of the Plan and emergence from the Chapter 11 Cases to mitigate uncertainty among employees, customers, and vendors, minimize disruptions to the Debtors' business, and limit professional fees and administrative costs.  Expeditious confirmation of a Plan and consummation of the restructuring transactions is in the best interests of the Debtors, their estates, and their stakeholders.

76.     Under the RSA, the Plan must be confirmed within 45 days of the Petition Date. Accordingly, the Debtors have agreed to the following case milestones:

| Milestone | Date |
|---|---|
| Plan and Disclosure Statement Filed | Petition Date (April 4, 2024) |
| Interim DIP Order Entered | Petition Date +3 Calendar Days (April 7, 2024) |
| Conditional Approval of Disclosure Statement | Petition Date +3 Calendar Days (April 7, 2024) |
| Final DIP Order Entered | Petition Date +35 Calendar Days (May 9, 2024) |
| Order Approving Adequacy of the Disclosure Statement | Petition Date +45 Calendar Days; (May 19, 2024) |
| Confirmation Order Entered | Petition Date +45 Calendar Days; (May 19, 2024) |
| Effective Date | Petition Date +60 Calendar Days. (June 3, 2024) |

**D.**     **Conditional Approval of the Debtors' Disclosure Statement and Related Relief**

77.     Consistent with the agreed milestones, the Debtors are seeking immediate conditional approval of the Disclosure Statement, as further described in the *Debtors' Emergency*

*Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Disclosure Statement, (III) Approving the Confirmation Timeline, Solicitation Procedures, Solicitation Package, Notices, the Election and Rights Offering Materials and Election/Subscription Timeline, (IV) Waiving the Requirement to Hold the Creditors' Meeting and File SOFAS, Schedules, and 2015.3 Reports, and (V) Granting Related Relief* ("**Disclosure Statement Motion**").  I helped prepare and have personally reviewed the Disclosure Statement.  To the best of my knowledge, the information contained in the Disclosure Statement is accurate, and based on my review, I believe the Disclosure Statement provides sufficient information for a party eligible to vote on the Plan to make an informed decision.

78.    Through the Disclosure Statement Motion, the Debtors are also seeking to establish several dates and deadlines leading up to a hearing on final approval of the Disclosure Statement and confirmation of the Plan (the "**Confirmation Timeline**").   The proposed Confirmation Timeline will allow the Debtors to meet the agreed milestones and promptly emerge from these Chapter 11 Cases.

### E.    Debtor-in-Possession Financing and Use of Cash Collateral

79.    During these Chapter 11 Cases, the Debtors will use the cash generated from their operations, in addition to current cash on hand of $21.4 million, to (a) satisfy payroll obligations, (b) honor postpetition obligations owed to customers and vendors, (c) maintain insurance coverage, (d) pay taxes, and (e) make any other payments essential to the continued management, operation, and preservation of the Debtors' business.  I have worked closely with the Debtors' advisors, including AlixPartners LLP, to review the Debtors' liquidity needs during these Chapter 11 Cases and prepare a 13-week cash flow forecast (the "**DIP Budget**") that projects the Debtors' weekly cash receipts, cash disbursements, and liquidity.  The Debtors and their advisors continued

to update the DIP Budget leading up to the Petition Date to account for changes in the Debtors'
funding needs resulting from, among other things, the estimated timing of the commencement of
these Chapter 11 Cases and ongoing discussions with the Debtors' largest vendors regarding their
open accounts payable balances.

80.     Based upon the DIP Budget and discussions with the Debtors' advisors, I do not
believe the Debtors would have sufficient liquidity to manage their estates solely by using cash
generated from operations and cash on hand as of the Petition Date.  Accordingly, the Debtors
seek access to further liquidity and financial accommodations provided by two debtor-in-
possession financing facilities during the Chapter 11 Cases.

81.     *First*, the Debtors seek approval of the "**ABL DIP Facility**."  The ABL DIP Facility
is a superpriority secured first lien asset-based debtor-in-possession lending facility in the
aggregate principal amount of $250 million that allows continued access to the Debtors'
prepetition revolving credit facility, subject to certain modifications set forth in the DIP Orders.
The ABL DIP Facility preserves the Debtors' access to their prepetition revolving credit line that
they use for daily working capital needs.  The ABL DIP Facility also contains a specific feature
that is critical to the Debtors' continued ordinary course operations during these Chapter 11 Cases:
a floorplan facility, which allows the Debtors to rapidly finance the purchase of products, software,
and services from certain of the Debtors' leading global technology partners and vendors.  Under
the floorplan facility, the Debtors are authorized to submit purchase orders to the Prepetition ABL
Agent, who is then obligated to advance amounts due to the applicable vendor under those
purchase orders promptly upon shipment.  As a result, the floorplan facility expedites payments to
vendors and, in turn, expedites shipments of products, software, and services to the Debtors and
their customers.  Any floorplan obligations then become revolving obligations under the

Prepetition ABL Facility, allowing the Debtors to immediately purchase products, software, and services from vendors and delay payment until the Debtors determine to pay down their outstanding obligations under the Prepetition ABL Facility.

82.     I understand that the Prepetition ABL Agent is requiring that all amounts outstanding under the floorplan facility be converted into postpetition obligations of the Debtors as a condition to entering into the ABL DIP Facility, which permits continued access to the floorplan postpetition.  Losing access to the floorplan facility would have an immediate, severe, and negative impact on the Debtors' continued operations by, among other things, causing the cancellation of all pending floorplan orders, delaying future shipments, and impairing the Debtors' ability to service their customers.  There are currently pending floorplan orders of $10 million waiting to be shipped that, if cancelled under the floorplan facility, would have to be immediately financed by the Debtors from available cash rather than through the floorplan.  Based on the DIP Budget, the Debtors do not have sufficient liquidity to make those payments directly, and the failure to immediately pay the amounts due on the corresponding purchase orders would interrupt the Debtors' delivery of goods and services to their customers.

83.     In addition, I understand that the floorplan facility cannot simply be replaced by a third-party revolving credit provider.  I understand that the Prepetition ABL Agent is able to offer the floorplan facility because of its existing relationships with the Debtors' top vendors who are authorized to receive floorplan financing under the Prepetition ABL Facility.  There is no assurance that any third-party financing provider has these same relationships, or that the Debtors' vendors would accept replacement financing from a third-party provider.  And, even if a third-party could replace the floorplan facility, all existing orders would need to be cancelled and then re-submitted to the new third-party financing provider's floorplan facility—which would still

cause material delay in the Debtors' ordinary course operations, obstruct the Debtors' delivery of goods and services to their customers, and impede the Debtors' seamless transition into these Chapter 11 Cases.

84.     I further understand that the Debtors presently lack availability under the Prepetition ABL Facility to incur new floorplan obligations.  In order for the Debtors to continue using the floorplan facility during the Chapter 11 Cases, the Debtors also must pay down existing amounts owed under the Prepetition ABL Facility in order to create new availability for postpetition floorplan orders and obligations in the ordinary course of business.

85.     As a result, to ensure continued access to the floorplan facility and preserve the ability to incur new floorplan obligations, the ABL DIP Facility contemplates the "**ABL Roll-Up**." The ABL Roll-Up provides for the following: (i) upon entry of the Interim DIP Order, all existing floorplan obligations owed under the floorplan facility will immediately convert on a cashless basis into obligations under the ABL DIP Facility; (ii) upon entry of the Interim DIP Order, the Debtors will be authorized to pay down amounts owing under the Prepetition ABL Facility with proceeds from the Debtors' term loan debtor-in-possession financing facility (discussed below), which will result in a corresponding increase in availability under the ABL DIP Facility for postpetition obligations, including floorplan obligations; and (iii) upon entry of the Final DIP Order, any remaining outstanding Prepetition ABL Facility obligations will convert on an automatic, cashless basis into obligations under the ABL DIP Facility.

86.     I understand that, without the ABL Roll-Up, among other terms in the ABL DIP Facility and proposed DIP Orders, the Prepetition ABL Agent would not be willing to enter into the ABL DIP Facility, including the floorplan facility, or consent to use of cash collateral.  The Debtors therefore have agreed to terms of the ABL DIP Facility, including the ABL Roll-Up, in

order to preserve access to their revolving credit line and floorplan facility, and to avoid material interruptions to their ordinary course options.

87.    ***Second***, in addition to the ABL DIP Facility, the Debtors seek approval of the "**Term DIP Facility**."  The Term DIP Facility is a super-senior multi-draw term loan facility of $215 million, with an initial draw of $145 million and a second draw of $70 million.  Proceeds from the first draw will be used to pay down the Prepetition ABL Facility (increasing availability for postpetition floorplan obligations), to fund critical vendor payments and other relief requested in the Debtors' first day motions (if approved by the Court), and for general corporate purposes. Both draws will be funded upon entry of the Interim DIP Order.  While the second draw will be immediately funded, it will be held in escrow pending entry of the Final DIP Order.  Under the restructuring transactions contemplated by the RSA, obligations under the Term DIP Facility will be repaid in full at emergence from the proceeds of an equity rights offering for the reorganized Debtors.  It is my understanding that the Term DIP Lenders would not allow borrowing under the Term DIP Facility or the use of cash collateral except on the terms set forth in the Term DIP Documents (as defined in the DIP Motion discussed below).

88.    As laid out more fully in the *Declaration of Evan Levine in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "**DIP Declaration**" in support of the "**DIP Motion**"), the ABL DIP Facility and the Term Loan DIP Facility are the product of extensive, arm's-length prepetition negotiations

between the Debtors, the Prepetition ABL Agent, and the Consenting Lenders, and are the best proposals that the Debtors received for that financing.

89.     Having participated in and being familiar with the events leading to these negotiations, I believe that the terms of the ABL DIP Facility, the ABL DIP Facility Documents, the Term Loan DIP Facility, and the Term Loan DIP Facility Documents, including the DIP Budget, and the form and amount of adequate protection to be provided to the Prepetition Secured Parties, are fair and appropriate under the circumstances and in the best interests of the Debtors' estates.  The transactions set forth in the RSA and the Plan, which contemplate the Debtors' entry into the ABL DIP Facility and Term Loan DIP Facility, will ensure that the Debtors' customers and vendors have a financially strong business partner during these Chapter 11 Cases, provide a viable path forward to maximize value for creditors and other parties in interest, and will position the Debtors for long-term success.

## PART V

90.     The Debtors have filed the First Day Motions to minimize the adverse effects on their business caused by the filing of these Chapter 11 Cases.  The First Day Motions seek relief to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, and expedite the restructuring of the Debtors' balance sheet.  The First Day Motions include:

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*;

- *Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to File Fee Letters Under Seal*;

- *Debtors' Emergency Motion for Entry of an Order (I) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (II) Conditionally Approving the Disclosure Statement, (III) Approving the Confirmation Timeline,*

*Solicitation Procedures, Solicitation Package, Notices, the Election and Rights Offering Materials and Election/Subscription Timeline, (IV) Waiving the Requirement to Hold the Creditors' Meeting and File SOFAs, Schedules, and 2015.3 Reports, and (V) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Chapter 11 Cases and (II) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Continue Their Prepetition Business Operations, Policies, and Practices and Pay Related Claims in the Ordinary Course of Business on a Postpetition Basis, (II) Granting Administrative Expense Priority to All Outstanding Orders and Authorizing the Debtors to Satisfy Such Obligations in the Ordinary Course, and (III) Granting Related Relief;*

- *Debtors' Emergency Ex Parte Application for Entry of an Order Authorizing the Retention and Employment of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent;*

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to File a Consolidated Creditor Matrix and Consolidated List of the 30 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (III) Approving the Form and Manner of the Notice of Commencement, and (IV) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using the Cash Management System and (B) Maintain Existing Bank Accounts, Business Forms, and Books and Records, (C) Continue Utilizing Corporate Credit Cards, (II) Authorizing Continued Intercompany Transactions and Granting Administrative Expense Status to Postpetition Intercompany Transactions, and (III) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, and (B) Continue Employee Benefits and Incentive Programs, and (II) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Performing Under Customer Contracts, (B) Continue Customer Programs, and (C) Honor Prepetition Obligations Related Thereto and (II) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue Operating Under Shared Services Arrangements and (II) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Related Obligations, (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers, and (III) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Maintain Insurance Coverage and Surety Bonds and Pay Related Prepetition Obligations, (B) Renew, Supplement, Modify, or Purchase Insurance Coverage and Surety Bonds, and (II) Granting Related Relief;*

- *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Form of Adequate Assurance of Payment to Utility Providers, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (III) Establishing Procedure for Resolving Objections by Utility Providers, and (IV) Granting Related Relief;* and

- *Debtors' Omnibus Motion for Entry of an Order (I) Authorizing (A) Rejection of Certain Unexpired Leases and (B) Abandonment of Certain Personal Property, Each Effective as of the Applicable Rejection Date and (II) Granting Related Relief.*[8]

91.     I am familiar with the content and substance of the First Day Motions and have reviewed each of them including their exhibits.  To the best of my knowledge and belief, the factual statements in each of the First Day Motions are true and accurate.  I incorporate by reference those factual statements as though set forth in this Declaration, with the exception of certain statements in the DIP Motion, which rely on the DIP Declaration.

92.     The relief requested in the First Day Motions is reasonable, necessary, and carefully tailored to allow the Debtors to operate with minimal disruption during the Chapter 11 Cases.  The relief requested is also critical to allowing the Debtors to successfully implement the Plan and promptly emerge from these Chapter 11 Cases.  Failure to obtain the relief requested in any of the First Day Motions could result in immediate and irreparable harm to the Debtors, their business, and their estates.  For all these reasons, I believe the relief requested in the First Day Motions is in the best interest of the Debtors' estates and that their approval will allow the Debtors to preserve and maximize the value of their estates for the benefit of their stakeholders.

*[Remainder of page intentionally left blank]*

---

[8]     The Debtors are not seeking emergency relief on this motion and parties will have 21 days from service to respond.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: April 4, 2024                    */s/ Salvatore Lombardi*
                                                      Salvatore Lombardi
                                                      Chief Financial Officer

**Exhibit A**

**Corporate Structure Chart**



ConvergeOne Investment LP (DE)
100%
PVKG Investment Holdings Inc. (DE)
100%
PVKG Intermediate Holdings Inc. (DE)
100%
ConvergeOne Holdings, Inc. (DE)
100%
ConvergeOne, Inc. (MN)
100%
ConvergeOne Government Solutions, LLC (DE)
ConvergeOne Unified Technology Solutions, Inc. (DE)
ConvergeOne Systems Integration, Inc. (DE)
NetSource Communications Inc. (IL)
Providea Conferencing, LLC (DE)
AAA Network Solutions, Inc. (CA)
NuAge Experts LLC (CO)
WrightCore, Inc. (TN)
100%
ConvergeOne Technology Utilities, Inc. (DE)
100%
ConvergeOne Managed Services, LLC (DE)
100%
ConvergeOne Dedicated Services, LLC (DE)
100%
SPS-Providea Limited (England and Wales)
Silent IT, LLC (IL)
Integration Partners Corporation (MA)
ConvergeOne Texas, LLC (TX)
ConvergeOne India Private Limited (India)
Legend
Debtor
Non-Debtor

**<u>Exhibit B</u>**

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE COMPANY PARTIES THAT WILL BE EFFECTUATED THROUGH FILING CHAPTER 11 CASES IN THE BANKRUPTCY COURT (AS DEFINED BELOW).

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER, ACCEPTANCE, OR SOLICITATION WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER, ACCEPTANCE OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE LAWS, INCLUDING SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS RESTRUCTURING SUPPORT AGREEMENT.

THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.

THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH RESTRUCTURING TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY RESTRUCTURING TRANSACTIONS SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.

### *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, including all exhibits, annexes, and schedules hereto in accordance with Section 14.02, this "***Agreement***")[1] is made and entered into as of April 3, 2024 (the "***Execution Date***"), by and among the following parties (each, a "***Party***" and together the "***Parties***"):

(i)        PVKG Intermediate Holdings Inc. ("***PVKG Intermediate***") and ConvergeOne Holdings, Inc. ("***C1 Holdings***"), on behalf of themselves and each of their direct

---

[1]    Capitalized terms used but not defined in the preamble or recitals to this Agreement shall have the meanings ascribed to such terms in Section 1.

and indirect subsidiaries listed on **Exhibit A** to this Agreement that have executed this Agreement (collectively, the "***Company Parties***");

(ii)    each Holder of a First Lien Claim that has executed and delivered counterpart signature pages to this Agreement on the date hereof, each solely in their capacities as such, or that executes and delivers a Joinder or Transfer Agreement to counsel to the Company Parties after the date hereof (such entities, the "***First Lien Consenting Lenders***"), including as of the date hereof:

   a.    each of the funds or accounts managed by (i) Kennedy Lewis Investment Management LLC, (ii) Monarch Alternative Capital LP, and (iii) Silver Point Capital (the "***Initial First Lien Ad Hoc Group Members***");

   b.    each of the funds or accounts managed by (i) MJX Asset Management LLC; (ii) PGIM, Inc., and (iii) Sound Point Capital Management, LP (the "***Subsequent First Lien Ad Hoc Group Members***");

   c.    Kennedy Lewis Investment Management LLC as the Holder of the KL Note Claims (the "***KL Lender***"); and

   d.    PVKG Investment Holdings, Inc. as the Holder of the PVKG Note Claims (the "***PVKG Lender***").

(iii)   each Holder of a Second Lien Claim that has executed and delivered counterpart signature pages to this Agreement on the date hereof, each solely in their capacities as such, or that executes and delivers a Joinder or Transfer Agreement to counsel to the Company Parties after the date hereof (such entities, the "***Second Lien Consenting Lenders***"), including, as of the date hereof, each of the funds or accounts managed by (i) Partners Group (USA) Inc., (ii) Siris Capital Group, LLC, (iii) AlbaCore Capital LLP, and (iv) Neuberger Berman Investment Advisers LLC and its affiliates; and

(iv)    PVKG Lender, ConvergeOne Investment, LP, and PVKG Investment US LP and each of their affiliates other than the Company Parties that have executed and delivered counterpart signature pages to this Agreement, in their capacities as direct or indirect Holders of Existing C1 Interests (collectively, the "***Consenting Sponsors***" and together with the First Lien Consenting Lenders, the "***Consenting Stakeholders***").

### *RECITALS*

**WHEREAS**, the Company Parties, the Consenting Stakeholders, and the Second Lien Consenting Lenders have in good faith and at arms' length negotiated certain restructuring transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit B** hereto (the "***Restructuring Term Sheet***" and, such transactions as described in this Agreement, the Restructuring Term Sheet, and the Definitive Documents, in each case, as may be amended, supplemented, or otherwise

modified from time to time in accordance with their applicable terms, and including any exhibits, annexes, and schedules thereto, collectively, the "**_Restructuring Transactions_**").

**WHEREAS**, the Restructuring Transactions shall be implemented through, among other things, voluntary bankruptcy cases to be commenced by the Company Parties under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended from time to time, the "**_Bankruptcy Code_**") in the United States Bankruptcy Court for the Southern District of Texas (the "**_Bankruptcy Court_**" and such cases, the "**_Chapter 11 Cases_**").

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement, the Restructuring Term Sheet, and the Definitive Documents.

**NOW**, **THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**    *Definitions and Interpretation*.

1.01.   Definitions.  The following terms shall have the following definitions:

"**_ABL DIP Agent_**" means Wells Fargo Commercial Distribution Finance, LLC.

"**_ABL DIP Commitment Letter_**" means the commitment letter, as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, to be entered into between the Company Parties and the ABL DIP Secured Parties, pursuant to which the ABL DIP Secured Parties have committed to make available to the Debtors the ABL DIP Facility in accordance with the terms thereof and the ABL DIP Documents.

"**_ABL DIP Documents_**" has the meaning set forth in the ABL DIP Facility Term Sheet.

"**_ABL DIP Facility_**" means the debtor in possession financing facility for the priming asset based revolving credit facility to be provided to the Debtors on the terms and conditions set forth in the ABL DIP Facility Term Sheet.

"**_ABL DIP Facility Term Sheet_**" means the term sheet attached as **Exhibit 1** to the Restructuring Term Sheet describing the material terms of the ABL DIP Facility.

"**_ABL DIP Secured Parties_**" has the meaning set forth in the ABL DIP Facility Term Sheet.

"**_Affiliate_**" means, with respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code.

"**_Agents/Trustees_**" means, collectively, any administrative agent, collateral agent, indenture trustee, floorplan funding agent, or similar Entity under the Prepetition ABL Credit

Agreement, the Prepetition First Lien Term Loan Credit Agreement, the Prepetition KL Note Purchase Agreement, the Prepetition PVKG Note Purchase Agreement, the Prepetition Second Lien Term Loan Credit Agreement, the Prepetition Intercreditor Agreements, the ABL DIP Facility, or the Term DIP Facility, including any successors thereto and including, without limitation, the ABL DIP Agent and Term DIP Agent.

"*Agreement*" has the meaning set forth in the preamble to this Agreement and, for the avoidance of any doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 14.02.

"*Agreement Effective Date*" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"*Agreement Effective Period*" means, with respect to a Party, the period from the Agreement Effective Date (or, in the case of any Consenting Stakeholder or Second Lien Consenting Lender that becomes a party hereto after the Agreement Effective Date, the date as of which such Consenting Stakeholder or Second Lien Consenting Lender becomes a party hereto) to the Termination Date applicable to that Party.

"*Alternative Restructuring Proposal*" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to any sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, asset sale, share issuance, consent solicitation, exchange offer, tender offer, recapitalization, plan of reorganization, plan of liquidation, share exchange, business combination, joint venture, debt incurrence (including, without limitation, any debtor-in-possession financing or exit financing), or similar transaction involving any one or more Company Parties or the debt, equity, or other Interests of or in any one or more Company Parties, whether written or oral, that is an alternative to, or is inconsistent with, any material component of the Restructuring Transactions.

"*Backstop Agreement*" means that certain Backstop Agreement agreed to between the Backstop Parties and the Company Parties regarding the Backstop Parties' commitment to backstop the Rights Offering on the terms set forth in the Rights Offering Term Sheet.

"*Backstop Parties*" means the Investors.

"*Bankruptcy Code*" has the meaning set forth in the recitals to this Agreement.

"*Bankruptcy Court*" has the meaning set forth in the recitals to this Agreement.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereafter amended.

4

"***Business Day***" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"***C1 Holdings***" has the meaning set forth in the preamble to this Agreement.

"***Causes of Action***" means any Claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code, or under similar local, state, federal, or foreign statutes and common law, including fraudulent transfer laws; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

"***Chapter 11 Cases***" has the meaning set forth in the recitals to this Agreement.

"***Claim***" means any claim, as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors.

"***Company Claims or Interests***" means any Claim against or Interest in a Debtor.

"***Company Parties***" has the meaning set forth in the preamble to this Agreement.

"***Confidentiality Agreement***" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information, in connection with any proposed Restructuring Transactions, and between any Company Party and any ad hoc groups, their advisors, or any Holder of any Company Claims or Interests.

"***Confirmation Order***" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"***Consenting Sponsors***" has the meaning set forth in the preamble to this Agreement.

"***Consenting Stakeholders***" has the meaning set forth in the preamble to this Agreement.

"***Debtors***" means the Company Parties set forth in the preamble to this Agreement and listed on **Exhibit A** hereto that become debtors and debtors in possession in the Chapter 11 Cases.

"***Definitive Documents***" means, collectively, each of the documents listed in Section 3.01.

"***DIP Orders***" means, together, the Interim DIP Order and the Final DIP Order.

5

"***Disclosure Statement***" means that certain disclosure statement disclosing the terms and conditions of the Plan, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of this Agreement and in accordance with, among other things, applicable securities Law, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Rule 3018 of the Bankruptcy Rules, and other applicable Law.

"***Entity***" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"***Execution Date***" has the meaning set forth in the preamble to this Agreement.

"***Existing C1 Interests***" has the meaning set forth in the Restructuring Term Sheet.

"***Exit ABL Facility***" has the meaning set forth in the Restructuring Term Sheet.

"***Exit ABL Facility Documents***" means any documents governing the Exit ABL Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"***Exit Term Loan Facility***" has the meaning set forth in the Restructuring Term Sheet.

"***Exit Term Loan Facility Documents***" means any documents governing the Exit Term Loan Facility and any amendments, modifications, and supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith.

"***Final DIP Order***" means any Final Order approving the ABL DIP Facility, the Term DIP Facility, the ABL DIP Documents, and the Term DIP Loan Documents, and authorizing the Debtors' use of cash collateral.

"***Final Order***" means, as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, that has not been reversed, stayed, modified, or amended and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken; or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing has been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, for the avoidance of any doubt, an order or judgment that is subject to appeal shall not constitute a Final Order even if a stay of such order or judgment pending resolution of the appeal has not been obtained; *provided*, *further*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

"*First Day Pleadings*" means the motions and related pleadings that the Debtors intend to file upon the commencement of the Chapter 11 Cases.

"*First Lien Ad Hoc Group*" means that certain ad hoc group of Holders of First Lien Claims, including the KL Lender, represented by the First Lien Ad Hoc Group Advisors.

"*First Lien Ad Hoc Group Advisors*" means Gibson, Dunn & Crutcher LLP, PJT Partners Inc., EY-Parthenon, any local counsel retained by the First Lien Ad Hoc Group, and such other professional advisors as are retained by the First Lien Ad Hoc Group with the prior written consent of the Debtors (not to be unreasonably withheld).

"*First Lien Claims*" has the meaning set forth in the Restructuring Term Sheet.

"*First Lien Consenting Lenders*" has the meaning set forth in the preamble to this Agreement.

"*First Lien Term Loan Claims*" has the meaning set forth in the Restructuring Term Sheet.

"*General Unsecured Claims*" has the meaning set forth in the Restructuring Term Sheet.

"*Governance Documents*" means, as applicable, the organizational and governance documents for New C1 and its direct and indirect subsidiaries, giving effect to the Restructuring Transactions, including, without limitation, certificates of incorporation, certificates of formation, or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, shareholder agreements (or similar governing documents), and the identities of proposed members of the board of directors of New C1, each consistent with the terms and conditions of the Governance Term Sheet and in form and substance acceptable to the Debtors and the Required Consenting Lenders.

"*Governance Term Sheet*" means the term sheet attached as **Exhibit 4** to the Restructuring Term Sheet describing organizational and governance matters for New C1.

"*Governmental Authority*" has the meaning as set forth in section 101(27) of the Bankruptcy Code.

"*Holder*" means any Person or Entity that is the record or beneficial owner of any Claim or Interest, including any investment advisors, sub-advisors, or managers of funds or discretionary accounts that hold any Claim or Interest on behalf of any signatory to this Agreement.

"*Initial First Lien Ad Hoc Group Members*" has the meaning set forth in the preamble to this Agreement.

"*Initial Second Lien Ad Hoc Group Members*" means each of the funds or accounts that are managed by (i) Partners Group (USA) Inc. and (ii) Siris Capital Group, LLC

"*Interest*" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, units, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to

acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, units, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"*Interim DIP Order*" means any order entered on an interim basis approving the ABL DIP Facility, the Term DIP Facility, the ABL DIP Documents, and the Term DIP Loan Documents, and authorizing the Debtors' use of cash collateral.

"*Investors*" has the meaning set forth in the Rights Offering Term Sheet.

"*Joinder*" means a joinder to this Agreement, substantially in the form attached hereto as **Exhibit C**, providing, among other things, that such Person or Entity signatory thereto is bound by the terms of this Agreement.  For the avoidance of any doubt, any party that executes a Joinder shall be a "Party" under this Agreement as provided therein and herein.

"*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority or court of competent jurisdiction (including the Bankruptcy Court).

"*KL Lender*" has the meaning set forth in the preamble to this Agreement.

"*KL Lender Advisor*" means Akin Gump Strauss Hauer & Feld LLP.

"*KL Lender Advisor Cap*" means $250,000.

"*KL Note Claims*" has the meaning set forth in the Restructuring Term Sheet.

"*Milestones*" means the applicable milestones set forth in the Restructuring Term Sheet, as such milestones may be extended in accordance with the terms of this Agreement and the Restructuring Term Sheet.

"*Minority Protections*" has the meaning set forth in the Governance Term Sheet.

"*New C1*" means either PVKG Investment, as reorganized pursuant to the Plan, or, if applicable, any successor or assign thereto, by merger, consolidation, or otherwise on and after the Plan Effective Date, or a new entity, and each of its direct and indirect wholly-owned subsidiaries, which in any case shall be the ultimate parent of the other Company Parties on and after the Plan Effective Date as set forth in the Plan.  For the avoidance of doubt, the identity of New C1 shall be subject to the consent of the Debtors and the Required Consenting Lenders.

"*Parties*" has the meaning set forth in the preamble to this Agreement.

"*Permitted Transferee*" means each transferee of any Company Claims or Interests who meets the requirements of Section 8.01.

"*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"***Petition Date***" means the first date that any of the Debtors commences a Chapter 11 Case.

"***Plan***" means the joint plan of reorganization that will be filed by the Debtors under the Bankruptcy Code to implement the Restructuring Transactions in accordance with, and subject to the terms and conditions of, this Agreement, the Restructuring Term Sheet, the Definitive Documents, and related exhibits and appendices.

"***Plan Effective Date***" means the Effective Date of the Plan, as defined in the Restructuring Term Sheet.

"***Plan Supplement***" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that, subject to the terms and conditions provided in the Plan, will be filed by the Debtors with the Bankruptcy Court.

"***Prepetition ABL Credit Agreement***" has the meaning set forth in the Restructuring Term Sheet.

"***Prepetition First Lien Term Loan Credit Agreement***" has the meaning set forth in the Restructuring Term Sheet.

"***Prepetition First Lien and Second Lien Intercreditor Agreement***" means that certain Intercreditor Agreement dated as of January 4, 2019 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), among Deutsche Bank AG New York Branch, as Initial Senior Lien Representative and Senior Lien Collateral Agent, UBS AG, Stamford Branch, as Initial Junior Lien Representative and Junior Lien Collateral Agent and the additional Representatives and Collateral Agents from time to time a party thereto, C1 Holdings, and certain subsidiaries and parent entities of C1 Holdings.

"***Prepetition Intercreditor Agreements***" means (a) that certain ABL Intercreditor Agreement, dated as of January 4, 2019 (as amended by that certain Joinder and Amendment to ABL Intercreditor Agreement dated as of July 10, 2020 and supplemented by that certain ABL Intercreditor Agreement Joinder dated as of May 15, 2023); (b) that certain First Lien Pari Passu Intercreditor Agreement, dated as of January 10, 2020 (as amended, amended and restated, supplemented, or otherwise modified from time to time); and (c) the Prepetition First Lien and Second Lien Intercreditor Agreement.

"***Prepetition KL Note Purchase Agreement***" has the meaning set forth in the Restructuring Term Sheet.

"***Prepetition PVKG Note Purchase Agreement***" has the meaning set forth in the Restructuring Term Sheet.

"***Prepetition Second Lien Term Loan Credit Agreement***" has the meaning set forth in the Restructuring Term Sheet.

"***PVKG Intermediate***" has the meaning set forth in the preamble to this Agreement.

"***PVKG Investment***" means PVKG Investment Holdings, Inc.

9

"***PVKG Lender***" has the meaning set forth in the preamble to this Agreement.

"***PVKG Lender Advisors***" means Latham & Watkins LLP and any local counsel retained by the PVKG Lender to advise the PVKG Lender in its capacity as the Holder of the PVKG Note Claims.

"***PVKG Note Claims***" has the meaning set forth in the Restructuring Term Sheet.

"***Qualified Marketmaker***" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims or Interests (or enter with customers into long and short positions in Company Claims or Interests), in its capacity as a dealer or market maker in Company Claims or Interests, and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"***Released Parties***" has the meaning set forth in the Restructuring Term Sheet.

"***Required ABL DIP Lenders***" has the meaning set forth in the ABL DIP Facility Term Sheet.

"***Required Consenting Lender Advisors***" means, collectively, the First Lien Ad Hoc Group Advisors and the PVKG Lender Advisors.

"***Required Consenting Lenders***" means, as of the relevant date, the Initial First Lien Ad Hoc Group Members and the PVKG Lender holding, collectively, in excess of 66 2/3% of the aggregate First Lien Claims collectively held by the Initial First Lien Ad Hoc Group Members and PVKG Lender.

"***Required Consenting Initial First Lien Ad Hoc Group Members***" means, as of the relevant date, the Initial First Lien Ad Hoc Group Members holding, collectively, in excess of 75% of the aggregate First Lien Claims collectively held by the Initial First Lien Ad Hoc Group Members.

"***Required Consenting Initial Second Lien Ad Hoc Group Members***" means, as of the relevant date, the Initial Second Lien Ad Hoc Group Members holding, collectively, in excess of 50.01% of the aggregate Second Lien Claims collectively held by the Initial Second Lien Ad Hoc Group Members.

"***Required Term DIP Lenders***" has the meaning set forth in the Term DIP Term Sheet.

"***Restructuring Expenses***" means the actual, reasonable, and documented fees and expenses of the First Lien Ad Hoc Group Advisors, the KL Lender Advisor (subject to the KL Lender Advisor Cap), the PVKG Lender Advisors, the Second Lien Ad Hoc Group Advisors, regardless of whether such fees and expenses are or were incurred before, on, or after the Agreement Effective Date, subject to the terms of any applicable fee reimbursement letter between any such Parties and any of the Company Parties, as the case may be; *provided*, *however*, that the invoices for such fees and expenses shall be in summary format (with such redactions as may be necessary to maintain attorney client privilege), and the First Lien Ad Hoc Group Advisors, PVKG

Lender Advisors, and the Second Lien Ad Hoc Group Advisors shall not be required to provide the Company Parties with attorney time entries or apply to the Bankruptcy Court for payment.

"***Restructuring Term Sheet***" has the meaning set forth in the recitals to this Agreement.

"***Restructuring Transactions***" has the meaning set forth in the recitals to this Agreement.

"***Rights Offering***" has the meaning set forth in the Restructuring Term Sheet.

"***Rights Offering Documents***" means, collectively, the Backstop Agreement, the Rights Offering Procedures, and any and all other agreements, documents, and instruments delivered or entered into in connection with the Rights Offering, not inconsistent with the terms of the Rights Offering Term Sheet.

"***Rights Offering Procedures***" means the procedures governing the Rights Offering.

"***Rights Offering Term Sheet***" means the term sheet attached as **Exhibit 3** to the Restructuring Term Sheet describing the material terms of the Rights Offering.

"***Second Lien Ad Hoc Group***" means that certain ad hoc group of Holders of Second Lien Claims represented by the Second Lien Ad Hoc Group Advisors.

"***Second Lien Ad Hoc Group Advisors***" means Davis Polk & Wardwell LLP, Guggenheim Securities, LLC, Haynes and Boone, LLP, and such other professional advisors as are retained by the Second Lien Ad Hoc Group with the prior written consent of the Required Consenting Lenders and the Debtors (not to be unreasonably withheld).

"***Second Lien Claims***" has the meaning set forth in the Restructuring Term Sheet.

"***Second Lien Consenting Lenders***" has the meaning set forth in the Preamble to this Agreement.

"***Solicitation Materials***" means all documents, forms, and other materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"***Subsequent First Lien Ad Hoc Group Members***" has the meaning set forth in the preamble to this Agreement.

"*Term DIP Agent*" has the meaning set forth in the Term DIP Term Sheet.

"***Term DIP Facility***" means the debtor in possession financing facility for the priming super priority secured term loans that the Term DIP Lenders have committed to provide to the Debtors on the terms and conditions set forth in the Term DIP Term Sheet.

"***Term DIP Lenders***" has the meaning set forth in the Term DIP Term Sheet.

"***Term DIP Loan Documents***" has the meaning set forth in the Term DIP Term Sheet.

11

"*Term DIP Term Sheet*" means the term sheet attached as **Exhibit 2** to the Restructuring Term Sheet describing the material terms of the Term DIP Facility.

"*Termination Date*" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 12.

"*Transfer*" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

"*Transfer Agreement*" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D**.

1.02.   <u>Interpretation</u>.  For purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, amended and restated, supplemented, or otherwise modified or replaced from time to time;

(e)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereunder," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not; and

(j)     the use of "$", "Dollar" or "dollar" shall refer to denominations in U.S. Dollars.

**Section 2.** *Effectiveness of this Agreement*.

2.01.    Agreement Effective Date. This Agreement shall become effective and binding upon each of the Parties on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)     each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(b)     Holders of at least 66 2/3% of the principal amount of First Lien Claims, including each of the Required Consenting Lenders, and exclusive of the Holders of the PVKG Note Claims, shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(c)     Holders of 100% of the principal amount of the PVKG Note Claims shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(d)     Holders of at least 66 2/3% of the principal amount of Second Lien Claims shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(e)     the Consenting Sponsors shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(f)     the Company Parties shall have paid, or caused to be paid, all Restructuring Expenses for which an invoice has been received by the Company Parties (inclusive of any reasonable estimate of Restructuring Expenses through and including the Agreement Effective Date) in accordance with the terms of any applicable fee letter prior to the Agreement Effective Date; and

(g)     counsel to the Company Parties shall have given written notice (email sufficient) to counsel to each of the other Parties in the manner set forth in Section 14.10 that the conditions to the Agreement Effective Date set forth in this Section 2 have occurred.

**Section 3.** *Definitive Documents*.

3.01.    The Definitive Documents governing the Restructuring Transactions shall include the following documents, including all exhibits, annexes, schedules, and other attachments thereto:

(a)     the Plan;

(b)     the Disclosure Statement;

(c)     the Solicitation Materials;

13

(d)     the DIP Orders (and motion(s) seeking approval thereof);

(e)     the ABL DIP Commitment Letter;

(f)     the ABL DIP Documents;

(g)     the Term DIP Loan Documents;

(h)     the Exit ABL Facility Documents;

(i)     the Exit Term Loan Facility Documents;

(j)     the Backstop Agreement and motion(s) seeking approval thereof;

(k)     the Rights Offering Procedures;

(l)     the Rights Offering Documents;

(m)     the Governance Documents;

(n)     any order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials (and motion(s) seeking approval thereof), which may be the Confirmation Order;

(o)     the Confirmation Order;

(p)     the Plan Supplement;

(q)     all material pleadings and motions filed by the Company Parties in connection with the Chapter 11 Cases (and related orders), including the First Day Pleadings, any "second day" pleadings, and all orders sought pursuant thereto;

(r)     such other agreements, instruments, and documentation that are necessary, or as may be agreed in writing (email sufficient) between the Company Parties and the Required Consenting Lenders, to document and consummate the Restructuring Transactions; and

(s)     any other material exhibits, schedules, amendments, modifications, supplements, appendices, or other documents, motions, pleadings, and/or agreements relating to any of the foregoing.

Completion of Definitive Documents. The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion. Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and/or covenants consistent with the terms of this Agreement and the Restructuring Term Sheet, as they may be modified, amended, or supplemented in accordance with Section 13. Notwithstanding anything to the contrary herein, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise, when completed, (i) be in form and substance, including with respect to any

amendment, modification, or supplement thereto, acceptable to the Company Parties and the Required Consenting Lenders; (ii) provide for equal treatment of the KL Note Claims and First Lien Term Loan Claims, unless otherwise consented to by the Required Consenting Lenders and the KL Lender; (iii) provide for equal rights to the Holders of, and treatment of, the PVKG Note Claims and First Lien Term Loan Claims, unless otherwise consented to by the PVKG Lender and the Required Consenting Initial First Lien Ad Hoc Group Members; (iv) be in a form and substance, including with respect to any amendment, modification, or supplement thereto, reasonably acceptable to the Required Consenting Initial Second Lien Ad Hoc Group Members solely with respect to matters that directly or indirectly relate to the rights, distribution and treatment of the Consenting Second Lien Lenders provided for herein; and (v) the Governance Documents will be reasonably acceptable to the Subsequent First Lien Ad Hoc Group Members and Required Consenting Initial Second Lien Ad Hoc Group Members solely with respect to the Minority Protections and board observer rights provided therein.

**Section 4.** *Commitments of the Consenting Stakeholders and Second Lien Consenting Lenders*.

    4.01.  <u>General Commitments</u>.

    (a)    During the Agreement Effective Period, each Consenting Stakeholder and Second Lien Consenting Lender severally, and not jointly, agrees, in respect of all of its Company Claims or Interests, to:

        (i)    agree by execution of this Agreement and the effectiveness of this Agreement to (A) consent, and to be deemed to have consented, to the incurrence of the ABL DIP Facility on the terms set forth in the ABL DIP Facility Term Sheet and the ABL DIP Documents and the Term DIP Facility on the terms set forth in the Term DIP Term Sheet and Term DIP Loan Documents; (B) consent, and direct the Agents/Trustees to consent, to the Company Parties' use of their cash collateral pursuant to the DIP Orders; and (C) if necessary, give any notice, order, instruction, or direction to the applicable Agents/Trustees necessary to give effect to the foregoing;

        (ii)    support the Restructuring Transactions on the terms and subject to the conditions of this Agreement and vote or consent and not object, to the extent applicable, all Company Claims or Interests owned by or held by such Consenting Stakeholder or Second Lien Consenting Lender and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions, subject to finalization of the Definitive Documents in accordance with the terms of this Agreement;

        (iii)    give any notice, order, instruction, or direction to the applicable Agents/Trustees necessary to give effect to the Restructuring Transactions; *provided* that no Consenting Stakeholder or Second Lien Consenting Lender shall be required hereunder to provide such Agents/Trustees with any indemnities or similar undertakings in connection with taking any such action or incur any fees or expenses in connection therewith;

(iv)      use commercially reasonable efforts to support the Company Parties' efforts to obtain any and all required regulatory or third-party approvals for the Restructuring Transactions;

(v)       use commercially reasonable efforts to cooperate in good faith with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other creditors and stakeholders;

(vi)      validly and timely deliver, and not withdraw, the consents, proxies, signature pages, tenders, ballots, or other means of voting or participation in the Restructuring Transactions (including directing its nominee or custodian, if applicable, on behalf of itself and the accounts, funds, or Affiliates for which it is acting as investment advisor, sub-advisor, or manager to validly and timely deliver and not withdraw) with respect to all Company Claims or Interests owned by or held by such Consenting Stakeholder or Second Lien Consenting Lender; and

(vii)     negotiate in good faith and use commercially reasonable efforts to execute, deliver, and implement the Definitive Documents and any other necessary filings, documents, pleadings, agreements, contracts and requests for regulatory approvals to which it is a party in a timely manner to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement.

(b)       During the Agreement Effective Period, each Consenting Stakeholder and Second Lien Consenting Lender severally, and not jointly, agrees, in respect of all of its Company Claims or Interests, that it shall not directly or indirectly:

(i)       object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)      propose, file, support, or vote for any Alternative Restructuring Proposal;

(iii)     seek to modify the Definitive Documents, in whole or in part, in a manner that is not consistent with this Agreement and the Restructuring Term Sheet;

(iv)      exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any of its Company Claims or Interests against the Company Parties other than in accordance with this Agreement and the Definitive Documents;

(v)       file any motion, objection, pleading, or other document with the Bankruptcy Court or any other court that, in whole or in part, is not materially consistent with this Agreement and the Restructuring Term Sheet (nor directly or indirectly cause or instruct any other person to make such a filing);

(vi)      initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to this Agreement, the Definitive Documents, or the other Restructuring Transactions contemplated herein against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this

Agreement (nor directly or indirectly cause or instruct any other person to initiate such litigation or proceeding);

(vii)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code (nor directly or indirectly cause or instruct any other person to take such action); or

(viii)    exercise any right or remedy for the enforcement, collection, or recovery of any of its Company Claims or Interests other than in accordance with this Agreement and the Definitive Documents (nor directly or indirectly cause or instruct any other person to take or exercise such right or remedy).

(c)    Solely upon the occurrence of the Plan Effective Date, each Consenting Stakeholder and Second Lien Consenting Lender agrees to release, waive, and discharge, without any further notice or action, any and all (i) Claims and Causes of Action it may have against the Released Parties, subject to the limits with respect to such release set forth in the Plan; and (ii) General Unsecured Claims against any of the Company Parties.

(d)    Solely with respect to the Consenting Stakeholders that are Term DIP Lenders, such Term DIP Lenders commit to provide the Term DIP Facility to the Debtors on the terms and conditions set forth in the Term DIP Term Sheet.

(e)    Solely with respect to the Consenting Stakeholders that are Backstop Parties, such Backstop Parties commit to provide the Backstop Commitment to the Debtors on the terms and conditions set forth in the Rights Offering Term Sheet.

4.02.    Chapter 11 Voting.

(a)    In addition to the obligations set forth in Section 4.01, during the Agreement Effective Period, each Consenting Stakeholder and Second Lien Consenting Lender that is entitled to vote to accept or reject the Plan pursuant to its terms, severally, and not jointly, agrees that it shall, subject to receipt by such Party of the Disclosure Statement and the Solicitation Materials, whether before or after the commencement of the Chapter 11 Cases:

(i)    use commercially reasonable efforts to support confirmation of the Plan, including the solicitation, confirmation, and consummation of the Plan, as may be applicable and not direct or instruct any of the Agents/Trustees to take any actions inconsistent with this Agreement or the Restructuring Term Sheet;

(ii)    vote each of its Company Claims or Interests entitled to vote to accept the Plan, and elect the Rights Offering Rights and Takeback Term Loan Recovery Option (if applicable to such Party), by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its receipt of the Disclosure Statement and any other Solicitation Materials and the ballot; *provided*, *however*, that each Consenting Stakeholder that acquires First Lien Claims after the Execution Date in accordance with the terms hereof shall be entitled to elect by the applicable election deadline the Takeback Term Loan Recovery Option solely with respect to such after-acquired First Lien

Claims, and solely to the extent that such acquisition and election is identified to the Company Parties and the Required Consenting Lender Advisors;

        (iii)     to the extent it is permitted to elect whether to opt out of (or opt in to) the releases set forth in the Plan, elect not to opt out of (or elect to opt in to) the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and

        (iv)     not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (ii) and (iii) above; *provided*, *however*, that such votes or elections shall be immediately revoked and deemed *void ab initio* upon the occurrence of a Termination Date.

     (b)     During the Agreement Effective Period, each Consenting Stakeholder and Second Lien Consenting Lender, in respect of each of its Company Claims or Interests, severally, and not jointly, will not directly or indirectly object to, delay, impede, or take any other action inconsistent with this Agreement and the Restructuring Term Sheet. Notwithstanding the foregoing, nothing in this Agreement shall require any Consenting Stakeholder or Second Lien Consenting Lender to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations against such Party.

     4.03.    <u>Prepetition First Lien and Second Lien Intercreditor Agreement</u>. For any and all purposes under the Prepetition First Lien and Second Lien Intercreditor Agreement, each Consenting Stakeholder hereby agrees (a) that each Holder of a Second Lien Claim may receive its *pro rata* share of the Second Lien Recovery in accordance with the terms of this Agreement, and such Consenting Stakeholder waives any of its rights in connection thereto, including, without limitation, any rights under Sections 4.02 or 6.10 of the Prepetition First Lien and Second Lien Intercreditor Agreement, and (b) that this Agreement shall serve as such Consenting Stakeholder's direction to the Senior Lien Collateral Agent and Senior Lien Representatives to do the same.

**Section 5.**    ***Additional Provisions Regarding the Consenting Stakeholders' and Second Lien Consenting Lenders' Commitments***.

     5.01.    Notwithstanding the Consenting Stakeholders' and Second Lien Consenting Lenders' agreements to support the Restructuring Transactions as set forth in Section 4, this Agreement shall not:

     (a)     be construed to impair any Consenting Stakeholder's or Second Lien Consenting Lender's rights to appear as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as the positions advocated are consistent with this Agreement;

     (b)     prevent any Consenting Stakeholder or Second Lien Consenting Lender from filing, or directing any agent or representative to file, any proof of claim in any Chapter 11 Cases;

     (c)     limit the ability of a Consenting Stakeholder or Second Lien Consenting Lender to purchase, sell, or enter into any transactions regarding the Company Claims or Interests, subject

to the terms hereof and any applicable agreements or Law governing such Company Claims or Interests;

(d)      constitute a waiver or amendment of any term or provision of the Prepetition First Lien Term Loan Credit Agreement, the Prepetition KL Note Purchase Agreement, the Prepetition PVKG Note Purchase Agreement, or the Prepetition Second Lien Term Loan Credit Agreement;

(e)      affect the ability of any Consenting Stakeholder or Second Lien Consenting Lender to consult with any other Consenting Stakeholder, Second Lien Consenting Lender, Company Parties, or any other party in interest (including, if applicable, any official committee and the United States Trustee), so long as such consultation does not violate such Consenting Stakeholder's or Second Lien Consenting Lender's support obligations set forth herein, any applicable Confidentiality Agreement, or applicable Law, including the Bankruptcy Code;

(f)      impair or waive the rights of any Consenting Stakeholder or Second Lien Consenting Lender to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(g)      prevent any Consenting Stakeholder or Second Lien Consenting Lender from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement;

(h)      obligate a Consenting Stakeholder or Second Lien Consenting Lender to deliver a vote to support the Plan (or any other Restructuring Transactions) or prohibit a Consenting Stakeholder or Second Lien Consenting Lender from withdrawing such vote, in each case, from and after the Termination Date (other than a Termination Date as a result of the occurrence of the Plan Effective Date or a material breach of this Agreement by such Consenting Stakeholder or Second Lien Consenting Lender, as applicable);

(i)      prevent any Consenting Stakeholder or Second Lien Consenting Lender from taking any action that is required by applicable Law upon the advice of counsel;

(j)      require any Consenting Stakeholder or Second Lien Consenting Lender to take any action that is prohibited by applicable Law upon the advice of counsel;

(k)      require any Consenting Stakeholder or Second Lien Consenting Lender to waive or forego the benefit of any applicable legal professional privilege;

(l)      unless expressly provided for under this Agreement, require any Consenting Stakeholder or Second Lien Consenting Lender to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations against such Party; or

(m)      prevent any Consenting Stakeholder or Second Lien Consenting Lender from making, seeking, or receiving any required regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, or licenses.

**Section 6.**      *Commitments of the Company Parties*.

6.01.   <u>Affirmative Commitments</u>.  Subject in all cases to Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a)      support and take all steps reasonably necessary and desirable to implement and consummate the Restructuring Transactions in accordance with the terms and conditions set forth in this Agreement and the Restructuring Term Sheet (including the Milestones);

(b)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment in consultation with the Required Consenting Lenders;

(c)      use commercially reasonable efforts to promptly obtain any and all regulatory and/or third-party approvals that are necessary or advisable to effectuate and consummate the Restructuring Transactions as determined by the Company Parties in consultation with the Required Consenting Lenders, including the expiration of any applicable waiting periods;

(d)      negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(e)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other stakeholders;

(f)      continue ordinary course practices to maintain good standing under the jurisdiction in which each Company Party is incorporated or organized;

(g)      except as otherwise contemplated by this Agreement or any order of the Bankruptcy Court, (i) conduct its businesses and operations only in the ordinary course in a manner that is consistent with past practices and in compliance with applicable Law, taking into account the Restructuring, (ii) maintain its physical assets, properties, and facilities, in the ordinary course, in a manner that is consistent with past practices, and in compliance with applicable Law (ordinary wear and tear and casualty and condemnation excepted), taking into account the Restructuring, (iii) maintain its books and records in the ordinary course, in a manner that is consistent with past practices, and in compliance with applicable Law, and (iv) maintain all insurance policies, or suitable replacements therefor, in full force and effect, in the ordinary course, in a manner that is consistent with past practices, and in compliance with applicable Law;

(h)      provide draft copies of all Definitive Documents to the Required Consenting Lender Advisors  and Second Lien Ad Hoc Group Advisors as soon as reasonably practicable, but in no event less than two (2) Business Days prior to the date when the Company Parties intend to file such documents, and, without limiting any approval rights set forth herein, consult in good faith with the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors regarding the form and substance of any such proposed filing; *provided*, *however*, that in the event that not less than two (2) Business Days' notice is impracticable or impossible under the circumstances, the Company Parties shall provide draft copies of any motions or other pleadings

to the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors as soon as otherwise practicable before the time when the Company Parties intend to file any such motion or other pleading;

(i)     pay and reimburse in full in cash in immediately available funds (i) prior to the Petition Date, all Restructuring Expenses accrued within five (5) Business Days of receipt of an invoice therefor (and in any event, before the Petition Date if invoiced before such date), (ii) after the Petition Date and prior to the Plan Effective Date, subject to any applicable orders of the Bankruptcy Court but without the need to file fee or retention applications, all Restructuring Expenses incurred prior to (to the extent not previously paid) on and after the Petition Date, but in any event within five (5) Business Days of delivery to the Company Parties of any applicable invoice or receipt, (iii) on the Plan Effective Date, all Restructuring Expenses incurred and outstanding in connection with the Restructuring Transactions (including any estimated fees and expenses estimated to be incurred through the Plan Effective Date) and after the Plan Effective Date, all accrued and unpaid Restructuring Expenses incurred in connection with the implementation and consummation of the Plan shall be paid by the Company Parties (or their successors in interest) on a regular and continuing basis promptly (but in any event within five (5) Business Days) following receipt of an invoice therefor;

(j)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order: (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code); (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; or (iii) dismissing any of the Chapter 11 Cases;

(k)     timely file a formal objection to any motion filed with the Bankruptcy Court by a party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file or solicit acceptances of a plan of reorganization, as applicable;

(l)     to the extent requested in writing by the Required Consenting Lender Advisors or the Second Lien Ad Hoc Group Advisors, provide the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors, as applicable, with reasonable access to information (excluding any privileged information) regarding the operations of the Company Parties subject to any confidentiality agreements in effect; and

(m)     promptly inform the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors in writing (email being sufficient) after obtaining actual knowledge of (i) any event or circumstance that has occurred that would permit any Party to terminate this Agreement; or (ii) any notice of any commencement of any material involuntary insolvency proceedings, legal suit for payment of debt, or securement of security from or by any person in respect of any Company Party.

6.02.   Negative Commitments.  Subject in all cases to Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)      take any action that is materially inconsistent with, or is intended to frustrate or impede, approval, implementation, and consummation of the Restructuring Transactions or any of the other transactions described in this Agreement or the Definitive Documents;

(c)      (i) execute, deliver, and/or file with the Bankruptcy Court or any other court any agreement, instrument, motion, pleading, order, form, or other document that is to be utilized to implement or effectuate, or that otherwise relates to, this Agreement, the Plan, and/or the Restructuring Transactions that is not in form and substance acceptable in accordance with the terms set forth in Section 3 hereof, or if applicable, file any pleading with the Bankruptcy Court seeking authorization to accomplish or effect any of the foregoing; or (ii) waive, amend, or modify any of the Definitive Documents, or, if applicable, file with the Bankruptcy Court a pleading seeking to waive, amend, or modify any term or condition of any of the Definitive Documents, which waiver, amendment, modification, or filing contains any provision that is materially inconsistent with this Agreement (including the Restructuring Term Sheet) or is otherwise not in form and substance acceptable in accordance with the terms set forth in Section 3 hereof;

(d)      seek to modify the Definitive Documents, in whole or in part, in a manner that is not consistent with Section 3 hereof;

(e)      without the prior written consent of the Required Consenting Lenders, with respect to any employee or director qualifying as an insider under the Bankruptcy Code, (i) enter into or amend, establish, adopt, restate, supplement, or otherwise modify or accelerate (A) any deferred compensation, incentive, success, retention, bonus, or other compensatory arrangements, programs, practices, plans, or agreements, including, without limitation, offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements with or for the benefit of any such insider employee, or (B) any contracts, arrangements, or commitments that entitle any current or former insider director, officer, employee, manager, or agent to indemnification from the Company Parties, or (ii) amend or terminate any existing compensation or benefit plans or arrangements (including employment agreements) with respect to such insiders;

(f)      grant or agree to grant (including pursuant to a key employee retention plan, key employee incentive plan, or other similar arrangement) any additional or any increase in the wages, salary, bonus, commissions, retirement benefits, pension, severance, or other compensation or benefits of any employee or director qualifying as an insider under the Bankruptcy Code in each case, outside of the ordinary course of business and inconsistent with past practice, without the prior written consent of the Required Consenting Lenders;

(g)      (i) commence any proceeding or other action that challenges in a manner inconsistent with this Agreement or the Restructuring Term Sheet (A) the amount, validity, allowance, character, enforceability, or priority of any Company Claims or Interests of any of the Consenting Stakeholders or Second Lien Consenting Lenders, or (B) the validity, enforceability, or perfection of any lien or other encumbrance securing (or purporting to secure) any First Lien Claim or Second Lien Claim; (ii) otherwise seek to restrict any rights of any of the Consenting Stakeholders or Second Lien Consenting Lenders; or (iii) support any person in connection with any of the acts described in the foregoing clauses;

(h)     initiate, or have initiated on its behalf, any litigation or proceeding of any kind against the other Parties in connection with the Restructuring, other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement or any Definitive Document;

(i)     without the prior written consent of the Required Consenting Lenders, enter into any contract with respect to debtor-in-possession financing, cash collateral usage, exit financing, and/or other financing arrangements;

(j)     amend or change, or propose to amend or change, any of their respective existing organizational documents without the prior written consent of the Required Consenting Lenders;

(k)     (i) authorize, create, issue, sell, or grant any additional Interests, or (ii) reclassify, recapitalize, redeem, purchase, acquire, declare any distribution on, or make any distribution on any Interests, in each case without the prior written consent of the Required Consenting Lenders.

(l)     modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(m)     file any motion, pleading, or Definitive Document with the Bankruptcy Court or any other court that, in whole or in part, is not materially consistent with this Agreement;

(n)     commence any process to sell, transfer, dispose, or otherwise monetize any assets of any of the Company Parties in a transaction or a series of transactions having a fair market value of $10,000,000 or greater without the prior written consent of the Required Consenting Lenders; or

(o)     assume, reject, terminate, settle, or renegotiate any material contract (including any material executory contracts and unexpired leases) without the prior written consent of the Required Consenting Lenders.

**Section 7.**     *Additional Provisions Regarding the Company Parties' Commitments*.

7.01.     Non-Solicitation.  The Company Parties shall not, directly or indirectly, solicit any Alternative Restructuring Proposal.

7.02.     Company Parties' Fiduciary Duties. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, to take any action or to refrain from taking any action to the extent such Company Party determines in good faith, after consultation with counsel, that taking or failing to take such action may violate applicable Law or be inconsistent with its fiduciary obligations under applicable Law.  The Company Parties shall promptly notify the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors in writing (email being sufficient) of any such determination within two (2) Business Days following such determination. This Section 7.02 shall not impede any Consenting

Stakeholder's or Second Lien Consenting Lender's right to terminate this Agreement pursuant to Section 12 of this Agreement in accordance with the terms hereof.

7.03.   <u>Alternative Restructuring Proposals</u>. Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), if any Company Party receives a written or oral proposal or expression of interest from any Person or Entity regarding any Alternative Restructuring Proposal that its board of directors, board of managers, or similar governing body determines in good faith and following consultation with counsel represents a higher or otherwise better economic recovery to its stakeholders, as compared to the Restructuring, the Company Parties shall have the right to: (i) consider, respond to, facilitate, discuss, negotiate, support, or otherwise pursue such Alternative Restructuring Proposal; (ii) provide access to non-public information concerning the Company Parties to any Person or Entity and enter into any confidentiality agreement with such Person or Entity in connection therewith; and (iii) otherwise cooperate with, assist, or participate in any inquiries, proposals, discussions, or negotiations of such Alternative Restructuring Proposal. Within two (2) Business Days of a determination pursuant to this Section 7.03, the Company shall notify (with email being sufficient) the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors of such proposal or expression of interest, with, subject to Section 7.04, such notice to include a copy of such proposal, if it is in writing, or otherwise a summary of the material terms thereof.

7.04.   <u>Notifications Regarding Alternative Restructuring Proposals</u>. The Company Parties shall (a) provide to the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors on a professional eyes only basis, (1) a copy of any written offer or proposal (and notice and a description of any oral offer or proposal) for any Alternative Restructuring Proposal pursued under Section 7.03, if not barred under any applicable Confidentiality Agreement between any Company Party and the submitting party or such submitting party otherwise consents or (2) a summary of the material terms thereof, if any Company Party is bound by a Confidentiality Agreement with, or other known contractual or legal obligation of confidentiality to, the submitting party, in each case within two (2) Business Days of the Company Parties' or their advisors' receipt of such offer or proposal, and (b) provide such information to the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors regarding such discussions (including copies of any materials provided to such parties hereunder) as necessary to keep the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors reasonably contemporaneously informed as to the status and substance of such discussions.

7.05.   <u>Non-Waiver of Company Parties' Rights</u>. Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**      *Transfer of Interests and Securities*.

8.01.   <u>Permitted Transfers</u>. During the Agreement Effective Period, no Consenting Stakeholder or Second Lien Consenting Lender shall Transfer any ownership interest (including any beneficial ownership as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims or Interests to any affiliated or unaffiliated party, including any

party in which it may hold a direct or indirect beneficial interest, unless: either (i) the transferee executes and delivers to counsel to the Company Parties, Required Consenting Lender Advisors, and Second Lien Ad Hoc Group Advisors at or before the time of the proposed Transfer, a Transfer Agreement, or (ii) the transferee is a Consenting Stakeholder or Second Lien Consenting Lender, or an Affiliate of such Party, bound by the terms of this Agreement and the transferee provides notice of such Transfer (including the amount and type of Company Claim or Interest Transferred) to counsel to the Company Parties and to the Required Consenting Lender  Advisors by the close of business on the second Business Day following such Transfer.  Notwithstanding the foregoing, this Section 8 shall not apply to the grant of any lien or encumbrance on any right, title or interest in a Company Claim or Interest in favor of a bank or broker-dealer holding custody of any such right, title or interest in the Company Claim or Interest in the ordinary course of business that is released upon the Transfer of any such right, title or interest.

8.02.   <u>Effectiveness of Permitted Transfers</u>. Upon compliance with the requirements of Section 8.01, the Permitted Transferee shall be deemed a Consenting Stakeholder or Second Lien Consenting Lender, as applicable, and the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims or Interests. Any Transfer that does not comply with Section 8.01 or Section 8.03, as applicable, shall be void *ab initio*.

8.03.   <u>Additional Company Claims or Interests</u>. This Agreement shall in no way be construed to preclude the Consenting Stakeholders or Second Lien Consenting Lenders from acquiring additional Company Claims or Interests; *provided*, *however*, that (a) such additional Company Claims or Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder or Second Lien Consenting Lender, as applicable, be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties, the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors) and (b) such Consenting Stakeholder or Second Lien Consenting Lender must provide notice of such acquisition (including the amount and type of Company Claim or Interest acquired) to counsel to the Company Parties, the Required Consenting Lender Advisors and Second Lien Ad Hoc Group Advisors within five (5) Business Days of such acquisition.

8.04.   <u>No Cleansing</u>. This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing" materials or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder or Second Lien Consenting Lender to Transfer any of its Company Claims or Interests.  Notwithstanding the foregoing, if a Company Party and another Party have entered into a confidentiality agreement, the terms of such confidentiality agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations of the Company Parties otherwise arising under such confidentiality agreements.

8.05.   <u>Qualified Marketmaker Matters</u>. Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims or Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims or Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims or Interests if (a) such Qualified Marketmaker subsequently transfers such Company Claims or Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a

transferee that is an Entity that is not an Affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 8.01; and (c) the Transfer otherwise is a permitted transfer under Section 8.01. To the extent that a Consenting Stakeholder or Second Lien Consenting Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title, or interests in Company Claims or Interests that the Qualified Marketmaker acquires from a Holder of the Company Claims or Interests who is not a Consenting Stakeholder or Second Lien Consenting Lender without the requirement that the transferee be a Permitted Transferee. For the avoidance of doubt, if a Qualified Marketmaker acquires any Company Claims or Interests from a Consenting Stakeholder or Second Lien Consenting Lender and is unable to transfer such Company Claims or Interests within the five (5) Business Day period referred to above, the Qualified Marketmaker shall execute and deliver a Transfer Agreement in respect of such Company Claims or Interests.

**Section 9.**     *Representations and Warranties of the Consenting Stakeholders and Second Lien Consenting Lenders.*

9.01.   Each Consenting Stakeholder and Second Lien Consenting Lender severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder or Second Lien Consenting Lender executes and delivers this Agreement:

(a)     it is the beneficial or record owner (which shall be deemed to include any unsettled trades) of the face amount of the Company Claims or Interests or is the nominee, investment manager, or advisor for beneficial Holders of the Company Claims or Interests reflected in such Consenting Stakeholder's or Second Lien Consenting Lender's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)     it has the full power and authority to tender, act on behalf of, vote, and consent to matters concerning, such Company Claims or Interests, subject to applicable Law;

(c)     such Company Claims or Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially and adversely affect in any way such Consenting Stakeholder's or Second Lien Consenting Lender's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed; and

(d)     it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), (7), (8), (9), (12), and (13) under the Securities Act of 1933, as amended), and any securities acquired by the Consenting Stakeholder or Second Lien Consenting Lender in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 10.**     *Representations and Warranties of the Company Parties.*

10.01.  Each Company Party represents and warrants that as of the date such Company Party executes and delivers this Agreement:

(a)     to the best of its knowledge having made all reasonable inquiries, no order has been made, petition presented, or resolution of such Company Party passed for the winding up of or appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager, or other similar officer in respect of such Company Party; *provided* that this Section 10 does not apply to any proceeding commenced in connection with filing the Chapter 11 Cases;

(b)     except as expressly provided for in this Agreement, it has not entered into any arrangement (including with any individual creditor, irrespective of whether it is or is to become a Consenting Stakeholder or Second Lien Consenting Lender), other than in the ordinary course of its business, on terms that are materially inconsistent with this Agreement;

(c)     to the best of its knowledge, the execution and delivery by it of this Agreement does not result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases of any Company Parties undertaking to implement the Restructuring Transactions through the Chapter 11 Cases) under any material contract to which it is a party; and

(d)     to the best of its knowledge, the diligence materials and other information concerning the Company Parties that such Company Party or its advisors provided to any Consenting Stakeholder or Second Lien Consenting Lender in connection with an actual or potential restructuring of the Company Parties did not, taken as a whole and as of the date such materials or information were so provided, contain any untrue statement of material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not materially misleading; *provided*, *however*, that, with respect to any projected financial information, forecasts, estimates, or forward-looking information, each Company Party represents only that such information was prepared in good faith based upon assumptions it believed to be reasonable at the time.

**Section 11.**     *Mutual Representations and Warranties*.

11.01.  Each of the Parties, severally, and not jointly, represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement, a Joinder, or a Transfer Agreement, as applicable:

(a)      it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, as applicable (and subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Restructuring Transactions), no consent or approval is required by any other

person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)        the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association, or other organizational or constitutional documents;

(d)        except as expressly provided in this Agreement and subject to any regulatory authority necessary to consummate the Restructuring Transactions, it has all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)        except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements relating to the Company Parties with any Person or Entity that have not been disclosed to all Parties to this Agreement.

**Section 12.**     *Termination Events*.

12.01.   <u>First Lien Consenting Lender and Second Lien Consenting Lender Termination Events</u>.  This Agreement may be terminated with respect to (i) the First Lien Consenting Lenders by the Required Consenting Initial First Lien Ad Hoc Group Members, (ii) the PVKG Lender solely as to itself,[2] or (iii) the Second Lien Consenting Lenders solely as to themselves by the Required Consenting Initial Second Lien Ad Hoc Group Members (provided, however, that the termination events set forth in sections 12.01(a)-(g), (n), (q), (r), and (s) may only be exercisable by the Second Lien Consenting Lenders to the extent that such termination event reasonably, directly or indirectly, impacts the rights, distribution and treatment of the Consenting Second Lien Lenders provided for herein, or such other consent rights of the Required Initial Consenting Second Lien Lenders set forth herein), in each case, by delivering to the Company Parties a written notice in accordance with Section 14.10 upon the occurrence of any of the following events:

(a)        the breach in any material respect by any Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that remains uncured (to the extent curable) for five (5) Business Days after delivery of a written notice in accordance with Section 14.10 detailing any such breach;

(b)        any of the Milestones set forth in the Restructuring Term Sheet is not achieved, except where such Milestone has been waived or extended by the Required Consenting Lenders; *provided*, *however*, that the right to terminate this Agreement under this Section 12.01(b) shall not be available if the failure of such Milestone to be achieved is caused by, or results from, the breach by the terminating Party of its covenants, agreements, or other obligations under this Agreement;

---

[2]      Any such termination by the PVKG Lender shall also apply in its capacity as a Consenting Sponsor.

(c)     this Agreement or any Definitive Document is amended, waived, or modified in any manner not consistent in any material respect with the terms of this Agreement and Restructuring Term Sheet;

(d)     any Company Party (i) files any motion or pleading that is inconsistent in any material respect with this Agreement or the Restructuring Term Sheet, (ii) files a pleading seeking approval of any Definitive Document or authority to amend or modify any Definitive Document in a manner that is materially inconsistent with or not permitted by this Agreement without the prior written consent of the Required Consenting Lenders, the Required ABL DIP Lenders (solely with respect to the ABL DIP Documents), and the Required Term DIP Lenders (solely with respect to the Term DIP Loan Documents), (iii) revokes the Restructuring Transactions without the prior written consent of the Required Consenting Lenders, including execution of a written agreement with respect to an Alternative Restructuring Proposal or the withdrawal of the Plan, as applicable, or support therefor, (iv) exercises its rights set forth in Section 7.02, or (v) publicly announces its intention to take any such acts listed in the foregoing clauses (i), (ii), (iii) or (iv), or is otherwise inconsistent with the consent rights afforded such Parties under this Agreement;

(e)     a Company Party files a motion or pleading seeking an order (without the prior written consent of the Required Consenting Lenders, the Required ABL DIP Lenders, and the Required Term DIP Lenders) vacating or modifying the DIP Orders;

(f)     if (i) any of the DIP Orders are reversed, stayed, dismissed, vacated, reconsidered, modified or amended without the prior written consent of the Required Consenting Lenders, Required ABL DIP Lenders, and the Required Term DIP Lenders, or (ii) a motion for reconsideration, reargument, or rehearing with respect to any such order has been filed and the Company Parties fail to timely object to such motion;

(g)     the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is not in the form of the DIP Orders or otherwise consented to by the Required Consenting Lenders, the Required ABL DIP Lenders, and the Required Term DIP Lenders;

(h)     the occurrence of any "Event of Default" under (and as defined in) the DIP Orders, the ABL DIP Documents, or the Term DIP Loan Documents that has not been cured (if susceptible to cure) or waived by the Required ABL DIP Lenders or the Required Term DIP Lenders, as applicable;

(i)     the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with outside counsel and pursuant to Section 7.02 or Section 7.03, as applicable, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(j)     the Bankruptcy Court enters an order denying confirmation of the Plan or disallowing any material provision thereof and (i) such order remains in effect for fifteen (15) Business Days after entry of such order and (ii) the Company Parties have failed to timely appeal such order;

(k)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Lenders), (i) dismissing any of the Chapter 11 Cases, (ii) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (iii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (iv) rejecting this Agreement;

(l)      upon the commencement of an involuntary case against any of the Company Parties or the filing of an involuntary petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, reorganization, or other relief in respect of the Company Parties or their debts, or of a substantial part of their assets, under any federal, state or foreign bankruptcy, insolvency, administrative, receivership, or similar law now or hereafter in effect; *provided*, *however*, that termination pursuant to this Section 12.01(l) shall only be effective if such involuntary proceeding is not dismissed within a period of thirty (30) days after the filing thereof, or if any court order grants the relief sought in such involuntary proceeding;

(m)      the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any Company Party's exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(n)      any Company Party files any motion or application seeking authority to sell any material assets without the prior written consent of the Required Consenting Lenders;

(o)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after the Required Consenting Lenders transmit a written notice in accordance with Section 14.10 detailing any such issuance; *provided*, *however*, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(p)      (i) the entry of an order by any court of competent jurisdiction invalidating, disallowing, subordinating, recharacterizing, or limiting, in any respect, as applicable, the enforceability, priority, or validity of any of the First Lien Claims with respect to the Consenting Stakeholders or of the Second Lien Claims with respect to the Second Lien Consenting Lenders, other than an order approving the transactions as contemplated by this Agreement or the Restructuring Term Sheet, as applicable, or (ii) the filing of any motion, application, or adversary proceeding by the Company Parties (or the Company Parties support any other party filing any motion, application, or adversary proceeding) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance, recharacterization, or subordination of any First Lien Claims or Second Lien Claims, as applicable, in a manner inconsistent with this Agreement or the Restructuring Term Sheet;

(q)      the Bankruptcy Court grants relief that (i) is inconsistent with this Agreement or the Restructuring Term Sheet or (ii) frustrates the purposes of this Agreement, unless the order

granting such relief has been stayed, modified, or reversed within fourteen (14) days after such terminating party delivers a written notice in accordance with Section 14.10 hereof;

(r)       the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any material asset(s) of the Company Parties and such order materially and adversely affect any Company Party's ability to operate its business in the ordinary course or to consummate the Restructuring Transactions;

(s)       the failure by the Company Parties to pay any of the Restructuring Expenses as and when required under this Agreement;

(t)       solely with respect to the Consenting Second Lien Lenders, the breach in any material respect by any Consenting Stakeholder of the agreements of the Consenting Stakeholder set forth in Section 4.03 of this Agreement that remains uncured (to the extent curable) for five (5) Business Days after delivery of a written notice in accordance with Section 14.10 detailing any such breach; or

(u)       the termination of this Agreement in accordance with its terms by the Company Parties.

12.02.  <u>Company Parties' Termination Events</u>. Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 14.10 hereof upon the occurrence of any of the following events:

(a)       the breach in any material respect by one or more First Lien Consenting Lenders of any representations, warranties, or covenants set forth in this Agreement that remains uncured (to the extent curable) for a period of five (5) Business Days after the receipt by the Required Consenting Lenders of notice of such breach; *provided*, *however*, that, so long as First Lien Consenting Lenders that have not breached this Agreement continue to hold or control at least 66 2/3% of the aggregate amount of the First Lien Claims, termination shall be effective only with respect to such breaching First Lien Consenting Lender;

(b)       the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with outside counsel and pursuant to Section 7.02 or Section 7.03, as applicable, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)       the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for fifteen (15) Business Days after entry of such order;

(d)       the filing of any motion or pleading by any First Lien Consenting Lender with the Bankruptcy Court that (i) is inconsistent in any material respect with this Agreement or the Restructuring Term Sheet or (ii) seeks approval of any Definitive Document or authority to amend or modify any Definitive Document in a manner that is materially inconsistent with or not permitted by this Agreement (including with respect to the consent rights afforded the Company Parties under this Agreement) without the prior written consent of the Company Parties, and such

motion or pleading has not been withdrawn within two (2) Business Days of the Company Parties notifying the Required Consenting Lenders and such filing party; *provided*, *however*, that, so long as First Lien Consenting Lenders that have not breached this Agreement continue to hold or control at least 66 2/3% of the aggregate amount of the First Lien Claims, termination shall be effective only with respect to such breaching First Lien Consenting Lender;

(e)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) would reasonably be expected to prevent the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Company Party transmits a written notice in accordance with Section 14.10 hereof detailing any such issuance; *provided*, *however*, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

12.03.   <u>Mutual Termination</u>. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement by the Company Parties and the Required Consenting Lenders.

12.04.   <u>Individual Termination Right</u>. Any Consenting Stakeholder or Second Lien Consenting Lender may terminate this Agreement as to itself only, upon five (5) Business Days' written notice to the Company Parties and the Required Consenting Lenders if this Agreement is modified, amended, supplemented, or waived in a manner that adversely affects the economic rights (including economic entitlements) or benefits of such Consenting Stakeholder or Second Lien Consenting Lender without its prior written consent.

12.05.   <u>Automatic Termination</u>. This Agreement shall terminate automatically without any further required action or notice immediately upon the occurrence of the Plan Effective Date.

12.06.   <u>Effect of Termination</u>.

(a)    <u>No Further Force and Effect</u>. Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Company Claims or Interests or other Claims or Causes of Action.

(b)    <u>Termination and Voting</u>. Upon the occurrence of a Termination Date prior to the Plan Effective Date, any and all consents or ballots tendered by a Party subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; *provided*, *however*, any Party withdrawing or changing its vote pursuant to this Section 12.08(b) shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such

withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.

(c)      Material Breaches. No purported termination of this Agreement shall be effective under this Section 12 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 12.02(b). Nothing in this Section 12 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.02(b).

(d)      Miscellaneous. Nothing in this Agreement shall be construed as prohibiting any Party from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder or Second Lien Consenting Lender, and (b) any right of any Consenting Stakeholder or Second Lien Consenting Lender, or the ability of any Consenting Stakeholder or Second Lien Consenting Lender, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party.

**Section 13.      *Amendments and Waivers*.**

13.01.  Amendments. This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 13. Any proposed modification, amendment, waiver or supplement that does not comply with this Section 13 shall be ineffective and void *ab initio*. This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by the Company Parties and the Required Consenting Lenders; *provided*, *however*, that (i) if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims or Interests held by a Consenting Stakeholder or Second Lien Consenting Lender as compared to similarly situated Parties, then the prior written consent of each such affected Party shall also be required to effectuate such modification, amendment, waiver, or supplement; (ii) if the proposed modification, amendment, waiver, or supplement does not provide for equal treatment of the KL Note Claims and First Lien Term Loan Claims, then the prior written consent of the KL Lender shall also be required; (iii) if the proposed modification, amendment, waiver, or supplement does not provide for equal rights to the Holders of, and the treatment of, the PVKG Note Claims and First Lien Term Loan Claims, then the prior written consent of the PVKG Lender shall also be required; (iv) if the proposed modification, amendment, waiver, or supplement reasonably relates to matters that, directly or indirectly, relate to the rights, distribution and treatment of the Consenting Second Lien Lenders provided for herein or the consent rights of the Required Consenting Second Lien Ad Hoc Group Members provided for herein, then the prior written consent of the Required Consenting Second Lien Ad Hoc Group Members shall also be required; (v) if the proposed modification, amendment, waiver, or supplement requires any Consenting Stakeholder to incur any expenses, liabilities, or other obligations, or to agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other

obligations against such Consenting Stakeholder, then the prior written consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver, or supplement; (vi) any modification, amendment, waiver, or supplement to Section 3.02 or this Section 13.01 shall require the prior written consent of all Parties; and (vii) any modifications, amendments, or supplements to the definitions of "Required Consenting Lenders," "Required Consenting Initial First Lien Ad Hoc Group Members," "Required Consenting Initial Second Lien Ad Hoc Group Members," or the rights set forth herein attributable thereto, shall require the prior written consent of all Consenting Stakeholders, Second Lien Consenting Lenders and Company Parties.

13.02.  <u>Waiver</u>. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other applicable remedies.

**Section 14.**     *Miscellaneous*.

14.01.  <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities, loans, or other instruments or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and other applicable Law.

14.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, schedules, annexes, and signature pages attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, schedules, annexes, and signature pages. In the event of any inconsistency between this Agreement (without reference to the exhibits, schedules, and annexes hereto) and the exhibits, schedules, and annexes hereto, this Agreement (without reference to the exhibits, schedules, and annexes thereto) shall govern.

14.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

14.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter

hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

14.05. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Upon the commencement of the Chapter 11 Cases, each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the Bankruptcy Court and, with respect to such claims, (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

14.06. <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14.07. <u>Execution of Agreement</u>. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

14.08. <u>Rules of Construction</u>. This Agreement is the product of negotiations among the Company Parties, the Consenting Stakeholders, and the Second Lien Consenting Lenders. In the enforcement or interpretation of this Agreement, this Agreement shall be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the enforcement or interpretation hereof. The Company Parties, Consenting Stakeholders, and Second Lien Consenting Lenders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

14.09. <u>Successors and Assigns; Third Parties</u>. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable. There are no third party beneficiaries under this Agreement, and, except as set forth in

Section 8, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

    14.10. <u>Notices</u>. All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

    (a)    if to a Company Party, to:

    ConvergeOne Holdings, Inc.
    10900 Nesbitt Ave. S.
    Bloomington, MN 55437
    Attention:  Rui Goncalves
    E-mail:  rgoncalves@onec1.com

    with copies to:

    White & Case LLP
    111 S. Wacker Dr.
    Chicago, IL 60606
    Attention:  Bojan Guzina, Andrew F. O'Neill, Erin R. Rosenberg, Blair M. Warner, and Adam T. Swingle
    E-mail:  bojan.guzina@whitecase.com
            aoneill@whitecase.com
            erin.rosenberg@whitecase.com
            blair.warner@whitecase.com
            adam.swingle@whitecase.com

    (b)    if to the PVKG Lender or a Consenting Sponsor, to:

    PVKG Investment Holdings, Inc.
    712 Fifth Avenue, Suite 43
    New York, NY 10019

    and

    Latham & Watkins LLP
    1271 6th Ave
    New York, NY 10020
    Attention:  Keith A. Simon, Joshua Tinkelman, and David Hammerman
    E-mail:  Keith.Simon@lw.com
            Joshua.Tinkelman@lw.com
            David.Hammerman@lw.com

(c)      if to the KL Lender, to:

       Kennedy Lewis Investment Management LLC
       225 Liberty Street, Suite 4210
       New York, NY 10281

       and

       Akin Gump Strauss Hauer & Feld LLP
       One Bryant Park
       New York, NY 10036
       Attention:  Daniel I. Fisher

       E-mail:  dfisher@akingump.com

(d)      if to a member of the First Lien Ad Hoc Group or to the First Lien Ad Hoc Group Advisors, to:

       Gibson Dunn & Crutcher LLP
       200 Park Avenue
       New York, NY 10166
       Attention:  Scott J. Greenberg, Keith R. Martorana, and Michelle Choi
       E-mail:  SGreenberg@gibsondunn.com
              KMartorana@gibsondunn.com
              MChoi@gibsondunn.com

(e)      if to a member of the Second Lien Ad Hoc Group or to the Second Lien Ad Hoc Group Advisors, to:

       Davis Polk & Wardwell LLP
       450 Lexington Avenue
       New York, NY 10017
       Attention:  Adam L. Shpeen and Abraham Bane
       E-mail:  adam.shpeen@davispolk.com
              abraham.bane@davispolk.com

Any notice given by electronic mail, courier, registered or certified mail shall be effective when received.

    14.11.  <u>Independent Due Diligence and Decision Making</u>. Each Consenting Stakeholder and Second Lien Consenting Lender hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial, and other conditions and prospects of the Company Parties.

    14.12.  <u>Enforceability of Agreement</u>. Each of the Parties to the extent enforceable waives any right to assert that the exercise of any termination rights under this Agreement is subject to the

automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

14.13.  <u>Settlement Discussions</u>. This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement. If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.

14.14.  <u>Specific Performance</u>. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

14.15.  <u>Several, Not Joint, Claims</u>.   The agreements, representations, warranties, and obligations of the Company Parties under this Agreement are joint and several.  The agreements, representations, warranties, and obligations of the Consenting Stakeholders and Second Lien Consenting Lenders under this Agreement are, in all respects, several and neither joint nor joint and several.

14.16.  <u>Severability and Construction</u>. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect.

14.17.  <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

14.18.  <u>Capacities of Consenting Stakeholders</u>. Each Consenting Stakeholder and Second Lien Consenting Lender has entered into this agreement on account of all Company Claims or Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims or Interests.

14.19.  <u>Relationship Among the Parties</u>. None of the Consenting Stakeholders or Second Lien Consenting Lenders shall have any fiduciary duty, any duty or trust or confidence in any form, or other duties or responsibilities to each other, the Company Parties, or any of the Company Parties' other creditors or stakeholders, including without limitation any Holders of Company

38

Claims or Interests, and, other than as expressly set forth herein, there are no commitments among or between the Consenting Stakeholders or Second Lien Consenting Lenders. It is understood and agreed that any Consenting Stakeholders or Second Lien Consenting Lenders may trade in any equity securities, debt, or debt securities of the Company Parties without the prior written consent of the Company Parties or any other Party, subject to applicable securities laws, any Confidentiality Agreement, and this Agreement. No prior history, pattern, or practice of sharing confidences among or between any of the Consenting Stakeholders, Second Lien Consenting Lenders, or the Company Parties shall in any way affect or negate this understanding and agreement. All rights under this Agreement are separately granted to each Consenting Stakeholder or Second Lien Consenting Lender, or by the Company Parties, and vice versa, and the use of a single document is for the convenience of the Company Parties. The decision to commit to enter into the transactions contemplated by this Agreement has been made independently.

14.20.  <u>Survival</u>. Notwithstanding (i) any Transfer of any Company Claims or Interests in accordance with this Agreement or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Sections 14.05, 14.06, 14.13, 14.14, and 14.22 and in the Confidentiality Agreements shall survive such Transfer or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

14.21.  <u>Email Consents</u>. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement by any Party, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

14.22.  <u>Confidentiality and Publicity</u>. Other than to the extent required by applicable Law and regulation or by any governmental or regulatory authority, no Party shall disclose to any person (including for the avoidance of doubt, any other Consenting Stakeholder), other than legal, accounting, financial, and other advisors to the Company Parties (who are under obligations of confidentiality to the Company Parties with respect to such disclosure, and whose compliance with such obligations the Company Parties shall be responsible for), the principal amount or percentage of the Company Claims or Interests held by any First Lien Consenting Lender, any Second Lien Consenting Lender or any of their respective subsidiaries (including, for the avoidance of doubt, any Company Claims or Interests acquired pursuant to any Transfer) or the signature page of such First Lien Consenting Lender or Second Lien Consenting Lender; provided, however, that the Company Parties shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, any class of the Company Claims or Interests held by the First Lien Consenting Lenders and Second Lien Consenting Lenders, collectively. Notwithstanding the foregoing, the First Lien Consenting Lenders and Second Lien Consenting Lenders hereby consent to the disclosure of the execution, terms, and contents of this Agreement by the Company Parties in the Definitive Documents to the extent required by law or regulation; provided, however, that (i) if any of the Company Parties determines that it is required to attach a copy of this Agreement, a Joinder, or a Transfer Agreement to any Definitive Documents or any other filing or similar document relating to the transactions contemplated hereby, to the extent permissible under applicable Law, it will redact any reference to or concerning a specific First Lien Consenting

Lender's holdings of Company Claims or Interests (including before filing any pleading with the Bankruptcy Court) and such First Lien Consenting Lender's and Second Lien Consenting Lender's signature page and (ii) if disclosure of additional information of any First Lien Consenting Lender or Second Lien Consenting Lender is required by applicable Law, advance notice of the intent to disclose, if permitted by applicable Law, shall be given by the disclosing Party to each applicable First Lien Consenting Lender or Second Lien Consenting Lender (who shall have the right to seek a protective order prior to disclosure). Notwithstanding the foregoing, the Company Parties will submit to the Required Consenting Lender Advisors and the Second Lien Ad Hoc Group Advisors all press releases, public filings, public announcements, or other communications with any news media, or material mass communications, other than in the ordinary course of business and unrelated to this Agreement or the Restructuring Transactions, with any customers, vendors, or current or former employees, in each case, to be made by the Company Parties relating to this Agreement or the transactions contemplated hereby and any amendments thereof at least two (2) Business Days in advance of release (it being understood that such period may be shortened to the extent there are exigent circumstances) and will use commercially reasonable, good faith efforts to incorporate any comments provided by the Required Consenting Lender Advisors and the Second Lien Ad Hoc Group Advisors. Nothing contained herein shall be deemed to waive, amend, or modify the terms of any Confidentiality Agreement.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

[*Signature pages follow.*]

**Company Parties' Signature Page to**
**the Restructuring Support Agreement**

**PVKG Intermediate Holdings Inc., and**
**ConvergeOne Holdings Inc., on behalf of themselves**
**and each of their direct and indirect subsidiaries listed on Exhibit [A] hereto**.

By: _____

Name:  Rui Goncalves

Title:   General Counsel

*[Consenting Stakeholders' and Second Lien Consenting Lenders'
signature pages on file with the Company Parties]*

**<u>Exhibit A</u>**

**Company Parties**

**<u>Company Parties</u>**

AAA Network Solutions, Inc.
ConvergeOne Dedicated Services, LLC
ConvergeOne Government Solutions, LLC
ConvergeOne Holdings, Inc.
ConvergeOne Managed Services, LLC
ConvergeOne Systems Integration, Inc.
ConvergeOne Technology Utilities, Inc.
ConvergeOne Texas, LLC
ConvergeOne Unified Technology Solutions, Inc.
ConvergeOne, Inc.
Integration Partners Corporation
NetSource Communications Inc.
NuAge Experts LLC
Providea Conferencing, LLC
PVKG Intermediate Holdings Inc.
Silent IT, LLC
WrightCore, Inc.

## Exhibit B

### Restructuring Term Sheet

**ConvergeOne Holdings, Inc.,** *et al.*
**RESTRUCTURING TERM SHEET[1]**

THIS TERM SHEET (THE "RESTRUCTURING TERM SHEET") SETS FORTH THE PRINCIPAL TERMS OF THE RESTRUCTURING TRANSACTIONS AND CERTAIN RELATED TRANSACTIONS CONCERNING THE COMPANY PARTIES AGREED TO BY THE COMPANY PARTIES AND THE CONSENTING STAKEHOLDERS. THIS RESTRUCTURING TERM SHEET DOES NOT CONTAIN A COMPLETE LIST OF ALL TERMS AND CONDITIONS OF THE POTENTIAL TRANSACTIONS DESCRIBED HEREIN. SUBJECT TO THE TERMS OF THE RESTRUCTURING SUPPORT AGREEMENT TO WHICH THIS RESTRUCTURING TERM SHEET IS ATTACHED, THE RESTRUCTURING TRANSACTIONS SHALL BE CONSUMMATED THROUGH A PREPACKAGED PLAN OF REORGANIZATION IN THE CHAPTER 11 CASES.

WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THIS RESTRUCTURING TERM SHEET AND THE UNDERTAKINGS CONTEMPLATED HEREIN ARE SUBJECT IN ALL RESPECTS TO THE NEGOTIATION, EXECUTION, AND DELIVERY OF DEFINITIVE DOCUMENTATION ACCEPTABLE TO THE COMPANY PARTIES AND THE CONSENTING STAKEHOLDERS, AS APPLICABLE, AND SUBJECT TO ANY APPLICABLE CONSENT RIGHTS OF THE SECOND LIEN CONSENTING LENDERS SET FORTH IN THE RESTRUCTURING SUPPORT AGREEMENT. THIS RESTRUCTURING TERM SHEET IS PROFFERED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. ACCORDINGLY, THIS RESTRUCTURING TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE ENTITLED TO PROTECTION FROM ANY USE OR DISCLOSURE TO ANY PERSON OR ENTITY PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE RULE, STATUTE, OR DOCTRINE OF SIMILAR IMPORT PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS, WHETHER ARISING UNDER FEDERAL OR STATE LAW. UNTIL PUBLICLY DISCLOSED UPON THE PRIOR WRITTEN AGREEMENT OF THE COMPANY PARTIES AND CONSENTING STAKEHOLDERS, THIS RESTRUCTURING TERM SHEET SHALL REMAIN STRICTLY CONFIDENTIAL AND MAY NOT BE SHARED WITH ANY OTHER PARTY OR PERSON WITHOUT THE CONSENT OF THE COMPANY PARTIES AND CONSENTING STAKEHOLDERS.

THE REGULATORY, TAX, ACCOUNTING, AND OTHER LEGAL AND FINANCIAL MATTERS AND EFFECTS RELATED TO THE RESTRUCTURING TRANSACTIONS OR ANY RELATED RESTRUCTURING OR SIMILAR TRANSACTION HAVE NOT BEEN FULLY EVALUATED AND ANY SUCH EVALUATION MAY AFFECT THE TERMS AND STRUCTURE OF ANY RESTRUCTURING TRANSACTIONS OR RELATED TRANSACTIONS.

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW, INCLUDING THE BANKRUPTCY CODE.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Restructuring Support Agreement.

| Restructuring Term Sheet | |
|---|---|
| **Restructuring Overview** | |
| **Debtors** | The Company Parties that are listed on **Exhibit A** to the Restructuring Support Agreement, which shall also be signatories to the Restructuring Support Agreement (each a "***Debtor***" and collectively, the "***Debtors***"). |
| **Restructuring Overview** | The Restructuring Transactions shall be implemented pursuant to the Definitive Documents through confirmation of a prepackaged chapter 11 plan (the "***Plan***") in cases to be commenced by the Debtors under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, *et seq.* (as amended, the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***" and such cases, the "***Chapter 11 Cases***"). |
| | The Restructuring Transactions shall be subject to the Definitive Documents, the terms of the Restructuring Support Agreement (including the exhibits thereto), and the consent rights set forth therein. |
| | The Restructuring Transactions provide for: |
| | (i) the incurrence of the ABL DIP Facility in accordance with the ABL DIP Documents, including the ABL DIP Term Sheet attached hereto as **Exhibit 1**, which, on the Effective Date, shall be (a) refinanced by the Exit ABL Facility by means of a cashless settlement or (b) indefeasibly paid in full in cash (or any combination thereof); |
| | (ii) the incurrence of the Term DIP Facility in accordance with the Term DIP Loan Documents, including the Term DIP Term Sheet attached hereto as **Exhibit 2**; |
| | (iii) the incurrence of the Exit ABL Facility on terms and conditions reasonably satisfactory to the Debtors and the Required Consenting Lenders, and the Exit Term Loan Facility in accordance with the Exit Term Loan Facility Documents, and in each case consistent with terms set forth below; |
| | (iv) a $245.0 million (subject to increase with the consent of the Debtors and the Required Consenting Lenders) equity rights offering (the "***Rights Offering***") which shall provide Rights Offering Rights, subject to the Holdback and the Put Option Premium (each as defined in the Rights Offering Term Sheet attached hereto as **Exhibit 3**) to the Holders of First Lien Claims eligible to participate in the Rights Offering on the terms and conditions set forth in the Rights Offering Term Sheet (as such terms may be modified subject to the consent rights set forth in the Restructuring Support Agreement) to be backstopped by the Investors (as defined in the Rights Offering Term Sheet) that commit to do so in accordance with the Backstop Agreement; |

2

| | |
|---|---|
| | (v) in full and final satisfaction of each First Lien Claim, each Holder of a First Lien Claim shall have the right to elect to receive its applicable pro rata share of (which elections shall be (i) adjusted on a pro rata basis, based on oversubscription, as necessary, so that participation in each recovery option is capped at 50% of the First Lien Claims) and (ii) subject to the DIP Term Loan Rights (as defined in the Term DIP Term Sheet): |
| | (a) the Takeback Term Loan Recovery Option; or |
| | (b) the Rights Offering Rights and Takeback Term Loan Recovery Option. |
| | (vi) the PVKG Note Claims shall be Allowed in the aggregate amount of $213.0 million; |
| | (vii) in full and final satisfaction of each Second Lien Claim, each Holder of a Second Lien Claim shall receive its applicable pro rata share of the Second Lien Recovery; |
| | (viii) all General Unsecured Claims shall be reinstated, paid in full, or otherwise provided such treatment as to render them unimpaired; and |
| | (ix) all Existing C1 Interests shall be cancelled and no consideration shall be paid to Holders of such Existing C1 Interests in respect thereof. |
| **ABL DIP Facility** | Subject to the terms of the ABL DIP Commitment Letter and ABL DIP Documents, the Debtors shall obtain a senior secured superpriority priming debtor-in-possession asset-based revolving credit facility, in the aggregate principal amount of up to $250.0 million (subject to the Borrowing Base (as such term is defined in the ABL DIP Term Sheet), which shall be approved by the Bankruptcy Court, and which shall provide for a roll-up and conversion of all Prepetition ABL Secured Obligations, on a cashless, dollar-for-dollar basis, into new loans or commitments that repay or effectively replace all such Prepetition ABL Secured Obligations in full and become indebtedness and obligations under the ABL DIP Facility. |
| | Upon the substantial consummation of the Plan, the remaining principal balance of the ABL DIP Loans (including any swingline loans, floorplan advances, and letters of credit issued thereunder) shall (a) if the ABL DIP Lenders (or a subset thereof) commit to provide the Exit ABL Facility (as defined below), automatically convert into asset-based revolving loans or letters of credit under an exit first lien asset based lending facility (the "***Exit ABL Facility***"), which shall be subject to (i) definitive documentation on terms to be agreed by the Debtors, the Required ABL DIP Lenders, and the Required Consenting Lenders, consistent with the consent rights set forth in the Restructuring Support Agreement, (ii) the Plan being in form and substance consistent in all material respects with the terms set forth in the Restructuring Support Agreement and such other terms to be agreed by the Debtors and the Required Consenting Lenders, consistent with the consent rights set forth in the Restructuring Support Agreement, and (iii) the |

| | |
|---|---|
| | consummation of such Plan, or (b) be indefeasibly paid in full in cash (or any combination thereof).<br><br>The Exit ABL Facility shall be subject to an intercreditor agreement on substantially the same terms as the ABL Intercreditor Agreement (as such term is defined in the Prepetition First Lien Term Credit Agreement) (the "***Exit Intercreditor Agreement***").<br><br>The obligations under the ABL DIP Facility are referred to herein as the "***ABL DIP Facility Claims***." |
| **Term DIP Facility** | The Term DIP Lenders (as defined in the Term DIP Term Sheet) shall provide multiple draw term loans in an aggregate principal amount of $215.0 million (the "***Term DIP Loans***") of which (i) $145.0 million shall be available in one draw upon entry of the Interim DIP Order, and (ii) $70.0 million shall be available for borrowing upon entry of the Final DIP Order and the satisfaction of certain other conditions precedent set forth in the Term DIP Term Sheet, each in accordance with the terms and conditions set forth in the Term DIP Loan Documents.<br><br>The obligations under the Term DIP Facility are referred to herein as the "***Term DIP Facility Claims***." |
| **Exit Term Loan Facility** | On the Effective Date, the Reorganized Debtors shall incur a secured term loan facility in the aggregate principal amount of not greater than $243 million (the "***Exit Term Loan Facility***") under an exit financing credit agreement (the "***Exit Term Loan Credit Agreement***").<br><br>The Exit Term Loan Facility shall consist of term loans issued to the Holders of First Lien Claims (the "***Takeback Term Loans***"), subject to the following material terms:<br><br>Interest Rate:  At the option of the Debtors, (i) SOFR (to be defined in a customary manner and subject to a floor of 0.00%) *plus* the Applicable Rate or (ii) Base Rate (to be defined in a customary manner and subject to a floor of 0.00%) *plus* the Applicable Rate, in each case payable in cash; *provided* that at any time an event of default exists under the Exit Term Loan Facility the Debtors shall not be able to elect SOFR.<br><br>Applicable Rate: 4.75% in the case of Base Rate loans and 5.75% in the case of SOFR loans.<br><br>Default Interest: During the continuance of an Event of Default, the Takeback Term Loans will bear interest at an additional 2.00% per annum and any overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% per annum.  Default interest shall be payable in cash on demand.<br><br>Interest Payment Dates: Interest on (i) Base Rate loans shall be payable on the last business day of each fiscal quarter in arrears and (ii) SOFR loans shall be payable on the last day of each Interest Period in arrears (or, if earlier, the 3-month anniversary of the commencement of such Interest Period). |

Interest Period: At the option of the Debtors, one, three, or six months.

Amortization: None.

Tenor: 6 years, provided that if, in the reasonable determination of the Required Consenting Lenders in good faith consultation with the Debtors, the Restructuring Transactions cannot be effectuated in a manner that causes a taxable transaction to the lenders for U.S. federal and applicable state and local income tax purposes by causing a Reorganized Debtor, other than C1 Holdings, to be the issuer of the Takeback Term Loans, because such structure would reasonably be expected to result in material adverse tax consequences to the Reorganized Debtors as compared to the tax consequences to the Reorganized Debtors had C1 Holdings been the issuer of the Takeback Loans, subject to the consent of the Required Consenting Lenders, the tenor will be reduced to 4.75 years and in that case the Applicable Rate will be reduced to 4.25% in the case of Base Rate loans and 5.25% in the case of SOFR loans.

Fees: None, other than annual agency fee.

Security: A (x) first priority lien on all collateral securing the First Lien Claims and any other collateral not previously pledged, in each case, that constitute Term Loan Priority Collateral (as defined in the ABL Intercreditor Agreement (as such term is defined in the Prepetition First Lien Term Credit Agreement)), and a first-priority lien on (A) that certain real property of the Reorganized Debtors located at 2368 Corporate Lane, Suite 112, Naperville, IL 60563 and (B) any other owned real property of the Reorganized Debtors and (y) a second priority lien on all collateral securing the First Lien Claims and any other collateral not previously pledged, in each case, that constitutes ABL Priority Collateral (as defined in the ABL Intercreditor Agreement (as such term is defined in the Prepetition First Lien Term Credit Agreement)), which second priority liens shall be subordinated to the liens on such collateral securing the Exit ABL Facility, in the case of either clause (x) or (y) above, subject to customary exclusions consistent with the exclusions under the Prepetition First Lien Credit Agreement (including the exclusion of 35% of the equity interests of any first-tier foreign subsidiaries) and otherwise as may be agreed by the Reorganized Debtors and the Required Consenting Lenders.

Documentation Principles: The Exit Term Loan Credit Agreement with respect to the Exit Term Loan Facility shall (i) be based upon the Prepetition First Lien Term Loan Credit Agreement; (ii) include such modifications as are necessary to reflect the Restructuring Transactions, as implemented through the Chapter 11 Cases, and the fact that the Exit Term Loan Facility is an exit financing; (iii) include appropriate modifications to reflect changes in law or accounting standards since the date of such precedent; and (iv) shall incorporate the following:

- Affirmative Covenants: Consistent with the First Lien Term Loan Credit Agreement (but shall be modified in a manner acceptable to the Debtors and the Required Consenting Lenders to provide for modified reporting requirements and information rights that are customary for facilities of this type and relate to reporting and

| | |
|---|---|
| | information readily available to the Debtors in the ordinary course of business). |
| | • <u>Negative Covenants</u>: Consistent with the First Lien Term Loan Credit Agreement, but shall be modified as may be required to effectuate the Restructuring Transactions, in each case, in a manner acceptable to the Debtors and the Required Consenting Lenders; *provided* that the Exit Term Loan Facility shall not include any financial covenants. |
| | • <u>Miscellaneous</u>: Shall also include certain customary liability management protections in form and substance acceptable to the Debtors and the Required Consenting Lenders. |
| | <u>Intercreditor Agreements</u>: The Exit Term Loan Facility shall be subject to the Exit Intercreditor Agreement. |
| | <u>Ratings</u>: The Reorganized Debtors shall use commercially reasonable efforts to have the Takeback Term Loans rated by Moody's and S&P within 60 days of the Effective Date. |
| **Rights Offering** | The Plan shall provide for the Rights Offering on the terms and conditions set forth in the Rights Offering Term Sheet. |
| | On the Effective Date, each Holder of a First Lien Claim that is an Eligible Offeree (as defined in the Rights Offering Term Sheet) or an Investor (as defined in the Rights Offering Term Sheet) or an entity designated by any of the foregoing shall receive, in accordance with the terms of the Rights Offering Term Sheet and relevant Definitive Documents, its applicable share of New Equity Interests (as defined in the Rights Offering Term Sheet). |

| Treatment of Claims and Interests | | |
|---|---|---|
| Each Holder of an allowed Claim or Interest, as applicable, shall receive the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's allowed Claim or Interest. | | |

| Type of Claim | Treatment | Impairment/ Voting |
|---|---|---|
| **ABL DIP Facility Claims** | On the Effective Date, in full and final satisfaction of the Allowed ABL DIP Facility Claims, (a) ABL DIP Facility Claims that are being converted to Exit ABL Facility Loans or other outstandings thereunder (such as letters of credit and floor plan advances, as provided below) shall be refinanced by the Exit ABL Facility in the amount of the remaining ABL DIP Facility Claims after such pay down by means of a cashless settlement, (b) ABL DIP Facility Claims that are not being converted to Exit ABL Facility Loans shall be indefeasibly paid in full in cash, and (c) accrued interest and fees under the ABL DIP Facility shall be paid in full | N/A |

| | in cash immediately prior to the conversion of ABL DIP Loans to Exit ABL Facility Loans. With respect to the amount of the ABL DIP Facility refinanced by means of a cashless settlement, (i) all principal amount of ABL DIP Loans (as defined in the ABL DIP Term Sheet) (including Swingline Loans and floorplan advances) shall be on a one-to-one basis automatically converted to and deemed to be Exit ABL Facility Loans, (ii) the Letters of Credit (as defined in the ABL DIP Term Sheet) issued and outstanding under the ABL DIP Credit Agreement shall automatically be converted to letters of credit deemed to be issued and outstanding under the Exit ABL Facility Documents, and (iii) all Collateral that secures the Obligations (each as defined in the ABL DIP Credit Agreement) under the ABL DIP Credit Agreement that shall also secure the Exit ABL Facility shall be reaffirmed, ratified and shall automatically secure all Obligations under the ABL Exit Facility Documents, subject to the priorities of liens set forth in the ABL Exit Facility Documents and the Exit Intercreditor Agreement.<br><br>For the avoidance of doubt, DIP Professional Fees and Restructuring Expenses shall be paid in full in cash in accordance with the terms of the DIP Orders and the Plan, as applicable. | |
|---|---|---|
| **Term DIP Facility Claims** | On the Effective Date, in full and final satisfaction of the Term DIP Facility Claims each Holder of a Term DIP Facility Claim shall receive its pro rata portion of cash on account of any principal, interest, fees, and expenses outstanding with respect to such Holder's Term DIP Facility Claim as of the Effective Date; *provided*, *however*, that any Holder of a Term DIP Facility Claim can, in lieu of such cash payment, exercise such Holder's Term DIP Loan Rights (as such term is defined in the Term DIP Term Sheet).<br><br>For the avoidance of doubt, DIP Professional Fees and Restructuring Expenses shall be paid in full in cash in accordance with the terms of the DIP Orders and the Plan, as applicable. | N/A |
| **Administrative Claims** | Except to the extent that a Holder of an Allowed Administrative Claim and the Debtor against which such allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim shall receive, in full satisfaction of its Claim, payment in full in cash. | N/A |

| Priority Tax Claims | Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive cash equal to the full amount of its Claim or such other treatment in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. | N/A |
|---|---|---|
| Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor, either:<br><br>(i) payment in full in cash of its Allowed Other Secured Claim;<br><br>(ii) the collateral securing its Allowed Other Secured Claim;<br><br>(iii) Reinstatement of its Allowed Other Secured Claim; or<br><br>(iv) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Priority Claim, each Holder of an Other Priority Claims shall receive cash in an amount equal to such Allowed Other Priority Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Deemed to Accept |
| First Lien Claims | Each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date, its elected pro rata share of (which elections shall be adjusted on a pro rata basis, based on oversubscription, as necessary, so that participation in each recovery option is capped at 50% of the First Lien Claims):<br><br>(i) Takeback Term Loans in a principal amount equal to such Holder's First Lien Claim multiplied by 20% (the "***Takeback Term Loan Recovery Option***"); or<br><br>(ii) (a) Takeback Term Loans in a principal amount equal to such Holder's First Lien Claim multiplied by 15%, plus (b) its pro rata share of the Rights Offering | Impaired / Entitled to Vote |

8

| | | |
|---|---|---|
| | Rights, subject to the Holdback and the Put Option Premium (the "***Rights Offering Rights and Takeback Term Loan Recovery Option***").<br><br>Each Holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee) that properly exercises its Rights Offering Rights to purchase New Equity Interests shall receive such New Equity Interests on the Effective Date.<br><br>In the event that a Holder of a First Lien Claim fails to timely elect its recovery, it shall receive the Rights Offering Rights and Takeback Term Loan Recovery Option. | |
| **Second Lien Claims** | Each Holder of a Second Lien Claim (or its designated Affiliate, managed fund or account or other designee) shall receive in full and final satisfaction, settlement, release, and discharge of such Claim, on or as soon as practicable after the Effective Date, its pro rata share of the Second Lien Recovery. | Impaired / Entitled to Vote |
| **General Unsecured Claims** | Each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, either:<br><br>(i) Reinstatement of such Allowed General Unsecured Claim pursuant to section 1124 of the Bankruptcy Code; or<br><br>(ii) Payment in full in cash on (A) the Effective Date or (B) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Unsecured Claim. | Unimpaired / Deemed to Accept |
| **Intercompany Claims** | Each Allowed Intercompany Claim shall be, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), either Reinstated, converted to equity, or otherwise set off, settled, distributed, contributed, cancelled, or released, in each case, in accordance with the Plan. | Impaired / Deemed to Reject or Unimpaired / Deemed to Accept |
| **Section 510 Claims** | On the Effective Date, all Section 510 Claims (including all claims on account of the Employee Partnership Sale Units) shall be cancelled, released, discharged, and extinguished and shall be of no further force or effect, and Holders of Section 510 Claims shall not receive any distribution on account of such Section 510 Claims. | Impaired / Deemed to Reject |
| **Intercompany Interests** | Each Allowed Intercompany Interest shall be, at the option of the applicable Debtor (with the consent of the Required Consenting Lenders), either Reinstated, converted, or otherwise set off, | Impaired / Deemed to Reject or |

| | settled, distributed, contributed, cancelled, or released, in each case, in accordance with the Plan. | Unimpaired / Deemed to Accept |
| --- | --- | --- |
| **Existing C1 Interests** | On the Effective Date, Existing C1 Interests shall be cancelled, released, and extinguished and shall be of no further force and effect, and Holders of Existing C1 Interests shall not receive any distribution on account thereof. | Impaired / Deemed to Reject |

| **Additional Terms** | |
| --- | --- |
| **Definitive Documents** | This Restructuring Term Sheet does not include a description of all the terms, conditions, and other provisions that will be contained in the Definitive Documents, which shall be as set forth in the applicable term sheets referred to herein and otherwise and in form and substance acceptable to the Debtors and the Required Consenting Lenders, subject to the consent rights set forth in the Restructuring Support Agreement and herein. |
| **Executory Contracts and Unexpired Leases** | Prior to the Effective Date, the Debtors shall not assume or reject any material executory contract or material unexpired lease without the consent of the Required Consenting Lenders.<br><br>The Plan shall provide that the executory contracts and unexpired leases that are not assumed or rejected as of the Effective Date (either pursuant to the Plan or a separate motion and in consultation with the Required Consenting Lenders) shall be deemed assumed pursuant to section 365 of the Bankruptcy Code. |
| **Organizational Documents and Governance** | The Governance Documents and any other documentation evidencing the corporate governance for the Reorganized Debtors, including charters, bylaws, limited liability company agreements, shareholder agreements (including minority shareholder protections), and any other customary organizational documents shall be consistent with the Governance Term Sheet attached hereto as **Exhibit 4** and the consent rights set forth in the Restructuring Support Agreement. |
| **PVKG Note Claims** | The PVKG Note Claims shall be Allowed pursuant to the Plan in the aggregate amount of $213.0 million and, for the avoidance of doubt, such claims shall be classified and treated as First Lien Claims under the Plan. |
| **New C1 Board of Directors** | The Chief Executive Officer of New C1 shall serve on the board of directors of New C1 (the "*New Board*"); all other directors shall be agreed by the Debtors and the Required Consenting Lenders, consistent with the terms set forth in the Governance Term Sheet; *provided* that each Initial First Lien Ad Hoc Group Member and the PVKG Lender shall each be entitled to appoint one director to serve on the New Board, so long as such entity is contemplated to receive no less than 10% of the fully-diluted New Equity Interests (excluding New Equity Interests reserved for the post-Effective Date Management Incentive Plan). |

| | |
|---|---|
| **Management Incentive Plan** | The Reorganized Debtors shall reserve a pool of up to 10% of the fully diluted New Equity Interests that are issued and outstanding on the Effective Date for a post-Effective Date management incentive plan (the "***Management Incentive Plan Pool***"), the terms of which, including with respect to participants, form, allocation, structure and vesting shall be determined by the New Board. |
| **Employee Matters** | The Debtors shall assume any employment, confidentiality, and non-competition agreements, bonus, gainshare and incentive programs (other than awards of stock options, restricted stock, restricted stock units, and other equity awards), vacation, holiday pay, severance, retirement, supplemental retirement, executive retirement, pension, deferred compensation, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs and arrangements, and all other wage, compensation, employee expense reimbursement, and other benefit obligations of the Debtors that are in effect immediately prior to the Effective Date; *provided*, *however*, that the Debtors shall not enter into new agreements with insider employees absent the consent of the Required Consenting Lenders.<br><br>Notwithstanding the foregoing, the Debtors shall not assume any agreements or obligations relating to the Employee Partnership Sale Units, which shall be cancelled as of the Effective Date and shall receive no payment on account thereof from the Debtors or the Reorganized Debtors. |
| **Prepetition Indemnification Agreements** | The Plan shall provide that, to the extent consistent with applicable law, all indemnification provisions currently in place (whether in the bylaws, constitutions, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, financial advisors, restructuring advisors, consultants and other professionals of the Debtors, as applicable, shall be reinstated and remain intact and irrevocable and shall survive effectiveness of the Restructuring Transactions. |
| **Releases, Injunctions, and Exculpations** | The Plan shall include customary releases, injunctions, and exculpations in each case to the fullest extent permitted by law and effective as of the Effective Date, as agreed by the Debtors and the Required Consenting Lenders. |
| **Tax Matters** | The Debtors, Required Consenting Lenders, and the Consenting Sponsors shall use reasonable best efforts to structure the Restructuring Transactions in a tax-efficient manner to the Reorganized Debtors and as a taxable transaction for U.S. federal and applicable state and local income tax purposes to the First Lien Consenting Lenders (other than PVKG Lender), ConvergeOne Investment LP, and PVKG Investment US L.P. as beneficial owner of ConvergeOne Investment, LP, and the tax structuring of the Restructuring Transactions shall be subject to the consent of the Required Consenting Lenders and the Consenting Sponsors, provided that, except for an adjustment to the tenor (and resultant change to the interest rate) as provided herein, neither such efforts nor such consent shall require a change to any other term provided herein. |

| | |
|---|---|
| **Professional Fees** | Upon entry of the Interim DIP Order, the Debtors shall open an escrow account to fund on an ongoing basis all unpaid Professional Fee Claims and other unpaid fees and expenses that Professionals estimate they have incurred or will incur in rendering services through the Effective Date. |
| **Restructuring Expenses** | The Debtors shall pay, as set forth in the Restructuring Support Agreement (and subject to any limitations set forth therein), the reasonable and documented fees and expenses of (i) the First Lien Ad Hoc Group Advisors; (ii) the KL Lender Advisor; (iii) the PVKG Lender Advisors; and (iv) the Second Lien Ad Hoc Group Advisors. |
| **Milestones** | The Restructuring Transactions shall be effectuated in accordance with the following deadlines (the "***Milestones***"): <br><br> (a) By 11:59 p.m. (prevailing Central Time) on April 3, 2024, the Petition Date shall have occurred. <br><br> (b) The Plan and Disclosure Statement shall have been filed no later than one (1) calendar day after the Petition Date. <br><br> (c) The Interim DIP Order shall have been entered no later than three (3) calendar days after the Petition Date. <br><br> (d) The order provisionally approving the adequacy of the Disclosure Statement shall have been entered no later than three (3) calendar days after the Petition Date. <br><br> (e) The Final DIP Order shall have been entered no later than thirty-five (35) calendar days after the Petition Date. <br><br> (f) The Disclosure Statement Order (which may be the Confirmation Order) shall have been entered no later than forty-five (45) calendar days after the Petition Date. <br><br> (g) The Confirmation Order shall have been entered no later than forty-five (45) calendar days after the Petition Date. <br><br> (h) The Effective Date shall have occurred no later than sixty (60) calendar days after the Petition Date. |
| **Conditions Precedent to the Effective Date** | It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived (in accordance with customary waiver provisions to be contained in the Plan): <br><br> (a) The Restructuring Support Agreement shall not have been terminated as to the Required Consenting Lenders and shall be in full force and effect; <br><br> (b) The Bankruptcy Court shall have entered the Interim DIP Order and the Final DIP Order, the latter of which shall be in full force and effect; <br><br> (c) The Bankruptcy Court shall have entered the Confirmation Order in form and substance consistent with and subject to the consent rights set forth in the Restructuring Support Agreement; |

(d) The Backstop Agreement shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order) and shall be in full force and effect;

(e) The Rights Offering (including the Rights Offering Procedures) shall have been approved by the Bankruptcy Court (which may be pursuant to the Confirmation Order) and shall have been consummated in accordance with its terms;

(f) The Debtors shall have received a commitment for the Exit ABL Facility, which shall refinance the ABL DIP Facility on the Effective Date and the terms and conditions of which shall be reasonably satisfactory to the Debtors and the Required Consenting Lenders;

(g) The Exit ABL Facility Documents and Exit Term Loan Facility Documents shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors and the Required Consenting Lenders), other than such conditions that relate to the effectiveness of the Plan and related transactions;

(h) The New Equity Interests shall have been issued;

(i) All Restructuring Expenses shall have been paid in full in cash;

(j) The Definitive Documents shall (i) be consistent with the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, and (iii) shall be adopted on terms consistent with the Restructuring Support Agreement and this Restructuring Term Sheet; and

(k) The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, actions, documents, and other agreements that are necessary to implement and effectuate the Plan and each of the other Restructuring Transactions.

| Certain Plan Definitions | |
|---|---|
| **Affiliate** | With respect to any Entity, all Entities that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code if such Entity was a debtor in a case under the Bankruptcy Code. |
| **Allowed** | With respect to any Claim or Interest, a Claim or an Interest expressly allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable. For the avoidance of doubt, (a) there is no requirement to File a Proof of Claim (or move the Bankruptcy Court for allowance) to be an Allowed Claim under the Plan, and (b) the Debtors (with the consent of the Required Consenting Lenders, which shall not be unreasonably withheld, delayed, or conditioned), may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable nonbankruptcy law; *provided, however* that the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan. |
| **Confirmation** | The Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases. |
| **Confirmation Date** | The date upon which the Bankruptcy Court confirms the Plan pursuant to section 1129 of the Bankruptcy Code. |
| **Confirmation Hearing** | The hearing held by the Bankruptcy Court on the confirmation of the Plan, pursuant to Bankruptcy Rule 3020(b)(2) and sections 1128 and 1129 of the Bankruptcy Code, as such hearing may be continued from time to time. |
| **DIP Professional Fees** | As of the Effective Date, all accrued and unpaid professional fees and expenses payable under the DIP Orders to the professionals for the ABL DIP Agent, the Term DIP Agent, the ABL DIP Lenders, and the Term DIP Lenders (each as defined in the ABL DIP Term Sheet and the Term DIP Term Sheet, as applicable). |
| **Effective Date** | The date that is the first business day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent to the occurrence of the Effective Date set forth in the Plan have been satisfied or waived in accordance with the terms of the Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter. |
| **Employee Partnership Sale Units** | Those certain partnership sale units issued to certain employees of the Debtors prior to the Petition Date in exchange for a waiver of the respective employee's then-existing equity interests in ConvergeOne Investment LP. |
| **Exculpated Parties** | Collectively, and in each case in their capacities as such: (a) the Debtors, (b) the directors, officers, managers, and employees of any Debtor, and (c) the Professionals. |

| Certain Plan Definitions | |
|---|---|
| **Existing C1 Interests** | The equity interests in PVKG Intermediate Holdings Inc. immediately prior to the Effective Date. |
| **First Lien Claims** | Collectively, the First Lien Term Loan Claims, the KL Note Claims, and the PVKG Note Claims. |
| **First Lien Term Loan Claims** | Any Claim against any Debtor derived from, based upon, or arising under the Prepetition First Lien Term Loan Credit Agreement. |
| **General Unsecured Claims** | Any Claim that is not an: (a) ABL DIP Facility Claim; (b) Administrative Claim; (c) First Lien Claim; (d) Intercompany Claim; (e) Other Priority Claim; (f) Other Secured Claim; (g) Priority Tax Claim; (h) Professional Fee Claim; (i) Second Lien Claim; (j) Section 510 Claim; or (k) Term DIP Facility Claim. |
| **Governance Documents** | As applicable, the organizational and governance documents for the Reorganized Debtors, which will give effect to the Restructuring Transactions, including, without limitation, any applicable certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, shareholder agreements (or equivalent governing documents), and registration rights agreements, which documents shall be consistent with the Restructuring Support Agreement and the Governance Term Sheet. |
| **Holder** | A Person or an Entity holding a Claim against, or an Interest in, any Debtor, as applicable. |
| **Impaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code |
| **Intercompany Claims** | Any Claim against a Debtor held by another Debtor. |
| **Intercompany Interests** | Any Interest in a Debtor held by another Debtor. |
| **KL Note Claims** | Any Claim against any Debtor derived from, based upon, or arising under the Prepetition KL Note Purchase Agreement. |
| **Management Incentive Plan** | A post-Effective Date equity incentive plan providing for the issuance from time to time, of equity and equity-based awards with respect to New Equity Interests, as approved by the New Board following the Effective Date. |

| Certain Plan Definitions | |
|---|---|
| **New C1** | Either PVKG Investment Holdings, Inc., as reorganized pursuant to this Plan, or, if applicable, any successor or assign thereto, by merger, consolidation, or otherwise on and after the Effective Date, or a new entity, and each of its direct and indirect wholly-owned subsidiaries, which in any case shall be the ultimate parent of the other Company Parties on and after the Effective Date, and which entity shall be determined by agreement of the Debtors and the Required Consenting Lenders. |
| **New Equity Interests** | New common equity units in New C1, to be issued on the Effective Date. |
| **Other Priority Claims** | Any Claim, other than an Administrative Claim, Priority Tax Claim, ABL DIP Facility Claim, or Term DIP Facility Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| **Other Secured Claims** | Any Secured Claim against the Debtors other than the ABL DIP Facility Claims, Term DIP Facility Claims, First Lien Claims, and Second Lien Claims. |
| **Prepetition ABL Credit Agreement** | That certain Amended and Restated ABL Credit Agreement dated as of January 4, 2019 (as amended by that certain Amendment No. 1 dated as of July 10, 2022, that certain Amendment No. 2 dated as of September 14, 2022, that certain Amendment No. 3 dated as of January 23, 2023, and that certain Amendment No. 4 dated as of August 29, 2023, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, certain subsidiary borrowers party thereto, Wells Fargo Commercial Distribution Finance, LLC, as administrative agent, collateral agent, floorplan funding agent, and swing line lender, and the lenders party thereto. |
| **Prepetition ABL Secured Obligations** | Any secured obligations arising under the Prepetition ABL Credit Agreement and related loan documents. |
| **Prepetition First Lien Term Loan Credit Agreement** | That certain First Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by that certain Amendment No. 1 dated as of March 14, 2019 and that certain Amendment No. 2 dated as of December 17, 2021, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, Deutsche Bank AG New York Branch, as administrative agent and collateral agent, and certain lenders from time to time party thereto. |

| Certain Plan Definitions | |
|---|---|
| **Prepetition KL Note Purchase Agreement** | That certain First Lien Secured Note Purchase Agreement dated as of July 10, 2020 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date) by and among C1 Holdings, as issuer, PVKG Intermediate, as holdings, Deutsche Bank Trust Company, as administrative agent and collateral agent, certain affiliates of Kennedy Lewis Investment Management LLC as holders party thereto, and each other holder from time to time party thereto. |
| **Prepetition PVKG Note Purchase Agreement** | That certain Amended Promissory Note and Purchase and Cashless Exchange Agreement dated as of July 6, 2023 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as issuer, PVKG Intermediate, as holdings, PVKG Lender (PVKG Investment Holdings, Inc.), as administrative agent and collateral agent, and PVKG Lender as holder. |
| **Prepetition Second Lien Term Loan Credit Agreement** | That certain Second Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by that certain Amendment No. 1 dated as of July 10, 2022, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, UBS AG, Stamford Branch, as administrative agent and collateral agent, and certain lenders from time to time party thereto. |
| **Professional** | Any Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code. |
| **Professional Fee Claim** | Any Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code. |
| **PVKG Note Claims** | Any Claim against any Debtor derived from, based upon, or arising under the Prepetition PVKG Note Purchase Agreement. |

4

| Certain Plan Definitions | |
|---|---|
| **Related Party** | With respect to an Entity, collectively, (a) such Entity's current and former Affiliates and (b) such Entity's and such Entity's current and former Affiliates' directors, managers, officers, shareholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors, managers, fiduciaries, trustees, employees, agents (including any disbursing agent), advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, and other professionals, representatives, advisors, predecessors, successors, and assigns, each solely in their capacities as such (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), and the respective heirs, executors, estates, and nominees of the foregoing. |
| **Released Party** | Collectively, and in each case in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the ABL DIP Lenders; (d) the Term DIP Lenders; (e) the Consenting Stakeholders; (f) the Second Lien Consenting Lenders; (g) the Agents/Trustees; (h) all Releasing Parties; and (i) each Related Party of each Entity in clause (a) through (h); *provided*, *however*, that any Holder of a Claim or Interest that opts out of the releases contained in the Plan shall not be a "Released Party." |
| **Releasing Party** | Collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the ABL DIP Lenders; (d) the Term DIP Lenders; (e) the Consenting Stakeholders; (f) the Second Lien Consenting Lenders; (g) the Agents/Trustees; (h) all Holders of Claims that vote to accept the Plan; (i) all Holders of Claims or Interests that are deemed to accept the Plan and who do not affirmatively opt out of the releases provided by the Plan; (j) all Holders of Claims or Interests that are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; (k) all Holders of Claims who abstain from voting on the Plan and who do not affirmatively opt out of the releases provided by the Plan; (l) all Holders of Claims who vote to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan; and (m) each Related Party of each Entity in clause (a) through (l); *provided*, *however*, that, for the avoidance of doubt, each Holder of Claims or Interests that is party to or has otherwise signed the Restructuring Support Agreement shall not opt out of the releases provided by the Plan. |
| **Reorganized Debtors** | A Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, unless otherwise dissolved pursuant to the Plan. |

| Certain Plan Definitions | |
|---|---|
| **Section 510 Claims** | Any Claim against any Debtor:  (a) arising from the rescission of a purchase or sale of an equity security as defined in section 101(17) of the Bankruptcy Code (including the Employee Partnership Sale Units) of any Debtor or an Affiliate of any Debtor; (b) for damages arising from the purchase or sale of such an equity security made to the Debtors prior to the Petition Date; (c) for reimbursement or contribution allowed under section 502(e) of the Bankruptcy Code on account of such a Claim; and (d) any other claim determined to be subordinated under section 510 of the Bankruptcy Code. |
| **Second Lien Claims** | Any Claim against any Debtor derived from, based upon, or arising under the Prepetition Second Lien Term Loan Credit Agreement. |
| **Second Lien Recovery** | 4.375% of the New Equity Interests (subject to dilution by the Management Incentive Plan Pool). |
| **Unimpaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code. |

## Exhibit 1

**ABL DIP Term Sheet**

**ConvergeOne Holdings, Inc**
**ABL DIP Facility Term Sheet**

This term sheet (together with all annexes, exhibits and schedules attached hereto, this "**Term Sheet**") sets forth certain material terms of the proposed ABL DIP Facility (as defined below). Capitalized terms used but not defined herein shall have the meaning ascribed to them in the commitment letter, dated as of April 3, 2024 (as amended, supplemented or modified in accordance with its terms, the "**Commitment Letter**"), to which this Term Sheet is attached.

This Term Sheet does not address all terms that would be required in connection with the ABL DIP Facility or that will be set forth in the ABL DIP Documents (as defined below), which are subject to negotiation and further subject to execution of definitive documents and the preparation of pleadings and proposed forms of orders that are consistent with this Term Sheet and the Documentation Principles and otherwise in form and substance acceptable to the ABL DIP Agent and the Borrowers.

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.**

| | |
|---|---|
| **Borrowers** | ConvergeOne Holdings, Inc. (the "**Company**") and each subsidiary borrower thereof that is a debtor and debtor-in-possession (collectively, the "**Borrowers**") in the cases (the "**Borrowers' Cases**") to be filed under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for Southern District of Texas (the "**Bankruptcy Court**"), which shall be jointly administered with the Guarantors' Cases (as defined below). |
| **Guarantors** | PVKG Intermediate Holdings Inc, a Delaware corporation ("**Holdings**"), in its capacity as a debtor and debtor-in-possession, and each subsidiary guarantor thereof that is a debtor and debtor-in-possession (other than the Company and each other Borrower), each in their respective capacities as debtors and debtors-in-possession (the "**Guarantors**" and, collectively with the Company and the other Borrowers, the "**Loan Parties**" or the "**Debtors**") in the cases to be filed under the Bankruptcy Code with the Bankruptcy Court contemporaneously and jointly administered with the Borrowers' Cases (the "**Guarantors' Cases**" and, collectively with the Borrowers' Cases, the "**Chapter 11 Cases**").  The date of commencement of the Chapter 11 Cases is referred to herein as the "**Petition Date**". |
| | SPS-Providea Limited and ConvergeOne India Private Limited shall not guarantee, and shall not provide security for, the ABL DIP Facility (as defined below) or the Term Loan DIP Facility (as defined below) and shall not be Loan Parties (consistent with the Prepetition ABL Credit Agreement in effect immediately prior to the Petition Date). |
| **Administrative Agent and** | Wells Fargo Commercial Distribution Finance, LLC shall act as administrative agent the collateral agent for the ABL DIP Lenders (as defined below) with |

| Collateral Agent | respect to the ABL DIP Facility (in such capacities, the "**ABL DIP Agent**"). |
|---|---|
| **Floorplan Facility Funding Agent** | Wells Fargo Commercial Distribution Finance, LLC shall act as floorplan facility funding agent for the ABL DIP Facility. |
| **ABL DIP Lenders** | Wells Fargo Commercial Distribution Finance, LLC, Deutsche Bank AG New York Branch, UBS AG, Stamford Branch, and/or one or more of their respective designated affiliates and/or related funds or accounts (each an "**ABL DIP Lender**", and collectively, the "**ABL DIP Lenders**", and together with the ABL DIP Agent, the "**ABL DIP Secured Parties**"). |
| **Prepetition ABL Facility** | Senior secured asset-based revolving credit facility (the "**Prepetition ABL Facility**") made available to the Company and the other borrowers thereunder pursuant to that certain Amended and Restated ABL Credit Agreement, dated as of January 4, 2019  (as amended by Amendment No. 1 to Amended and Restated ABL Credit Agreement, dated as of July 10, 2022, Amendment No. 2 to Amended and Restated ABL Credit Agreement, dated as of September 14, 2022, Amendment No. 3 to Amended and Restated ABL Credit Agreement, dated as of January 23, 2023 and Amendment No. 4 to Amended and Restated ABL Credit Agreement, dated as of August 29, 2023) among the Borrowers, Holdings, Wells Fargo Commercial Distribution Finance, as administrative agent, collateral agent, floorplan funding agent and swing line lender (in such capacity, the "**Prepetition ABL Representative**") and the lenders party thereto (the "**Prepetition ABL Lenders**", and together with the Prepetition ABL Representative and the other secured parties under the Prepetition ABL Credit Agreement and related loan documents, the "**Prepetition ABL Secured Parties**") (as amended, restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "**Prepetition ABL Credit Agreement**"; the obligations thereunder and under the related loan documents, the "**Prepetition ABL Obligations**"; and the liens and security interests granted in connection therewith, the "**Prepetition ABL Liens**"). |
| | ABL DIP Agent and ABL DIP Lenders acknowledge and agree that there shall not be deemed to be a termination of the commitments, an acceleration of the Prepetition ABL Obligations or any occurrence of any other event or condition that automatically occurs, in each case under the Prepetition ABL Credit Agreement solely as a result of the commencement of the Chapter 11 Cases; provided, that the Interim DIP Order shall have been entered no later than three (3) calendar days after the Petition Date, provided, further, that all other terms and conditions applicable to the commitments in the Prepetition ABL Credit Agreement (including the other conditions precedent set forth in Section 4.02 of the Prepetition ABL Credit Agreement) shall remain in full force and effect (this paragraph, the "**Prepetition ABL Credit Agreement Acknowledgment**"). |
| **Existing ABL Intercreditor Agreement** | That certain ABL Intercreditor Agreement, dated as of January 4, 2019 (as amended by that certain Joinder and Amendment to ABL Intercreditor Agreement dated as of July 10, 2020 and supplemented by that certain ABL |

| | |
|---|---|
| | Intercreditor Agreement Joinder dated as of May 15, 2023), among the Prepetition ABL Representative, the Prepetition First Lien Term Loan Agent (as defined below), UBS AG, Stamford Branch as the Initial Junior Lien Term Loan Agent, Deutsche Bank Trust Company Americas, as a New Term Loan Agent and PVKG Investment Holdings, Inc., as a New Term Loan Agent (the "**Existing ABL Intercreditor Agreement**"). |
| **Prepetition First Lien Term Facility** | Senior secured first lien term loan facility (the "**Prepetition First Lien Term Loan Facility**"; the loans thereunder, the "**Prepetition First Lien Term Loans**" and, the lenders thereunder, the "**Prepetition First Lien Term Loan Lenders**") made available to the Company pursuant to that certain First Lien Term Loan Credit Agreement, dated as of January 4, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition First Lien Term Loan Credit Agreement**"; the liens and security interests granted in connection therewith, the "**Prepetition First Lien Term Loan Liens**"; and the obligations arising thereunder, the "**Prepetition First Lien Term Loan Secured Obligations**") among the Company, Holdings, Deutsche Bank AG New York Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien Term Loan Agent**", and together with the First Lien Term Loan Lenders, the "**Prepetition First Lien Term Loan Secured Parties**"), and the other parties party thereto. |
| **Prepetition First Lien KL Notes** | Senior secured first lien notes (the "**First Lien KL Notes**" and, the holders of such notes, the "**First Lien KL Noteholders**") made available to the Company pursuant to that certain Note Purchase Agreement, dated as of July 10, 2020 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition First Lien KL Note Purchase Agreement**"; the liens and security interests granted in connection therewith, the "**Prepetition First Lien KL Notes Liens**"; the obligations arising thereunder, the "**Prepetition First Lien KL Notes Secured Obligations**") among the Company, Holdings, Deutsche Bank Trust Company Americas, as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien KL Notes Agent**", and together with the Prepetition First Lien KL Noteholders, the "**Prepetition First Lien KL Notes Secured Parties**"), and the other parties party thereto. |
| **Prepetition First Lien CVC Notes** | Senior secured first lien notes (the "**Prepetition First Lien CVC Notes**" and, the holders of such notes, the "**Prepetition First Lien CVC Noteholders**") made available to the Company pursuant to that certain Note Purchase Agreement, dated as of July 6, 2023 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Prepetition First Lien CVC Note Purchase Agreement**"; the liens and security interests granted in connection therewith, the "**Prepetition First Lien CVC Notes Liens**", and together with the Prepetition First Lien Term Loan Liens and the Prepetition First Lien KL Notes Liens, the "**Prepetition First Lien Liens**"); and the obligations arising thereunder, the "**Prepetition First Lien CVC Notes Secured Obligations**", and, together with the Prepetition First Lien Term Loan Secured Obligations and the Prepetition First Lien KL Notes Secured |

3

| | |
|---|---|
| | Obligations, the "**Prepetition First Lien Secured Obligations**") among the Company, Holdings, PVKG Investment Holdings, Inc., as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien CVC Notes Agent**", and together with the Prepetition First Lien CVC Noteholders, the "**Prepetition First Lien CVC Notes Secured Parties**"; the Prepetition First Lien CVC Notes Secured Parties, together with the Prepetition First Lien Term Loan Secured Parties and the Prepetition First Lien KL Notes Secured Parties, the "**Prepetition First Lien Secured Parties**") and the other parties party thereto. |
| **Prepetition Second Lien Term Facility** | Senior secured second lien term loan facility (the "**Prepetition Second Lien Facility**"; and the lenders thereunder, the "**Prepetition Second Lien Lenders**") made available to the Company pursuant to that certain Second Lien Term Loan Credit Agreement, dated as of January 4, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time); the liens and security interests granted in connection therewith, the "**Prepetition Second Lien Liens**" and, together with the Prepetition First Lien Liens, the "**Prepetition Liens**"; and the obligations arising thereunder, the "**Prepetition Second Lien Secured Obligations**") among the Company, Holdings, UBS AG, Stamford Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition Second Lien Agent**", and together with the Prepetition Second Lien Lenders, the "**Prepetition Second Lien Secured Parties**"; and together with the Prepetition First Lien Secured Parties, the "**Prepetition Secured Parties**")), and the other parties party thereto. |
| **ABL DIP Facility** | Upon the Closing Date, the Prepetition ABL Facility shall be ratified and amended pursuant to a customary Ratification and Amendment Agreement (the "**Ratification and Amendment Agreement**") consistent with this Term Sheet and the Documentation Principles (as defined below) and otherwise in form and substance satisfactory to ABL DIP Agent and the ABL DIP Lenders (the "**DIP ABL Credit Agreement**"). Pursuant to the DIP ABL Credit Agreement, the ABL DIP Agent and the ABL DIP Lenders will provide a senior secured superpriority priming debtor-in-possession asset-based revolving credit facility, in the aggregate principal amount of up to $250 million, subject to the Borrowing Base (the "**ABL DIP Facility**"); and the loans outstanding under the ABL DIP Facility from time to time, the "**ABL DIP Loans**" and the commitments outstanding under the ABL DIP Facility from time to time, the "**ABL DIP Commitments**") will be available to the Borrowers from and after the Closing Date, subject to the terms expressly set forth in the DIP ABL Credit Agreement, and such ABL DIP Facility shall provide for a gradual roll-up and conversion of all Prepetition ABL Obligations under the Interim DIP Order (as defined below), and upon entry of the Final DIP Order (as defined below), any remaining Prepetition ABL Obligations shall be fully rolled-up and converted into ABL DIP Obligations (as defined below) (the "**Roll-Up**"); provided that all Letters of Credit and Floorplan Approvals issued pursuant to the Prepetition ABL Credit Agreement shall automatically be deemed to have been issued pursuant to the DIP ABL Credit Agreement upon entry of the Interim DIP Order. All indebtedness and obligations from time to time arising under the |

4

ABL DIP Facility, including the Roll-Up, are hereinafter referred to as the "**ABL DIP Obligations**".  The DIP ABL Credit Agreement and the other ABL DIP Documents shall be in form and substance, and upon terms and conditions, consistent with this Term Sheet and the Documentation Principles (as defined below).

The ABL DIP Loans may be incurred, subject to the satisfaction or waiver of all conditions thereto set forth in this Term Sheet (with such conditions in the Term Sheet to be set forth in the ABL DIP Documents), in accordance with the terms of the ABL DIP Documents, including as follows: (a) following the entry by the Bankruptcy Court of the Interim DIP Order (as defined below), in form and substance acceptable to the Required ABL DIP Lenders and the Required Consenting Lenders (as defined in the Restructuring Support Agreement, to be dated on or around April 3, 2024 (the "**RSA**")), authorizing the Roll-Up and (b) on and after the entry by the Bankruptcy Court of the Final DIP Order authorizing the ABL DIP Facility on a final basis, which shall be in form and substance acceptable to the Required ABL DIP Lenders and the Required Consenting Lenders (as defined in the RSA).

The definition of "Borrowing Base" (and any component definitions thereof) shall be consistent with the Prepetition ABL Credit Agreement in effect immediately prior to the Petition Date, except that (i) clause (2) of the definition of "Borrowing Base" shall be replaced by the following:  "(2) 50% of the Eligible Unbilled Accounts (net of Unbilled Accounts Reserves) owned by any Borrowing Base Party; provided that the amount calculated this clause (2) shall not exceed 15% of the Borrowing Base; plus" and (ii) an availability block of $25,000,000 shall be implemented. In addition, the definition of Eligible Accounts shall be modified to include as ineligible any Accounts (as defined in the Prepetition ABL Credit Agreement) owing by an account debtor which has any bonded projects.

The ability to impose additional Availability Reserves, Accounts Reserves, Dilution Reserves, Inventory Reserves, Landlord Lien Reserves, Secured Cash Management Reserves, Secured Hedging Reserves, Unbilled Account Reserves and other Reserves shall remain consistent with the Prepetition ABL Credit Agreement in effect on the Petition Date, except that (i) Availability Reserves may be implemented to account for the Carve Out (as defined below) as provided below, including with respect to the projected amount of professional fees and expenses for each rolling 2-week period and the amount of the Post-Carve Out Trigger Notice Cap (as defined below), as well as any other allowed administrative expense or priority claims arising in the Borrowers' Cases that, in the ABL DIP Agent's good faith determination, require payment prior to the full repayment of the ABL DIP Obligations, (ii)  any such reserves will take immediate effect to the extent the Borrowers request to borrow any ABL DIP Loans during the three (3) business day notice period normally required for the imposition of such reserves, (iii) reserves may be implemented in respect of claims or amounts payable or which may reasonably be expected to be incurred in connection with surety bonds and bonded projects in amounts determined by Agent in its Permitted Discretion, and (iv) any implementation of any new

| | |
|---|---|
| | reserves (other than reserves implemented in respect of surety bonds and bonded projects), or increase in any existing reserves, after the Closing Date shall be based on any material facts or circumstances which arise after the Closing Date or which otherwise first become known to the ABL DIP Agent after the Closing Date. In addition, references to "Closing Date" in the definition of Permitted Discretion (other than with respect to reserves or ineligibility criteria implemented in respect of surety bonds and bonded projects), clause (23) of the definition of Eligible Accounts and clause (15) of the definition of Eligible Inventory, in each case, under the Prepetition ABL Credit Agreement, shall be changed to a reference to the Closing Date as defined herein. |
| | The ABL DIP Documents shall permit, subject to the DIP Intercreditor Arrangements (as defined below), the Loan Parties to incur a senior secured postpetition term loan facility on a superpriority basis in form and substance reasonably acceptable to the Required ABL DIP Lenders (as defined below), it being understood and agreed that (a) such term loan facility shall be secured by liens consistent with the priority set forth on Annex III, (b) such a term loan facility that is on terms substantially consistent with the terms set forth in the DIP Term Loan term sheet attached to the RSA (the "**Term Loan DIP Term Sheet**") shall be deemed to be acceptable to the Required ABL DIP Lenders (the "**Term Loan DIP Facility**," the loans outstanding thereunder, the "**Term DIP Loans**", the liens securing the Term Loan DIP Facility, the "**Term DIP Liens**", and the agent thereunder, the "**Term DIP Agent**"). |
| | The DIP Order shall provide for intercreditor arrangements that govern certain intercreditor arrangements between the ABL DIP Facility and the Term Loan DIP Facility (the "**DIP Intercreditor Arrangements**") with such arrangements to be on terms generally consistent with the Existing ABL Intercreditor Agreement and otherwise acceptable to the ABL DIP Agent, the Required ABL DIP Lenders (in their discretion), Required Consenting Lenders (in their discretion) and the Loan Parties. |
| **Floorplan Facility** | The ABL DIP Facility will be available for floorplan advances and floorplan approvals to approved vendors in respect of inventory to be acquired by the Company or any of its Restricted Subsidiaries (to be defined in a manner consistent with the Prepetition ABL Facility) from such vendors substantially on the same terms and conditions contained in the Floorplan Facility under, and as defined in, the Prepetition ABL Credit Agreement (the "**DIP Floorplan Facility**"). Any floorplan advances and other obligations under the Floorplan Facility arising under the Prepetition ABL Facility shall be deemed "rolled-up" and converted into ABL DIP Obligations upon the Closing Date. |
| **Letters of Credit** | A portion of the ABL DIP Facility not in excess of an amount to be agreed (but, in any event, not less than $85 million) will be available for the issuance of letters of credit ("**Letters of Credit**") by the ABL DIP Agent, sharing ratably in such Letters of Credit commitment (in such capacity, the "**Issuing Lender**"), to be on terms consistent with the Letter of Credit provisions under, and as |

6

| | |
|---|---|
| | defined in, the Prepetition ABL Credit Agreement. The face amount of any outstanding Letter of Credit (and, without duplication, any unpaid drawing in respect thereof) will reduce availability under the ABL DIP Facility on a dollar-for-dollar basis. |
| | Letters of Credit may be issued on the Closing Date to backstop or replace surety bonds, letters of credit or similar instruments outstanding on the Closing Date (including by "grandfathering" such existing surety bonds, letters of credit or similar instruments into the ABL DIP Facility)**.** |
| **Swingline Loans** | A portion of the ABL DIP Facility not in excess of the lesser of $10.0 million or 5% of the ABL DIP Commitments will be available for swingline loans (the "**Swingline Loans**") on same-day notice from the ABL DIP Agent (in such capacity, the "**Swingline Lender**") to be on terms consistent with the Swing Line Loan provisions under, and as defined in, the Prepetition ABL Credit Agreement. Any Swingline Loans will reduce availability under the ABL DIP Facility on a dollar-for-dollar basis (other than for purposes of calculating the Non-Use Fee). Each ABL DIP Lender under the ABL DIP Facility will be irrevocably and unconditionally required to purchase, under certain circumstances, a participation in each Swingline Loan on a pro rata basis. |
| **Permitted Liens** | (A)    Any valid liens ("**Permitted Prior Liens**") that are (1) in existence on the Petition Date, (2) are either perfected as of the Petition Date or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code, (3) senior in priority to the Prepetition First Lien Liens, (4) non-avoidable under the Bankruptcy Code or other applicable law, and (5) are permitted to be incurred under the First Lien Term Loan Credit Agreement, the Prepetition First Lien KL Note Purchase Agreement and the Prepetition First Lien CVC Note Purchase Agreement; and |
| | (B)    liens permitted to have seniority over the ABL DIP Liens (as defined below) securing the ABL DIP Facility as specified in the DIP ABL Credit Agreement (the liens referenced in (A) and (B) above, collectively, the "**Permitted Liens**"). |
| **DIP Orders** | The order approving the Term Loan DIP Facility (as defined below) and the ABL DIP Facility on an interim basis, which shall be in form and substance, and upon terms and conditions, acceptable in all respects to the Loan Parties, the ABL DIP Agent, the Required ABL DIP Lenders (as defined below) and the Required Consenting Lenders (the "**Interim DIP Order**"), shall authorize and approve, among other matters, (i) the Loan Parties' entry into the Term DIP Documents (as defined below) and the ABL DIP Documents, as applicable, (ii) the making of the Term DIP Loans (as defined below) and the ABL DIP Loans (including Swingline Loans, floorplan advances, other obligations under the Floorplan Facility, and the issuance of Letters of Credit under the DIP ABL Credit Agreement) (including the Roll-Up and conversion of all amounts outstanding under the Prepetition ABL Facility into the ABL DIP Facility upon entry of the Interim DIP Order and Final DIP Order, as applicable), (iii) the |

7

| | |
|---|---|
| | granting of the super-priority claims and liens against the Loan Parties and their assets in accordance with the Term DIP Documents, the ABL DIP Documents (as applicable), the Existing ABL Intercreditor Agreement and the DIP Intercreditor Arrangements, respectively, with respect to the DIP Collateral (as defined below), (iv) the use of cash collateral solely in accordance with the terms of the ABL DIP Documents and the Term Loan DIP Documents, (v) the granting of adequate protection to the Prepetition First Lien Secured Parties and the Prepetition ABL Secured Parties, (vi) granting waivers of Debtors' rights to seek non-consensual use of cash collateral under Section 363 of the Bankruptcy Code, and (vii) granting other waivers (including, without limitation, surcharge waivers under Section 506(c) of the Bankruptcy Code, equities of the case waiver under Section 552 of the Bankruptcy Code, and marshaling requirements) with respect to the ABL DIP Obligations and the DIP Collateral. |
| | The order approving the Term Loan DIP Facility and the ABL DIP Facility on a final basis, which shall be in form and substance acceptable to the Required ABL DIP Lenders and the Required Consenting Lenders, shall be the "**Final DIP Order**" and, together with the Interim DIP Order, shall be the "**DIP Orders**". The Final DIP Order shall grant (or reaffirm, as the case may be) waivers (including, without limitation, surcharge waivers under Section 506(c) of the Bankruptcy Code), equities of the case waiver under Section 552 of the Bankruptcy Code, rights to seek non-consensual use of cash collateral under Section 363 of the Bankruptcy Code, and marshaling requirements) with respect to the Prepetition ABL Obligations, the Prepetition First Lien Secured Obligations, the Prepetition Collateral, the DIP Collateral, the ABL DIP Obligations and the obligations under the Term Loan DIP Facility, and releases in favor of the Prepetition ABL Secured Parties and Prepetition First Lien Secured Parties. |
| **Adequate Protection** | As adequate protection against the risk of any diminution in the value of the respective Prepetition Liens in all collateral securing the Prepetition ABL Obligations, the Prepetition First Lien Secured Obligations and the Prepetition Second Lien Secured Obligations (collectively, the "**Prepetition Collateral**") (as applicable), including as a result of the imposition of the automatic stay, the Loan Parties' use, sale, or lease of such collateral, including Cash Collateral (as defined below), during the Chapter 11 Cases, the granting of priming liens and claims on a dollar-for-dollar basis as set forth herein, and the imposition of the Carve Out, the Prepetition Secured Parties shall be granted the following adequate protection, subject in all cases to the Carve Out and the priority set forth on Annex III: |
| | The Prepetition ABL Secured Parties shall be entitled to receive, subject in all cases to the Carve Out and Permitted Prior Liens, the following as adequate protection: (A) to the extent of any diminution in value of the Prepetition ABL Liens in Prepetition Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**Prepetition ABL Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex III** attached hereto, as applicable; (B) to the extent of any diminution in value of the Prepetition ABL Liens in Prepetition Collateral, a superpriority |

administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claim shall have priority over all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise (other than the Carve Out) (the "**Prepetition ABL Adequate Protection Claims**"), which claims shall be subject to the priorities set forth on **Annex III** attached hereto, as applicable; (C) the payment of the reasonable and documented fees and out-of-pocket expenses of the Prepetition ABL Representative, and the payment of the reasonable and documented fees of the Prepetition ABL Representative's legal counsel and any financial advisors or consultants retained by Prepetition ABL Representative (including without limitation, the prepetition and post-petition fees and expenses of (i) Otterbourg P.C., as counsel to the Prepetition ABL Representative, (ii) M3 Advisory Partners, LP, as financial advisor to the Prepetition ABL Representative, and (iii) local Texas counsel to the Prepetition ABL Representative); and (E) financial reporting consistent with the "Budget" section set forth below.

The Prepetition First Lien Secured Parties shall be entitled to receive, subject in all cases to the Carve Out and Permitted Prior Liens, the following as adequate protection: (A) to the extent of any diminution in value of the Prepetition First Lien Liens in Prepetition Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**First Lien Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex III** attached hereto, as applicable; (B) to the extent of any diminution in value of the Prepetition First Lien Liens in Prepetition Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claim shall have priority over all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise (other than the Carve Out) (the "**First Lien Adequate Protection Claims**"), which claims shall be subject to the priorities set forth on **Annex III** attached hereto, as applicable; (C) the payment of the reasonable and documented fees and out-of-pocket expenses of the Prepetition First Lien Term Loan Agent, the Prepetition First Lien KL Notes Agent and the Prepetition First Lien CVC Notes Agent, and the payment of the reasonable and documented fees of the First Lien Ad Hoc Group (as such term is defined in the RSA) (the "**First Lien Ad Hoc Group**") (including without limitation, the prepetition and post-petition fees and expenses of (i) Gibson Dunn & Crutcher LLP, as counsel to the First Lien Ad Hoc Group, (ii) PJT Partners, as financial advisor to the First Lien Ad Hoc Group, (iii) Latham & Watkins LLP, as counsel to the Prepetition First Lien CVC Notes Secured Parties and (iv) with the Borrower's consent (not to be unreasonably withheld), such other attorneys, financial

9

|  | advisors or professionals retained by the First Lien Ad Hoc Group; and (D) financial reporting consistent with the "Budget" section set forth below. |
|---|---|
|  | The Prepetition Second Lien Secured Parties shall be entitled to receive, subject in all cases to the Carve Out and Permitted Prior Liens, the following as adequate protection: (A) to the extent of any diminution in value of the Prepetition Second Lien Liens in Prepetition Collateral, validly perfected replacement liens on any security interests in all DIP Collateral (the "**Second Lien Adequate Protection Liens**"), which replacement liens shall have the priority set forth on **Annex III** attached hereto, as applicable; (B) to the extent of any diminution in value of the Prepetition Second Lien Liens in Prepetition Collateral, a superpriority administrative expense claim as contemplated by section 507(b) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claim shall have priority over all other claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise (other than the Carve Out) (the "**Second Lien Adequate Protection Claims**"), which claims shall be subject to the priorities set forth on **Annex III** attached hereto, as applicable; and (C) the payment of the reasonable and documented fees and out-of-pocket expenses of the Prepetition Second Lien Agent and, subject to the terms of the RSA, the payment of the reasonable and documented fees of the Second Lien Ad Hoc Group (as such term is defined in the RSA) (the "**Second Lien Ad Hoc Group**") (including without limitation, the prepetition and post-petition fees and expenses of (i) Davis Polk & Wardwell LLP, as counsel to the Second Lien Ad Hoc Group, (ii) Guggenheim Securities, LLC, as financial advisor to the Second Lien Ad Hoc Group, and (iii) with the Borrower's consent (not to be unreasonably withheld), such other attorneys, financial advisors or professionals retained by the Second Lien Ad Hoc Group. |
| **Carve Out** | The liens on and security interests in the DIP Collateral (as defined below), the adequate protection liens, and all super-priority administrative expense claims granted under the DIP Orders, shall be subject and subordinate to the Carve Out. |
|  | For purposes hereof, "**Carve Out**" means, without duplication, an amount equal to the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (the "**Chapter 7 Trustee Carve-Out**"); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees, disbursements, costs, and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtors' Professionals**") and to the extent set forth in the Budget as of the date of determination by the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the |

10

7834612.18

Debtors' Professionals, "**Professional Persons**") at any time before or on the first business day following delivery by the ABL DIP Agent or Term DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice, less the amount of any retainers or other amounts held by any such Professional Person as of the Petition Date; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the ABL DIP Agent or Term DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"). For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the ABL DIP Agent or Term DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Creditors' Committee, and the ABL DIP Agent and Term DIP Agent, as applicable, which notice may be delivered following the occurrence and during the continuation of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

Not later than 7:00 p.m. New York time on the Tuesday of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Person (through Saturday of such week, the "**Calculation Date**") (collectively, "**Estimated Fees and Expenses**"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "**Weekly Statement**"); provided, that within one business day of the occurrence of the Termination Declaration Date, each Professional Person shall deliver one additional Weekly Statement (the "**Final Statement**") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered on the same day received to the ABL DIP Agent and Term DIP Agent). If any Professional Person fails to timely deliver a Weekly Statement within one business day after such Weekly Statement is due, such Professional Person shall not be entitled to any funds in the Carve Out Reserves with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period. The ABL DIP Agent shall at all times maintain a Reserve (as defined in the ABL DIP Credit Agreement) in an amount equal to the Post-Carve Out Trigger Notice Cap, plus the aggregate amount of projected fees for all Professional Persons set forth in the Approved Budget for the week subsequent to the date of determination for such Reserve; provided that nothing set forth herein shall limit the ability of the ABL DIP Agent to increase such reserve if ABL DIP Agent

11

| | |
|---|---|
| | determines that the aggregate amount of Allowed Professional Fees are likely to exceed the amount set forth in the Approved Budget for such week. |
| **ABL DIP Facility Availability** | From and after the Closing Date (as defined below), subject to the entry of the Interim DIP Order and the satisfaction of the other conditions set forth in this Term Sheet, the ABL DIP Facility will be made available to the Borrower in the aggregate principal amount of up to $250,000,000 (subject to the Borrowing Base).  Amounts borrowed under the ABL DIP Facility may be reborrowed. |
| **Use of Proceeds of ABL DIP Facility and Term Loan DIP Facility** | The proceeds of the ABL DIP Loans under the ABL DIP Facility shall be used only for the following purposes: (i) the Roll-Up, (ii) payment of certain prepetition amounts of the type contemplated in the then current Approved Budget (including prepetition payments to critical vendors identified by the Loan Parties) and solely as authorized by the Bankruptcy Court pursuant to orders approving the first day motions filed by the Loan Parties, which orders shall be in form and substance reasonably satisfactory to the Required ABL DIP Lenders, (iii) to the extent of the type contemplated in the then current Approved Budget and in accordance with the terms of the ABL DIP Facility and the Interim DIP Order/Final DIP Order, and (iv) payment of the costs and expenses of administering the Cases (including payments benefiting from the Carve Out) subject to the terms and conditions of the ABL DIP Facility, in each case of the forgoing, solely in accordance with and subject to the credit agreement governing the terms of the ABL DIP Facility, Interim DIP Order and Final DIP Order. |
| | Solely in accordance with and subject to the credit agreement governing the terms of the Term Loan DIP Facility (the "**Term DIP Credit Agreement**", and together with all security and collateral agreements related thereto, the "**Term DIP Documents**"), the proceeds of the Term Loan DIP Facility may be used only to (i) pay down certain Prepetition ABL Loans under the Prepetition ABL Facility (without a corresponding reduction in commitments thereunder), and (ii) for the other purposes described in the Term Loan DIP Term Sheet, in each case, in accordance with and subject to the Term DIP Documents, the DIP Orders and the Approved Budget (as defined below). |
| **ABL DIP Documents Control** | The provisions of the ABL DIP Documents shall, upon execution, supersede the provisions of this Term Sheet. |
| **Maturity** | The "**ABL DIP Termination Date**" with respect to the ABL DIP Facility shall be the earliest to occur of: |
| | (i)      the date that is six (6) months after the Petition Date (or if such day shall not be a business day, the next succeeding business day) (the "**Scheduled Termination Date**"); |
| | (ii)     11:59 p.m. New York City Time on the date that is thirty five (35) calendar days after the Petition Date, if the Final DIP Order has not been entered by the Bankruptcy Court prior to such date and time, |

|  | unless otherwise extended by the Required ABL DIP Lenders; |
|---|---|
|  | (iii)  the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court (the "**Plan**"); |
|  | (iv)  dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under Chapter 7 of the Bankruptcy Code; |
|  | (v)  the acceleration of the ABL DIP Loans and the termination of the commitments under the ABL DIP Facility in accordance with the ABL DIP Documents; and |
|  | (vi)  the consummation of a sale of all or substantially all assets of the Loan Parties pursuant to Section 363 of the Bankruptcy Code (other than to another Loan Party). |
|  | Subject to the provisions of the DIP Orders, as applicable, on the ABL DIP Termination Date (or such earlier date on which the ABL DIP Facility shall have been terminated), the Loan Parties shall repay all obligations arising under the ABL DIP Facility in full in cash and provide such amounts necessary to cash collateralize Letters of Credit and floorplan approvals under the Floorplan Facility (to the extent not backstopped), in each case subject to arrangements satisfactory to the ABL DIP Agent (provided that such payment may, in the case of any ABL DIP Lender who agrees to participate in any "exit financing", take the form of a cashless roll-up into such new "exit financing" and not cash; provided further that, to the extent any ABL DIP Lender does not participate or provide commitment to "exit financing", such payment shall be made in full in cash and such ABL DIP Lender's commitment shall be terminated). |
| **Amortization** | None. |
| **Payments and Interest Rates** | Consistent with the Prepetition ABL Facility except as set forth on **Annex II** attached hereto. |
| **Line Cap** | Consistent with the Prepetition ABL Facility, except that an availability block of $25,000,000 shall be implemented with respect to the Revolving Commitment component of the Line Cap calculation. |
| **Excess Availability** | At any time, (a) the Line Cap then in effect, plus (b) 100% of Qualified Cash (to be defined in a manner consistent with the Prepetition ABL Facility, except reference to accounts subject to control agreements shall include accounts that are subject to control agreements on the Petition Date or other accounts held at the ABL DIP Agent or any of its affiliates, and any cash in such accounts that is used for cash collateralizing the pre-funded ACH Treasury Management services provided through Wells Fargo Commercial Distribution Finance, LLC shall be excluded as Qualified Cash) not to exceed for this purpose 25% of the Borrowing Base, minus (c) the sum, without duplication, of (i) the then |

13

| | |
|---|---|
| | aggregate outstanding principal amount of ABL DIP Loans (including Swingline Loans and floorplan advances), (ii) unreimbursed drawings under letters of credit under the DIP ABL Credit Agreement and (iii) the undrawn face amount of outstanding letters of credit under the DIP ABL Credit Agreement ("**Excess Availability**") |
| **Cash Dominion** | Consistent with the Prepetition ABL Facility. |
| **Mandatory Prepayments** | Consistent with the Prepetition ABL Facility. |
| **Voluntary Prepayments** | Consistent with the Prepetition ABL Facility. |
| **Collateral and Priority** | Subject to the Carve Out, as security for the prompt payment and performance of all amounts due under the ABL DIP Facility, including, without limitation, all principal, interest, premiums, payments, fees, costs, expenses, indemnities or other amounts (collectively, the "**ABL DIP Obligations**"), effective as of the Petition Date, the ABL DIP Agent, for the benefit of itself and the ABL DIP Lenders, shall be granted automatically and properly perfected liens and security interests ("**ABL DIP Liens**") in all assets and properties of each of the Loan Parties and their bankruptcy estates, whether tangible or intangible, real, personal or mixed, wherever located, whether now owned or consigned by or to, or leased from or to, or hereafter acquired by, or arising in favor of the Loan Parties, whether prior to or after the Petition Date, including all unencumbered assets of the Loan Parties (except for all claims and causes of action arising under Chapter 5 of the Bankruptcy Code ("**Avoidance Actions**"), but including, upon entry of the Final DIP Order,  the proceeds of property recovered, whether by judgment, settlement or otherwise from Avoidance Actions ("**Avoidance Action Proceeds**")) (collectively, "**Unencumbered Property**") (collectively, the "**DIP Collateral**"); *provided,* that DIP Collateral shall exclude Excluded Assets but shall include any and all proceeds and products of Excluded Assets, unless such proceeds and products otherwise separately constitute Excluded Assets.<br><br>"**Excluded Assets**" has the meaning set forth in the Collateral Agreement (as defined in the Prepetition ABL Credit Agreement).<br><br>The ABL DIP Liens shall have the following priorities (subject in all cases to the Carve Out):<br><br>   i.  *First Liens on Unencumbered Property.* Pursuant to Section 364(c)(2) of the Bankruptcy Code, the ABL DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to valid, perfected and non-avoidable liens or security interests in existence as of the Petition Date (or perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code), including Unencumbered Property, which ABL DIP Liens in Unencumbered Property shall be *pari passu* with any Term DIP Liens |

<center>14</center>

| | |
|---|---|
| | in such Unencumbered Property, subject to the priorities set forth in **Annex III** attached hereto and the Carve Out. |
| | ii. *Priming DIP Liens and Liens Junior to Certain Other Liens*. The ABL DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected in all DIP Collateral (other than as described in <u>clause (i)</u> above), which ABL DIP Liens (a) shall be, pursuant to Section 364(c)(3) of the Bankruptcy Code, subject and subordinate only to the (1) Carve Out, (2) Permitted Prior Liens, and (3) solely with respect to Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement) and DIP Collateral of a type that would otherwise constitute Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement), the Term DIP Liens, as applicable (to the extent the Term Loan DIP Facility asserts a first priority lien on such Term Loan Priority Collateral (as defined in the Existing ABL Intercreditor Agreement)), (b) pursuant to Section 364(d)(1) of the Bankruptcy Code, shall be senior to any and all other liens and security interests in DIP Collateral, including, without limitation, all liens and security interests in the ABL Priority Collateral (as defined in the Existing ABL Intercreditor Agreement) or any DIP Collateral that would otherwise constitute ABL Priority Collateral (as defined in the Existing ABL Intercreditor Agreement) (including, without limitation, any Term DIP Liens, as applicable, in ABL Priority Collateral), and (c) shall otherwise be subject to the priorities set forth in **Annex III** attached hereto. |
| | iii. *Liens Senior to Other Liens*. Except to the extent expressly permitted hereunder, subject to the Carve Out, the ABL DIP Liens and the ABL DIP Superpriority Claims (as defined below) (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, including any lien or security interest granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, (B) any lien or security interest that is avoided or preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (C) any intercompany or affiliate claim, lien or security interest of the Debtors or their affiliates, or (D) any other lien, security interest or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof. |
| **Guarantees** | Each Guarantor shall unconditionally guarantee, on a joint and several basis, all ABL DIP Obligations arising under or in connection with the ABL DIP Facility. |
| **ABL DIP Superpriority Claims** | Subject to the Carve Out, the ABL DIP Obligations shall be allowed super-priority administrative expense claims under Section 364(c) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claims shall have priority over all other claims against the Debtors, of any kind or nature whatsoever, including, without limitation, administrative expenses of the |

15

|  | kind specified in or so ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise, with recourse against all DIP Collateral (the "**ABL DIP Superpriority Claims**"), which ABL DIP Superpriority Claims shall be subject to the priorities set forth in **Annex III** attached hereto. |
|---|---|
| **Term DIP Superpriority Claims** | Subject to the Carve Out, all amounts due under the Term Loan DIP Facility, including, without limitation, all principal, interest, premiums, payments, fees, costs, expenses indemnities or other amounts shall be allowed super-priority administrative expense claims under Section 364(c) of the Bankruptcy Code against each of the Debtors, on a joint and several basis, which claims shall have priority over all other claims against the Debtors, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or so ordered pursuant to Sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise, with recourse against all DIP Collateral (the "**Term DIP Superpriority Claims**"), which Term DIP Superpriority Claims shall be subject to the priorities set forth in **Annex III** attached hereto. |
| **Documentation Principles** | The ABL DIP Facility (including the terms and conditions applicable thereto) will be documented pursuant to and evidenced by (a) a credit agreement and other guarantee, security, intercreditor, and other relevant documentation (the "**ABL DIP Documents**") based on the Prepetition ABL Credit Agreement and relevant guarantee, security and intercreditor documents, negotiated in good faith, in form and substance acceptable to the Loan Parties and the Required ABL DIP Lenders, which shall (i) reflect the terms set forth herein, (ii) reflect the terms of the Interim DIP Order or the Final DIP Order, as applicable, (iii) have usual and customary provisions for debtor-in-possession financings of this kind and provisions that are necessary to effectuate the financing contemplated hereby and (iv) otherwise be mutually agreed among the Borrower and the each ABL DIP Lender, (b) the Interim DIP Order and (c) the Final DIP Order (this paragraph, the "**Documentation Principles**"). |
| **Representations and Warranties** | The ABL DIP Documents will contain representations and warranties consistent with the Prepetition ABL Credit Agreement (modified as necessary to reflect the commencement of the Cases and to include those representations and warranties customarily found in loan documents for similar debtor-in-possession ABL Financings, and subject to the Documentation Principles). |
| **Budget** | The Loan Parties shall deliver:<br><br>• a rolling 13-week cash flow forecast (the "**DIP Budget**") in form and substance satisfactory to the Required ABL DIP Lenders delivered on or prior to the Petition Date initially covering the period commencing on or about the Petition Date (the "**Initial DIP Budget**"), which reflects on a line-item basis, the Debtors' (a) weekly projected cash receipts ("**Budgeted Cash Receipts**"), (b) weekly projected disbursements (including ordinary course operating expenses, capital expenditures and bankruptcy related expenses) under the Chapter 11 Cases ("**Budgeted** |

<div align="center">16</div>

**Disbursement Amounts**") and (c) the weekly projected liquidity of the Debtors, and which shall be updated on the first Wednesday that is two full weeks after the Petition Date and every two weeks thereafter, which such proposed updated DIP Budget shall modify and supersede any prior agreed DIP Budget unless the ABL DIP Agent, acting at the direction of the Required ABL DIP Lenders, notifies (through counsel or otherwise) the Loan Parties in writing that such proposed DIP Budget is not in form and substance satisfactory to the Required ABL DIP Lenders within five Business Days after receipt thereof, in which case the existing Approved Budget shall remain in effect until superseded by an updated DIP Budget in form and substance satisfactory to the Required ABL DIP Lenders (as so updated, each an   "**Approved Budget**");

- on each Wednesday following each Variance Testing Period (beginning with the first Wednesday following the first Variance Testing Period), the delivery to the ABL DIP Lender Advisors of a variance report, which reflects for the applicable Variance Testing Period (defined below), (a) all variances, on a line item by line item basis and a cumulative basis, from the Budgeted Cash Receipts and the Budgeted Disbursement Amounts for such period as set forth in the Approved Budget as in effect for such period, (b) containing an indication as to whether each variance is temporary or permanent and analysis and explanations for all material variances, (c) certifying compliance with or non-compliance with the Permitted Variances (defined below), and (d) including explanations for all violations, if any, of such covenant and if any such violation exists, setting forth the actions which the Debtors have taken or intend to take with respect thereto (each, a "**Variance Report**");

- together with each DIP Budget and each Variance Report, a reasonably detailed schedule listing all bank accounts of the Debtors with a balance in excess of $25,000 and their associated balances as of the applicable reporting date, including an identification of accounts covered by a deposit account control agreement; and

- such other financial reporting readily available to the Debtors and reasonably requested by the ABL DIP Agent.

"**Variance Testing Period**" shall mean (i) initially, the two-week period ending on the Friday of the second calendar week occurring after the Petition Date, and (ii) thereafter, each rolling two-week period ending on Friday of every second calendar week.

| | |
|---|---|
| **Affirmative and Negative Covenants** | The ABL DIP Documents will contain the affirmative and negative covenants set forth in the Prepetition ABL Credit Agreement (modified as necessary to reflect the commencement of the Cases and to include those affirmative and negative covenants customarily found in loan documents for similar debtor-in-possession ABL financings, subject to the Documentation Principles) other than the Minimum Fixed Charge Coverage Ratio contained in Section 6.10(1) of the |

17

Prepetition ABL Credit Agreement; *provided, that*, without limitation, the ABL DIP Documents shall require:

(i)     update meetings and/or calls with the Debtors' senior management and advisors, the ABL DIP Lender Advisors and the ABL DIP Lenders every two weeks (or to the extent requested by ABL DIP Lender Advisors, every week), which update calls may cover the Debtors' financial performance and the other documentation provided pursuant to the reporting covenant described above;

(ii)    compliance with the DIP Orders;

(iii)   delivery of internal management prepared unaudited monthly financial statements, including an income statement for such month, balance sheet as of the end of such month and a cash flow statement for such month, within 30 days of month-end; and

(iv)    monthly (springing to weekly consistent with the Prepetition ABL Credit Agreement) delivery of Borrowing Base Certificates and related deliverables (including those deliverables that have been delivered with the Borrowing Base Certificates delivered under the Prepetition ABL Credit Agreement plus such additional deliverables as may be reasonably required by ABL DIP Agent, including, without limitation, supporting materials and information related to bonded contracts) through the DIP process;

(v)     Variances against the Approved Budget not to exceed the following permitted variances, with the covenant tested on a cumulative rolling two-week basis at the delivery of each Variance Report (collectively, the "**Permitted Variances**"):

•   Aggregate receipts for the Variance Testing Period shall not be less than 85% of the Budgeted Cash Receipts for such Variance Testing Period;

•   Aggregate disbursements (including ordinary course operating expenses, capital expenditures and bankruptcy related expenses but excluding professional fees and expenses and any costs or cash collateralization associated with surety bonds) for the Variance Testing Period shall not be greater than 115% of the Budgeted Disbursement Amounts for such Variance Testing Period;

(vi)    the requirement to satisfy the following milestones:

•   By 8:00 a.m. (prevailing Central Time) on April 8, 2024, the Petition Date shall have occurred.

•   The Interim DIP Order shall have been entered no later than three (3) calendar days after the Petition Date.

18

7834612.18

- The Plan, Disclosure Statement (as defined in the RSA) and Backstop Motion (as defined in the RSA) shall have been filed no later than five (5) business days after the Petition Date.

- The Final DIP Order shall have been entered no later than thirty-five (35) calendar days after the Petition Date.

- The Disclosure Statement Order (as defined in the RSA) and Backstop Order (as defined in the RSA) shall have been entered no later than sixty (60) calendar days after the Petition Date.

- The Confirmation Order (as defined in the RSA) shall be in form and substance satisfactory to ABL DIP Agent and Required ABL DIP Lenders, and shall have been entered no later than 105 calendar days after the Petition Date.

- The Effective Date (as defined in the RSA) shall have occurred no later than 120 calendar days after the Petition Date.

(vii) Minimum Excess Revolving Availability covenant to be deleted and replaced with an availability block in the Borrowing Base as noted in the "ABL DIP Facility" section above.

(viii) Minimum Liquidity (which shall be defined as the sum of (i) all cash and cash equivalents of Loan Parties plus (ii) Excess Availability (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) and which shall not count Qualified Cash (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) in the calculation of clause (i) above) of $20,000,000 and tested in a manner as provided for in the Term DIP Credit Agreement.

(ix) Within seven (7) Business Day after entry of the Final DIP Order, Borrowers shall have received not less than $70,000,000 (net of fees and expenses set forth in the Approved Budget) in proceeds of loans under the Term DIP Credit Agreement (which, for the avoidance of doubt, shall be in addition to the amount set forth in clause (vi) of Annex I), and not less than $35,000,000 of such net proceeds shall be paid to the ABL DIP Agent on such date to repay the loans under the ABL DIP Facility (without a corresponding reduction in commitments thereunder).

*provided, further, that*, (x) the covenant baskets contained in Sections 6.01(2)(b), 6.01(3)(b), 6.03(3), 6.04(3), 6.04(4), 6.04(33), 6.04(38), 6.05(32), 6.06(15), 6.06(16), 6.09(2)(a) and 6.09(2)(b) of the Prepetition ABL Credit Agreement shall not be included in the DIP ABL Credit Agreement (it being understood and agreed that any use of such baskets prior to the Petition Date shall be separately grandfathered in under the DIP ABL Credit Agreement), (y) the covenant baskets contained in 6.01(33) and 6.02(33) shall be reduced to an aggregate amount not to exceed $1,000,000 (it being understood and agreed that any use of such baskets prior to the Petition Date shall be separately grandfathered in under the DIP ABL Credit Agreement), and (z) certain other covenant baskets shall be modified or deleted in a manner consistent with

19

| | |
|---|---|
| | debtor-in-possession facilities of this type and in form and substance acceptable to the Company and the Required ABL DIP Lenders. |
| **Equity Cure** | The equity cure contained in Section 8.02 of the Prepetition ABL Credit Agreement shall not be included in the DIP ABL Credit Agreement. |
| **Conditions Precedent to Closing and the Initial Borrowing** | The closing of the ABL DIP Facility (the "**Closing Date**") shall occur as promptly as practical after the entry of the Interim DIP Order by the Bankruptcy Court, subject to the conditions precedent set forth on **Annex I** attached hereto. |
| **Conditions to Each Borrowing** | As set forth on **Annex II** attached hereto.

For the avoidance of doubt, such conditions precedent shall not apply to any ABL DIP Loan deemed made as a result of the Roll-Up. |
| **Events of Default** | The ABL DIP Documents will contain events of default consistent with those set forth in the Prepetition ABL Credit Agreement as well as additional events of default customarily found in loan documents for similar debtor-in-possession financing and other events of default reasonably agreed among the Loan Parties and the Required ABL DIP Lenders, subject to the Documentation Principles, including without limitation (a) any request made by the Loan Parties for, or the reversal, modification, amendment, stay, reconsideration or vacatur of a DIP Order, as entered by the Bankruptcy Court which adversely effects the ABL DIP Lenders, without the prior written consent of the Required ABL DIP Lenders, (b) the occurrence and continuance of an "Event of Default" under the Term Loan DIP Facility, (c) the allowance of any superpriority claim arising under section 507(b) of the Bankruptcy Code which is pari passu with (other than the superpriority claims of the DIP Term Loan Facility) or senior to those of the DIP ABL Agent and the ABL DIP Lenders; (d) the dismissal of the Cases, or conversion of the Cases to cases under chapter 7 of the Bankruptcy Code; (e) the termination of the RSA; (f) if a surety declares a default or exercises any remedies in respect of a bonded contract, which default will or could reasonably be expected to result in claims against or payments by the Debtors in an aggregate amount of $7,500,000; and (g) the filing of any Plan that does not provide for the repayment in full in cash (provided that such payment may, in the case of any ABL DIP Lender who agrees to participate in any "exit financing", take the form of a cashless roll-up into such new "exit financing" and not cash; provided further that, to the extent any ABL DIP Lender does not participate or provide commitment to "exit financing", such payment shall be made in full in cash and such ABL DIP Lender's commitment shall be terminated). of the Prepetition ABL Obligations and ABL DIP Obligations on the Effective Date of such Plan.

Upon the occurrence and during the continuation of an Event of Default, subject to the DIP Intercreditor Arrangements or Existing ABL Intercreditor Agreement (as applicable), without further order from or application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the ABL DIP |

Agent, acting at the request of the Required ABL DIP Lenders, to (A) deliver to the Borrowers a notice declaring the occurrence of an Event of Default, (B) declare the termination, reduction, or restriction of the commitments under the ABL DIP Facility, (C) declare the ABL DIP Loans then outstanding to be due and payable, (D) declare the termination, reduction or restriction on the ability of the Loan Parties to use any Cash Collateral, (E) terminate the ABL DIP Facility, (F) charge the default rate of interest under the ABL DIP Facility, (G) freeze all monies in any deposit accounts of the Debtors, (H) exercise any and all rights of setoff, (I) exercise any other right or remedy with respect to the DIP Collateral or the ABL DIP Liens, or (J) take any other action or exercise any other right or remedy permitted under the ABL DIP Documents, the DIP Orders or applicable law; *provided, however*, that in the case of the enforcement of rights against the DIP Collateral pursuant to <u>clauses (I)</u> and <u>(J)</u> above, (i) the ABL DIP Agent, acting at the request of the Required ABL DIP Lenders, shall provide counsel to the Loan Parties, counsel to the Official Committee, the Term DIP Agent and the Office of the United States Trustee with five (5) Business Days' prior written notice (such period, the "**Remedies Notice Period**").  Immediately upon the expiration of the Remedies Notice Period, the Bankruptcy Court shall hold an emergency hearing when the Bankruptcy Court is available (the "**Enforcement Hearing**") at which the Debtors, any Official Committee, and/or any other party in interest shall be entitled to seek a determination from the Bankruptcy Court solely as to whether an Event of Default has occurred, and at the conclusion of the Enforcement Hearing, the Bankruptcy Court may fashion an appropriate remedy that is consistent with the terms of the DIP Orders; *provided*, that during the Remedies Notice Period, the Loan Parties shall be permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Debtors' businesses, as determined by the Required ABL DIP Lenders and the Required Term DIP Lenders (as such term is defined in the Term Loan DIP Term Sheet) in their sole discretion. Except as otherwise set forth in the DIP Orders or ordered by the Bankruptcy Court prior to the expiration of the Remedies Notice Period, after the Remedies Notice Period, the Loan Parties shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the ABL DIP Secured Parties or the Term DIP Secured Parties (as such term is defined in the Term Loan DIP Term Sheet) under the DIP Orders.  No enforcement rights set forth in <u>clauses (I)</u> and <u>(J)</u> above shall be exercised prior to the Bankruptcy Court holding an Enforcement Hearing, subject to Bankruptcy Court availability, and the expiration of the Remedies Notice Period, and the Remedies Notice Period shall not expire until the conclusion of the Enforcement Hearing and the issuance of a ruling by the Bankruptcy Court if such Enforcement Hearing is conducted by the Bankruptcy Court.

Furthermore, upon the occurrence and during the continuation of an Event of Default, the ABL DIP Agent shall have the right, subject only to any separate applicable agreement between landlord and ABL DIP Agent, to enter upon any leased premises of the Debtors or any other party for the purpose of exercising

21

| | |
|---|---|
| | any remedy with respect to ABL DIP Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from the landlords thereunder. |
| **Stipulations, Waivers, Releases and Protections** | 1. Upon entry of the Interim DIP Order, the Debtors shall waive any right to surcharge the DIP Collateral with respect to the ABL DIP Secured Parties. |
| | 2. Upon entry of the Interim DIP Order, the Debtors shall waive the equitable doctrine of "marshaling" against the DIP Collateral with respect to the ABL DIP Secured Parties. |
| | 3. The Debtors shall waive any right that they may have to seek further authority (a) to use Cash Collateral other than as provided in the DIP Order, (b) to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) or 364(d) of the Bankruptcy Code that does not provide for the indefeasible repayment in full of all Prepetition ABL Obligations and ABL DIP Obligations in cash at the time any such post-petition loans or financial accommodations are provided, extended or otherwise made available to Debtors, (c) to challenge the application of any payments authorized by the Interim DIP Order as pursuant to Section 506(b) of the Bankruptcy Code, or (d) to seek relief under the Bankruptcy Code, including without limitation, under Section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of the ABL DIP Agent or any of the ABL DIP Secured Parties or the ABL DIP Agent's or any of the ABL DIP Secured Parties' exercise of such rights or remedies. |
| | 4. The Debtors shall waive, subject to "Challenge Rights", and forever release and discharge any and all claims and causes of action against each of the ABL DIP Secured Parties (and their respective related parties and representatives) as of the date of the applicable DIP Order. |
| | 5. No Cash Collateral, proceeds of the ABL DIP Facility, or any cash or other amounts may be used to (a) investigate, challenge, object to or contest the extent, validity, enforceability, security, perfection or priority of any of the the Prepetition ABL Liens, the Prepetition ABL Obligations, ABL DIP Liens or ABL DIP Obligations, (b) investigate or initiate any claim or cause of action against any of the Prepetition ABL Secured Parties or the ABL DIP Secured Parties, (c) object to or seek to prevent, hinder or delay or take any action to adversely affect the rights or remedies of the ABL DIP Secured Parties, (d) seek to approve superpriority claims or grant liens or security interests (other than those expressly permitted under the ABL DIP Documents and the DIP Orders) that are senior to or *pari passu* with the ABL DIP Liens, ABL DIP Superpriority Claims, or the adequate protection liens or claims granted hereunder, or (e) propose, support or have a plan of reorganization or liquidation that does not provide for Payment in Full of |

|  | all Prepetition ABL Obligations and DIP ABL Obligations in cash (provided that such payment may, in the case of any ABL DIP Lender who agrees to participate in any "exit financing", take the form of a cashless roll-up into such new "exit financing" and not cash; provided further that, to the extent any ABL DIP Lender does not participate or provide commitment to "exit financing", such payment shall be made in full in cash and that ABL DIP Lender's commitment shall be terminated) on or before the Effective Date of such plan in accordance with the terms and conditions contained herein without the prior written consent of the ABL DIP Required Lenders. |
| --- | --- |
|  | 6. The ABL DIP Secured Parties shall have the unqualified right to credit bid all ABL DIP Obligations, in each case, subject to the DIP Intercreditor Arrangements or the Existing ABL Intercreditor Agreement, as applicable. |
|  | 7. The ABL DIP Secured Parties shall be entitled to good faith protection under Section 364(e) of the Bankruptcy Code. |
| **Expenses and Indemnification** | The DIP ABL Credit Agreement shall provide for the payment of all costs and expenses of the ABL DIP Agent and the ABL DIP Lenders, including, without limitation, the payment of all reasonable and documented fees and expenses of the ABL DIP Lender Advisors. <br><br> The DIP ABL Credit Agreement shall also provide for customary indemnification by each of the Loan Parties, on a joint and several basis, of each of the ABL DIP Secured Parties (together with their related parties and representatives). |
| **Assignments and Participations** | The DIP ABL Credit Agreement shall contain assignment and participation provisions that are usual and customary for financings of this type and as determined in accordance with the Documentation Principles. <br><br> Each assignment or participation of ABL DIP Loans shall be subject to a right of first refusal for the benefit of the initial ABL DIP Lenders providing ABL DIP Commitments. |
| **Required ABL DIP Lenders** | "**Required ABL DIP Lenders**" shall mean ABL DIP Lenders holding greater than 50% of the aggregate amount of ABL DIP Commitments and ABL DIP Loans; provided that if  there are two or more ABL DIP Lenders that are not Affiliates of each other, an affirmative vote of the "Required ABL DIP Lenders" shall require the affirmative vote of no  fewer than two ABL DIP Lenders that are not Affiliates of each other. |
| **Amendments** | Amendments shall require the consent of the Required ABL DIP Lenders consistent with the consent required by the Prepetition ABL Credit Agreement, except for amendments customarily requiring approval by affected ABL DIP Lenders under the ABL DIP Facility. |
| **Governing Law** | This Term Sheet and the ABL DIP Documents will be governed by the laws of |

23

| | |
|---|---|
| | the State of New York (except as otherwise set forth therein). The Bankruptcy Court shall maintain exclusive jurisdiction with respect to the interpretation and enforcement of the ABL DIP Documents and the exercise of the remedies by the ABL DIP Secured Parties and preservation of the value of the DIP Collateral. |
| **ABL DIP Lender Advisors** | Otterbourg P.C., as counsel to the ABL DIP Agent and the ABL DIP Lenders and M3 Advisory Partners, LP as financial advisor to the ABL DIP Agent and the ABL DIP Lenders  (the "**ABL DIP Lender Advisors**"). |

7834612.18

**Annex I**

<u>Conditions Precedent to Closing and the Initial Borrowing</u>

The Closing Date under the ABL DIP Facility, and the initial borrowing thereunder, shall be subject to the following conditions:

(i)      the Bankruptcy Court shall have entered the Interim DIP Order, and the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Required ABL DIP Lenders;

(ii)     the preparation, authorization and execution of the ABL DIP Documents with respect to the ABL DIP Facility, in form and substance consistent with this Term Sheet and otherwise acceptable to the Loan Parties, the ABL DIP Lenders and the ABL DIP Agent;

(iii)    the ABL DIP Lenders and the ABL DIP Agent shall have received and approved the Initial Budget;

(iv)    the delivery of customary legal opinions, which shall be satisfactory to the ABL DIP Agent and the ABL DIP Lenders;

(v)     the delivery of (i) a secretary's (or other officer's) certificate of the Borrowers and each of the other Loan Parties, dated as of the Closing Date and in such form as is customary for the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments (including good standing certificates); and (ii) a customary closing officer's certificate of the Borrower;

(vi)    the preparation, authorization and execution of the Term DIP Documents with respect to the Term Loan DIP Facility, the Term Loan DIP Facility shall be in full force and effect and there shall not be a default or event of default thereunder, and Borrowers shall receive not less than $145,000,000 in gross proceeds of loans and a further $70,000,000 of gross proceeds of loans to be funded into escrow, in each case, under the Term DIP Documents, and not less than $75,000,000 of such net proceeds shall be paid to the ABL DIP Agent on the Closing Date to repay the revolving loans under the Prepetition ABL Facility (without a corresponding reduction in commitments thereunder);

(vii)   all premiums, payments, fees, costs and expenses (including, without limitation, the fees and expenses of the ABL DIP Lender Advisors and all other counsel, financial advisors and other professionals of the ABL DIP Lenders and ABL DIP Agent (whether incurred before or after the Petition Date) to the extent earned, due and owing, and including estimated fees and expenses through the Closing Date) shall have been paid;

(viii)  ABL DIP Agent shall have received at least five (5) Business Days prior to the Closing Date all documentation and information as is reasonably requested by ABL DIP Agent that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations in applicable jurisdictions, including, without limitation, the PATRIOT Act and Beneficial Ownership Regulation, in each case to the extent requested in writing at least seven (7) Business Days prior to the Closing Date, <u>provided</u>, that, the Loan Parties will use reasonable efforts to promptly provide any additional information requested thereafter;

(ix)    the ABL DIP Agent shall have a fully perfected lien on the DIP Collateral to the extent required by the ABL DIP Documents and the Interim DIP Order, having the priorities set forth in the Interim DIP Order;

(x)     each Uniform Commercial Code financing statement and each intellectual property security

25

agreement required by the ABL DIP Documents to be filed in order to create in favor of the ABL DIP Agent a perfected lien on the DIP Collateral having the priorities set forth in the DIP Orders shall have been filed;

(xi)     all first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases (including any motions related to cash management or any critical vendor or supplier motions) shall be in form and substance reasonably satisfactory to the Required ABL DIP Lenders;

(xii)    the Closing Date shall have occurred on or before the date that is five calendar days after the date of entry of the Interim DIP Order;

(xiii)   other than in respect of any projections, estimates or information of a general or industry specific nature, there shall be no material misstatements in (or omissions of material facts necessary in order to make the statements contained therein, taken as a whole, not materially misleading in light of the circumstances under which such statements are made) the materials (when taken as a whole and after giving effect to any updates or supplements thereto) previously furnished to the ABL DIP Agent and the ABL DIP Secured Parties by the Loan Parties in connection with the transactions contemplated herein. The ABL DIP Agent shall not have become aware of any material information or other matter after the date of the Commitment Letter and prior to the Closing Date that is inconsistent in a material and adverse manner with any previous due diligence, information or matter (including any financial information) in connection with the transactions contemplated herein;

(xiv)   after giving effect to the transactions occurring on the Closing Date, there shall be no default or event of default under the Prepetition ABL Credit Agreement as amended by the Ratification and Amendment Agreement;

(xv)    The amount of the opening Excess Availability (to be defined in a manner consistent with the Prepetition ABL Facility), but excluding any Qualified Cash in the determination of such Excess Availability, as calculated after giving effect to any credit extensions under the ABL DIP Facility, the repayment of any credit extensions under the ABL DIP Facility with the proceeds of the Term Loan DIP Facility and after provision for payment of all fees and expenses of the transactions paid or payable on or about the Closing Date, shall be not less than $35,000,000; and

(xvi)   ABL DIP Agent shall have received, in form and substance reasonably satisfactory to ABL DIP Agent, an updated Borrowing Base Certificate which calculates the Borrowing Base as of February 29, 2024.

<u>Conditions Precedent to Each Credit Extension</u>

In addition to the conditions precedent noted above, each borrowing or other credit extension under the ABL DIP Facility shall be subject to the following conditions:

(i)     the Bankruptcy Court shall have entered the Interim DIP Order or the Final DIP Order;

(ii)    the representations and warranties set forth in the ABL DIP Documents shall be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or material adverse effect, in all respects) as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties will be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or material adverse effect, in all respects) as of such earlier date);

(iii)   at the time of and immediately after any such borrowing, no default or event of default under the DIP ABL Credit Agreement shall have occurred and be continuing or would result therefrom;

(iv)    the ABL DIP Agent shall have received a signed borrowing request from the relevant Borrower; and

(v)     at the time of and immediately after such borrowing, Availability (to be defined in a manner consistent with the Prepetition ABL Facility) is not less than $0.

27

**Annex II**

Interest and Certain Payments

| | |
|---|---|
| Interest Rate: | At the option of the Borrowers, the ABL DIP Loans and Swingline Loans shall bear interest at a rate per annum equal to (i) the Adjusted SOFR Rate (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) (subject to a floor of 0.00%) plus the Applicable Rate or (ii) ABR (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) (subject to a floor of 0.00%) plus the Applicable Rate. |
| | "**Applicable Rate**" means 2.75% in the case of ABR Loans and 3.75% in the case of SOFR Loans. |
| Interest Payment Dates: | Interest on ABR Loans and SOFR Loans shall be payable on the last business day of each month in arrears; other interest payment dates shall be consistent with the Prepetition ABL Facility. |
| Non-Use Fee: | A payment equal to 0.50% per annum on the undrawn ABL DIP Commitments under the ABL DIP Facility, which shall be paid monthly. |
| Letter of Credit Fees: | Consistent with the Prepetition ABL Facility. |
| Default Rate: | Consistent with the Prepetition ABL Facility. |
| Rate Computation and Payment Basis: | Consistent with the Prepetition ABL Facility. |
| Arrangement Fees | Consistent with Fee Letter between Loan Parties and ABL DIP Agent. |
| Structuring Fees: | $2,500,000 Structuring Fee to be shared pro rata with all ABL DIP Lenders |
| Other Fees and Charges: | Consistent with the Prepetition ABL Facility. |

\*      \*      \*

28

**Annex III**

| Priority | DIP Collateral (other than Avoidance Action Proceeds) that constitutes ABL Priority Collateral or that would otherwise constitute ABL Priority Collateral | DIP Collateral (other than Avoidance Action Proceeds) that constitutes Term Loan Priority Collateral or that would otherwise constitute Term Loan Priority Collateral | DIP Collateral that constitutes Avoidance Action Proceeds |
|---|---|---|---|
| *First* | Carve Out and Permitted Liens described in clause (B) of the definition thereof | Carve Out and Permitted Liens | Carve Out |
| *Second* | ABL DIP Liens<br><br>ABL DIP Superiority Claims | Term DIP Liens<br><br>Term DIP Superpriority Claims | ABL DIP Liens and Term DIP Liens, on a *pari passu* basis<br><br>ABL DIP Superiority Claims and Term DIP Superpriority Claims, on a *pari passu* basis |
| *Third* | Prepetition ABL Adequate Protection Liens<br><br>Prepetition ABL Adequate Protection Claims | First Lien Adequate Protection Liens<br><br>First Lien Adequate Protection Claims | Prepetition ABL Adequate Protection Liens and First Lien Adequate Protection Liens, on a *pari passu* basis<br><br>Prepetition ABL Adequate Protection Claims and First Lien Adequate Protection Claims, on a *pari passu* basis |
| *Fourth* | Prepetition ABL Liens<br><br>Prepetition ABL Claims | Prepetition First Lien Liens<br><br>Prepetition First Lien Claims | N/A |
| *Fifth* | Term DIP Liens<br><br>Term DIP Superpriority Claims | Second Lien Adequate Protection Liens<br><br>Second Lien Adequate Protection Claims | N/A |

7834612.18

| _Sixth_ | First Lien Adequate Protection Liens | Prepetition Second Lien Liens | N/A |
|---|---|---|---|
| | First Lien Adequate Protection Claims | Prepetition Second Lien Claims | |
| _Seventh_ | Prepetition First Lien Liens | ABL DIP Liens | N/A |
| | Prepetition First Lien Claims | ABL DIP Superpriority Claims | |
| _Eighth_ | Second Lien Adequate Protection Liens | Prepetition ABL Adequate Protection Liens | N/A |
| | Second Lien Adequate Protection Claims | Prepetition ABL Adequate Protection Claims | |
| _Ninth_ | Prepetition Second Lien Liens | Prepetition ABL Liens | |
| | Prepetition Second Lien Claims | Prepetition ABL Claims | |

30

**<u>Exhibit 2</u>**

**Term DIP Term Sheet**

**CONVERGEONE HOLDINGS, INC., ET AL.**
**$215 MILLION SUPER-PRIORITY SENIOR SECURED**
**DEBTOR-IN-POSSESSION CREDIT FACILITY**

*The terms set forth in this Summary of Principal Terms and Conditions (the "Term DIP Term Sheet")*
*are being provided on a confidential basis as part of a comprehensive proposal, each element of*
*which is consideration for the other elements and an integral aspect of the proposed Term DIP*
*Facility (as defined below). Capitalized terms used but not defined herein have the meanings ascribed*
*to such terms in the Restructuring Support Agreement (the "RSA") or the Restructuring Term Sheet*
*(the "RTS"), as applicable.*

<u>**Summary of Proposed Terms and Conditions**</u>

| | |
|---|---|
| *Term DIP Facility:* | A super-priority senior secured debtor-in-possession term loan facility in an aggregate principal amount of $215 million (the "<u>Term DIP Facility</u>"; the Term DIP Lenders' commitments thereunder, the "<u>Term DIP Commitments</u>"; the loans thereunder, the "<u>Term DIP Loans</u>" and, together with the Term DIP Commitments, the "<u>Term DIP Loan Exposure</u>"; the Term DIP Lenders' claims thereunder, the "<u>Term DIP Superpriority Claims</u>"; and the proceeds received by the Borrower from the Term DIP Loans, the "<u>Term DIP Proceeds</u>"), subject to the terms and conditions set forth in this Term DIP Term Sheet and the Term DIP Loan Documents (as defined below). The Term DIP Loans will be available to be made in two draws, with the first draw being in an amount equal to $145 million and occurring substantially concurrently with the entry of the Interim DIP Order (the "<u>Initial Draw</u>") and the second draw being in an amount equal to $70 million and occurring at the same time as the Initial Draw with net proceeds funded into escrow as provided below with the release of such proceeds from escrow to occur upon entry of the Final DIP Order and satisfaction of the applicable conditions precedent set forth herein (the "<u>Second Draw</u>"); <u>provided that</u> the portion of the Term DIP Facility attributable to the Second Draw shall be funded into escrow substantially concurrently with the funding of the Initial Draw (such portion of the Term Facility, the "<u>Escrowed Amount</u>" and the agent in connection with the escrow arrangements, the "<u>Escrow Agent</u>") subject to escrow arrangements consistent with this Term Sheet and otherwise reasonably satisfactory to the Borrower and the Required Term DIP Lenders. The Escrowed Amount shall accrue interest and fees, commencing with the funding into escrow thereof. |
| *ABL DIP Facility:* | The Term DIP Loan Documents shall permit the Debtors to incur the ABL DIP Facility on terms and conditions acceptable to the Required Term DIP Lenders, it being understood and agreed that the terms and conditions set forth in the ABL DIP Facility Term Sheet attached to the fully executed RSA shall be deemed to be acceptable to the Required Term DIP Lenders. |
| *Relevant Prepetition Debt and Documents:* | That certain First Lien Term Loan Credit Agreement, dated as of January 4, 2019 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time, the "<u>First Lien Credit Agreement</u>"), by and among, PVKG Intermediate Holdings, Inc. as holdings, ConvergeOne Holdings, Inc., as borrower, Deutsch Bank AG New York Branch, as |

administrative agent, and the lenders party thereto from time to time (the "First Lien Term Loan Lenders");

That certain Note Purchase Agreement, dated as of July 10, 2020 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time, the "First Lien KL Note Purchase Agreement"), by and among, PVKG Intermediate Holdings, Inc. as holdings, ConvergeOne Holdings, Inc., as issuer, Deutsch Bank Trust Company Americas, as administrative agent, and the holders party thereto from time to time (the "KL Noteholder");

That certain Note Purchase Agreement, dated as of July 6, 2023 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "First Lien CVC Note Purchase Agreement," and together with the First Lien Credit Agreement and the First Lien KL Note Purchase Agreement, the "First Lien Debt Agreements" the obligations thereunder, the "Prepetition First Lien Claims," and the liens related thereto, the "Prepetition First Lien Liens") among ConvergeOne Holdings, Inc., PVKG Intermediate Holdings Inc., PVKG Investment Holdings, Inc., as administrative agent and collateral agent, and the holders party thereto from time to time (the "CVC Noteholder," and together with the First Lien Term Loan Lenders and the KL Noteholder, the "First Lien Lenders");

That certain senior secured asset-based revolving credit facility made available to the Company and the other borrowers thereunder pursuant to that certain Amended and Restated ABL Credit Agreement (the "Prepetition ABL Credit Agreement"), dated as of January 4, 2019  (as amended by Amendment No. 1 to Amended and Restated ABL Credit Agreement, dated as of July 10, 2022, Amendment No. 2 to Amended and Restated ABL Credit Agreement, dated as of September 14, 2022, Amendment No. 3 to Amended and Restated ABL Credit Agreement, dated as of January 23, 2023 and Amendment No. 4 to Amended and Restated ABL Credit Agreement, dated as of August 29, 2023) among ConvergeOne Holdings, Inc., PVKG Intermediate Holdings, Inc., Wells Fargo Commercial Distribution Finance, as administrative agent, collateral agent, floorplan funding agent and swing line lender, and the lenders party thereto (the "Prepetition ABL Lenders") (as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition ABL Facility," the liens thereunder, the "Prepetition ABL Liens," and the claims thereunder, the "Prepetition ABL Claims");

That certain Second Lien Term Loan Credit Agreement, dated as of January 4, 2019 (as amended, amended and restated, supplemented or otherwise modified from time to time the "Second Lien Credit Agreement" and the claims thereunder, the "Prepetition Second Lien Claims") by and among ConvergeOne Holdings, Inc., PVKG Intermediate Holdings Inc., UBS AG, Stamford Branch, as administrative agent and collateral agent, and the lenders party thereto from time to time (the "Second Lien Term Loan Lenders");

That certain ABL Intercreditor Agreement dated as of January 4, 2019 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time, the "ABL Intercreditor Agreement") among, *inter alios*, Wells Fargo Commercial Distribution Finance, LLC, as the ABL Agent, Deutsche Bank AG New York Branch, as the Initial Senior Lien Term Loan Agent, and UBS AG, Stamford Branch, as the Initial Junior Lien Term Loan Agent; and

That certain First Lien Pari Passu Intercreditor Agreement dated as of July 10, 2020 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time) among, *inter alios*, Deutsche Bank AG New York Branch, as Initial First Lien Representative and Initial First Lien Collateral Agent, and Deutsche Bank Trust Company Americas, as the Initial Other Representative and Initial Other Collateral Agent.

| | |
|---|---|
| *Borrower:* | ConvergeOne Holdings, Inc. (the "Borrower"), as a debtor and debtor-in-possession in a case under chapter 11 of the Bankruptcy Code to be filed in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") contemporaneously and jointly-administered with the other Chapter 11 Cases (the date of filing of the Chapter 11 Cases, the "Petition Date"). |
| *Guarantors:* | Each of the guarantors under the First Lien Debt Agreements, which are debtors and debtors-in-possession in the Chapter 11 Cases (collectively, the "Guarantors"). All obligations of the Borrower under the Term DIP Facility will be unconditionally guaranteed on a joint and several basis by the Guarantors.<br><br>The Borrower and the Guarantors are referred to herein as "Loan Parties" and each, a "Loan Party", or as "Debtors" and each, a "Debtor." |
| *Administrative Agent/Administrative Agent Fee:* | A financial institution acceptable to the Required Term DIP Lenders (as defined below) (in such capacity, the "Term DIP Agent").<br><br>The Term DIP Agent shall be paid an annual agency fee to be agreed by the Term DIP Agent, the Borrower and the Required Term DIP Lenders. |
| *Term DIP Lenders:* | Each of the entities set forth on Annex 1 hereto, which entities are either members of the First Lien Ad Hoc Group represented by Gibson, Dunn & Crutcher LLP ("Gibson") and PJT Partners ("PJT"), the CVC Noteholder or an entity that is related to or affiliated with any of the foregoing (collectively, the "Term DIP Lenders" and each, a "Term DIP Lender") that commits to provide the amount of the Term DIP Facility set forth opposite its name on Annex 1.  For the avoidance of doubt, CVC Noteholder's principal and accrued interest holdings under the First Lien Debt Agreements on the Petition Date shall be deemed to be $213 million in the aggregate.<br><br>Each Term DIP Lender may participate in the Term DIP Facility on behalf of some or all accounts and funds managed by such Term DIP Lender and |

some or all accounts and funds managed by the investment manager, or any affiliate of the investment manager, of such Term DIP Lender or any other affiliate of such Term DIP Lender (any such managed account or fund, or affiliate, a "Lender Affiliate"), and may allocate its Term DIP Commitments among Lender Affiliates in its sole discretion; provided that any such Lender Affiliate to which any such allocation is made shall immediately become a party to the RSA and commit to provide its applicable portion of the Term DIP Facility; provided further that any Term DIP Lender may elect to participate in the Term DIP Facility, initially, through a fronting lender and any associated fees and expenses in connection with such fronting arrangement shall be paid out of the Term DIP Proceeds.

"Required Term DIP Lenders" means one or more Term DIP Lenders holding at least 50.1% of the aggregate Term DIP Loan Exposure.

*Term DIP Premiums:*   The following premiums shall be applicable to all Term DIP Loans (the "Term DIP Premiums"):

- "Term DIP Commitment Premium": a premium totaling 7.00% of the Term DIP Loans, payable in-kind in the form of additional Term DIP Loans to all Term DIP Lenders on a *Pro Rata* basis, earned and payable upon entry of the Interim DIP Order.

- "Term DIP Exit Premium": a premium totaling 3.00% of the Term DIP Loans (inclusive of the capitalized Term DIP Commitment Premium), payable in-kind in the form of additional Term DIP Loans to all Term DIP Lenders on a *Pro Rata* basis, earned upon entry of the Interim DIP Order and payable upon, but immediately prior to the occurrence of, the earlier of the Plan Effective Date or the Maturity Date (defined below).

*Maturity:*   All obligations under the Term DIP Loan Documents (collectively, the "Term DIP Obligations") will be due and payable in full in cash (subject to the DIP Term Loan Rights (defined below)) on the earliest of: (i) the date that is six months after the Closing Date (as defined below); (ii) the date of acceleration of the Term DIP Loans pursuant to the terms of the Term DIP Credit Agreement and the other Term DIP Loan Documents; (iii) the date the Bankruptcy Court orders a conversion of any Chapter 11 Case to a chapter 7 liquidation or the dismissal of the Chapter 11 Case of any Debtor; (iv) the substantial consummation of a plan of reorganization or liquidation of the Debtors, which has been confirmed by an order entered by the Bankruptcy Court (the "Plan"); (v) the appointment of a chapter 11 trustee or other Bankruptcy Court-mandated fiduciary with decision-making authority (including an examiner with expanded powers), (vi) the date of consummation of a sale of all or substantially all of the Debtors' assets, and (vii) the date of the Milestone relating to entry of the Final DIP Oder, to the extent the Final DIP Order is not entered into on or prior to such date (the earliest date to occur, the "Maturity Date").

On the Maturity Date, the Term DIP Loan Obligations shall be paid in full in cash; provided, however, that for convenience purposes in the event of a Maturity Date triggered pursuant to clause (iv) above as a result of the consummation of the Plan that is consistent with the RSA and acceptable to the Required Term DIP Lenders, then (such options (i) and (ii) below, collectively, the "DIP Term Loan Rights")

(i) each Term DIP Lender that is, or is a Lender Affiliate of, or is related to, (A) an Initial First Lien Ad Hoc Group Member, (B) CVC Noteholder, or (C) a Subsequent First Lien Ad Hoc Group Member (in each case, at its sole option) shall be entitled to exchange some or all of the Allocated Portion (defined below) of its Term DIP Obligations, on a dollar for dollar basis, for New Equity Interests pursuant to the terms of the Rights Offering, Backstop Commitment and Direct Investment (with the remainder of such Term DIP Obligations to be satisfied in cash), and

(ii) each Term DIP Lender that is, or is a Lender Affiliate of, or is related to, a Subsequent First Lien Ad Hoc Group Member (A) shall be entitled (at its sole option) to exchange the Allocated Portion (defined below) of its Term DIP Obligations, on a dollar for dollar basis, for Takeback Term Loans (with the remainder of such Term DIP Obligations to be satisfied in cash), and (B) any Subsequent First Lien Ad Hoc Group Member that is a Term DIP Lender or is a Lender Affiliate thereof of is related thereto, that elects  the option described in clause (A), shall utilize the Takeback Term Loan recovery portion of its First Lien Claims as currency, on a dollar for dollar basis, for New Equity Interests issuable under and pursuant to the terms of the Rights Offering, Backstop Commitment and Direct Investment (whether in their capacities as Investors or Eligible Offerees).

For purposes of the foregoing, the "Allocated Portion" shall mean Term DIP Obligations in an amount equal to the Rights, Direct Investment and Backstop Commitment (as each such term is defined in the Plan or the Rights Offering Term Sheet) that are allocated to an applicable Term DIP Lender under the Plan and the Backstop Agreement as either an Investor or Eligible Offeree; provided that, in the case of the Subsequent First Lien Ad Hoc Group Members, the amount of Term DIP Obligations exchanged for New Equity Interests and Takeback Term Loans pursuant to clauses (i) and (ii) above, respectively, on an aggregate basis, shall not exceed such Subsequent First Lien Ad Hoc Group Member's respective Allocated Portion.

*Use of Proceeds:*                 Solely in accordance with and subject to the Approved Budget ((as defined below) subject to Permitted Variances), and the DIP Orders, the Term DIP Proceeds may be used only (i) to pay down Loans under the Prepetition ABL Facility (without a corresponding reduction in commitments thereunder), (ii) to pay reasonable and documented transaction and administrative costs, fees and expenses that are incurred in connection with the Chapter 11 Cases (including payments benefiting from the Carve Out), (iii) for working capital and general corporate purposes of the Loan Parties, and (iv) for such other purposes as may be detailed in the Approved Budget

(subject to Permitted Variances).

*Interest:*

Interest on the Term DIP Loans shall be payable in cash at the end of each month in arrears. At all times prior to the occurrence of an Event of Default (as defined below), interest on the outstanding principal amount of the Term DIP Loans shall accrue at a rate equal to SOFR + 8.00% *per annum* (subject to a SOFR floor of 4.00%).

Interest shall be calculated on the basis of the actual number of days elapsed in a 360 day year.

*Default Interest:*

During the continuance of an Event of Default, the Term DIP Loans will bear interest at an additional 2.00% *per annum* and any overdue amounts (including overdue interest and fees) will bear interest at the applicable non-default interest rate plus an additional 2.00% *per annum*.  Default interest shall be payable in cash on demand.

*Permitted Liens:*

(A)    Any valid liens ("Permitted Prior Liens") that are (1) in existence on the Petition Date, (2) are either perfected as of the Petition Date or perfected subsequent to the Petition Date under section 546(b) of the Bankruptcy Code, (3) senior in priority to the ABL Liens, (4) non-avoidable under the Bankruptcy Code or other applicable law, and (5) are permitted to be incurred under the Prepetition ABL Facility; and

(B)    liens permitted to have seniority over the Term DIP Liens (as defined below) securing the Term DIP Facility as specified in the Term DIP Credit Agreement (the liens referenced in (A) and (B) above, collectively, the "Permitted Liens").

*Collateral:*

The Term DIP Obligations shall constitute claims against each Loan Party entitled to the benefits of Bankruptcy Code section 364(c)(1), having super-priority over any and all administrative expenses and claims, of any kind or nature whatsoever, and subject to the priorities set forth in **Annex 2** attached hereto.

The Term DIP Facility shall be secured by (collectively, the "DIP Collateral," and the liens thereon, the "Term DIP Liens") (i) a first priority lien on all unencumbered assets of the Loan Parties (except for all claims and causes of action arising under Chapter 5 of the Bankruptcy Code ("Avoidance Actions"), but including, upon entry of the Final DIP Order, the proceeds of property recovered, whether by judgment, settlement or otherwise from Avoidance Actions ("Avoidance Action Proceeds")) (collectively, "Unencumbered Property"), which Term DIP Liens in Unencumbered Property shall be pari passu with any ABL DIP Liens (as defined below) in Unencumbered Property but subject to the priorities set forth in Annex 2 attached hereto, (ii) a priming first priority lien on all assets currently securing the First Lien Debt Agreements that constitute Term Loan Priority Collateral (as defined in the ABL Intercreditor Agreement), subject only to Permitted Liens and (iii) a priming junior priority lien on all assets currently securing the First Lien Credit Agreement that constitute ABL Priority Collateral (as defined in the ABL Intercreditor

6

Agreement), subject only to Permitted Liens, the Prepetition ABL Facility and any super priority debtor-in-possession asset-based loan credit facility provided by the Prepetition ABL Lenders that is consented to by the Required Term DIP Lenders (an "<u>ABL DIP Facility</u>," and the liens and claims thereunder, the "<u>ABL DIP Liens</u>" and "<u>ABL DIP Superpriority Claims</u>," respectively), all subject to the Carve-Out and the priorities set forth in **<u>Annex 2</u>** attached hereto; *provided,* that DIP Collateral shall exclude Excluded Assets but shall include any and all proceeds and products of Excluded Assets, unless such proceeds and products otherwise separately constitute Excluded Assets.

"<u>Excluded Assets</u>" shall be defined in a manner customary for facilities of this type and shall be based on such definition in the First Lien credit Agreement (it being understood and agreed that the definition of "Excluded Assets" shall include equity interests in excess of 65% of the issued and outstanding equity interests of non-U.S. subsidiaries but shall exclude all owned real property of the Loan Parties).

*Covenants, Etc.:*

The Term DIP Loan Documents will contain representations, warranties, reporting requirements, mandatory prepayment requirements, voluntary prepayment requirements, affirmative covenants, negative covenants, and "sacred rights" based on the First Lien Credit Agreement (and consistent with the consent rights of the RSA) with the following modifications and such other modifications consistent with debtor-in-possession facilities of this type and in form and substance acceptable to the Company and the Required Term DIP Lenders:

(i) update meetings and/or calls with the Debtors' senior management and advisors, the Term DIP Advisors and the Term DIP Lenders every two weeks (or to the extent requested by the Term DIP Advisors, every week), which update calls may cover the Debtors' financial performance and the other documentation provided pursuant to the reporting covenant described below,

(ii) delivery of internal management prepared unaudited monthly financial statements, including an income statement for such month, balance sheet as of the end of such month and a cash flow statement for such month, within 30 days of month-end (the "<u>Monthly Reports</u>"),

(iii) a rolling 13-week cash flow forecast (the "<u>DIP Budget</u>") in form and substance satisfactory to the Required Term DIP Lenders delivered on or prior to the Petition Date initially covering the period commencing on or about the Petition Date (the "<u>Initial DIP Budget</u>"), which reflects on a line-item basis, the Debtors' (a) weekly projected cash receipts ("<u>Budgeted Cash Receipts</u>"), (b) weekly projected disbursements (including ordinary course operating expenses, capital expenditures and bankruptcy related expenses) under the Chapter 11 Cases ("<u>Budgeted Disbursement Amounts</u>") and (c) the weekly projected liquidity of the Debtors, and which shall be updated on the first Wednesday that is two full weeks after the Petition Date and every two weeks thereafter, which such proposed updated DIP Budget shall modify and supersede any prior agreed DIP Budget unless the Required

7

Term DIP Lenders, through counsel or otherwise, notify the Loan Parties in writing that such proposed DIP Budget is not in form and substance satisfactory to the Required Term DIP Lenders within five business days after receipt thereof, in which case the existing Approved Budget shall remain in effect until superseded by an updated DIP Budget in form and substance satisfactory to the Required Term DIP Lenders (as so updated, each an "Approved Budget"),

(iv) on each Wednesday following each Variance Testing Period (beginning with the first Wednesday following the first Variance Testing Period), the delivery to the Term DIP Advisors of a variance report, which reflects for the applicable Variance Testing Period (defined below), (a) all variances, on a line item by line item basis and a cumulative basis, from the Budgeted Cash Receipts and the Budgeted Disbursement Amounts for such period as set forth in the Approved Budget as in effect for such period, (b) containing an indication as to whether each variance is temporary or permanent and analysis and explanations for all material variances, (c) certifying compliance or non-compliance with the Permitted Variances (defined below), and (d) including explanations for all violations, if any, of such covenant and if any such violation exists, setting forth the actions which the Debtors have taken or intend to take with respect thereto (each, a "Variance Report"),

(v) the requirement to satisfy the Milestones set forth in the RTS;

(vi) compliance with the DIP Orders; and

(vii) such other financial reporting readily available to the Debtors and reasonably requested by the Term DIP Agent or any Term DIP Lender, including, if requested by any Term DIP Lender, deliver to each requesting Term DIP Lender monthly bookings and backlog reports.

"Variance Testing Period" shall mean (i) initially, the two-week period ending on the Friday of the second calendar week occurring after the Petition Date, and (ii) thereafter, each rolling two-week period ending on Friday of every second calendar week.

*Financial Covenants:*    Financial covenants and tests will be limited to:

(i) Variances against the Approved Budget not to exceed the following permitted variances, with the covenant tested on a cumulative rolling two-week basis at the delivery of each Variance Report (collectively, the "Permitted Variances"):

- Aggregate receipts for the Variance Testing Period shall not be less than 85% of the Budgeted Cash Receipts for such Variance Testing Period;

- Aggregate disbursements (including ordinary course operating expenses, capital expenditures and bankruptcy related expenses but excluding professional fees and expenses and any costs or cash

collateralization associated with surety bonds) for the Variance Testing Period shall not be greater than 115% of the Budgeted Disbursement Amounts for such Variance Testing Period.

(ii) Minimum Liquidity (which shall be defined as the sum of (i) all cash and cash equivalents of Loan Parties plus (ii) Excess Availability (to be defined in a manner consistent with the Prepetition ABL Credit Agreement but excluding Qualified Cash (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) from the calculation of Excess Availability) of $20,000,000.

|                       |                                                                                                                                 |
|-----------------------|---------------------------------------------------------------------------------------------------------------------------------|
| *Events of Default:*  | The Term DIP Loan Documents will contain events of default based on those set forth in the First Lien Credit Agreement as well as additional events of default customarily found in loan documents for similar debtor-in-possession financing and other events of default agreed among the Debtors and the Required Term DIP Lenders, including without limitation (a) any request made by the Debtors for, or the reversal, modification, amendment, stay, reconsideration or vacatur of a DIP Order, as entered by the Bankruptcy Court which adversely affects the Term DIP Lenders, without the prior written consent of the Required Term DIP Lenders, (b) the occurrence and continuance of an "Event of Default" under the ABL DIP Facility, (c) the allowance of any superpriority claim arising under section 507(b) of the Bankruptcy Code which is pari passu with (other than the superpriority claims of the ABL DIP Facility) or senior to those of the Term DIP Agent and the Term DIP Lenders; (d) the dismissal of the Chapter 11 Cases, or conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (e) the termination of the RSA and (f) the filing of any Plan that is inconsistent with the RSA unless consented to by the Required Term DIP Lenders. |

Upon the occurrence and during the continuation of an Event of Default, subject to the Existing ABL Intercreditor Agreement, without further order from or application to the Bankruptcy Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Term DIP Agent, acting at the request of the Required Term DIP Lenders, to (A) deliver to the Borrower a notice declaring the occurrence of an Event of Default, (B) declare the termination, reduction, or restriction of the commitments under the Term DIP Facility, (C) declare the Term DIP Loans then outstanding to be due and payable, (D) declare the termination, reduction or restriction on the ability of the Loan Parties to use any Cash Collateral, (E) terminate the Term DIP Facility, (F) charge the default rate of interest under the Term DIP Facility (which default rate shall be charged automatically in accordance with the terms of the Term DIP Facility), (G) freeze all monies in any deposit accounts of the Debtors, (H) exercise any and all rights of setoff, (I) exercise any other right or remedy with respect to the DIP Collateral or the Term DIP Liens, or (J) take any other action or exercise any other right or remedy permitted under the Term DIP Documents, the DIP Orders or applicable law; *provided, however,* that in the case of the enforcement of rights against the DIP Collateral pursuant to clauses (I) and (J) above, (i) the Term DIP Agent, acting at the request of the Required

9

Term DIP Lenders, shall provide counsel to the Loan Parties, counsel to the Official Committee, the ABL DIP Agent and the Office of the United States Trustee with five (5) Business Days' prior written notice (such period, the "Remedies Notice Period"). Immediately upon the expiration of the Remedies Notice Period, the Bankruptcy Court shall hold an emergency hearing when the Bankruptcy Court is available (the "Enforcement Hearing") at which the Debtors, any Official Committee, and/or any other party in interest shall be entitled to seek a determination from the Bankruptcy Court solely as to whether an Event of Default has occurred, and at the conclusion of the Enforcement Hearing, the Bankruptcy Court may fashion an appropriate remedy that is consistent with the terms of the DIP Orders; *provided*, that during the Remedies Notice Period, the Loan Parties shall be permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Debtors' businesses, as determined by the Required Term DIP Lenders and the Required ABL DIP Lenders (as such term is defined in the ABL DIP Facility Term Sheet) in their sole discretion. Except as otherwise set forth in the DIP Orders or ordered by the Bankruptcy Court prior to the expiration of the Remedies Notice Period, after the Remedies Notice Period, the Loan Parties shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Term DIP Agent or Term DIP Lenders (together the "Term DIP Secured Parties") or the ABL DIP Secured Parties under the DIP Orders. No enforcement rights set forth in clauses (I) and (J) above shall be exercised prior to the Bankruptcy Court holding an Enforcement Hearing, subject to Bankruptcy Court availability, and the expiration of the Remedies Notice Period, and the Remedies Notice Period shall not expire until the conclusion of the Enforcement Hearing and the issuance of a ruling by the Bankruptcy Court.

| | |
|---|---|
| *Rating:* | The Loan Parties shall use commercially reasonable efforts to obtain a rating for the Term DIP Facility by Moody's and S&P within 120 days of entry of the Final DIP Order. |
| *Term DIP Loan Documents*: | The Term DIP Facility will be documented by a Senior Secured Superpriority Debtor-in-Possession Term Loan Credit Agreement (the "Term DIP Credit Agreement") and other guarantee, security and loan documentation (together with the Term DIP Credit Agreement, the "Term DIP Loan Documents") in each case based on documentation related to the First Lien Credit Agreement (and the Loan Documents as defined thereunder) and shall reflect the terms and provisions set forth in this Term DIP Term Sheet and otherwise in form and substance satisfactory to the Required Term DIP Lenders. |
| *Interim and Final DIP Orders:* | The Interim DIP Order, which shall be satisfactory in form and substance to the Term DIP Agent and the Required Term DIP Lenders, shall authorize and approve, among other matters to be agreed, (i) the Debtors' entry into the Term DIP Loan Documents, (ii) the making of the Term DIP Loans, (iii) the granting of the super-priority claims and liens against the Loan Parties and their assets as required by this Term DIP Term Sheet in |

10

accordance with the Term DIP Loan Documents with respect to the DIP Collateral, (iv) the granting of adequate protection as set forth below, (v) the Term DIP Premiums, (vi) the waivers and marshalling provisions set forth below, (vii) stipulations as to the amount, validity, enforceability, perfection and priority of the prepetition indebtedness, (viii) waiver of any requirement of the Term DIP Lenders and prepetition secured lenders to file any proof of claim, (ix) the "Carve Out" referenced and defined below, and (x) customary indemnification and payment of all fees and expenses of Gibson, as counsel to the Term DIP Lenders, Latham & Watkins LLP, as counsel to the CVC Noteholder, PJT, as financial advisor to the Term DIP Lenders, applicable local counsel, and other necessary advisors (collectively, the "Term DIP Advisors"), as well as advisors to the Term DIP Agent. The Final DIP Order shall be in form and substance satisfactory to the Required Term DIP Lenders (the Final DIP Order and the Interim DIP Order, collectively, the "DIP Orders").

*Adequate Protection:*   The DIP Orders shall approve customary adequate protection to be provided to the holders of Prepetition ABL Claims, Prepetition First Lien Claims and Prepetition Second Lien Claims (and the applicable Agents/Trustees on their behalf) to the extent of any diminution in value, including (i) replacement or new liens on the unencumbered and encumbered assets of the Loan Parties junior to the liens securing the Term DIP Facility and ABL DIP Facility (as applicable) (such liens, the "Prepetition ABL Adequate Protection Liens," the "First Lien Adequate Protection Liens" and the "Second Lien Adequate Protection Liens," as applicable), and (ii) super-priority claims against the Loan Parties as provided in section 507(b) of the Bankruptcy Code junior to the Term DIP Obligations and ABL DIP Obligations (as applicable) (such claims, the "Prepetition ABL Adequate Protection Claims," the "First Lien Adequate Protection Claims," and the "Second Lien Adequate Protection Claims", as applicable), subject in all cases to the Carve Out and the priorities set forth in **Annex 2** attached hereto, and (iii) with respect to the Prepetition ABL Claims and Prepetition First Lien Claims, delivery of the Monthly Reports, Initial Budget, and any updated DIP Budget via posting to the lender website maintained for the holders of Prepetition First Lien Claims.

*Carve Out*   The liens on and security interests of the Term DIP Lenders in the DIP Collateral, the adequate protection liens, and all super-priority administrative expense claims granted under the DIP Orders, shall be subject and subordinate to the Carve Out.

For purposes hereof, "Carve Out" means, without duplication, an amount equal to the sum of (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve-Out"); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees, disbursements, costs, and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections

327, 328, or 363 of the Bankruptcy Code (the "Debtors' Professionals") and to the extent set forth in the Budget as of the date of determination by the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtors' Professionals, "Professional Persons") at any time before or on the first business day following delivery by the ABL DIP Agent or Term DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice, less the amount of any retainers or other amounts held by any such Professional Person as of the Petition Date; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the ABL DIP Agent or Term DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the ABL DIP Agent or Term DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to the Creditors' Committee, and the ABL DIP Agent and Term DIP Agent, as applicable, which notice may be delivered following the occurrence and during the continuation of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

Not later than 7:00 p.m. New York time on the Tuesday of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Person (through Saturday of such week, the "Calculation Date") (collectively, "Estimated Fees and Expenses"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "Weekly Statement"); provided, that within one business day of the occurrence of the Termination Declaration Date, each Professional Person shall deliver one additional Weekly Statement (the "Final Statement") setting forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered on the same day received to the ABL DIP Agent and Term DIP Agent). If any Professional Person fails to timely deliver a Weekly Statement within one business day after such Weekly Statement is due, such Professional Person shall not be entitled to any funds in the Carve Out Reserves with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period. The ABL DIP Agent shall at all times maintain a Reserve (as defined in the DIP ABL Credit Agreement (as such term is defined in the ABL DIP Facility Term Sheet)) in an amount equal to the Post-Carve Out

Trigger Notice Cap, plus the aggregate amount of projected fees for all Professional Persons set forth in the Approved Budget for the week subsequent to the date of determination for such Reserve; provided that nothing set forth herein shall limit the ability of the ABL DIP Agent to increase such reserve if ABL DIP Agent determines that the aggregate amount of Allowed Professional Fees are likely to exceed the amount set forth in the Approved Budget for such week.

| | |
|---|---|
| *Waivers; Marshaling* | The Interim DIP Order shall provide for waivers of (i) section 506(c) and the "equities of the case" exception set forth in section 552 of the Bankruptcy Code and (ii) the doctrine of marshaling with respect to the Term DIP Loans and the DIP Collateral.  The Final DIP Order shall provide for waivers of (i) section 506(c) and the "equities of the case" exception set forth in section 552 of the Bankruptcy Code and (ii) the doctrine of marshaling with respect to the Prepetition ABL Claims, the Prepetition First Lien Claims and the collateral securing the Prepetition ABL Obligations, the Prepetition First Lien Claims and the Prepetition Second Lien Claims. |
| *Conditions Precedent to the Closing:* | The closing date (the "Closing Date") under the Term DIP Facility shall be subject solely to the following conditions: |

(i) execution and delivery of the Term DIP Credit Agreement and any other Term DIP Loan Document being executed and delivered on the Closing Date, in form and substance consistent with this Term Sheet and otherwise acceptable to the Loan Parties, the Term DIP Lenders, the Term DIP Agent and the Escrow Agent;

(ii) delivery of the Initial DIP Budget, in form and substance satisfactory to the Required Term DIP Lenders;

(iii) entry of the Interim DIP Order, and the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Required Term DIP Lenders;

(iv) the payment of (x) all fees required to be paid on the Closing Date under the Term DIP Credit Agreement and the other Term DIP Loan Documents (including any applicable fee letters) and (y) all reasonable and documented fees and expenses of the Term DIP Advisors;

(v) delivery of a borrowing request;

(vi) the Chapter 11 Cases shall have been commenced by the Debtors and the same shall each be a debtor and a debtor in possession; the Chapter 11 Cases of the Debtors shall not have been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code; no trustee under chapter 7 or chapter 11 of the Bankruptcy Code shall have been appointed in the Chapter 11 Cases;

(vii) delivery of a secretary's (or other officer's) certificate of the Loan Parties, dated as of the Closing Date and in such form as is customary for

13

the jurisdiction in which the relevant Loan Party is organized, with appropriate insertions and attachments (including good standing certificates);

(viii) Term DIP Agent shall have received at least five (5) Business Days prior to the Closing Date all documentation and information as is reasonably requested by Term DIP Agent or any Term DIP Lender that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations in applicable jurisdictions, including, without limitation, the PATRIOT Act, in each case to the extent requested in writing at least seven (7) Business Days prior to the Closing Date, provided, that, the Loan Parties will use reasonable efforts to promptly provide any additional information requested thereafter;

(ix) the representations and warranties set forth in the Term DIP Credit Agreement and any other Term Loan DIP Facility Documents entered into on the Closing Date shall be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or Material Adverse Effect, in all respects) on and as of the Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties will be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or Material Adverse Effect, in all respects) as of such earlier date);

(xi) on the Closing Date and immediately after giving effect to the Initial Draw, no default or Event of Default shall have occurred and be continuing or would result therefrom;

(xii) the RSA shall be in full force and effect and shall not have been modified in a fashion that is adverse to the Term DIP Lenders without the consent of the Required Term DIP Lenders;

(xiii) delivery of customary legal opinions;

(xiv) delivery of executed ABL DIP Facility Documents with respect to the ABL DIP Facility, which shall be consistent with the ABL DIP Facility Term Sheet and otherwise acceptable to the Term DIP Lenders; the ABL DIP Facility Documents shall be in full force and effect and there shall not be a default or event of default thereunder; provided that the amount of the opening Excess Availability (to be defined in a manner consistent with the Prepetition ABL Facility), but excluding any Qualified Cash (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) in the determination of such Excess Availability under the DIP ABL Credit Agreement, as calculated after giving effect to any credit extensions under the ABL DIP Facility, the repayment of any credit extensions under the ABL DIP Facility with the proceeds of the Term DIP Facility and after provision for payment of all fees and expenses of the transactions paid or payable on or about the Closing Date, shall be not less than $35,000,000;

14

(xv) the Term DIP Agent shall have a fully perfected lien on the DIP Collateral to the extent required by the Term DIP Loan Documents and the Interim DIP Order, having the priorities set forth in the Interim DIP Order;

(xvi) all first day motions filed by the Loan Parties on the Petition Date and related orders entered by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to the Required Term DIP Lenders;

(xvii) the Closing Date shall have occurred on or before the date that is five calendar days after the date of entry of the Interim DIP Order;

(xviii) after giving effect to the transactions occurring on the Closing Date, there shall be no default or event of default under the Prepetition ABL Credit Agreement as amended by the Ratification and Amendment Agreement (as such term is defined in the ABL DIP Facility Term Sheet); and

(xix) delivery of an officer's certificate of the Borrower confirming compliance with the each of the conditions precedent (other than any matters which are to be delivered by, provided by, or subject to the satisfaction of, any party other than the Loan Parties).

*Conditions Precedent to the Second Draw:*

The conditions to release from escrow of the proceeds of the Second Draw shall be subject solely to the following conditions:

(i) the Loan Parties being in compliance with the Approved Budget (subject to Permitted Variances) in all respects and the proceeds of any such Term DIP Loan being made being used or intending to be used solely in accordance with the Approved Budget, subject to Permitted Variances;

(ii) the Final DIP Order shall have been entered by the Bankruptcy Court and shall not have been amended, modified, repealed or stayed in any respect without the Required Term DIP Lenders' consent;

(iii) the representations and warranties set forth in the Term DIP Credit Agreement and any other Term Loan DIP Facility Documents shall be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or Material Adverse Effect, in all respects) on and as of the date of the release from escrow of the proceeds of the Second Draw with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties will be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality or Material Adverse Effect, in all respects) as of such earlier date);

(iv) on the date of release from escrow of the proceeds of the Second Draw and immediately after giving effect to such release, no default or Event of Default under the Term DIP Credit Agreement shall have occurred and be

continuing or would result therefrom;

(v) receipt of a withdrawal request; and

(vi) the RSA shall be in full force and effect and shall not have been modified in a fashion that is adverse to the Term DIP Lenders without the consent of the Required Term DIP Lenders.

**Annex 2**

| Priority | DIP Collateral (other than Avoidance Action Proceeds) that constitutes ABL Priority Collateral or that would otherwise constitute ABL Priority Collateral | DIP Collateral (other than Avoidance Action Proceeds) that constitutes Term Loan Priority Collateral or that would otherwise constitute Term Loan Priority Collateral | DIP Collateral that constitutes Avoidance Action Proceeds |
|---|---|---|---|
| *First* | Carve Out and Permitted Liens | Carve Out and Permitted Liens described in clause (B) of the definition thereof | Carve Out |
| *Second* | ABL DIP Liens<br><br>ABL DIP Superiority Claims | Term DIP Liens<br><br>Term DIP Superpriority Claims | ABL DIP Liens and Term DIP Liens, on a *pari passu* basis<br><br>ABL DIP Superiority Claims and Term DIP Superpriority Claims, on a *pari passu* basis |
| *Third* | Prepetition ABL Adequate Protection Liens<br><br>Prepetition ABL Adequate Protection Claims | First Lien Adequate Protection Liens<br><br>First Lien Adequate Protection Claims | Prepetition ABL Adequate Protection Liens and First Lien Adequate Protection Liens, on a *pari passu* basis<br><br>Prepetition ABL Adequate Protection Claims and First Lien Adequate Protection Claims, on a *pari passu* basis |
| *Fourth* | Prepetition ABL Liens<br><br>Prepetition ABL Claims | Prepetition First Lien Liens<br><br>Prepetition First Lien Claims | N/A |
| *Fifth* | Term DIP Liens<br><br>Term DIP Superpriority Claims | Second Lien Adequate Protection Liens<br><br>Second Lien Adequate Protection Claims | N/A |
| *Sixth* | First Lien Adequate Protection Liens<br><br>First Lien Adequate Protection Claims | Prepetition Second Lien Liens<br><br>Prepetition Second Lien Claims | N/A |
| *Seventh* | Prepetition First Lien Liens<br><br>Prepetition First Lien Claims | ABL DIP Liens<br><br>ABL DIP Superpriority Claims | N/A |
| *Eighth* | Second Lien Adequate | Prepetition ABL Adequate Protection | N/A |

18

|  | Protection Liens<br><br>Second Lien Adequate Protection Claims | Liens<br><br>Prepetition ABL Adequate Protection Claims |  |
|---|---|---|---|
| ***Ninth*** | Prepetition Second Lien Liens<br><br>Prepetition Second Lien Claims | Prepetition ABL Liens<br><br>Prepetition ABL Claims |  |

**Exhibit 3**

**Equity Rights Offering Term Sheet**

**CONVERGEONE HOLDINGS, INC.**

**Summary of Principal Terms of Proposed Equity Rights Offering**

This Summary of Principal Terms (this "***Rights Offering Term Sheet***") provides an outline of a proposed equity rights offering of the Issuer identified below in connection with the emergence of the Issuer and certain of its affiliates (collectively, the "***Debtors***" and as reorganized pursuant to the Joint Chapter 11 Plan of Reorganization of ConvergeOne Holdings, Inc. and Its Debtor Affiliates (the "***Plan***"), "***ConvergeOne***" or the "***Company***") from chapter 11 proceedings (the "***Chapter 11 Cases***") pursuant to the Plan.

This Rights Offering Term Sheet is referenced in, and appended to, that certain Restructuring Support Agreement dated as of April 3, 2024, by and among the Debtors and the Consenting Stakeholders (as amended, supplemented, or otherwise modified from time to time, the "***RSA***"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the RSA or the Restructuring Term Sheet attached thereto as **_Exhibit B_**, to which this Rights Offering Term Sheet is attached.

The statements contained in this Rights Offering Term Sheet and all discussions between and among the parties in connection therewith constitute privileged settlement communications entitled to protection under Rule 408 of the Federal Rules of Evidence and shall not be treated as an admission regarding the truth, accuracy or completeness of any fact or the applicability or strength of any legal theory.

THIS RIGHTS OFFERING TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW.

| Issuer | PVKG Investment Holdings, Inc. ("***PVKG Investment***"). |
|---|---|
| Security Description | New shares of common stock (the "***New Equity Interests***") in PVKG Investment, which shall be issued to applicable holders of First Lien Claims and/or Term DIP Facility Claims, in each case on the Effective Date as set forth herein.[1] |
| Offering | In connection with the Plan, the Debtors shall commence an equity rights offering (the "***Rights Offering***") (subject to the terms below) of $245.0 million, which may be increased with the consent of the Debtors and the Required Consenting Lenders (the applicable amount, the "***Rights Offering Amount***"). 35% of the Rights Offering Amount shall be available solely for the Investors (the "***Holdback***"), while 65% of the Rights Offering Amount shall be available to all holders of First Lien Claims (the "***Non-Holdback Rights Offering Amount***"). <br><br> Each holder of a First Lien Claim (or its designated Affiliate, managed fund or account or other designee, in accordance with the terms of the Backstop Agreement (as defined below) that elects the Rights Offering Rights and Takeback Term Loan |

[1] The structure for effectuating the Rights Offering is subject to the Description of Transaction Steps (as defined in the Plan) to be included in the Plan Supplement.

1

| | Recovery Option and is either (A) a "qualified institutional buyer" (a "**_QIB_**"), as such term is defined in Rule 144A under the Securities Act of 1933, as amended (the "**_Securities Act_**"), or (B) an institutional "accredited investor" (an "**_IAI_**") within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act or an entity in which all of the equity investors are IAIs (which, in the case of (A) and (B), for the avoidance of doubt, may not include any natural person) (collectively, the "**_Eligible Offerees_**") will be offered rights (the "**_Rights_**") to participate in the Rights Offering, in an amount not to exceed such holder's pro rata share of the Non-Holdback Rights Offering Amount based upon a fraction (expressed as a percentage) the numerator of which is the First Lien Claims held by such Eligible Offeree(s) and the denominator of which is all First Lien Claims held by all Eligible Offerees. For the avoidance of doubt, such elections shall be adjusted on a pro rata basis, based on oversubscription, as necessary, so that participation in the Rights Offering Rights and Takeback Term Loan Recovery Option is capped at 50% of the First Lien Claims. |
| --- | --- |
| | New Equity Interests issued pursuant to the Rights Offering, including the Holdback, the Non-Holdback Rights Offering Amount, and the Put Option Premium, shall be offered at a 35% discount to the stipulated equity value of the reorganized Debtors under the Plan (the "**_Plan Discount_**"). |
| | For the avoidance of doubt, each Eligible Offeree may exercise all or a portion of its Rights, but upon exercising its Rights, such Eligible Offeree shall be committed to participate for its full amount of exercised Rights in the Rights Offering, and will receive New Equity Interests as set forth in this Rights Offering Term Sheet. |
| | The Rights may be exercised only in exchange for (x) cash or (y) to the extent that a holder of Rights is a Term DIP Lender under the Term DIP Facility, the exercise of such holders' DIP Term Loan Rights (as such term is defined in the Term DIP Term Sheet) on the terms set forth in the Term DIP Term Sheet appended as **Exhibit 2** to the Restructuring Term Sheet. |
| | The RSA and subscription documents for the Rights Offering will provide that all Eligible Offerees that exercise their Rights must vote to accept the Plan and not object to the confirmation of the Plan. |
| **Use of Proceeds** | Proceeds of the Rights Offering shall be used for (i) refinancing of the Term DIP Facility, and (ii) for general corporate and working capital purposes. |
| **Transferability of Rights** | The Rights shall not be transferable, assignable, or detachable other than in connection with the transfer of the corresponding First Lien Claims. The holder shall not transfer or assign any First Lien Claims unless such holder transfers or assigns with such First Lien Claims the right to receive the corresponding Rights in the Rights Offering, subject to compliance with applicable securities laws relating to the transfer of restricted securities. After a Right has been exercised by submitting an election form, the underlying First Lien Claims will cease to be transferrable. |
| **Oversubscription Privilege** | The Rights shall not have an oversubscription privilege. |

| Investors | The entities that will backstop the Rights Offering and are party to the Backstop Agreement (or their designated Affiliate(s), managed fund(s) or account(s) or other designee(s) in accordance with the Backstop Agreement) (collectively, the "***Investors***").  The Investors will be the parties set forth on Schedule I hereto (or their designated Affiliate(s), managed fund(s) or account(s) or other designee(s) in accordance with the Backstop Agreement). |
|---|---|
| Holdback | The Investors shall have the sole right and obligation to purchase the Holdback, at the Investor Percentages (as defined below) set forth in Schedule I hereto. |
| Backstop Commitment | The Investors will, pursuant to a backstop agreement to be entered into among the Company and the Investors (the "***Backstop Agreement***"), backstop the Rights Offering by committing in the respective percentages (the "***Investor Percentages***") set forth on <u>Schedule I</u> hereto (the "***Backstop Commitment***") to purchase from the Company in the Rights Offering the New Equity Interests that are not purchased by the Eligible Offerees in the Rights Offering for an aggregate amount equal to the Rights Offering Amount, which purchase may be in cash or may utilize the currency of DIP Loan Obligations or Takeback Loans pursuant to the DIP Term Loan Rights.

The Backstop Agreement shall contain the terms and conditions set forth in this Rights Offering Term Sheet and other customary terms and conditions, including representations, warranties, conditions, covenants and indemnification for transactions of this type, and shall be acceptable to the Required Consenting Lenders and the Company Parties.

The Investors will also be obligated to fully exercise all Rights issued to the Investors and their Affiliates in the Rights Offering. |
| Put Option Premium | The "***Put Option Premium***" means, as consideration for the Investors providing the Backstop Commitment, a fully earned non-refundable aggregate premium, which shall in the event of a Closing (as defined in the Backstop Agreement), be payable on the Effective Date of the Plan to the Investors in additional units of New Equity Interests equal to 10% of the Rights Offering Amount (issued at the Plan Discount); it being understood that any Investor that breaches the Backstop Agreement as set forth in the Backstop Agreement shall not be entitled to its pro rata share of the Put Option Premium under any circumstances. The Put Option Premium shall be allocated pro rata among the Investors based on the Investor Percentages. |
| Transferability of Backstop Commitments | The Investors' respective Backstop Commitments under the Backstop Agreement shall be transferrable from (i) one Investor to another Investor, with the consent of the Required Consenting Lenders, (ii) from any Investor to any of its Affiliates, managed funds or accounts (so long as such Investor remains liable for such transferred Backstop Commitment), and (iii) to any other person approved in advance by the Company (acting reasonably) and the Required Consenting Lenders, in each case as long as such transferees are or become signatories to the Backstop Agreement. |

| Several Obligations | The Investors' respective Backstop Commitments and obligations under the Backstop Agreement shall be several obligations and neither joint nor joint and several obligations and, unless otherwise expressly agreed in writing by an Investor, no Investor shall have any liability for any obligation of another Investor. |
|---|---|
| Funding Failures | If an Investor fails to satisfy its Backstop Commitment (a "<u>Backstop Shortfall</u>"), the other non-defaulting Investors shall have the right, but not the obligation, severally and not jointly in their sole discretion, to assume their pro rata share of the Backstop Shortfall based on the Investor Percentages. |
| Conditions Precedent | The Backstop Agreement will contain conditions precedent to the obligations of the parties to consummate the transactions contemplated by the Backstop Agreement that are customary for transactions of the type contemplated by the Backstop Agreement, and otherwise acceptable to the Required Consenting Lenders and the Company Parties, including:<br><br><u>Conditions Precedent for the Company</u>:<br><br>• the Bankruptcy Court shall have approved the Backstop Agreement;<br><br>• the Bankruptcy Court shall have entered the order confirming the Plan;<br><br>• the concurrent occurrence of the Effective Date;<br><br>• receipt of required regulatory approvals and the absence of legal impediments to closing; and<br><br>• other customary conditions.<br><br><u>Conditions precedent for Investors</u>:<br><br>• the Bankruptcy Court shall have approved the Backstop Agreement;<br><br>• the Bankruptcy Court shall have entered the order confirming the Plan;<br><br>• the concurrent occurrence of the Effective Date;<br><br>• receipt of required regulatory approvals and the absence of legal impediments to closing; and<br><br>• other customary conditions. |
| No Shop; Termination Payment | The Backstop Agreement will include a customary no-shop provision for competing proposals to restructure or acquire the Company with a customary fiduciary out for a superior proposal.<br><br>The Backstop Agreement will provide that if the Backstop Agreement is terminated as a result of a "fiduciary-out" by the Company, then the Company shall pay the Investors a termination payment of 5% of the Rights Offering Amount. The Backstop Agreement will provide that the termination payment shall be fully earned upon execution of the Backstop Agreement. |
| Securities Law Matters | The issuance of the New Equity Interests (except for any units of New Equity Interests issued in respect of the Backstop Commitments or Put Option Premium) shall be exempt from the registration requirements of the securities laws as a result |

|  | of section 1145 of the Bankruptcy Code to the maximum extent available by law or, if section 1145 is not available, then otherwise exempt from registration under the Securities Act of 1933, as amended (the "***Securities Act***") and any other applicable securities laws. |
|  | Any units of New Equity Interests issued in respect of the Backstop Commitments or Put Option Premium shall be exempt from registration requirements of the securities laws pursuant to Section 4(a)(2) of the Securities Act, and/or the safe harbor of Regulation D, or such other exemption as may be available from any applicable registration requirements. |

**Exhibit 4**

**Governance Term Sheet**

**ConvergeOne Holdings, Inc.,** *et al.*
**GOVERNANCE TERM SHEET[1]**

THIS TERM SHEET (THE "GOVERNANCE TERM SHEET") SETS FORTH THE PRINCIPAL TERMS OF THE PROPOSED GOVERNANCE STRUCTURE OF THE COMPANY AFTER ITS EMERGENCE FROM THE CHAPTER 11 PROCESS. THIS GOVERNANCE TERM SHEET IS REFERENCED IN, AND APPENDED TO, THAT CERTAIN RESTRUCTURING SUPPORT AGREEMENT DATED AS OF APRIL 3, 2024, BY AND AMONG THE COMPANY PARTIES AND THE CONSENTING STAKEHOLDERS (AS AMENDED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "RSA").

THIS GOVERNANCE TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND OTHER APPLICABLE LAW.

UNLESS OTHERWISE SET FORTH HEREIN, TO THE EXTENT THAT ANY PROVISION OF THIS GOVERNANCE TERM SHEET IS INCONSISTENT WITH THE RSA, THE TERMS OF THIS GOVERNANCE TERM SHEET WITH RESPECT TO SUCH PROVISION SHALL CONTROL.

| Governance Term Sheet | |
|---|---|
| **General** | PVKG Investment Holdings, Inc. (or an affiliate thereof or newly formed holding company) ("**New C1**") shall indirectly hold the equity of ConvergeOne Holdings, Inc. and New C1 shall be managed on a day-to-day basis by its Chief Executive Officer and executive officers with oversight from the New Board (as defined below). |
| **Corporate Form** | New C1 is expected to be managed by a Board of Directors (the "**New Board**") subject to a determination by the Debtors, the Company Parties, and Consenting Stakeholders. |
| **Board of Directors** | <u>**Number of Directors**</u>: New C1 will be governed by the New Board. The Chief Executive Officer of New C1 shall serve on the New Board; all other initial directors shall be appointed by the Required Consenting Lenders, with representation being proportionate to anticipated post-emergence equity ownership; for the avoidance of doubt, each Initial First Lien Ad Hoc Group Member and the PVKG Lender shall each be entitled to appoint one director to serve on the New Board, so long as such entity is contemplated to receive no less than 10% of the fully-diluted New Equity Interests (excluding New Equity Interests reserved for the post-Effective Date Management Incentive Plan). The identities of directors on the New Board shall be set forth in the Plan Supplement to the extent known at the time of filing. Any action, agreement, |

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the RSA or the Restructuring Term Sheet, as applicable.

|  | undertaking or authorization of New C1 or any of its subsidiaries outside of the ordinary course of business or that is material to C1 or any of its subsidiaries must be approved by the New Board.  In addition, and without limiting the foregoing, certain significant corporate actions (to be specified in the definitive documentation) will require the approval of the New Board.<br><br>Representation on each committee of the New Board shall also be proportionate to the Required Consenting Lenders' equity ownership.<br><br>If any subsidiary of New C1 has a board of directors (or similar governing body) which includes anyone other than employees of New C1 or its subsidiaries, then such board or governing body will be composed in the same manner as the New Board and be subject to the same governance terms. |
|---|---|
| **Board Observer** | The Subsequent First Lien Ad Hoc Group Members and the Required Consenting Initial Second Lien Ad Hoc Group Members shall be entitled (but not required) to collectively (by vote or consent of a majority in interest) designate one representative as a non-voting observer to the New Board; *provided* that such entitlement shall expire if such holders, at any time, cease to hold in excess of 12.5% of the New Equity Interests in the aggregate.<br><br>In addition, the Required Consenting Initial Second Lien Ad Hoc Group Members shall be entitled (but not required) to collectively (by vote or consent of a majority in interest) designate one representative to receive materials that were presented to the New Board at any board meeting; *provided, however*, that such representative shall sign a customary non-disclosure agreement (which shall provide that such representative may share such materials with Required Consenting Initial Second Lien Ad Hoc Group Members that are subject to confidentiality restrictions and whose individual holdings exceed 1% of the New Equity Interests), and New C1 shall be entitled to not include any privileged or competitively sensitive information, and such entitlement shall expire if such holders, at any time, cease to hold in excess of 1.0% of the New Equity Interests in the aggregate. |
| **Minority Protections** | The Governance Documents will include customary minority shareholder protections and rights for the benefit of each of the Subsequent First Lien Ad Hoc Group Members, the Initial Second Lien Ad Hoc Group Members and other minority shareholders, including, but not limited to, drag rights, tag- along rights, preemptive rights, information rights and prohibition on amendments with respect to the foregoing without the consent of majority of holders disproportionately affected by any such amendment (the "**Minority Protections**"). The Minority Protections will be in a form and substance reasonably acceptable to the Required Consenting First Lien Lenders, Subsequent First Lien Ad Hoc Group Members and Required Consenting Initial Second Lien Ad Hoc Group Members. |

**<u>Exhibit C</u>**

**Joinder**

## Joinder to Restructuring Support Agreement

The undersigned hereby acknowledges that it has reviewed and understands the Restructuring Support Agreement (as amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "**RSA**") dated as of April 3, 2024, by and among the Company Parties, Consenting Stakeholders, and Second Lien Consenting Lenders.[1]

The undersigned hereby makes the applicable representations and warranties set forth in Section 9 and Section 11 of the RSA to each other Party, effective as of the date hereof and agrees to be bound by the terms and conditions of the RSA.

This joinder agreement shall be governed by the governing law set forth in the RSA.

Date: _____, 2024

**[JOINING PARTY]**

_____

Name:

Title:

Address:

E-mail address(es):

| Aggregate Principal Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Term Loan Claims | |
| KL Note Claims | |
| PVKG Note Claims | |
| Second Lien Term Loan Claims | |

---

[1]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the RSA.

## **Exhibit D**

**Transfer Agreement**

## Transfer Agreement to Restructuring Support Agreement

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of April 3, 2024 (the "**RSA**"),[1] by and among the Company Parties, Consenting Stakeholders, and Second Lien Consenting Lenders, including the transferor of the Company Claims or Interests referenced herein ("**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound.

The Transferee specifically agrees to be bound by the terms and conditions of the RSA and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer set forth herein.

Date: _____, 2024

**[TRANSFEREE]**

_____

Name:

Title:

Address:

E-mail address:

| Aggregate Principal Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| First Lien Term Loan Claims | |
| KL Note Claims | |
| PVKG Note Claims | |
| Second Lien Term Loan Claims | |

---

[1]   Capitalized terms used by not defined herein shall have the meanings ascribed to them in the RSA.