## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| CONVERGEONE HOLDINGS, INC., *et al.*,[1] | Case No. 24-90194 (CML) |
| Debtors. | (Joint Administration Requested) |
| | Emergency Hearing Requested |

## DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINSTRATIVE EXPENSE CLAIMS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

> **Emergency relief has been requested. Relief is requested not later than 2:30 p.m. (prevailing Central Time) on April 4, 2024.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on April 4, 2024 at 2:30 p.m. (prevailing Central Time) in Courtroom 401, 4th floor, 515 Rusk, Houston, Texas 77002. Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "JudgeLopez." Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "electronic appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "submit" to complete your appearance.**

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

## PRELIMINARY STATEMENT

1.        The Debtors commenced these Chapter 11 Cases to implement a balance sheet restructuring transaction with the support, pursuant to the terms of a Restructuring Support Agreement (the "**RSA**"), of creditors holding approximately 81% of the Debtors' first lien loan debt and approximately 81% of the Debtors' second lien debt.[2]  The RSA contemplates a comprehensive restructuring that will de-lever the Debtors' funded debt by approximately $1.6 billion.  The RSA further contemplates, with the support of the Debtors' secured creditors, that general unsecured creditors will be unimpaired and will recover in full.  The Debtors are contemporaneously filing a plan of reorganization consistent with the RSA and will seek to confirm that Plan before the end of May 2024.

2.        To successfully reorganize, the Debtors require immediate access to liquidity.  As described in the First Day Declaration, the Debtors enter these Chapter 11 Cases with only approximately $21.4 million cash on hand.  First Day Decl. ¶ 29.  That amount of cash, in addition to the Debtors' forecasted receipts from operations in the ordinary course, is insufficient to fund the Debtors' businesses or these Chapter 11 Cases.  *Id*. ¶¶ 78, 80–82.  In light of the Debtors' liquidity position, the Debtors' investment banker, Evercore Group LLC ("**Evercore**") ran a comprehensive prepetition marketing process for debtor-in-possession financing.  That marketing process resulted in commitments for two debtor-in-possession financing facilities that will provide the Debtors sufficient liquidity to support the orderly continuation and the operation of their businesses, satisfy payroll obligations, pay general unsecured creditors in full in the ordinary course of business, and fund other payments and the administration of these Chapter 11 Cases.

---

[2]     Capitalized terms used but not defined in this Preliminary Statement shall have the meanings given to such terms elsewhere in this Motion or in the RSA, as applicable.

3.      The Debtors have commitments for two separate debtor-in-possession facilities –
an ABL facility (the "**ABL DIP Facility**") and a term loan facility (the "**Term DIP Facility**").
The ABL DIP Facility is a superpriority secured first lien asset-based debtor-in-possession lending
facility in the aggregate principal amount of $250 million that will allow the Debtors continued
access to their prepetition revolving credit facility, subject to certain modifications set forth in the
DIP Orders.  The ABL DIP Facility preserves the Debtors' access to their prepetition revolving
credit line that they use for daily working capital needs, including a specific feature that is critical
to the Debtors' continued ordinary course operations during these Chapter 11 Cases: a floorplan
facility that allows the Debtors to rapidly finance the purchase of products, software, and services
from certain of the Debtors' leading global technology partners and vendors.  Under the floorplan
facility, the Debtors are authorized to submit purchase orders to the Prepetition ABL Agent, who
is then obligated to advance amounts due to the applicable vendor under those purchase orders
promptly upon shipment.  Floorplan obligations then become revolving obligations under the
Prepetition ABL Facility.  The floorplan facility expedites payments to vendors and, in turn,
expedites shipments of products, software, and services to the Debtors and their customers.

4.      In order to maintain the floorplan facility on a postpetition basis, the Prepetition
ABL Agent required that all amounts outstanding under the prepetition floorplan facility be
converted into postpetition obligations under the ABL DIP Facility.  Losing access to the floorplan
facility would have an immediate, severe, and negative impact on the Debtors' continued
operations by, among other things, causing the cancellation of all pending floorplan orders,
delaying future shipments, and impairing the Debtors' ability to service their customers.  First Day
Decl. ¶ 80.  In addition, there were no third-party options available to replace the existing floorplan
facility.  *Id.* ¶ 81.  Finally, because the Debtors presently lack availability under the Prepetition

ABL Facility to incur new floorplan obligations, in order for the Debtors to continue using the floorplan facility during the Chapter 11 Cases, the Debtors also must pay down existing amounts owed under the Prepetition ABL Facility in order to create new availability for postpetition floorplan orders and obligations in the ordinary course of business.

5.      To address their critical need to ensure continued access to the floorplan facility and preserve the ability to incur new floorplan obligations, the Debtors agreed to the "**ABL Roll-Up**."  Pursuant to the ABL Roll-up, upon entry of the Interim DIP Order, (i) all existing floorplan obligations owed under the floorplan facility will immediately convert on a cashless basis into obligations under the ABL DIP Facility and (ii) the Debtors will be authorized to pay down amounts owing under the Prepetition ABL Facility with proceeds from the Term DIP Facility, which will result in a corresponding increase in availability under the ABL DIP Facility for postpetition obligations, including floorplan obligations.  Upon entry of the Final DIP Order, any remaining outstanding Prepetition ABL Facility obligations will convert on an automatic, cashless basis into obligations under the ABL DIP Facility.

6.      The Prepetition ABL Agent would not be willing to enter into the ABL DIP Facility, including the floorplan facility, or consent to use of cash collateral without the ABL Roll-Up.  The Debtors therefore have agreed to terms of the ABL DIP Facility, including the ABL Roll-Up, in order to preserve access to their revolving credit line and floorplan facility, and to avoid material interruptions to their ordinary course operations.

7.      The Debtors also seek approval of the Term DIP Facility, a super-senior multi-draw term loan facility of $215 million, with an initial draw of $145 million and a second draw of $70 million.  The Term DIP Facility will be funded by the holders of the Debtors' first lien debt who are parties to the RSA.  Proceeds from the first draw of the Term DIP Facility will be used to pay

down the Prepetition ABL Facility (increasing availability for postpetition floorplan obligations), fund vendor payments and other relief requested in the Debtors' first day motions (if approved by the Court), pay the administrative costs of these Chapter 11 Cases, and for general corporate purposes. Both draws will be funded upon entry of the Interim DIP Order, with the second draw held in escrow pending entry of the Final DIP Order. Under the restructuring transactions contemplated by the RSA, obligations under the Term DIP Facility will be repaid in full at emergence from the proceeds of an equity rights offering for the reorganized Debtors.

8.      The relief requested by this Motion is necessary to preserve the Debtors' operations and consummate a comprehensive restructuring transaction, as contemplated by the RSA and supported by the Debtors' first and second lien secured creditors. For the reasons set forth in this Motion, the First Day Declaration, and the DIP Declaration, the Debtors firmly believe that the ABL DIP Facility and Term DIP Facility will maximize value for the Debtors' stakeholders, reflect the reasoned and sound exercise of the Debtors' business judgment, and incorporate the best terms available in the market. The Debtors therefore respectfully request that the Court authorize the Debtors to enter into the ABL DIP Facility and Term DIP Facility on the terms proposed herein.

## **RELIEF REQUESTED**

9.      The Debtors seek entry of an interim order, substantially in the form attached hereto (the "**Interim Order**"), and a final order (the "**Final Order**")[3] and, together with the Interim Order, the "**DIP Orders**"), granting the following relief:

- *ABL DIP Facility*: Authorizing ConvergeOne Holdings, Inc. and each Debtor subsidiary borrower thereof, in their capacities as borrowers (collectively, the "**ABL DIP Borrowers**"), to obtain postpetition financing, and for each of the other Debtors to guarantee unconditionally (such other Debtors, the "**DIP Guarantors**"), on a joint and several basis, the ABL DIP Borrowers' obligations in connection with a superpriority, senior secured and priming asset-based revolving credit

---

[3]     The Debtors will file the proposed form of Final Order prior to the Final Hearing (as defined herein).

facility (the "**ABL DIP Facility**") in the aggregate principal amount of up to $250 million, subject to the terms and conditions of that certain Ratification and Amendment Agreement with respect to the Debtors' prepetition asset-based revolving credit facility (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "**ABL DIP Credit Agreement**" attached hereto as **Exhibit A** and, together with the Interim Order, the Final Order, and all agreements, documents, and instruments delivered or executed in connection therewith, collectively, the "**ABL DIP Documents**"), among the ABL DIP Borrowers, the other DIP Guarantors, the lenders party thereto (collectively in such capacities, the "**ABL DIP Lenders**"), Wells Fargo Commercial Distribution Finance, LLC, as administrative agent and collateral agent (in such capacities, the "**ABL DIP Agent**" and, together with the ABL DIP Lenders, the "**ABL DIP Secured Parties**");

- *ABL Roll-Up*: (i) Upon entry of the Interim Order, (a) approving a roll-up and cashless conversion of all amounts outstanding under the Debtors' prepetition Floorplan Advances, Floorplan Approvals, and Letters of Credit (each as defined in the Prepetition ABL Credit Agreement) into Floorplan Advances, Floorplan Approvals, and Letters of Credit under the ABL DIP Facility, and (b) authorizing the Debtors to make postpetition repayments of the obligations under the Prepetition ABL Credit Agreement, to the extent consistent with the Approved DIP Budget, which repayments shall result in a corresponding increase in availability under the ABL DIP Facility (the transactions described in subclauses (a) and (b), the "**Interim ABL Roll-Up**"); and (ii) upon entry of the Final Order, approving a full roll-up and cashless conversion of all outstanding obligations under the Prepetition ABL Credit Agreement into obligations under the ABL DIP Facility (together with the Interim ABL Roll-Up, the "**ABL Roll-Up**");

- *Term DIP Facility*: Authorizing Debtor ConvergeOne Holdings, Inc., in its capacity as borrower (the "**Term DIP Borrower**" and, together with the ABL DIP Borrower, the "**DIP Borrowers**"), to obtain postpetition financing, and for each of the DIP Guarantors to guarantee unconditionally, on a joint and several basis, the Term DIP Borrower's obligations in connection with a superpriority senior secured debtor in possession term loan credit facility (the "**Term DIP Facility**" and together with the ABL DIP Facility, the "**DIP Facilities**," and each obligation owed thereunder, the "**DIP Obligations**"), with an aggregate principal amount of $215,000,000 (the "**Term DIP Loans**"), (i) $145,000,000 of which shall be available for borrowing upon entry of the Interim Order (the "**Initial Draw**"), and (ii) $70,000,000 of which shall be available for borrowing upon entry of the Final Order, subject to the terms and conditions of that certain Senior Secured Superpriority Debtor in Possession Term Loan Credit Agreement (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "**Term DIP Credit Agreement**," substantially in the form attached hereto as **Exhibit B**, and together with the ABL DIP Credit Agreement, the "**DIP Credit Agreements**," and together with the Interim Order, the Final Order, and all agreements, documents, and instruments delivered or executed in connection therewith, collectively, the "**Term DIP Documents**" and together with the ABL

DIP Documents, the "**DIP Documents**"), among the Term DIP Borrower, the DIP Guarantors, the lenders party thereto (collectively, in such capacities, the "**Term DIP Lenders**" and, together with the ABL DIP Lenders, the "**DIP Lenders**"), and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (in such capacities, the "**Term DIP Agent**" and together with the ABL DIP Agent, the "**DIP Agents**"; the Term DIP Agent, together with the Term DIP Lenders, the "**Term DIP Secured Parties**"); and the Term DIP Secured Parties together with the ABL DIP Secured Parties, the "**DIP Secured Parties**");

- *Cash Collateral*: Authorizing the Debtors to use the proceeds of the DIP Facilities and the prepetition collateral of the Debtors' prepetition secured lenders, including cash collateral, subject to the terms of the DIP Documents;

- *DIP Superpriority Claims and DIP Liens*: Granting superpriority administrative expense claims against each of the Debtors' estates, as set forth in the Interim Order, to the DIP Secured Parties with respect to the DIP Obligations over any and all administrative expenses of any kind or nature, subject and subordinate only to the payment of the Carve Out on the terms and conditions set forth in the DIP Documents;

- *Adequate Protection*: Granting adequate protection to the Debtors' prepetition secured lenders to the extent of any postpetition diminution in value of their interests in the Prepetition Collateral;

- *Automatic Stay*: Vacating and modifying the automatic stay imposed by section 362 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents, and in accordance with the terms of the DIP Orders;

- *Final Hearing*: Scheduling a final hearing (the "**Final Hearing**") to consider final approval of the ABL DIP Facility, the ABL Roll-Up, the Term DIP Facility, the Debtors' use of Cash Collateral, and the other relief requested in this Motion on a final basis, and approving the form of notice with respect to the Final Hearing; and

- *Immediate Effectiveness*: Waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order and providing for the immediate effectiveness of the Interim Order.

10.    In support of this Motion, the Debtors rely upon and incorporate by reference the

*Declaration of Salvatore Lombardi in Support of the Debtors' Chapter 11 Petitions and First Day*

*Relief* (the "**First Day Declaration"**), and the *Declaration of Evan Levine in Support of Debtors'*

*Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain*

*Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Claims, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "**DIP Declaration**"), each filed contemporaneously herewith.

## JURISDICTION, VENUE, AND PREDICATES FOR RELIEF

11.     The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction to consider this Motion under 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The Debtors confirm their consent to the entry of a final order or judgment by the Court.

12.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.     The predicates for the relief requested by this Motion are sections 105, 361, 362, 363, 364, 503, 506(c), 507, and 552 of the Bankruptcy Code, rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and rules 1075-1, 2002-1, 4001-1(b), 4002-1, 9013-1(b), and 9037-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Bankruptcy Local Rules**").

## CONCISE STATEMENT PURSUANT TO
## BANKRUPTCY RULE 4001(B) AND BANKRUPTCY LOCAL RULE 4001-3

14.     The below chart contains a summary of the material terms of the proposed DIP

Facilities, together with references to the applicable sections of the relevant DIP Documents, as

required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Bankruptcy Local Rule 4001-

3.[4]

| Material Term | ABL DIP Facility | Term DIP Facility |
|---|---|---|
| **DIP Borrowers** Bankruptcy Rule 4001(c)(1)(B) | ConvergeOne Holdings, Inc. and each Debtor designated as a subsidiary borrower under the ABL DIP Credit Agreement.<br><br>ABL DIP Credit Agreement, Preamble. | ConvergeOne Holdings, Inc.<br><br>Term DIP Credit Agreement, Preamble. |
| **DIP Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Each debtor-affiliate of ConvergeOne Holdings, Inc.<br><br>ABL DIP Credit Agreement, § 1.01, "Guarantor." | Each debtor-affiliate of ConvergeOne Holdings, Inc.<br><br>Term DIP Credit Agreement, § 1.01, "Guarantor." |
| **DIP Lenders** Bankruptcy Rule 4001(c)(1)(B) | Wells Fargo Commercial Distribution Finance, LLC; UBS AG, Stamford Branch; and Deutsche Bank AG New York Branch.<br><br>*See generally* ABL DIP Credit Agreement. | Those certain banks, financial institutions, and other lender parties under the Term DIP Credit Agreement, including affiliates or funds or accounts managed by members of the First Lien Ad Hoc Group, as well as affiliates of PVKG Lender.<br><br>Restructuring Support Agreement, § 4.01(d). |
| **DIP Agents** Bankruptcy Rule 4001(c)(1)(B) | Wells Fargo Commercial Distribution Finance, LLC.<br><br>ABL DIP Credit Agreement, Preamble. | Wilmington Savings Fund Society, FSB.<br><br>Term DIP Credit Agreement, Preamble. |

---

[4]     The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Material Term | ABL DIP Facility | Term DIP Facility |
|---|---|---|
| **DIP Commitments** Bankruptcy Rule 4001(c)(1)(B) | A superpriority, senior secured and priming asset-based revolving credit facility in the aggregate principal amount of up to $250 million, subject to the Borrowing Base under the ABL DIP Credit Agreement. ABL DIP Credit Agreement, Recitals. | A superpriority senior secured debtor in possession term loan credit facility with an aggregate principal amount of $215,000,000, of which (i) $145,000,000 shall be available for borrowing upon entry of the Interim Order, and (ii) $70,000,000 shall be available for borrowing upon entry of the Final Order and the satisfaction of certain other conditions precedent set forth in the Term DIP Credit Agreement. Term DIP Credit Agreement, Recitals. |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) | The DIP Orders and ABL DIP Credit Agreement include conditions to closing that are customary and appropriate for similar debtor in possession financings of this type. ABL DIP Credit Agreement, §§ 4.01-4.02. | The DIP Orders and Term DIP Credit Agreement include conditions to closing that are customary and appropriate for similar debtor in possession financings of this type. Term DIP Credit Agreement, §§ 4.01-4.02. |
| **Use of DIP Facilities and Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(ii) | Proceeds of the ABL DIP Facility will be used for: (i) the ABL Roll-Up; (ii) payment of certain prepetition amounts of the type contemplated in the Approved DIP Budget and as authorized by the Bankruptcy Court pursuant to orders approving the first day motions filed by the Debtors, which orders shall be in form and substance reasonably satisfactory to the Required ABL DIP Lenders; (iii) to the extent of the type contemplated in the then current Approved DIP Budget and in accordance with the terms of the ABL DIP Facility and the DIP Orders; and, (iv) payment of the costs and expenses of administering the Chapter 11 | Proceeds of the Term DIP Facility will be used: (i) to pay down the Prepetition Asset-Based Loans under the Prepetition ABL Credit Agreement; (ii) to pay reasonable and documented transaction and administrative costs, fees, and expenses that are incurred in connection with these Chapter 11 Cases, including for funding the Carve Out and the payment of any adequate protection payments; (iii) for working capital and general corporate purposes of the Debtors; and, (iv) for such other purposes as may be detailed in the Approved DIP Budget. |

| Material Term | ABL DIP Facility | Term DIP Facility |
|---|---|---|
| | Case (including payments benefiting from the Carve Out) subject to the terms and conditions of the ABL DIP Facility, in each case of the forgoing, solely in accordance with and subject to the ABL DIP Credit Agreement and the DIP Orders.<br><br>ABL DIP Credit Agreement, § 5.08. | Term DIP Credit Agreement, § 5.08. |
| **Maturity**<br>Bankruptcy Rules 4001(b)(1)(B)(iii); 4001(c)(1)(B) | The earliest to occur of:<br><br>(i)   the date that is six (6) months after the Petition Date (or if such day shall not be a business day, the next succeeding business day);<br><br>(ii)   11:59 p.m. New York City Time on the date that is thirty five (35) calendar days after the Petition Date, if the Final DIP Order has not been entered by the Bankruptcy Court prior to such date and time, unless otherwise extended by the Required ABL DIP Lenders;<br><br>(iii)   the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court;<br><br>(iv)   dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases into a case under Chapter 7 of the Bankruptcy Code;<br><br>(v)   the acceleration of the ABL DIP Loans and the termination of the commitments under the ABL DIP Facility in accordance with the | The earliest to occur of:<br><br>(ii)  the date that is six (6) months after the Closing Date (as defined in the Term DIP Credit Agreement);<br><br>(iii) the date of acceleration of the Term DIP Loans pursuant to the terms of the Term DIP Credit Agreement and the other Term DIP Documents;<br><br>(iv) the date the Bankruptcy Court orders a conversion of any Chapter 11 Case to a chapter 7 liquidation or the dismissal of the Chapter 11 Case of any Debtor;<br><br>(v)  the substantial consummation of a plan of reorganization or liquidation of the Debtors, which has been confirmed by an order entered by the Bankruptcy Court;<br><br>(vi) the appointment of a chapter 11 trustee or other Bankruptcy Court-mandated fiduciary with decision-making authority (including an examiner with expanded powers);<br><br>(vii)    the date of consummation of a sale of all or substantially all of the Debtors' assets; and,<br><br>(vi) the date of the milestone relating to entry of the Final DIP Oder (35 days after the Petition Date), to the extent the Final DIP Order is not entered into on or prior to |

| Material Term | ABL DIP Facility | Term DIP Facility |
|---|---|---|
| | ABL DIP Documents; and<br><br>(i) the consummation of a sale of all or substantially all assets of the Debtors pursuant to section 363 of the Bankruptcy Code (other than to another Debtor).<br><br>ABL DIP Credit Agreement, § 1.01, "Maturity Date." | such date.<br><br>Term DIP Credit Agreement, § 1.01, "Maturity Date." |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | <u>Interest Rate</u>: Interest rate *per annum*, payable monthly in cash, equal to (i) SOFR (subject to a floor of 0.00%) plus 3.75%; or (ii) ABR (subject to a floor of 0.00%) plus 2.75%.<br><br><u>Default Interest Rate</u>: During the continuance of an event of default, the ABL DIP Loans will bear interest at an additional 2.00% *per annum*, payable in cash.<br><br>ABL DIP Credit Agreement, § 1.01, "Applicable Rate." | <u>Interest Rate</u>: SOFR plus 8.00% *per annum* (subject to a floor of 4.00%), payable in cash.<br><br><u>Default Interest Rate</u>: During the continuance of an event of default, the Term DIP Loans will bear interest at an additional 2.00% *per annum*, payable in cash.<br><br>Term DIP Credit Agreement, § 1.01, "Applicable Rate." |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | Non-Use Fee totaling 0.50% of the undrawn ABL DIP Commitments under the ABL DIP Facility accruing *per annum*, payable monthly in cash.<br><br>All reasonable and documented expenses incurred by professionals retained by the ABL DIP Agent, as more fully set forth in the DIP Orders.<br><br>Certain additional fees identified in the Commitment Letter and Fee Letter between the Debtors and the ABL DIP Agent, filed under seal.<br><br>Term DIP Credit Agreement, § 2.05. | Term DIP Commitment Premium totaling 7.00% of the Term DIP Loans, payable in-kind in the form of additional Term DIP Loans to all Term DIP Lenders on a *pro rata* basis.<br><br>Term DIP Exit Premium totaling 3.00% of the Term DIP Loans, payable in-kind in the form of additional Term DIP Loans to all Term DIP Lenders on a *pro rata* basis.<br><br>All reasonable and documented expenses incurred by professionals retained by certain of the Term DIP Lenders and the Term DIP Agent, as more fully set forth in the DIP Orders.<br><br>Term DIP Credit Agreement, § 2.13. |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | The Debtors are permitted to use the proceeds of the DIP Facilities and the Cash Collateral in accordance with the Approved DIP Budget. The initial Approved DIP Budget is attached to the Interim Order as **Exhibit A**.<br><br>*See* Interim Order ¶ 4. | |

| Material Term | ABL DIP Facility | Term DIP Facility |
|---|---|---|
| Bankruptcy Local Rule 4001-3 | | |
| **Variance Reporting** Bankruptcy Rule 4001(c)(1)(B) | On or before the first Wednesday that is the first two full weeks after the Petition Date and every two weeks thereafter, the Debtors shall deliver to the Term DIP Agent, the Term DIP Agent Advisors, the ABL DIP Agent, the ABL DIP Agent Advisors, the First Lien Advisors, and the PVKG Lender Advisors a rolling 13-week cash flow forecast (the "**DIP Budget**"), which reflects on a line-item basis, the Debtors' (a) weekly projected cash receipts ("**Budgeted Cash Receipts**"), (b) weekly projected disbursements (including ordinary course operating expenses, capital expenditures, and bankruptcy related expenses) under the Chapter 11 Cases ("**Budgeted Disbursement Amounts**"), and (c) the weekly projected liquidity of the Debtors.  Upon delivery of each updated DIP Budget, such updated DIP Budget shall modify and supersede any prior agreed DIP Budget unless the Required Term DIP Lenders, through counsel or otherwise, or the ABL DIP Agent, through counsel or otherwise, notifies the Debtors in writing that such proposed DIP Budget is not in form and substance satisfactory to the Required Term DIP Lenders or ABL DIP Agent within five (5) business days after receipt thereof, in which case the existing DIP Budget shall remain in effect until superseded by an updated DIP Budget in form and substance satisfactory to the Required Term DIP Lenders and Required ABL DIP Lenders (as so approved, an "**Approved DIP Budget**").<br><br>On each Wednesday following each Variance Testing Period (as defined below) (beginning with the first Wednesday following the first Variance Testing Period), the Debtors shall deliver to the Term DIP Agent, the Term DIP Agent Advisors, the ABL DIP Agent, the ABL DIP Agent Advisors, the First Lien Advisors, and the PVKG Lender Advisors a variance report, which reflects for the applicable Variance Testing Period, (i) all variances, on a line item by line item basis and a cumulative basis, from the Budgeted Cash Receipts and the Budgeted Disbursement Amounts for such period as set forth in the Approved DIP Budget as in effect for such period, (ii) containing an indication as to whether each variance is temporary or permanent and analysis and explanations for all material variances; (iii) certifying compliance or non-compliance with the Permitted Variances, and (iv) including explanations for all violations, if any, of such covenants and, if any such violation exists, setting forth the actions that the Debtors have taken or intend to take with respect thereto (each such variance report, a "**Variance Report**").  "**Variance Testing Period**" shall mean, (x) initially, the two-week period ending on the Friday of the second calendar week occurring after the Petition Date, and (y) thereafter, each rolling two-week period ending on Friday of every second calendar week.<br><br>During any Variance Testing Period, the Debtors shall not permit: (i) the Debtors' aggregate disbursements (including ordinary course operating expenses, capital expenditures, and bankruptcy related expenses, but excluding professional fees and expenses and any costs or cash collateralization associated with surety bonds) for the Variance Testing Period to be greater than 115% of the Budgeted Disbursement Amounts for such Variance Testing Period (the "**Permitted Disbursement Variances**") or (ii) the Debtors' aggregate receipts |

| Material Term | ABL DIP Facility | Term DIP Facility |
|---|---|---|
| | for the Variance Testing Period to be less than 85% of the Budgeted Cash Receipts for such Variance Testing Period (the "**Permitted Receipt Variances**" and, together with the Permitted Disbursement Variances, the "**Permitted Variances**").<br><br>In addition, the Debtors shall not permit minimum liquidity (which shall be defined as the sum of (i) all cash and cash equivalents of the Debtors plus (ii) Excess Availability (to be defined in a manner consistent with the Prepetition ABL Credit Agreement but excluding Qualified Cash (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) from the calculation of Excess Availability) of $20,000,000.<br><br>Interim Order ¶ 4. | |
| **DIP Collateral**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Collateral shall include (i) the Debtors' interest in all assets and properties (whether tangible, intangible, real, personal, or mixed), whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless of where located, in each case to the extent such assets and properties constitute Prepetition Collateral; and (ii) property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected, and non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) (subject only to the Carve Out), including, without limitation, an equity pledge of all direct subsidiaries organized in the U.S. and all unencumbered assets of the Debtors, all prepetition property and post-petition property of the Debtors' estates, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including, without limitation, unencumbered cash (and any investment of such cash) of the Debtors (whether maintained with the DIP Agents or otherwise) all equipment, all goods, all accounts, cash, payment intangibles, bank accounts and other deposit or securities accounts of the Debtors (including any accounts opened prior to, on, or after the Petition Date), insurance policies and proceeds thereof, equity interests, instruments, intercompany claims, accounts receivable, other rights to payment, all general intangibles, all contracts and contract rights, securities, investment property, letters of credit and letter of credit rights, chattel paper, all interest rate hedging agreements, all owned real estate, real property leaseholds, fixtures, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, all commercial tort claims, and all claims and causes of action, and any and all proceeds, products, rents, and profits of the foregoing, all products and proceeds of the foregoing, excluding Avoidance Actions but including, subject to entry of the Final Order, Avoidance Proceeds; *provided* that DIP Collateral shall not include any Excluded Assets (as defined in the DIP Credit Agreements, which definition shall include equity interests in excess of 65% of the issued and outstanding equity interests of non-U.S. subsidiaries but shall exclude all owned real property of the Debtors) but shall include any and | |

| Material Term | ABL DIP Facility | Term DIP Facility |
|---|---|---|
| | all proceeds and products of Excluded Assets, unless such proceeds and products otherwise separately constitute Excluded Assets.<br><br>Interim Order ¶ 8(a). | |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(1)(B)(i) | The DIP Obligations shall be secured by valid, enforceable, binding, non-avoidable, and fully perfected first priority priming liens (the "**DIP Liens**") on, and senior security interests in, the DIP Collateral.<br><br>The DIP Liens shall be junior only to the Carve Out; any valid, perfected, enforceable, and nonavoidable prepetition liens (if any) that are senior to the liens or security interests of the Prepetition Secured Parties as of the Petition Date by operation of law or permitted by the Prepetition ABL Documents or Permitted First Lien Debt Documents, as applicable, and the intercreditor priorities set forth on **Annex B** to the Interim Order.<br><br>Interim Order ¶ 9. | |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B) | "**Carve Out**" means, without duplication, an amount equal to the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (the "**Chapter 7 Trustee Carve-Out**"); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees, disbursements, costs, and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "**Debtors' Professionals**") and to the extent set forth in the DIP Budget as of the date of determination by the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtors' Professionals, "**Professional Persons**") at any time before or on the first business day following delivery by the ABL DIP Agent or Term DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, <u>less</u> the amount of any retainers or other amounts held by any such Professional Person as of the Petition Date; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the ABL DIP Agent or Term DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"). For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the ABL DIP Agent or Term DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to any Official Committee, and the ABL DIP Agent and Term DIP Agent, as applicable, which notice may be delivered following the occurrence and during the continuation of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked. | |

| Material Term | ABL DIP Facility | Term DIP Facility |
|---|---|---|
| | Interim Order ¶ 13. | |
| **Challenge Period** Bankruptcy Rule 4001(c)(1)(B) | The Debtors' stipulations and releases and the ABL Roll-Up shall be binding upon the Debtors, their estates, and any of their respective successors in all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all challenges as of the Petition Date, unless and to the extent that a party in interest with proper standing granted by order of the Court (or other court of competent jurisdiction) has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (i) before the earlier of (a) the deadline to object to confirmation of the Debtors' prepackaged plan of reorganization and (b) the earlier of (I) in the case of any such adversary proceeding or contested matter filed by any party other than any Official Committee, 75 calendar days after entry of the Interim Order, and (II) in the case of any such adversary proceeding or contested matter filed by any Official Committee, 60 calendar days after the appointment of such Official Committee (each such date of expiration of the Challenge Period, a "**Challenge Period Termination Date**"); *provided, however*, that (x) upon the filing by the Official Committee of a Challenge, including an appropriate standing motion, by the Challenge Period Termination Date, the Official Committee shall agree on a Challenge litigation schedule that provides for a hearing or trial on any such Challenge to be sufficiently in advance of the confirmation hearing to be held in accordance with the RSA (subject to the availability of the Court), and (y) if the Chapter 11 Cases convert to chapter 7 or if a chapter 11 trustee is appointed, then, in each such case, the Challenge Period Termination Date shall be extended by the time remaining until the existing Challenge Period Termination Date plus thirty (30) days; *provided, however*, that the Challenge Period Termination Date shall only be extended thirty (30) days if the Challenge Period has not yet expired; (ii) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations regarding: (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of the Prepetition Agents or the Prepetition Secured Parties; or (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition Obligations (any such claim, a "**Challenge**"); and (iii) in which the Court enters a final order in favor of the plaintiff or movant sustaining any such Challenge in any such timely filed adversary proceeding or contested matter.<br><br>Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled): (a) any and all such Challenges by any party (including the Official Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any successor Case (any such case, a "**Successor Case**")) shall be deemed to be forever barred; (b) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Cases and any Successor Cases; (c) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected secured claims, not subject to recharacterization, | |

| Material Term | ABL DIP Facility | Term DIP Facility |
|---|---|---|
| | subordination, or avoidance; and (d) all of the Debtors' stipulations and admissions contained in the Interim Order, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Secured Parties' claims, liens, and interests contained in the Interim Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases.<br><br>If any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules and remains pending and the Cases are converted to chapter 7, the chapter 7 trustee may continue to prosecute such adversary proceeding or contested matter on behalf of the Debtors' estates. Furthermore, if any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the stipulations and admissions contained in the Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Official Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date. Nothing in the Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including, without limitation, any Official Committee appointed in the Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation any challenges (including a Challenge) with respect to the Prepetition Loan Documents, the Prepetition Liens, and the Prepetition Obligations, and a separate order of the Court conferring such standing on any Official Committee or other party in interest shall be a prerequisite for the prosecution of a Challenge by such Official Committee or such other party in interest.<br><br>Interim Order ¶ 16. | |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(1)(B)(iv); 4001(c)(1)(B)(ii) | As protection against any postpetition diminution in value of the Prepetition Secured Parties' interests in the Prepetition Collateral, the Prepetition Secured Parties shall receive adequate protection, including:<br><br>(i) The Prepetition First Lien Secured Parties shall be granted replacement liens on all DIP Collateral subject to the intercreditor priorities set forth on **Annex B** to the Interim Order, superpriority claims subject only to the Carve Out and the DIP Superpriority Claims, adequate protection payments of the reasonable and documented fees and expenses of advisors to the Prepetition First Lien Secured Parties, and certain reporting and other information provided to the DIP Agents, all as more fully set forth in the Interim Order.<br><br>(ii) The Prepetition ABL Secured Parties shall be granted replacement liens on all DIP Collateral subject to the intercreditor priorities set forth on **Annex B** to the Interim Order, superpriority claims subject to the Carve Out and the DIP Superpriority Claims, adequate protection payments of the reasonable and documented fees and expenses of advisors to the Prepetition ABL | |

| Material Term | ABL DIP Facility | Term DIP Facility |
|---|---|---|
| | Secured Parties, certain reporting and other information provided to the DIP Agents, all as more fully set forth in the Interim Order.<br><br>(iii) The Prepetition Second Lien Secured Parties shall be granted replacement liens on all DIP Collateral subject to the intercreditor priorities set forth on **Annex B** to the Interim Order, superpriority claims subject to the Carve out and DIP Superpriority Claims, and adequate protection payments of the reasonable and documented fees and expenses of advisors to the Prepetition Second Lien Secured Parties.<br><br>Interim Order ¶¶ 10-12. | |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facilities contain Events of Default that are usual and customary for debtor in possession financings, including, without limitation, the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under the DIP Orders, and the termination of the RSA.<br><br>ABL DIP Credit Agreement, § 8.01; Term DIP Credit Agreement, § 8.01. | |
| **Waiver or Modification of the Automatic Stay**<br>Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application or order of the Court to the extent necessary to permit the DIP Agents to perform any act authorized or permitted under or by virtue of the Interim Order and the DIP Documents, as applicable, including, without limitation, (i) to implement the postpetition financing arrangements authorized by the Interim Order, (ii) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (iii) to assess, charge, collect, advance, deduct and receive payments with respect to the ABL DIP Obligations and Term DIP Obligations (or any portion thereof), including, without limitation, all interests, fees, costs and expenses permitted under any of the DIP Documents and apply such payments to the Prepetition Obligations in accordance with the DIP Documents, and (iv) immediately following the expiration of the Remedies Notice Period (as defined below), unless stayed, and subject to paragraph 19 of the Interim Order, to take any action and exercise all rights and remedies provided to it by the Interim Order, the DIP Documents, or applicable law.<br><br>Interim Order ¶ 14. | |
| **Waiver / Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br>Bankruptcy Rule 4001(c)(1)(B)(vii) | The DIP Liens constitute valid, binding, enforceable, nonavoidable, and automatically and properly perfected security interests in and liens on all DIP Collateral, without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Agents or any DIP Lender of, or over, any DIP Collateral.<br><br>Interim Order ¶ 8. | |

| Material Term | ABL DIP Facility | Term DIP Facility |
|---|---|---|
| **Indemnification**<br>Bankruptcy Rule<br>4001(c)(1)(B)(ix) | The Debtors will indemnify each of the DIP Lenders, the DIP Agents, the Prepetition Secured Parties (in each case, to the extent set forth in the Prepetition Loan Documents), and each of their respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing (each an "**Indemnified Person**") and hold them harmless from and against all reasonable and documented out of pocket costs, fees, and expenses (including the reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facilities.<br><br>No Indemnified Person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred by reason of the bad faith, gross negligence, actual fraud, or willful misconduct of such person (or their related persons). No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's bad faith, gross negligence, actual fraud, or willful misconduct or breach of their obligations under the DIP Facilities, and in no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential, or punitive damages.<br><br>Interim Order ¶ 24. | |

## SIGNIFICANT PROVISIONS UNDER THE COMPLEX CASE PROCEDURES

15.     The Interim Order contains certain significant provisions identified in paragraph 8 of the Procedures for Complex Cases in the Southern District of Texas (the "**Significant Provisions**") as set forth below.[5]  Each Significant Provision is justifiable because the ABL DIP Lenders and Term DIP Lenders would not have provided the ABL DIP Facility or Term DIP Facility, as applicable, without such provisions.  Moreover, the DIP Facilities, taken as a whole, are fair and reasonable to the Debtors under the total facts and circumstances of these Chapter 11

---

[5]     The Final Order is also expected to contain substantially similar Significant Provisions.

Case 24-90194   Document 22   Filed in TXSB on 04/04/24   Page 20 of 150

Cases, are the best financing option available, and are essential to facilitating the restructuring

transactions contemplated by the Restructuring Support Agreement.

| Significant Provision | Description |
|---|---|
| **Roll-Up** | The Interim Order approves the Interim ABL Roll-Up, which provides for a roll-up of all amounts outstanding under the Debtors' prepetition Floorplan Advances, Floorplan Approvals, and Letters of Credit (each as defined in the Prepetition ABL Credit Agreement), as well as authorizes the Debtors to repay prepetition obligations outstanding under the Prepetition ABL Facility, to the extent consistent with the Approved DIP Budget, and which will result in a corresponding increase in availability under the ABL DIP Facility. In addition, the Final Order will provide for a full roll-up and cashless conversion of all outstanding obligations under the Prepetition ABL Facility into ABL DIP Obligations.<br><br>Interim Order ¶ 3(d).<br><br>Justification: As discussed in the First Day Declaration, the ABL Roll Up is a critical component of the ABL DIP Facility that the ABL DIP Lenders (acting through the ABL DIP Agent) required as a condition to provide the Debtors with the ABL DIP Facility and to consent to the Debtors' use of Cash Collateral. First Day Decl. ¶¶ 80-85. The Debtors believe that the ABL DIP Lenders would not be willing to permit borrowing under the ABL DIP Facility (which continues the Prepetition ABL Facility, as modified by the DIP Orders) or use of Cash Collateral absent this feature. *Id.* However, notwithstanding the ABL Roll Up, parties in interest may review the validity and enforceability of the prepetition liens related to the Prepetition ABL Facility pursuant to the challenge period provisions in the DIP Orders. |
| **Liens on Avoidance Actions or Proceeds Thereof** | The DIP Facilities will not be secured by DIP Liens on Avoidance Actions. However, following entry the Final Order, the DIP Facilities will be secured by DIP Liens on the proceeds of any Avoidance Actions.<br><br>Interim Order ¶ 8(a).<br><br>Justification: Providing liens on proceeds of avoidance actions is justifiable because (a) the DIP Agents, or any DIP Lenders, shall use commercially reasonable efforts to satisfy any DIP Obligations from all other DIP Collateral prior to seeking recovery from Avoidance Proceeds; (b) the Debtors, in the exercise of their fiduciary duties, and not the DIP Lenders, will control the prosecution, settlement, and resolution of Avoidance Actions; (c) the Debtors had minimal unencumbered property to provide as collateral for the DIP Facilities; and (d) liens on Avoidance Proceeds are subject to the Final Order, allowing other parties in interest to preserve their rights and object to the inclusion of Avoidance Proceeds as DIP Collateral. |
| **Marshaling; 552(b) Waiver; and Waiver of 506(c) Claims** | The DIP Secured Parties shall not be subject to the equitable doctrine of marshaling or any other similar doctrine with respect to any of the DIP Collateral, and proceeds of the DIP Collateral shall be received and applied pursuant to the Orders and the DIP Documents. Further, with respect to the |

| Significant Provision | Description |
|---|---|
| | DIP Collateral, the Debtors shall waive any right of surcharge under section 506(c) of the Bankruptcy and any "equities of the case" exception under section 552(b) of the Bankruptcy Code. Such waivers shall be effective with respect to the DIP Collateral and DIP Secured Parties upon entry of the Interim Order.<br><br>The foregoing anti-marshaling provision and waivers of sections 506(c) and 552 shall apply to the Prepetition Secured Parties and Prepetition Collateral, as applicable, solely upon entry of the Final Order, but effective as of the Petition Date.<br><br>Interim Order ¶¶ 43-44.<br><br>Justification: The Debtors believe that these waivers were necessary to induce the DIP Lenders to provide the DIP Facilities to the Debtors and consent to use of Cash Collateral, as well as induce the Prepetition Secured Parties to consent to use of Cash Collateral. These waivers are customary under the type of debtor-in-possession financings proposed here. Further, third-parties' rights with respect to the waivers concerning the Prepetition Secured Parties and Prepetition Collateral are preserved, as such waivers are not effective until entry of the Final Order. |

| Significant Provision | Description |
|---|---|
| **Plan Related Milestones** | The Debtors are required to comply with certain milestones, including:<br><br>(i)    The Plan and Disclosure Statement shall have been filed no later than one (1) calendar day after the Petition Date;<br><br>(ii)    The Interim DIP Order shall have been entered no later than three (3) calendar days after the Petition Date;<br><br>(iii)    The order provisionally approving the adequacy of the Disclosure Statement shall have been entered no later than three (3) calendar days after the Petition Date;<br><br>(iv)    The Final DIP Order shall have been entered no later than thirty-five (35) calendar days after the Petition Date;<br><br>(v)    The Disclosure Statement Order (which may be the Confirmation Order) shall have been entered no later than forty-five (45) calendar days after the Petition Date;<br><br>(vi)    The Confirmation Order shall have been entered no later than forty-five calendar days after the Petition Date; and<br><br>(vii)    The Effective Date shall have occurred no later than sixty (60) calendar days after the Petition Date.<br><br>Term DIP Credit Agreement § 5.15.<br><br>Justification: The Debtors believe that these milestones are achievable and will allow them to confirm a value-maximizing Plan on an appropriate timeline. Further, the Debtors believe that the milestones balance the DIP Lenders' justifiable concerns about process costs associated with the Chapter 11 Cases, the need to exit these Chapter 11 Cases expeditiously, and the Debtors' obligation to discharge their fiduciary duties to maximize the value of their estates. |
| **Default Provisions and Remedies** | The DIP Facilities contain Events of Default that are usual and customary for debtor in possession financings, as set forth above.<br><br>Immediately upon the occurrence and during the continuation of an Event of Default, under the Term DIP Facility or the ABL DIP Facility, as applicable, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of the Interim Order and the Remedies Notice Period (as defined below), the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Term DIP Agent or the ABL DIP Agent (acting at the direction or authorization of the Required Term DIP Lenders or the Required ABL DIP Lenders, as applicable) to (i) deliver to the applicable DIP Borrower a notice declaring the occurrence of an Event of Default; (ii) declare (any such declaration, a "<u>Termination Declaration</u>" and the date on which a Termination Declaration is delivered, the "<u>DIP Termination Date</u>"), upon delivery by |

| Significant Provision | Description |
|---|---|
| | electronic mail (or other electronic means) to counsel to the Debtors, counsel to any Official Committee, counsel to the First Lien Group, counsel to the PVKG Lender, counsel to the other DIP Agent, and the U.S. Trustee, (a) all Term DIP Obligations or ABL DIP Obligations, as applicable, owing under the DIP Documents to be immediately due and payable, (b) the termination, reduction, or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the Term DIP Facility or the ABL DIP Facility, as applicable, (c) termination of the Term DIP Facility and the Term DIP Documents or the ABL DIP Facility and the ABL DIP Documents, as applicable, as to any future liability or obligation of the DIP Agents and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (d) termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, and (e) that the Carve Out shall be triggered, through the delivery of the Carve Out Trigger Notice in accordance with paragraph 16 of the Interim Order; (iii) charge the default rate of interest under the applicable DIP Facility (which default rate of interest shall be charged automatically in accordance with the terms of the applicable DIP Documents); (iv) exercise any other right or remedy with respect to the DIP Collateral or the DIP Liens; and (v) take any other action or exercise any other right or remedy permitted under the applicable DIP Documents, the Interim Order, the Final Order, or applicable law; *provided*, *however*, that in the case of the enforcement of rights pursuant to clauses (iv)-(v) of paragraph 19 of the Interim Order,  the Term DIP Agent or the ABL DIP Agent (acting at the direction or authorization of the Required Term DIP Lenders or Required ABL DIP Lenders, as applicable) shall provide counsel to the Debtors, counsel to any Official Committee, counsel to the First Lien Group, counsel to the PVKG Lender, counsel to the other DIP Agent, and the U.S. Trustee with five (5) business days' prior written notice (such period, the "Remedies Notice Period"). Immediately upon the expiration of the Remedies Notice Period, the Court shall hold an emergency hearing when the Court is available (the "Enforcement Hearing") at which the Debtors, any Official Committee, and/or any other party in interest shall be entitled to seek a determination from the Court solely as to whether an Event of Default has occurred, and at the conclusion of the Enforcement Hearing, the Court may fashion an appropriate remedy that is consistent with the terms of the Interim Order; *provided*, *further*, that during the Remedies Notice Period, the Debtors are permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Debtors' businesses, as determined by the Required DIP Lenders in their sole discretion. Except as set forth in the Interim Order or otherwise ordered by the Court prior to the expiration of the Remedies Notice Period, after the Remedies Notice Period, the Debtors shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Secured Parties under the Interim Order. Notwithstanding anything to the contrary herein, no enforcement rights set forth in paragraph 19 of the Interim Order shall be exercised prior to the Court holding an Enforcement Hearing, subject to Court availability, and the expiration of the Remedies Notice Period, and the Remedies Notice Period |

| Significant Provision | Description |
|---|---|
| | shall not expire until the conclusion of the Enforcement Hearing and the issuance of a ruling by the Court.<br><br>Interim Order ¶ 19.<br><br><u>Justification</u>: The Debtors believe that the provisions limiting the automatic stay in the Interim Order are justifiable because in no case can the stay be lifted without a hearing before this Court, should the Debtors or another party in interest timely seek such hearing. |
| **Release of Claims** | Effective upon entry of the Final Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge each of the DIP Secured Parties and the Prepetition Secured Parties, and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, DIP Liens, DIP Documents, Prepetition Obligations, Prepetition Liens, or Prepetition Loan Documents, as applicable, including, without limitation:<br><br>    (i) any so-called "lender liability" or equitable subordination claims or defenses;<br><br>    (ii) any and all claims and causes of action arising under the Bankruptcy Code; and<br><br>    (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Secured Parties and the Prepetition First Lien Secured Parties;<br><br>*provided*, that nothing in this paragraph shall in any way limit or release any of the Debtors' claims or causes of action related to, or arising from, (x) any obligations of any DIP Secured Party under the DIP Documents or (y) any obligations pursuant to the RSA that any party may owe to the Debtors or their estates.<br><br>Interim Order ¶ 31. |

| Significant Provision | Description |
|---|---|
| | Justification: The Debtors believe that the releases of claims in the Interim Order are appropriate, and they comply with the Complex Case Procedures because they are subject to a Challenge Period with a length consistent with the Complex Case Procedures.  Additionally, the Debtors have been provided significant consideration in the form of the DIP Facilities and use of their Cash Collateral by the DIP Lenders and the Prepetition Secured Parties, respectively, such that the releases of claims are a fair exchange. |
| **Limitations on Use of Cash Collateral Other than General Carve-Outs** | The DIP Facilities, the DIP Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve Out or proceeds thereof may not be used:  (a) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against any of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such), and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such) under the DIP Documents, the Prepetition Loan Documents, or the Interim Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtors or any Official Committee appointed in these Cases in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral or seeking affirmative relief against any of the DIP Secured Parties or the Prepetition Secured Parties related to the DIP Obligations or the Prepetition Obligations; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations or the Prepetition Obligations, or the DIP Agents', the DIP Lenders', and the Prepetition Secured Parties' liens or security interests in the DIP Collateral or Prepetition Collateral, as applicable; or (iii) for monetary, injunctive, or other affirmative relief against the DIP Secured Parties or the Prepetition Secured Parties, or the DIP Agents', the DIP Lenders', or the Prepetition Secured Parties' respective liens on or security interests in the DIP Collateral or the Prepetition Collateral that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties, as applicable, to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations or the Prepetition  Obligations, to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the |

| Significant Provision | Description |
|---|---|
| | Prepetition Secured Parties related to the Prepetition Obligations, or by or on behalf of the DIP Agent and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Liens, the Prepetition  Obligations, or the Prepetition Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of:  (x) any of the DIP Liens or any other rights or interests of the DIP Agents or the DIP Lenders related to the DIP Obligations or the DIP Liens, or (y) any of the Prepetition Liens or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Obligations or the Prepetition Liens; *provided* that no more than $50,000 of the proceeds of the Term DIP Facility, the ABL DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by the Official Committee solely to investigate, within the Challenge Period, the claims, causes of action, adversary proceedings, or other litigation against the Prepetition Secured Parties solely concerning the legality, validity, priority, perfection, enforceability or extent of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Obligations.<br><br>Interim Order ¶ 34.<br><br><u>Justification</u>: The Debtors believe that it is reasonable for the DIP Lenders to limit the amount of financing that they provide that is being used to fund litigation against them.  Limits on investigation fees and costs are common practice, and the limit in the Interim Order is consistent with similar cases in this district. |
| **Waiver of Right to Seek Non-Consensual Use of Cash Collateral** | The Interim Order provides that, prior to payment of the DIP Facilities in full, (x) it shall be an Event of Default if the Debtors seek further authority, and (y) whether or not an Event of Default has occurred, the Debtors irrevocably waive any right that they may have: (a) to use Cash Collateral of DIP Agents and DIP Lenders under section 363 of the Bankruptcy Code other than as provided in this Interim Order, (b) to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code, other than as provided in this Interim Order or as may be otherwise expressly permitted pursuant to the DIP Documents, (c) to challenge the application of any payments authorized by this Interim Order as pursuant to section 506(b) of the Bankruptcy Code, (d) to propose, support or have a plan of reorganization or liquidation that is either inconsistent with the Ratification Agreement or RSA, or (e) to seek relief under the Bankruptcy Code, including without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of DIP Agents or DIP Lenders as provided in this Interim Order and the DIP Documents or DIP Agents' or DIP Lenders' exercise of such rights or remedies; *provided*, *however*, that DIP Agents may otherwise consent in |

| Significant Provision | Description |
|---|---|
|  | writing, but no such consent shall be implied from any other action, inaction, or acquiescence by DIP Agents or DIP Lenders. |
|  | Interim Order ¶ 42. |
|  | Justification: The ABL DIP Agent informed the Debtors that the ABL DIP Lenders would not provide the ABL DIP Facility, or consent to the use of Cash Collateral, without the Debtors waiving their rights to seek non-consensual use of cash collateral, along with the other waivers contained in this paragraph. |
| Cross-Collateralization | The DIP Orders do not contemplate cross-collateralization. |
| Non-Consensual Priming Liens | The DIP Orders do not contemplate any non-consensual priming liens. |
| Provisions Limiting the Ability of Estate Fiduciaries to Fulfill Their Duties | The DIP Orders do not limit the ability of the estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law. |

## THE DEBTORS' PREPETITION CAPITAL STRUCTURE

16.     As of the Petition Date, the Debtors have approximately $1.821 billion in aggregate outstanding principal of funded debt obligations.   The following table depicts the Debtors' prepetition capital structure:

| Funded Debt | Maturity | Principal Amount Outstanding ($ millions) |
|---|---|---|
| Prepetition ABL Credit Agreement | April 2025 | $190 |
| Prepetition First Lien Term Loan Credit Agreement | January 2026 | $1,061 |
| Prepetition KL Note Purchase Agreement | January 2026 | $75 |
| Prepetition PVKG Note Purchase Agreement | June 2028 | $220 |
| Prepetition Second Lien Term Loan Credit Agreement | January 2027 | $275 |
| TOTAL |  | $1,821 |

**I.      Funded Indebtedness**

      **A.      Prepetition ABL Facility**

      17.      Under its Amended and Restated ABL Credit Agreement dated as of January 4, 2019 (as amended by Amendment No. 1 dated as of July 10, 2022, Amendment No. 2 dated as of September 14, 2022, Amendment No. 3 dated as of January 23, 2023, and Amendment No. 4 dated as of August 29, 2023, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition ABL Credit Agreement**") by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, Wells Fargo Commercial Distribution Finance, LLC, as administrative agent, collateral agent, and floorplan funding agent (in such capacities, the "**Prepetition ABL Agent**"), and as swing line lender, and the lenders from time to time party thereto (together with the Prepetition ABL Agent and other secured parties under the Prepetition ABL Credit Agreement, the "**Prepetition ABL Secured Parties**"), the Prepetition ABL Secured Parties agreed to provide C1 Holdings with a secured revolving credit loan with aggregate availability of $250 million, subject to compliance with a borrowing base, various sublimits applicable to swingline loans, letters of credit, and floorplan advances otherwise authorized under the Prepetition ABL Credit Agreement, and various reserves that may be established in accordance with the Prepetition ABL Credit Agreement (the "**Prepetition ABL Facility**").

      18.      As of the Petition Date, an aggregate balance of approximately $190 million, including revolving loans, floorplan obligations, and accrued and unpaid interest remains outstanding under the Prepetition ABL Facility.  The Company is unable to access the remaining availability under the Prepetition ABL facility due to Prepetition ABL Credit Agreement's borrowing base limitations, reserves and sublimits, and minimum availability requirements.  The obligations under the Prepetition ABL Facility are secured by a first priority security interest in

substantially all of the Debtors' assets, subject to the intercreditor agreements described below. The Prepetition ABL Facility matures in April 2025.

**B.      Prepetition First Lien Term Loan Facility**

19.      Under the terms of a certain First Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by Amendment No. 1 dated as of March 14, 2019 and Amendment No. 2 dated as of December 17, 2021, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition First Lien Term Loan Credit Agreement**") by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, Deutsche Bank AG New York Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition First Lien Term Loan Agent**"), and certain lenders from time to time party thereto (together with the First Lien Term Loan Agent, the "**Prepetition First Lien Term Loan Secured Parties**"), the Prepetition First Lien Term Loan Secured Parties agreed to provide C1 Holdings with initial term loans in the principal amount of $960 million and incremental term loans in the principal amount of $150 million, resulting in aggregate borrowings under the Prepetition First Lien Term Loan Credit Agreement of $1.110 billion in principal (the "**Prepetition First Lien Term Loan Facility**").

20.      As of the Petition Date, approximately $1.1 billion of obligations, including accrued and unpaid interest and OID, are outstanding under the Prepetition First Lien Term Loan Facility.  C1 Holdings' obligations under the Prepetition First Lien Term Loan Facility are guaranteed by each of its Debtor subsidiaries and PVKG Intermediate.  The Debtors' obligations under the Prepetition First Lien Term Loan Facility are secured by a first priority security interest in substantially all assets of the Debtors, subject to the intercreditor agreements described below. The Prepetition First Lien Term Loan Facility matures in January 2026.

C.      **Prepetition KL Notes**

21.      Under the terms of a First Lien Secured Note Purchase Agreement dated as of July 10, 2020 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition KL Note Purchase Agreement**") by and among C1 Holdings, as issuer, PVKG Intermediate, as holdings, Deutsche Bank Trust Company, as administrative agent and collateral agent (the "**Prepetition KL Notes Agent**"), certain affiliates of Kennedy Lewis Investment Management LLC as holders party thereto ("**Kennedy Lewis**"), and any other holder from time to time party thereto (together with the Prepetition KL Notes Agent, the "**Prepetition KL Notes Secured Parties**"), C1 Holdings issued senior secured notes to Kennedy Lewis in the aggregate principal amount of $75 million (the "**Prepetition KL Notes**").

22.      As of the Petition Date, approximately $78.8 million of obligations, including accrued and unpaid interest and OID, are outstanding under the Prepetition KL Notes.  C1 Holdings' obligations under the Prepetition KL Notes are guaranteed by each of its Debtor subsidiaries and PVKG Intermediate.  The obligations under the Prepetition KL Notes are secured by a first priority security interest in substantially all of the Debtors' assets, subject to the intercreditor agreements described below.  The Prepetition KL Notes mature in January 2026.

D.      **Prepetition PVKG Notes**

23.      Under the terms of the Third Amendment and Restatement to Promissory Note and Purchase and Cashless Exchange Agreement dated as of July 6, 2023 (the "**Prepetition PVKG Note Purchase Agreement**") by and among parties including C1 Holdings, as issuer, and PVKG Investment Holdings Inc. (an entity controlled by CVC), as holder (in such capacity, "**PVKG Lender**") and as administrative agent and collateral agent (in such capacities, the "**Prepetition PVKG Notes Agent,**" and in its capacities as holder, administrative agent, and collateral agent, the "**Prepetition PVKG Notes Secured Parties**"), C1 Holdings issued senior secured notes to

PVKG Lender in the principal amount of approximately $160 million, and rolled up approximately $33 million of notes previously issued to PVKG Lender, resulting in a total principal balance of approximately $193 million (the "**Prepetition PVKG Notes**").  The Prepetition PVKG Notes Secured Parties, together with the Prepetition First Lien Term Loan Secured Parties and the Prepetition KL Note Secured Parties are referred to as the "**Prepetition First Lien Secured Parties**."

24.     As of the Petition Date, pursuant to a settlement of claims related to the Prepetition PVKG Notes, the parties thereto have agreed that $213 million of obligations, including paid-in-kind interest added to principal and amortized OID, but excluding prepayment premiums and unamortized OID, remain outstanding under the Prepetition PVKG Notes.  C1 Holdings' obligations under the Prepetition PVKG Notes are guaranteed by each of its Debtor subsidiaries and PVKG Intermediate.  The obligations under the Prepetition PVKG Notes are secured by a first priority security interest in substantially all of the Debtors' assets, subject to the intercreditor agreements described below.  The Prepetition PVKG Notes mature in June 2028.

E.     **Prepetition Second Lien Facility**

25.     Under the terms of a Second Lien Term Loan Credit Agreement dated as of January 4, 2019 (as amended by Amendment No. 1 dated as of July 10, 2022, and as further amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition Second Lien Credit Agreement**") by and among C1 Holdings, as borrower, PVKG Intermediate, as holdings, UBS AG, Stamford Branch, as administrative agent and collateral agent (in such capacities, the "**Prepetition Second Lien Agent**"), and certain lenders from time to time party thereto (together with the Prepetition Second Lien Agent, the "**Prepetition**

**Second Lien Secured Parties**"),[6] the Prepetition Second Lien Secured Parties provided C1 Holdings with a single-draw secured term loan in the aggregate principal amount of $275 million (the "**Prepetition Second Lien Facility**").

26.     As of the Petition Date, approximately $287 million of obligations, including accrued and unpaid interest but excluding unamortized OID, are outstanding under the Prepetition Second Lien Facility.  C1 Holdings' obligations under the Prepetition Second Lien Facility are guaranteed by each of its Debtor subsidiaries and PVKG Intermediate.  The obligations under the Prepetition Second Lien Facility are secured by a second priority security interest in substantially all assets of the Debtors.  The Prepetition Second Lien Facility matures in January 2027.

### F.     Intercreditor Agreements

27.     A series of intercreditor agreements govern the relative lien and payment priorities of the Prepetition ABL Secured Parties, the Prepetition First Lien Secured Parties, and the Prepetition Second Lien Secured Parties (together, the "**Prepetition Secured Parties**").  Under an ABL Intercreditor Agreement dated as of January 4, 2019 (as amended by that certain ABL Intercreditor Agreement Joinder dated as of May 15, 2023 and as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date, the "**Prepetition ABL Intercreditor Agreement**") by and among the Prepetition ABL Agent, the Prepetition First Lien Term Loan Agent, Prepetition KL Notes Agent, and the Prepetition PVKG Notes Agent, the liens held by the Prepetition ABL Secured Parties on specified collateral, including the Debtors' cash, accounts receivable, and inventory, have priority over the liens held by the Debtors' Prepetition First Lien Term Loan Secured Parties, Prepetition KL Notes Secured

---

[6]     Collectively, the Prepetition ABL Secured Parties, Prepetition First Lien Term Loan Secured Parties, Prepetition KL Notes Secured Parties, Prepetition PVKG Notes Secured Parties, and Prepetition Second Lien Secured Parties are referred to as the "**Prepetition Secured Parties**."

Parties, and Prepetition PVKG Notes Secured Parties on that collateral.  Conversely, the liens held by the Prepetition First Lien Term Loan Secured Parties, Prepetition KL Notes Secured Parties, and Prepetition PVKG Notes Secured Parties on certain collateral other than the Debtors' cash, accounts receivable, and inventory have priority over the liens on that collateral held by the Prepetition ABL Secured Parties.

28.     Under the terms of a First Lien Pari Passu Intercreditor Agreement dated as of January 10, 2020 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among the Prepetition First Lien Term Loan Agent, Prepetition KL Notes Agent, and the Prepetition PVKG Notes Agent, the parties agreed that they would be *pari passu* with respect to the priority of their liens on common collateral and that any payments in respect of their common collateral would be made pro rata, subject to the provisions of the Prepetition ABL Intercreditor Agreement.

29.     Finally, under the terms of a certain first lien and second lien Intercreditor Agreement dated as of January 4, 2019 (as amended, modified, supplemented, and/or restated and in effect immediately prior to the Petition Date), by and among the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties, the liens securing the Prepetition ABL Facility, Prepetition First Lien Term Loan Facility, Prepetition KL Notes, and Prepetition PVKG Notes have priority over the liens securing the Prepetition Second Lien Term Loan Facility.

## THE DIP FACILITIES

I.      **The Debtors' Need for Access to Financing and the Use of Cash Collateral**

30.     To continue operating in the ordinary course, and to effectuate an efficient and expeditious restructuring, the Debtors need immediate access to liquidity.  As of the Petition Date, the Debtors only have $21.4 million in cash on hand, which is not sufficient to support business operations as a going concern in the near term or for the duration of these Chapter 11 Cases.

31.     As described in greater detail in the First Day Declaration, the Debtors, with the assistance of their financial advisor, AlixPartners LLP, analyzed their cash needs in order to determine the liquidity levels necessary to stabilize the Debtors' operations and administer these Chapter 11 Cases.  *See* First Day Decl. ¶ 77.  As part of that analysis, the Debtors and their advisors developed an initial 13-week budget, a copy of which is attached as **Exhibit A** to the Interim Order (the "**DIP Budget**").   The DIP Budget projects the Debtors' weekly cash receipts, cash disbursements, and liquidity and considers a number of factors, including required costs to maintain operations, fees and interest expense associated with the Debtors' proposed DIP Facilities, professional fees, and anticipated funding under the proposed DIP Facilities. Furthermore, the DIP Budget includes the expenditures that the Debtors seek authority to pay under the Debtors' first day motions, subject to approval by the Court, including the payment of all general unsecured claims in the ordinary course of business.

32.     With the consent of their prepetition lenders, in their separate capacities as DIP Lenders and holders of prepetition funded debt claims, the Debtors will use Cash Collateral for working capital and other general corporate purposes.   Cash Collateral alone, however, is insufficient to fund the costs associated with the Debtors' operations and restructuring while pursuing the restructuring transactions contemplated by the RSA.  The Debtors, with the assistance of their advisors, have therefore determined that the additional postpetition financing provided by the DIP Facilities is immediately necessary to allow the Debtors to administer these Chapter 11 Cases while continuing to operate their businesses in the ordinary course, fund adequate protection payments, and demonstrate to their customers and other contract counterparties that they are well-capitalized.  Unless the Debtors can demonstrate that they have the means available to operate in the ordinary course and procure goods and services that are vital to ongoing business operations,

34

vendors and suppliers may refuse to do business with the Debtors.  Moreover, absent access to the funds available under the DIP Facility and access to Cash Collateral, the Debtors will promptly lack sufficient liquidity to continue their operations in the ordinary course to the material detriment of the Debtors' customers, employees, vendors, suppliers, and other creditors.

33.     Accordingly, granting authority for the Debtors to use Cash Collateral and enter into the DIP Facilities is essential to preserve and maximize the value of their estates, responsibly administer these Chapter 11 Cases, and successfully reorganize.

## II.     Alternative Sources of Financing Are Not Available on Better Terms

34.     To evaluate alternatives to the proposed DIP Facilities, the Debtors' investment banker, Evercore, initiated a marketing process for postpetition financing.  As part of this process, Evercore solicited interest from twenty-one sources of financing outside of the Debtors' capital structure.  DIP Decl. ¶¶ 16.  The potential third-party lenders Evercore contacted included various institutions that routinely provide postpetition financing, including both well-known commercial banks and specialty lenders.  *Id*.  From that group of potential third-party lenders, eleven lenders expressed an interest in participating in either an asset-based revolving loan facility or term loan facility, and subsequently executed confidentiality agreements with the Debtors and received access to non-public information.  *Id*.  The Debtors then received three alternative asset-based revolving loan proposals.  *Id*.  Despite the outreach described above, the Debtors did not receive any alternative term loan financing proposals.  *Id*.

35.     Ultimately, after reviewing all available alternatives, and evaluating those proposals based on, among other things, access to liquidity, cost of capital, covenants, conditions to funding, certainty of execution, and risk of challenge, the Debtors determined that the ABL DIP Facility and Term DIP Facility together provided the most favorable economic terms to the

Debtors' estates and provided the most certainty in consummating the restructuring transactions contemplated by the RSA. *Id.* ¶ 18.

## USE OF CASH COLLATERAL

36.     The DIP Facilities contemplate that the Debtors will have immediate access to Cash Collateral on a consensual basis, subject to the terms and conditions of the DIP Documents and the DIP Orders.  Coupled with the liquidity provided under the DIP Facilities, immediate access to the Cash Collateral will ensure that the Debtors have sufficient working capital to, among other things, continue their business operations in the ordinary course by serving their customers and paying their employees, vendors, landlords, and service providers, enable the Debtors to honor their prepetition obligations proposed under their first day motions (if granted by the Court), and satisfy administrative expenses of these Chapter 11 Cases.  By providing the Debtors with the immediate ability to use Cash Collateral, the DIP Facilities also ensure that the Debtors avoid unnecessary business disruptions that would otherwise be costly and potentially damaging to their businesses and creditors.

## FORMS OF ADEQUATE PROTECTION

37.     After arms' length, and good faith negotiations, the Prepetition Secured Parties have agreed to consent to the use of the Prepetition Collateral, including Cash Collateral, subject to the Debtors providing adequate protection.  The adequate protection included in the DIP Orders is designed to protect the Prepetition Secured Parties' interests in the Debtors' property from any postpetition diminution in value caused by, among other things, the imposition of the priming DIP liens on the Prepetition Collateral, the Carve Out, the Debtors' use of Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay.  Specifically, the Debtors have agreed to provide the following forms of adequate protection:

- **Adequate Protection Liens**: As further set forth in the Interim Order, the Debtors will grant the Prepetition Secured Parties replacement security interests in, and liens on, the DIP Collateral, with the priorities and subject to the limitations set forth in the DIP Orders.

- **Adequate Protection Claims**: As further described in the Interim Order, the Prepetition Secured Parties will be granted adequate protection superpriority claims under sections 503(b) and 507 of the Bankruptcy Code, with the priorities, and subject to the limitations, set forth in the DIP Orders.

- **Adequate Protection Fees and Expenses**: The Debtors will pay certain reasonable fees and expenses of the Prepetition Secured Parties, as set forth in the DIP Orders and the RSA.

- **Adequate Protection Reporting**: The Debtors will provide certain reports and notices to the Prepetition ABL Secured Parties and Prepetition First Lien Secured Parties, which are customary for debtor in possession financings of this type and as set forth in the DIP Credit Agreements, including each Approved DIP Budget.

38.    The adequate protection proposed under the DIP Orders does not include current cash pay interest or payment of accrued but unpaid prepetition interest.  The Debtors' agreement to provide adequate protection liens, claims, and reporting, and to pay certain fees and expenses of the Prepetition Secured Parties provides reasonable and appropriate adequate protection for the Prepetition Secured Parties.  The proposed adequate protection is sufficient to protect the Prepetition Secured Parties from any postpetition diminution in value to the Prepetition Collateral, including Cash Collateral.  Moreover, the Prepetition Secured Parties have consented to the use of Cash Collateral.  In light of the foregoing, the proposed adequate protection for the benefit of the Prepetition Secured Parties is appropriate under the circumstances.

## BASIS FOR RELIEF

I.      **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Facilities**

        A.      **Entry Into the DIP Facilities Is an Exercise of the Debtors' Sound Business Judgment**

39.     The Debtors meet the requirements for relief under section 364 of the Bankruptcy Code, which permits a debtor to obtain post-petition financing and grant superpriority administrative status and liens on its property in exchange for that financing.  Specifically, section 364(c)(1) of the Bankruptcy Code provides that the court may approve financing, "with priority over any or all administrative expenses. . .." 11 U.S.C. § 364(c)(1).  Section 364(d) of the Bankruptcy Code also provides that priming liens may be incurred to support postpetition financing if the debtor is "unable to obtain such credit otherwise" and the primed lienholders are adequately protected.  11 U.S.C. § 364(d)(1)(A)–(B).

40.     Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of the Bankruptcy Code.  *See, e.g., In re N. Bay Gen. Hosp., Inc.*, Case No. 08-20368 (JB) [Docket No. 21] (Bankr. S.D. Tex. July 8, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) (noting that courts will generally defer to "the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

41.     To determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).  For this analysis, a court may take into consideration non-economic benefits to a debtor offered by a proposed postpetition financing facility.  For example, in *In re ION Media Networks, Inc.*, 2009 WL 2902568, at *14 (Bankr. S.D.N.Y. July 6, 2009), the Bankruptcy Court for the Southern District of New York explained that "noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies, and the likelihood of a successful reorganization" may be properly considered by debtors when selecting postpetition financing, because the "business decision to obtain credit from a particular lender is almost never based purely on economic terms." *Id*.

42.     Here, given all the facts and circumstances present in these Chapter 11 Cases, the Debtors have satisfied the necessary conditions under sections 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP Facilities.  Following an arms-length process and careful evaluation of available alternatives, the Debtors exercised their reasoned business judgment on an informed basis when determining to entering into the DIP Facilities.  DIP Decl. ¶¶ 16-19.   The terms of the DIP Facilities are also fair and reasonable and the best available to the Debtors under the circumstances and in the current market.  *Id. ¶¶* 16-26.  Moreover, despite marketing the DIP Facilities to third-parties and seeking alternative financing proposals, the Debtors could not obtain junior secured or unsecured credit, and there is no actionable DIP facility without the consensual priming contemplated by the Interim Order.  *Id*. ¶¶ 16-18.  The Debtors therefore request that the Court grant this Motion and authorize the Debtors to enter into each of the DIP Facilities.

**B.** **The ABL Roll-Up Is Appropriate Under the Circumstances and Should Be Approved**

43.     The proposed ABL Roll-Up is also a sound exercise of the Debtors' business judgment and should be approved.

44.     Section 363(b) of the Bankruptcy Code permits a debtor to use property of the estate, other than in the ordinary course of business, if that use reflects a debtor's business judgment and is approved by the court.  11 U.S.C. § 363(b).  The business judgment rule shields a debtor's management from judicial second-guessing.  *Committee of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").  In addition, courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going concern value.  *See, e.g., In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing that the "Doctrine of Necessity" provides a basis to "authorizing payment of prepetition claims in appropriate cases."); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).

45.     The conversion of prepetition debt into postpetition debt (often referred to as a "roll-up") is a common feature in debtor in possession financing arrangements.  The importance of "roll-up" features in DIP facilities has been repeatedly recognized by courts in this district and others, and such courts have granted relief similar to the relief requested herein.  *See e.g., In re Noble House Home Furnishings LLC*, No. 23-90773 (CML) (Bankr. S.D. Tex. Sept. 11, 2023) [Docket No. 41] (authorizing a $12.2 million new-money DIP financing which included a roll up

of approximately $73 million of outstanding prepetition ABL obligations); *In re Instant Brands Acquisition Holdings, Inc.*, No. 23-90716 (DRJ) (Bankr. S.D. Tex. June 12, 2023) [Docket No. 257] (deeming all prepetition ABL loans to be substituted and exchanged for ABL DIP obligations on a cashless dollar-for-dollar basis); *In re Diebold Holding Co., LLC*, No. 23-90602 (DRJ) (Bankr. S.D. Tex. June 2, 2023) [Docket No. 90] (approving in the interim order the use of DIP loan proceeds "indefeasibly pay in full in cash" prepetition ABL obligations); *In re QualTek Services, Inc.*, 23-90584 (CML) (Bankr. S.D. Tex. May 24, 2023) [Docket No. 180] (authorizing roll-up of prepetition ABL obligations, on a cashless, dollar-for-dollar basis, into DIP obligations); *In re Monitronics Int'l, Inc.*, No. 23-90332 (CML) (Bankr. S.D. Tex. May 16, 2023) [Docket No. 70] (approving in the interim order the use of DIP loan proceeds "to repay indefeasibly and in full" certain prepetition loans); *In re Venator Materials PLC*, No. 23-90301 (DRJ) (Bankr. S.D. Tex. May 16, 2023) [Docket No. 98] (approving in the interim order the roll-up of prepetition ABL obligations to be immediately, automatically, and irrevocably deemed to be obligations under the ABL DIP facility).

46.     Here, the Court should approve the ABL Roll-Up as a reasoned exercise of the Debtors' business judgment and necessary under the circumstances.  The ABL Roll-Up is essential to the proposed ABL DIP Facility.  Without the ABL Roll-Up, among other terms in the ABL DIP Facility and proposed DIP Orders, the Prepetition ABL Agent would not be willing to enter into the ABL DIP Facility, including the floorplan facility, or consent to use of Cash Collateral.  First Day Decl. ¶ 84.  The ABL Roll-Up is therefore essential to the Debtors' ability to preserve access to their revolving credit line and floorplan facility, avoid material interruptions to their ordinary course options during these Chapter 11 Cases, and consummate the restructuring transactions contemplated by the RSA.  Further, a majority of the Prepetition First Lien Secured Parties, who

share liens on the prepetition ABL lenders' collateral subject to the Prepetition ABL Intercreditor Agreement, have consented to the ABL DIP Facility and the ABL Roll-Up through their agreement to the RSA.  Accordingly, the ABL Roll-Up should be approved as a reasonable, appropriate, and sound exercise of the Debtors' business judgment.

### C.    The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lenders

47.    The Debtors propose to obtain financing under the DIP Facilities, in part, by providing superpriority claims and liens pursuant to section 364(c) of the Bankruptcy Code. Significantly, the Debtors propose to provide first priority liens on substantially all of the Debtors' assets, including previously unencumbered property and "priming" liens on all of the DIP Collateral, with relative priorities as between the ABL DIP Lenders and Term DIP Lenders set forth in the Interim Order.

48.    In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court:

> [M]ay authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor should be authorized to grant superpriority administrative expense claims for financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether: (i) the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy

Code, *i.e.*, by allowing a lender only an administrative claim; (ii) the credit transaction is necessary to preserve the assets of the estate; and (iii) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders. *See In re Ames Dep't Stores*, 115 B.R. at 37–40; *see also Norris Square Civic Ass'n v. Saint Mary Hosp. (In re Mary Hosp.)*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988); *In re Crouse Group*, 71 B.R. at 549.

49.     The Debtors meet each prong of this test.  No party that Evercore contacted as part of the Debtors' marketing process for postpetition financing was willing to provide financing on an unsecured basis.  DIP Decl. ¶¶ 16-18.  Indeed, no potential lender, including the DIP Lenders and alternative third-party providers, provided a postpetition financing proposal on anything other than a superpriority or priming basis.  *Id.*  Absent the DIP Facilities, which will provide certainty that the Debtors will have sufficient liquidity to administer these Chapter 11 Cases, and comfort to their employees and vendor constituencies that business will continue in the ordinary course, the value of the Debtors' estates would be impaired to the detriment of all stakeholders.  *Id.* ¶ 26.  Accordingly, granting superpriority administrative expense claims to the DIP Lenders on account of the DIP Facilities is appropriate in light of the Debtors' financing needs and the lack of viable unsecured debtor in possession financing alternatives.

50.     Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1)(A)–(B).  The Debtors may therefore incur "priming" liens under the DIP Facilities if they are unable to obtain unsecured or junior secured credit and either (a) the existing secured

parties have consented or (b) the existing secured parties' interests in collateral are adequately protected.

51.     As set forth more fully herein and in the Interim Order, the Debtors propose to provide a variety of adequate protection to protect the interests of the Prepetition Secured Parties. In addition, Prepetition Secured Parties holding over 81% of the First Lien Claims have affirmatively consented to the DIP Facilities and proposed adequate protection, and are actively participating in the DIP Facilities.  And the Prepetition Second Lien Secured Parties holding over 81% of the Second Lien Claims have affirmatively consented to the DIP Facilities and proposed adequate protection.   Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate and the priming superpriority administrative expense claims in favor of the DIP Lenders should be approved.

### D.     No Comparable Alternatives to the DIP Facilities Are Reasonably Available

52.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re*

*Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).  Furthermore, courts will defer to debtor's business judgment in selecting financing.  *In re L.A. Dodgers LLC*, 457 B.R. at 313; *In re General Growth Properties, Inc.*, 412 B.R. 122, 126 (Bankr. S.D.N.Y. 2009) (approving DIP financing where it reflected the prudent business judgment of the debtors).

53.     Here, the Debtors conducted a competitive marketing process leading up to the Petition Date to explore alternative financing options.  As described in greater detail in the DIP Declaration, the Debtors contacted multiple alternative lenders as part of that process.  DIP Decl. ¶¶ 16-18.  Ultimately, the Debtors did not receive any offer or combination of offers from third-party lenders superior to the DIP Facilities.  *Id.* ¶ 16.  Simply put, the DIP Facilities provide the Debtors with the liquidity they need at the lowest cost available while simultaneously placing the Debtors on an optimal path for a successful restructuring.  *Id.* ¶¶ 20-26.  Therefore, the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**II.     The Prepetition Secured Parties Are Adequately Protected**

54.     Section 363(c)(2) of the Bankruptcy Code provides that, absent consent, a debtor may use cash collateral where "the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2)(A)–(B).  Absent consent, section 363(e) of the Bankruptcy Code further conditions the use of collateral upon the debtor providing "adequate protection" of a secured creditor's interest in the property proposed to be used.  11 U.S.C. § 363(e); COLLIER ON BANKRUPTCY ¶ 363.05 (16th ed. 2010).  Section 362(d)(1) of the Bankruptcy Code further provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).

45

55.     While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See, e.g., In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case.") (citation omitted); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

56.     Bankruptcy courts have found lenders are adequately protected when priming debt is used to improve the value of their collateral or the Debtors' estates. *See, e.g., In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *see also In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).  For a court to find that a secured creditor is adequately protected under a proposed postpetition financing arrangement, it may evaluate whether "projections grounded on a firm evidentiary basis" support the claim that priming debt is likely to ultimately improve outcomes for the primed creditors.  *In re Mosello*, 195 B.R. at 292.

57.     Here, after extensive arm's length and good faith negotiations, the Prepetition Secured Parties have agreed to consent to the use of their Prepetition Collateral, including Cash Collateral, subject to the adequate protection set forth in the Interim Order.  Among other things, the Adequate Protection Liens contemplated by the DIP Facilities are designed to protect the Prepetition Secured Parties' interests in the Debtors' property from any diminution in value caused by the Debtors' use of the Prepetition Collateral, including Cash Collateral, during the pendency of these Chapter 11 Cases.  The proposed DIP Facilities, which are consensually priming the

Prepetition ABL Secured Parties, Prepetition First Lien Secured Parties, and Prepetition Second Lien Secured Parties, provide adequate protection for all parties by allowing the Debtors to continue operating their businesses as a going concern, seek to consummate the restructuring transactions contemplated by the RSA, and ultimately increase the value ultimately distributable to the Debtors' creditors.  Accordingly, the value created by virtue of allowing the Debtors to continue to operate is enough to adequately protect the Prepetition Secured Parties, notwithstanding their consent to the adequate protection packages included in the Interim Order.

**III.    Continued Access to Cash Collateral is Warranted and Should Be Approved**

58.    The Debtors' use of property of their estates, including the Cash Collateral, is governed by section 363 of the Bankruptcy Code, which provides in relevant part that if the debtor is authorized to continuing operating its business during its chapter 11 case, the debtor "may use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).

59.    Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses Cash Collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d at 556.  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See, e.g., Resolution Trust Corp. v. Swedeland Dev.*

*Grp. (In re Swedeland Dev. Grp., Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis").

60.     Here, the Debtors have an immediate and critical need to obtain the DIP Facilities and authority to use Cash Collateral throughout these Chapter 11 Cases to, among other things, support the orderly continuation and the operation of their businesses, maintain working relationships with customers, vendors, and suppliers, make payroll, partially pay down the Debtors' prepetition ABL facility (subject to a creeping roll-up), satisfy other working capital and operational needs, and fund the administration of these Chapter 11 Cases.  DIP Decl. ¶ 9.  Further, the Prepetition Secured Parties have expressly consented to the Debtors' use of Cash Collateral, subject to the adequate protection set forth in the DIP Orders.  Accordingly, the Court should grant the Debtors authority to continue using Cash Collateral during these Chapter 11 Cases, subject to the terms of the DIP Orders.

## IV.   The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Agents and the DIP Lenders Under the DIP Documents

61.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Agents and the DIP Lenders.  In particular, the Debtors have agreed to pay:

a.    ***ABL DIP Interest Rate***.  Obligations under the ABL DIP Facility shall accrue interest annually, and shall be payable monthly in cash, equal to (i) SOFR (subject to a floor of 0.00%) plus 3.75%, or (ii) ABR (subject to a floor of 0.00%) plus 2.75%.  During any event of default, the ABL DIP Loans will accrue interest at an additional 2.00% per year, payable in cash.

b.    ***ABL DIP Non-Use Fee***.  A fee of 0.5% on the undrawn portion of the ABL DIP Facility shall accrue annually and be payable monthly in arrears in cash.

c.    ***Term DIP Interest Rate***.  Interest on the outstanding principal amount of the Term DIP Loans shall accrue at a rate equal to SOFR + 8.00% per year (subject to a SOFR floor of 4.00%), and shall be payable in cash at the end of each month in arrears.  During any event of default, the Term DIP Loans will accrue interest at an additional 2.00% per year, payable in cash.

      d.     ***Term DIP Commitment Premium***.  Upon entry of the Interim Order, the Term DIP lenders shall earn a premium totaling 7.00% of the Term DIP loans, payable in-kind in the form of additional Term DIP loans.

      e.     ***Term DIP Exit Premium***.  Upon entry of the Interim Order, the Term DIP lenders shall earn a premium totaling 3.00% of the Term DIP loans, payable in-kind in the form of additional Term DIP Loans, and payable upon, but immediately prior to the occurrence of, the effective date of the plan contemplated by the RSA.

62.     As set forth in the DIP Declaration, the interest and fees to be paid under the DIP Facilities are reasonable and appropriate, particularly in light of the circumstances of these Chapter 11 Cases and the marketing process undertaken, and represent the only viable option presently available to the Debtors.  DIP Decl. ¶¶ 24, 26.  The fees and rates to be paid under the proposed DIP Term Loan Facility were the subject of rigorous arm's-length negotiation between the Debtors and the DIP Lenders, and are an integral component of the overall terms of the proposed DIP Term Loan Facility.  *Id.*

63.     The interest and fees under the DIP Facilities are consistent with the market and are reasonable and appropriate, particularly in light of the robust marketing process undertaken, and represent the most favorable terms available to the Debtors.  DIP Decl. ¶¶ 24, 26.  The Debtors also carefully considered the interest and fees described above when determining in their sound business judgment that the DIP Facilities constituted the best, and only, actionable terms on which the Debtors could obtain necessary postpetition financing to continue their operations and administer these Chapter 11 Cases while seeking to consummate the restructuring transactions contemplated by the RSA.  *Id.*  The Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with the DIP Facilities.

**V.      The DIP Lenders Should Be Afforded Good-Faith Protection Under Section 364(e) Of the Bankruptcy Code**

64.      Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

65.      The DIP Facilities are the result of (i) the Debtors' reasonable and informed determination that the DIP Lenders offered the only terms on which to obtain critical postpetition financing given the circumstances, and (ii) extensive good-faith, arm's length negotiations between the Debtors and the DIP Lenders.  DIP Decl. ¶¶ 18–19.  The terms and conditions of the DIP Facilities are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code.  *Id.* at ¶ 19.  Further, no consideration is being provided to any party other than as described herein.  *Id.* Accordingly, the Court should find that the DIP Lenders are "good-faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**VI.      The Automatic Stay Should Be Modified on a Limited Basis**

66.      The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to: (i) allow the DIP Lenders to file any financing statements,

security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the DIP Liens; (ii) permit the Debtors to grant the DIP Liens and the DIP Superpriority Claims to the DIP Lenders and to incur liabilities and obligations to the DIP Lenders in accordance with the DIP Documents; and (iii) following the occurrence of an Event of Default, permit the DIP Agents to exercise all rights and remedies in accordance with the DIP Documents, including the terms of the DIP Orders, and applicable law.

67.     Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases.  *See, e.g., In re Audacy, Inc.*, No. 24-90004 (CML) (Bankr. S.D. Tex. Jan. 7, 2024) [Docket No. 290]; *In re Noble House Home Furnishings LLC*, No. 23-90773 (CML) (Bankr. S.D. Tex. Sept. 11, 2023) [Docket No. 130]; *In re Venator Materials PLC*, No. 23-90301 (DRJ) (Bankr. S.D. Tex. May 16, 2023) [Docket No. 98]; *In re Envision Healthcare Corp.*, No. 23-90342 (CML) (Bankr. S.D. Tex. May 15, 2023) [Docket No. 104]; *In re MLCJR LLC*, No. 23-90324 (CML) (Bankr. S.D. Tex. May 14, 2023) [Docket No. 116]; *In re Instant Brands Acquisition Holdings, Inc.*, No. 23-90716 (DRJ) (Bankr. S.D. Tex. June 12, 2023) [Docket No. 257]; *In re Avaya, Inc.*, No. 23-90088 (DRJ) (Bankr. S.D Tex. Feb. 14, 2023) [Docket No. 278]; *In re Party City Holdco Inc.*, No. 23-90005 (DRJ) (Bankr. S.D. Tex. Jan. 17, 2023) [Docket No. 587]; *In re Sanchez Energy Corp.*, No. 19-34508 (MI) (Bankr. S.D. Tex. Aug. 15, 2019) [Docket No. 144]; *In re Legacy Reserves Inc.*, No. 19-33395 (MI) (Bankr. S.D. Tex. July 23, 2019) [Docket No. 255].

**VII.     Failure to Obtain Immediate Access to the DIP Facilities and to Cash Collateral Would Cause Immediate and Irreparable Harm**

68.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to

section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate. *See* Bankruptcy Rule 4001(b)(2). Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3). Furthermore, the Complex Case Procedures provide that "on motion by the debtors, a hearing will routinely be conducted as a first-day hearing to consider either cash collateral use and/or interim debtor in possession financing." Complex Case Procedures ¶ 5.

69.    As set forth in the First Day Declaration and DIP Declaration, the Debtors have an immediate postpetition need to use Cash Collateral and access the liquidity provided by the DIP Facilities. First Day Declaration ¶ 77; DIP Decl. ¶ 26. The Debtors cannot maintain the value of their estates during the pendency of these Chapter 11 Cases without access to Cash Collateral and the proceeds of the DIP Facilities. *Id.* ¶¶ 9, 26. In particular, the Debtors require immediate liquidity to satisfy their obligations to, among others, employees, customers, vendors, and other creditors that are critical to the Debtors' operations, as well as to implement the relief requested in the Debtors' other first day motions. *Id.* ¶ 9. Without access to Cash Collateral and the DIP Facilities, the Debtors face value-destructive interruptions to their business, which would cause immediate and irreparable harm to the Debtors and their creditors. *Id.* ¶¶ 9, 26.

70.    Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code, Bankruptcy Rule 4001(b), and paragraph 5 of the Complex Case Procedures, the Debtors request that the Court conduct an expedited hearing on this Motion, and enter the Interim Order authorizing the Debtors

to use Cash Collateral and obtain credit under the DIP Facilities, all on an interim basis, pending approval on a final basis after the Final Hearing.

## **EMERGENCY CONSIDERATION**

71.     The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first twenty-one days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations.  Failure to receive the requested relief during the first twenty-one days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this critical juncture.  The Debtors have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and request that the Court approve the relief requested in this Motion on an emergency basis.

## **WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)**

72.     The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **RESERVATION OF RIGHTS**

6.     Nothing contained in this Motion nor any actions taken pursuant to the relief requested herein is intended or shall be construed as:  (a) an implication or admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable non-bankruptcy law; (b) an impairment or waiver of the Debtors' or any other party in interest's rights to dispute the amount of, basis for, or validity of any claim against, or interest in, any Debtor, its property, or its estate on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any claim is of a type specified or defined in

this Motion or any order granting the relief requested by this Motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a waiver of any claim or cause of action that may exist against any creditor or interest holder; (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code or otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease; (g) a waiver or limitation of the Debtors', or any other party in interest's, rights under the Bankruptcy Code or any other applicable law; (h) an implication or admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance of property of the Debtors' estates; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to this Motion are valid and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) an impairment or waiver of any claims or causes of action that may exist against any entity under the Bankruptcy Code or any other applicable law.  If the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended and should not be construed as an admission as to the validity or priority of any claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute the extent, perfection, priority, validity, or amount of such claim.

### **NOTICE**

73.     The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Prepetition ABL Agent; (d) counsel to the Prepetition First Lien Term Loan Agent; (e) counsel to the Prepetition KL Notes

Agent; (f) counsel to the Prepetition PVKG Notes Agent; (g) counsel to the Prepetition Second Lien Agent; (h) counsel to the First Lien Ad Hoc Group; (i) counsel to the Second Lien Ad Hoc Group; (j) the United States Attorney's Office for the Southern District of Texas; (k) the state attorneys general for states in which the Debtors conduct business; (l) the Internal Revenue Service; (m) the United States Securities and Exchange Commission; (n) the Environmental Protection Agency and similar state environmental agencies for states in which the Debtors conduct business; (o) other governmental agencies having a regulatory or statutory interest in these cases; (p) the DIP Secured Parties; and (q) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Local Rule 9013-1(d).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is required.

*[Remainder of Page Intentionally Left Blank]*

The Debtors respectfully request that the Court enter the Interim Order, substantially in the form attached hereto, and the Final Order, granting the relief requested herein and any further relief the Court may deem just and proper.

Dated: April 4, 2024
      Houston, Texas

**WHITE & CASE LLP**

*/s/ Charles R. Koster*
Charles R. Koster (Texas Bar No. 24128278)
**WHITE & CASE LLP**
609 Main Street, Suite 2900
Houston, Texas 77002
Telephone: (713) 496-9700
Facsimile: (713) 496-9701
Email: charles.koster@whitecase.com

-and-

Bojan Guzina (*pro hac vice* pending)
Andrew F. O'Neill (*pro hac vice* pending)
Erin R. Rosenberg (*pro hac vice* pending)
Blair M. Warner (*pro hac vice* pending)
Adam T. Swingle (*pro hac vice* pending)
**WHITE & CASE LLP**
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Telephone: (312) 881-5400
Email: bojan.guzina@whitecase.com
      aoneill@whitecase.com
      erin.rosenberg@whitecase.com
      blair.warner@whitecase.com
      adam.swingle@whitecase.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## **Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Local Rule 9013-1(i).

/s/ Charles R. Koster
Charles R. Koster

## **Certificate of Service**

I certify that on April 4, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ Charles R. Koster
Charles R. Koster

## **Exhibit A**

**ABL DIP Credit Agreement**

(To be filed separately.)

## **Exhibit B**

**Term DIP Credit Agreement**

(To be filed separately.)

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CONVERGEONE HOLDINGS, INC., *et al*[1] | ) | Case No. 24-90194 (CML) |
|  | ) |  |
|  | ) | (Joint Administration Requested) |
| Debtors. | ) |  |
|  | ) |  |

## INTERIM ORDER (I) AUTHORIZING
## THE DEBTORS TO OBTAIN POSTPETITION FINANCING,
## (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL,
## (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY
## ADMINISTRATIVE EXPENSE CLAIMS, (IV) GRANTING
## ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY,
## (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Cases") for entry of an interim order (this "Interim Order"), pursuant to sections 105, 361, 362, 363, 364, 503, 506(c), 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 1075-1, 2002-1, 4001-1(b),

---

[1]    The Debtors in these Cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: AAA Network Solutions, Inc. (7602); ConvergeOne Dedicated Services, LLC (3323); ConvergeOne Government Solutions, LLC (7538); ConvergeOne Holdings, Inc. (9427); ConvergeOne Managed Services, LLC (6277); ConvergeOne Systems Integration, Inc. (9098); ConvergeOne Technology Utilities, Inc. (6466); ConvergeOne Texas, LLC (5063); ConvergeOne Unified Technology Solutions, Inc. (2412); ConvergeOne, Inc. (3228); Integration Partners Corporation (7289); NetSource Communications Inc. (6228); NuAge Experts LLC (8150); Providea Conferencing, LLC (7448); PVKG Intermediate Holdings Inc. (4875); Silent IT, LLC (7730); and WrightCore, Inc. (3654). The Debtors' mailing address is 10900 Nesbitt Avenue South, Bloomington, Minnesota 55437.

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

4002-1, 9013-1, and 9037-1 of the Bankruptcy Local Rules for the Southern District of Texas (the

"Local Rules"), seeking entry of this interim order (this "Interim Order"):

    (i)    authorizing ConvergeOne Holdings, Inc. (the "Company"), in its capacity as borrower (the "Term DIP Borrower"), to obtain postpetition financing, and for each of the other Debtors to guarantee unconditionally (such other Debtors, the "DIP Guarantors") on a joint and several basis, the Term DIP Borrower's obligations in connection with a superpriority senior secured debtor-in-possession term loan credit facility (the "Term DIP Facility"), with an aggregate principal amount of $215,000,000 (the term loans made thereunder, the "Term DIP Loans"), (i) $145,000,000 of which shall be available for borrowing upon entry of this Interim Order (the "Initial Draw"), and (ii) $70,000,000 of which shall be available for borrowing upon entry of the Final Order (as defined below) and the satisfaction of certain other conditions precedent set forth in the Term DIP Credit Agreement (as defined below), subject to the terms and conditions of the Term DIP Credit Agreement (the "Second Draw"); *provided* that the portion of the Term DIP Facility attributable to the Second Draw shall be funded into escrow substantially concurrently with the funding of the Initial Draw (such portion of the Term DIP Facility, the "Escrowed Amount") with the release of the Escrowed Amount from escrow to occur upon entry of the Final Order and the satisfaction of certain other conditions precedent set forth in the Term DIP Credit Agreement; *provided*, *further*, that the Escrowed Amount shall accrue interest and fees, commencing with the funding into escrow thereof;

    (ii)    authorizing the Debtors to (a) enter into and perform under that certain Senior Secured Super-Priority Debtor-in-Possession Term Loan Credit Agreement dated as of April 4, 2024 (as the same may be amended, restated, supplemented, waived or otherwise modified from time to time, the "Term DIP Credit Agreement," attached to the Motion as **Exhibit A**, and together with this Interim Order, the Final Order, and all agreements, documents, and instruments delivered or executed in connection therewith (including the fee letters executed by the Term DIP Borrower in connection with the Term DIP Facility and other guarantee and security documentation, collectively, the "Term DIP Documents"), among the Term DIP Borrower, the DIP Guarantors, the lenders party thereto (collectively in such capacities, the "Term DIP Lenders," and each a "Term DIP Lender"), and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (in such capacities, the "Term DIP Agent," and, together with the Term DIP Lenders, the "Term DIP Secured Parties") and (b) to perform such other and further acts as may be required in connection with the Term DIP Documents;

    (iii)    authorizing the Company and each Debtor subsidiary borrower thereof, in their capacities as borrowers (collectively, the "ABL DIP Borrowers" and, together with the Term DIP Borrower, the "DIP Borrowers"), to obtain postpetition financing, and for each of the DIP Guarantors to guarantee unconditionally, on a joint and several basis, the ABL DIP Borrowers' obligations in connection with a superpriority, senior secured and priming asset-based revolving credit facility (the

"ABL DIP Facility" and together with the Term DIP Facility, the "DIP Facilities") in the aggregate principal amount of up to $250 million, subject to the Borrowing Base (as defined in the ABL DIP Credit Agreement) under the ABL DIP Facility (the "ABL DIP Loans" and the commitments outstanding under the ABL DIP Facility from time to time, the "ABL DIP Commitments"), which ABL DIP Facility includes (x) the automatic deemed re-issuance or re-advancement (as applicable) under the ABL DIP Facility of all Letters of Credit (as defined in the Prepetition ABL Credit Agreement), Floorplan Advances (as defined in the Prepetition ABL Credit Agreement), and Floorplan Approvals (as defined in the Prepetition ABL Credit Agreement) issued under the Prepetition ABL Credit Agreement as Letters of Credit (as defined in the ABL DIP Credit Agreement (as defined below)), Floorplan Advances (as defined in the ABL DIP Credit Agreement), and Floorplan Approvals (as defined in the ABL DIP Credit Agreement), respectively, upon entry of this Interim Order; (y) the Debtors' repayment of Prepetition Asset-Based Loans (as defined below) under the Prepetition ABL Credit Agreement after the Petition Date with Cash Collateral (as defined below) possessed or controlled by the Debtors in accordance with the Approved DIP Budget (as defined below) (but excluding any proceeds of ABL DIP Loans or Term DIP Loans (other than proceeds of the Term DIP Loans from the Initial Draw used to pay down Prepetition Asset-Based Loans)), which repayments shall automatically, without further Court order, result in a corresponding increase in Availability (as defined in the ABL DIP Credit Agreement) in accordance with and subject to the terms and conditions contained in the ABL DIP Credit Agreement (the transactions described in subclauses (x) and (y), the "Interim ABL Roll-Up"); and (z) upon entry of the Final Order, a deemed advance of the ABL DIP Loans for the deemed payment in full of any then remaining outstanding Prepetition ABL Obligations (as defined below) and the deemed cashless conversion and exchange of all such Prepetition ABL Obligations into ABL DIP Obligations (together with the Interim ABL Roll-Up, the "ABL Roll-Up") (subject solely to the rights of parties in interest with respect to the Debtors' Stipulations (as defined below) set forth in paragraph 16 of this Interim Order);

(iv)     authorizing the Debtors to (a) enter into that certain Ratification and Amendment Agreement dated as of April 4, 2024 (the "Ratification Agreement" and as the same may otherwise be amended, restated, supplemented, waived or otherwise modified from time to time, the "ABL DIP Credit Agreement" attached to the Motion as **Exhibit B**, and together with the Term DIP Credit Agreement, the "DIP Credit Agreements" and together with this Interim Order, the Final Order, and all agreements, documents, and instruments delivered or executed in connection therewith (including the fee letters executed by the ABL DIP Borrowers in connection with the ABL DIP Facility and other guarantee and security documentation), collectively, the "ABL DIP Documents" and together with the Term DIP Documents, the "DIP Documents"), among the ABL DIP Borrowers, the other DIP Guarantors, the lenders party thereto (collectively in such capacities, the "ABL DIP Lenders" and, together with the Term DIP Lenders, the "DIP Lenders"), Wells Fargo Commercial Distribution Finance, LLC, as administrative agent and collateral agent (in such capacities, the "ABL DIP Agent" and together with the Term DIP Agent, the "DIP Agents"; the ABL DIP Agent, together with

the ABL DIP Lenders, the "ABL DIP Secured Parties"; and the ABL DIP Secured Parties together with the Term DIP Secured Parties, the "DIP Secured Parties"), and (b) to perform such other and further acts as may be required in connection with the ABL DIP Documents;

(v)     authorizing the Debtors to use the proceeds of the DIP Facilities and the Prepetition Collateral (as defined below), including Cash Collateral (as defined below), (a) to pay fees, interest, and other amounts payable under the DIP Documents, (b) upon entry of this Interim Order, to immediately effectuate the Interim ABL Roll-Up (subject solely to the rights of parties in interest with respect to the Debtors' Stipulations set forth in paragraph 16 of this Interim Order), and (c) solely in accordance with the applicable DIP Documents and the Approved DIP Budget (as defined below) (subject to the Permitted Variances (as defined below)) in form and substance acceptable to the Required Term DIP Lenders (as defined in the Term DIP Credit Agreement) (the "Required Term DIP Lenders"), the Required ABL DIP Lenders (as defined in the ABL DIP Credit Agreement) (the "Required ABL DIP Lenders", and together with the Required Term DIP Lenders, the "Required DIP Lenders"), (1) to pay reasonable and documented transaction and administrative costs, fees, and expenses that are incurred in connection with these Cases (including for funding the Carve Out (as defined below) and the payment of any Adequate Protection Payments (as defined below), (2) for working capital and general corporate purposes of the Debtors, (3) for such other purposes as may be detailed in the Approved DIP Budget (subject to the Permitted Variances), and (4) in the case of the proceeds of the Term DIP Facility, to pay down Prepetition Asset-Based Loans under the Prepetition ABL Facility;

(vi)    granting adequate protection to the Prepetition Secured Parties (as defined below) to the extent of any Postpetition Diminution in Value (as defined below) of their interests in the Prepetition Collateral;

(vii)   granting valid, enforceable, binding, non-avoidable, and fully perfected first priority priming liens on and senior security interests in substantially all of the property, assets, and other interests in property and assets of the Debtors as set forth herein, whether such property is presently owned or after-acquired, and each Debtor's estate as created by section 541 of the Bankruptcy Code, of any kind or nature whatsoever, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, whether existing prior to or arising after the Petition Date (as defined below), subject only to the (x) Carve Out (as defined below), (y) Permitted Prior Liens (as defined below), and (z) the priorities set forth in the post-petition lien priority annex attached hereto as **Annex B** (the "Post-Petition Lien/Claim Priority Annex");

(viii)  granting superpriority administrative expense claims against each of the Debtors' estates to the DIP Secured Parties with respect to the DIP Obligations (as defined below) over any and all administrative expenses of any kind or nature subject and subordinate only to the payment of the Carve Out on the terms and conditions set forth herein and in the DIP Documents;

(ix)     waiving the Debtors' and the estates' right to seek to use non-consensual use of Cash Collateral pursuant to section 363 of the Bankruptcy Code, subject to the terms and conditions contained in this Interim Order;

(x)      waiving the Debtors' and the estates' right to surcharge against the DIP Collateral (as defined below) pursuant to section 506(c) of the Bankruptcy Code, and effective as of the Petition Date but subject to entry of the Final Order and to the extent set forth herein, waiving the Debtors' and the estates' right to surcharge against the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

(xi)     waiving the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the DIP Collateral and the proceeds, products, offspring, or profits thereof, and effective as of the Petition Date but subject to entry of the Final Order and to the extent set forth herein, waiving the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the Prepetition Collateral and the proceeds, products, offspring, or profits thereof;

(xii)    waiving the equitable doctrine of marshaling with respect to the DIP Collateral and the DIP Secured Parties, and effective as of the Petition Date but subject to entry of, the Final Order and to the extent set forth herein, waiving the equitable doctrine of marshaling with respect to the Prepetition Collateral and the Prepetition Secured Parties;

(xiii)   scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and the entry of a final order (the "Final Order"), and approving the form of notice with respect to the Final Hearing;

(xiv)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility, the DIP Documents, and this Interim Order;

(xv)     waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order and providing for immediate effectiveness of this Interim Order; and

(xvi)    granting related relief.

This Court having considered the Motion, the exhibits thereto, the *Declaration of Salvatore Lombardi in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), the *Declaration of Evan Levine in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims,*

5

*(III) Granting Adequate Protections, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "<u>DIP Declaration</u>"), and the other evidence submitted or adduced and the arguments of counsel made at the Interim Hearing held pursuant to Bankruptcy Rule 4001(b)(2) on April 4, 2024; and this Court having heard and resolved or overruled any objections, reservations of rights, or other statements with respect to the relief requested in the Motion; and the Court having noted the appearances of all parties in interest; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry into the Term DIP Credit Agreement, the ABL DIP Credit Agreement, and all other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and the Debtors having provided notice of the Motion as set forth in the Motion, and it appearing that no other or further notice of the Motion need be given; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]

A.      *Petition Date*.  On April 4, 2024 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas, commencing these Cases.

B.      *Debtors in Possession*.  The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Cases.

C.      *Jurisdiction and Venue*.  The Court has jurisdiction over the Motion, these Cases, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  Venue for these Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b) and this Court may enter a final order consistent with Article III of the United States Constitution.  The bases for the relief sought in the Motion and granted in this Interim Order are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 1075-1, 2002-1, 4001-1, 4002-1, 9013-1, and 9037-1.

D.      *Committee*.  As of the date hereof, no official committee of unsecured creditors has been appointed in these Cases pursuant to section 1102 of the Bankruptcy Code (any such committee, the "Official Committee").

---

[3]   Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

E.    *Final Hearing*.  At the Final Hearing, the Debtors will seek approval of the Final

Order, which shall be subject to the terms and conditions of the DIP Documents.  Notice of the

Final Hearing and Final Order will be provided in accordance with this Interim Order.

F.    *Debtors' Stipulations*.  Without prejudice to the rights of parties in interest

specifically set forth in paragraph 16 of this Interim Order, the Debtors stipulate and agree that

(collectively, paragraphs F(i) through (vi) below are referred to herein as the "Debtors'

Stipulations"):

   (i)    ***ABL Facility***

      (a)    *Prepetition ABL Credit Agreement.*  Under that certain Amended and
      Restated ABL Credit Agreement, dated as of January 4, 2019 (as amended
      by Amendment No. 1 to Amended and Restated ABL Credit Agreement,
      dated as of July 10, 2022, Amendment No. 2 to Amended and Restated ABL
      Credit Agreement, dated as of September 14, 2022, Amendment No. 3 to
      Amended and Restated ABL Credit Agreement, dated as of January 23,
      2023, Amendment No. 4 to Amended and Restated ABL Credit Agreement,
      dated as of August 29, 2023, and Forbearance Agreement, dated as of March
      24, 2024, and as may be further amended, restated, supplemented, or
      otherwise modified from time to time, the "Prepetition ABL Credit
      Agreement," and together with all other documentation executed in
      connection therewith, the "Prepetition ABL Documents"), by and among
      PVKG Intermediate Holdings Inc. ("Holdings"), the Company, and the
      other Borrowers (as defined in the Prepetition ABL Credit Agreement)
      party thereto (collectively with the Company, the "ABL Borrowers"), Wells
      Fargo Commercial Distribution Finance, LLC, as Administrative Agent,
      Collateral Agent, and Floorplan Funding Agent (each as defined in the
      Prepetition ABL Credit Agreement and, in such capacities and including
      any assignees thereof and successors thereto, the "ABL Agent") and as
      Swing Line Lender (as defined in the Prepetition ABL Credit Agreement),
      and the lenders from time to time party thereto (such lenders, the
      "Prepetition ABL Lenders," and together with the ABL Agent and each of
      the other secured parties under the Prepetition ABL Credit Agreement,
      the "Prepetition ABL Secured Parties"), the ABL Borrowers were provided
      with an asset-based facility pursuant to which, among other things, the ABL
      Agent and the Prepetition ABL Lenders extended to the ABL Borrowers
      Loans (as defined in the Prepetition ABL Credit Agreement, and hereinafter
      referred to herein as the "Prepetition Asset-Based Loans") and other Credit
      Extensions (as defined in the Prepetition ABL Credit Agreement, and
      together with the Prepetition Asset-Based Loans, collectively referred to
      herein as the "Prepetition ABL Credit Extensions").  As used herein, the

"Prepetition ABL Loan Parties" shall mean, collectively, Holdings, the ABL Borrowers, and the other Guarantors under, and as defined in, the Prepetition ABL Credit Agreement.

(b)     *Prepetition ABL Obligations.* As of the Petition Date, the Prepetition ABL Loan Parties were jointly and severally indebted to the Prepetition ABL Secured Parties pursuant to the Prepetition ABL Documents, without objection, defense, counterclaim, or offset of any kind, (x) in the aggregate principal amount of up to $250 million on account of Prepetition ABL Credit Extensions, *plus* (y) accrued and unpaid interest with respect thereto and any additional fees, costs, premiums, expenses (including any attorneys', accountants', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as defined in the Prepetition ABL Credit Agreement) owing under or in connection with the Prepetition ABL Documents (clauses (x) and (y), collectively, the "Prepetition ABL Obligations" and the claims thereto, the "Prepetition ABL Claims").

(c)     *ABL Collateral.* In connection with the Prepetition ABL Credit Agreement, certain of the Debtors entered into the Security Documents (as defined in the Prepetition ABL Credit Agreement and referred to herein, together with related security agreements, as the "ABL Security Documents"). Pursuant to the ABL Security Documents, the other Prepetition ABL Documents, and the Intercreditor Agreements (defined below), the Prepetition ABL Obligations are secured by valid, binding, perfected, and enforceable security interests in and liens on (x) the ABL Collateral (as defined in the ABL Intercreditor Agreement (as defined below)) and (y) the Term Loan Collateral (as defined in the ABL Intercreditor Agreement)  (the ABL Collateral and the Term Loan Collateral together, the "Prepetition Collateral" and the liens and security interests securing the collateral in clauses (x) and (y), the "Prepetition ABL Liens") with the priority set forth in the lien priority annex attached hereto as **Annex A** (the "Prepetition Lien Priority Annex").

(d)     *Validity, Perfection, and Priority of Prepetition ABL Liens and Prepetition ABL Obligations.* Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date: (i) the Prepetition ABL Liens encumber all of the Prepetition Collateral, as the same existed on the Petition Date; (ii) the Prepetition ABL Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral, with the priority set forth in the Prepetition Lien Priority Annex; (iii) subject to the priority set forth in the Prepetition Lien Priority Annex and pursuant to the Intercreditor Agreements, the Prepetition ABL Liens are subject and subordinate only to valid, perfected, enforceable,

9

and nonavoidable prepetition liens (if any) that are senior to the liens or security interests of the Prepetition ABL Secured Parties as of the Petition Date by operation of law or permitted by the Prepetition ABL Documents (such liens, the "Permitted ABL Prior Liens"); (iv) the Prepetition ABL Liens were granted to or for the benefit of the Prepetition ABL Secured Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby; (v) the Prepetition ABL Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; (vi) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition ABL Liens or Prepetition ABL Obligations exist, and no portion of the Prepetition ABL Liens or Prepetition ABL Obligations is subject to any challenge, cause of action, or defense, including impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset, contest, defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (vii) the Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), against the Prepetition ABL Secured Parties or any of their respective affiliates, agents, representatives, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to their loans under the Prepetition ABL Documents, the Prepetition ABL Obligations, or the Prepetition ABL Liens.

(ii)   *First Priority Term Facilities*

(a)   *Prepetition First Lien Term Loan Credit Agreement.* Under that certain First Lien Term Loan Credit Agreement, dated as of January 4, 2019 (as amended by Amendment No. 1 to First Lien Term Loan Credit Agreement, dated as of March 14, 2019, Amendment No. 2 to First Lien Term Loan Credit Agreement, dated as of December 17, 2021, and as may be further amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition First Lien Term Loan Credit Agreement," and together with all other documentation executed in connection therewith, including, without limitation, each Security Document (as defined in the Prepetition First Lien Term Loan Credit Agreement) executed in connection therewith, the "Prepetition First Lien Term Loan Documents"), by and among Holdings, the Company, as borrower, Deutsche Bank AG New York

10

Branch, as administrative agent and collateral agent (in such capacities and including any assignees thereof and successors thereto, the "Prepetition First Lien Term Loan Agent"), and the lenders from time to time party thereto (such lenders, the "Prepetition First Lien Term Loan Lenders," and together with the Prepetition First Lien Term Loan Agent and each of the other secured parties under the Prepetition First Lien Term Loan Credit Agreement, the "Prepetition First Lien Term Loan Secured Parties"), the Company was provided with a first-lien secured term loan facility (the loans borrowed thereunder, the "Prepetition First Lien Term Loans").  As used herein, the "Prepetition First Lien Term Loan Parties" shall mean, collectively, Holdings, the Company, and the other Guarantors under and as defined in, the Prepetition First Lien Term Loan Credit Agreement.

(b)     *Prepetition First Lien Term Loan Obligations.* As of the Petition Date, the Prepetition First Lien Term Loan Parties were jointly and severally indebted to the Prepetition First Lien Term Loan Secured Parties pursuant to the Prepetition First Lien Term Loan Documents, without objection, defense, counterclaim, or offset of any kind, (x) in the aggregate principal amount of not less than $1,095,726,307.00 on account of Prepetition First Lien Term Loans, *plus* (y) accrued and unpaid interest with respect thereto and any additional fees, costs, premiums, original issue discount, expenses (including any attorneys', accountants', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as defined in the Prepetition First Lien Term Loan Credit Agreement) owing under or in connection with the Prepetition First Lien Term Loan Documents, but excluding, for the avoidance of doubt, any makewhole, prepayment, or similar premiums (clauses (x) and (y),  collectively, the "Prepetition First Lien Term Loan Obligations" and the claims thereto, the "Prepetition First Lien Term Loan Claims").

(c)     *Prepetition KL Note Purchase Agreement.*  Under the terms of that certain Note Purchase Agreement, dated as of July 10, 2020 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition KL Note Purchase Agreement," and together with all other documentation executed in connection therewith, including, without limitation, each Security Document (as defined in the Prepetition KL Note Purchase Agreement) executed in connection therewith, the "Prepetition KL Note Purchase Agreement Documents") by and among Holdings, the Company, as issuer, Deutsche Bank Trust Company Americas, as administrative agent (in such capacity and including any assignees thereof and successors thereto, the "Prepetition KL Note Purchase Agreement Agent"), and each Holder (as defined in the Prepetition KL Note Purchase Agreement) from time to time party thereto (collectively, the "Prepetition KL Note Purchase Agreement Holders," and together with the Prepetition

11

KL Note Purchase Agreement Agent, the "Prepetition KL Note Purchase Agreement Secured Parties"), the Company issued and sold to each Holder and each Holder purchased from the Company certain notes (the "Prepetition KL Notes"). As used herein, the "Prepetition KL Note Purchase Agreement Note Parties" shall mean, collectively, the Company, Holdings, and the other Guarantors under, and as defined in, the Prepetition KL Note Purchase Agreement.

(d)     *Prepetition KL Note Obligations.* As of the Petition Date, the Prepetition KL Note Purchase Agreement Parties were jointly and severally indebted to the Prepetition KL Note Purchase Agreement Secured Parties pursuant to the Prepetition KL Note Purchase Agreement Documents, without objection, defense, counterclaim, or offset of any kind, (x) in the aggregate principal amount of not less than $78,812,500.00 on account of Prepetition KL Notes, *plus* (y) accrued and unpaid interest with respect thereto and any additional fees, costs, premiums, original issue discount, expenses (including any attorneys', accountants', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as defined in the Prepetition KL Note Purchase Agreement) owing under or in connection with the Prepetition KL Note Purchase Agreement Documents, but excluding, for the avoidance of doubt, any makewhole, prepayment, or similar premiums (clauses (x) and (y), collectively, the "Prepetition KL Note Obligations" and the claims thereto, the "Prepetition KL Note Claims").

(e)     *Prepetition PVKG Note Purchase Agreement.* Under the terms of that certain Note Purchase Agreement, dated as of July 6, 2023 (as may be amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition PVKG Note Purchase Agreement,"[4] together with all other documentation executed in connection therewith, including, without limitation, each Security Document (as defined in the Prepetition PVKG Note Purchase Agreement) executed in connection therewith, the "Prepetition PVKG Note Purchase Agreement Documents"[5]) by and among Holdings, the Company, as issuer, PVKG Investment Holdings Inc., as a holder (in such capacity, the "Prepetition PVKG Note Purchase Agreement

---

[4]     As used herein, the term "Prepetition First Lien Debt Agreements" shall mean, collectively, the Prepetition First Lien Term Loan Credit Agreement, the Prepetition KL Note Purchase Agreement, and the Prepetition PVKG Note Purchase Agreement.

[5]     As used herein, the term "Prepetition First Lien Debt Documents" shall mean, collectively, the Prepetition First Lien Term Loan Documents, the Prepetition KL Note Purchase Agreement Documents, and the Prepetition PVKG Note Purchase Agreement Documents.

Holder")[6] and as administrative agent (in such capacity and including any assignees thereof and successors thereto, the "Prepetition PVKG Note Purchase Agreement Agent[7] and together with the Prepetition PVKG Note Purchase Agreement Agent, the "Prepetition PVKG Note Purchase Agreement Secured Parties"[8]), the Company issued and sold to the Prepetition PVKG Note Purchase Agreement Holder and the Prepetition PVKG Note Purchase Agreement Holder purchased from the Company certain notes in the aggregate principal amount (including original issue discount) of not less than $193 million (the "Prepetition PVKG Notes"[9]). As used herein, the "Prepetition PVKG Note Purchase Agreement Note Parties"[10] shall mean, collectively, the Company, Holdings, and the other Guarantors under, and as defined in the Prepetition PVKG Note Purchase Agreement.

(f)     *Prepetition PVKG Note Obligations.* As of the Petition Date, the Prepetition PVKG Note Purchase Agreement Parties were jointly and severally indebted to the Prepetition PVKG Note Purchase Agreement Secured Parties pursuant to the Prepetition PVKG Note Purchase Agreement Documents, without objection, defense, counterclaim, or offset of any kind, in the aggregate amount of $213,000,000.00 on account of the Prepetition PVKG Notes, which amount is inclusive of certain accrued and unpaid interest with respect thereto and certain additional fees, costs, expenses (including attorneys', accountants', consultants', appraisers', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, guarantee obligations, other contingent obligations, and certain other charges owing under or in connection with the Prepetition PVKG Note Purchase Agreement Documents, but excluding, for the avoidance of doubt, any makewhole, prepayment, or similar premiums and any unamortized original issue

---

[6]   As used herein, the term "Prepetition First Lien Lenders" shall mean, collectively, the Prepetition First Lien Term Loan Lenders, the Prepetition KL Note Purchase Agreement Holders, and the Prepetition PVKG Note Purchase Agreement Holders.

[7]   As used herein, the term "Prepetition First Lien Agents" shall mean, collectively, the Prepetition First Lien Term Loan Agent, the Prepetition KL Note Purchase Agreement Agent, and the Prepetition PVKG Note Purchase Agreement Agent.

[8]   As used herein, the term "Prepetition First Lien Debt" shall mean, collectively, the Prepetition First Lien Term Loans, the Prepetition KL Notes, and the Prepetition PVKG Notes.

[9]   As used herein, the term "Prepetition First Lien Secured Parties" shall mean, collectively, the Prepetition First Lien Term Loan Secured Parties, the Prepetition KL Note Purchase Agreement Secured Parties, and the Prepetition PVKG Note Purchase Agreement Secured Parties.

[10]  As used herein, the term "Prepetition First Lien Debt Parties" shall mean, collectively, the Prepetition First Lien Term Loan Parties, the Prepetition KL Note Purchase Agreement Note Parties, and the Prepetition PVKG Note Purchase Agreement Note Parties.

discount (collectively, the "<u>Prepetition PVKG Note Obligations</u>"[11] and the claims thereto, the "<u>Prepetition PVKG Note Claims</u>"[12]).

(g)     *First Lien Term Collateral*.  In connection with the Prepetition First Lien Debt Agreements, certain of the Debtors entered into the Security Documents (as defined in the Prepetition First Lien Debt Documents and referred to herein as the "<u>Prepetition First Lien Security Documents</u>"). Pursuant to the First Lien Security Documents, the other Prepetition First Lien Debt Documents, and the Intercreditor Agreements, the Prepetition First Lien Obligations are secured by valid, binding, perfected, and enforceable security interests in and liens on (such security interests and liens, the "<u>Prepetition First Lien Liens</u>") the Prepetition Collateral with the priority set forth in the Prepetition Lien Priority Annex.

(h)     *Validity, Perfection, and Priority of Prepetition First Lien Liens and Prepetition First Lien Obligations.*  Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date: (i) the Prepetition First Lien Liens encumber all of the Prepetition Collateral, as the same existed on the Petition Date; (ii) the Prepetition First Lien Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral, with the priority set forth in the Prepetition Lien Priority Annex; (iii) subject to the priority set forth in the Prepetition Lien Priority Annex and pursuant to the Intercreditor Agreements, the Prepetition First Lien Liens are subject and subordinate only to valid, perfected, enforceable, and nonavoidable prepetition liens (if any) that are senior to the liens or security interests of the Prepetition First Lien Secured Parties as of the Petition Date by operation of law or permitted by the Prepetition First Lien Debt Documents (such liens, the "<u>Permitted First Lien Prior Liens</u>"); (iv) the Prepetition First Lien Liens were granted to or for the benefit of the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby; (v) the Prepetition First Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; (vi) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition First Lien Liens or Prepetition First Lien Obligations exist, and no portion of the Prepetition First Lien Liens or Prepetition First Lien Obligations is subject to any challenge, cause of action, or defense, including impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement,

---

[11]   As used herein, the term "<u>Prepetition First Lien Obligations</u>" shall mean, collectively, the Prepetition First Lien Term Loan Obligations, the Prepetition KL Note Obligations, and the Prepetition PVKG Note Obligations.

[12]   As used herein, the term "<u>Prepetition First Lien Claims</u>" shall mean, collectively, the Prepetition First Lien Term Loan Claims, the Prepetition KL Note Claims, and the Prepetition PVKG Note Claims.

reduction, recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset, contest, defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (vii) the Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), against the Prepetition First Lien Secured Parties or any of their respective affiliates, agents, representatives, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to their loans under the Prepetition First Lien Debt Documents, the Prepetition First Lien Obligations, or the Prepetition First Lien Liens.

(iii) *Second Priority Term Loan Facility*

(a) *Prepetition Second Lien Term Loan Credit Agreement.* Under that certain Second Lien Term Loan Credit Agreement, dated as of January 4, 2019 (as amended by First Amendment to Second Lien Credit Agreement, dated as of March 14, 2019, and as may be further amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Second Lien Term Loan Credit Agreement," and together with all other documentation executed in connection therewith, including, without limitation, each Security Document, and all other Credit Agreement Collateral Documents (each as defined in the Prepetition Second Lien Term Loan Credit Agreement) executed in connection therewith, the "Prepetition Second Lien Term Loan Documents," and together with the Prepetition ABL Documents, and the Prepetition First Lien Debt Documents, the "Prepetition Loan Documents"), among Holdings, the Company, as borrower, UBS AG, Stamford Branch, as administrative agent (in such capacity and including any assignees thereof and successors thereto, the "Prepetition Second Lien Agent," and, together with the ABL Agent and the Prepetition First Lien Agents, the "Prepetition Agents"), and the lenders from time to time party thereto (such lenders, the "Prepetition Second Lien Lenders," and together with the Prepetition Second Lien Agent and each of the other secured parties under the Prepetition Second Lien Term Loan Credit Agreement, the "Prepetition Second Lien Secured Parties," and together with the Prepetition ABL Secured Parties and the Prepetition First Lien Secured Parties, collectively, the "Prepetition Secured Parties"), the Company was provided with a secured term loan facility (the loans borrowed thereunder, the "Prepetition Second Lien Term Loans") with the priority set forth in the Prepetition Lien Priority Annex.

(b)  *Prepetition Second Lien Term Loan Obligations.* As of the Petition Date, the Prepetition Loan Parties were jointly and severally indebted to the Prepetition Second Lien Secured Parties pursuant to the Prepetition Second Lien Term Loan Documents in the aggregate principal amount of not less than $286,541,971.71 on account of Prepetition Second Lien Term Loans (the "Prepetition Second Lien Term Loan Obligations," and together with the Prepetition ABL Obligations and the Prepetition First Lien Term Loan Obligations, the "Prepetition Obligations").

(c)  *Second Lien Term Loan Collateral.*  In connection with the Prepetition Second Lien Term Loan Credit Agreement, certain of the Debtors entered into the Security Documents (as defined in the Prepetition Second Lien Term Loan Credit Agreement and referred to herein as the "Prepetition Second Lien Security Documents").  Pursuant to the Prepetition Second Lien Security Documents, the other Prepetition Second Lien Term Loan Documents, and the Intercreditor Agreements, the Prepetition Second Lien Term Loan Obligations are secured by security interests in and liens on (such security interests and liens, the "Prepetition Second Lien Liens," and together with the Prepetition ABL Liens and the Prepetition First Lien Liens, the "Prepetition Liens") the Prepetition Collateral with the priority set forth in the Prepetition Lien Priority Annex.

(d)  *Validity, Perfection, and Priority of Prepetition Second Lien Liens and Prepetition Second Lien Obligations.*  Each of the Debtors acknowledges and agrees that, in each case as of the Petition Date: (i) the Prepetition Second Lien Liens encumber all of the Prepetition Collateral, as the same existed on the Petition Date; (ii) the Prepetition Second Lien Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral, with the priority set forth in the Prepetition Lien Priority Annex; (iii) subject to the priority set forth in the Prepetition Lien Priority Annex and pursuant to the Intercreditor Agreements, the Prepetition Second Lien Liens are subject and subordinate only to valid, perfected, enforceable, and nonavoidable prepetition liens (if any) that are senior to the liens or security interests of the Prepetition Second Lien Secured Parties as of the Petition Date by operation of law or permitted by the Prepetition Second Lien Debt Documents (such liens, the "Permitted Second Lien Prior Liens" and, together with the Permitted ABL Prior Liens and Permitted First Lien Prior Liens, the "Permitted Prior Liens"); (iv) the Prepetition Second Lien Liens were granted to or for the benefit of the Prepetition Second Lien Secured Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby; (v) the Prepetition Second Lien Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors; (vi) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Second Lien Liens or Prepetition Second Lien Obligations

16

exist, and no portion of the Prepetition Second Lien Liens or Prepetition Second Lien Obligations is subject to any challenge, cause of action, or defense, including impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset, contest, defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (vii) the Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), against the Prepetition Second Lien Secured Parties or any of their respective affiliates, agents, representatives, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to their loans under the Prepetition Second Lien Debt Documents, the Prepetition Second Lien Obligations, or the Prepetition Second Lien Liens.

(iv)   *Intercreditor Agreements*

(a)   *ABL Intercreditor Agreement*.  The ABL Agent, the Prepetition First Lien Term Loan Agent, and the Prepetition Second Lien Agent are parties to that certain ABL Intercreditor Agreement, dated as of January 4, 2019, which was acknowledged and agreed by Holdings and the Company (as amended, restated, supplemented, or otherwise modified from time to time, the "ABL Intercreditor Agreement"), which governs, among other things, the rights, interests, obligations, priority, and positions of the Prepetition ABL Secured Parties, the Prepetition First Lien Secured Parties, and the Prepetition Second Lien Secured Parties.  On July 10, 2020, the Prepetition KL Note Purchase Agreement Agent signed a joinder agreement to the ABL Intercreditor Agreement, as a New Term Loan Agent (as defined in the ABL Intercreditor Agreement). On May 15, 2023, the Prepetition PVKG Note Purchase Agreement Agent signed a joinder agreement to the ABL Intercreditor Agreement, as a New Term Loan Agent (as defined in the ABL Intercreditor Agreement).

(b)   *1L Pari Passu Intercreditor Agreement*.  The Prepetition First Lien Term Loan Agent and the Prepetition KL Note Purchase Agreement Agent are parties to that certain First Lien Pari Passu Intercreditor Agreement, dated as of July 10, 2020, which was acknowledged and agreed by Holdings and the Company (as amended, restated, supplemented, or otherwise modified from time to time, the "1L Pari Passu Intercreditor Agreement"), which governs, among other things, the rights, interests, obligations, priority, and positions of the Prepetition First Lien Secured Parties relative to each other.

17

On May 15, 2023, the Prepetition PVKG Note Purchase Agreement Agent signed a joinder agreement to the 1L Pari Passu Intercreditor Agreement, as an Additional First Lien Representative (as defined in the 1L Pari Passu Intercreditor Agreement).

(c)    *1L/2L Intercreditor Agreement.*   The Prepetition First Lien Term Loan Agent and the Prepetition Second Lien Agent are parties to that certain First Lien/Second Lien Intercreditor Agreement, dated as of January 4, 2019, which was acknowledged and agreed by Holdings and the Company (as amended, restated, supplemented, or otherwise modified from time to time, the "1L/2L Intercreditor Agreement" and together with the ABL Intercreditor Agreement and the 1L Pari Passu Intercreditor Agreement, the "Intercreditor Agreements"), which governs, among other things, the rights, interests, obligations, priority, and positions of the Prepetition First Lien Secured Parties and the Prepetition Second Lien Secured Parties.  On July 10, 2020, the Prepetition KL Note Purchase Agreement Agent signed a joinder agreement to the 1L/2L Intercreditor Agreement, as an Additional Senior Lien Representative (as defined in the 1L/2L Intercreditor Agreement).  On May 15, 2023, the Prepetition PVKG Note Purchase Agreement Agent signed a joinder agreement to the 1L/2L Intercreditor Agreement, as an Additional Senior Lien Representative (as defined in the 1L/2L Intercreditor Agreement).

(d)    Each of the Prepetition Secured Parties are parties to or otherwise bound by the applicable Intercreditor Agreements.  Pursuant to section 510 of the Bankruptcy Code, the Intercreditor Agreements, and any other applicable intercreditor or subordination provisions contained in any of the Prepetition Loan Documents shall (i) remain in full force and effect, (ii) continue to govern the relative obligations, priorities, rights, and remedies of (a) the Prepetition ABL Secured Parties, the Prepetition First Lien Secured Parties, and the Prepetition Second Lien Secured Parties, in the case of the ABL Intercreditor Agreement (b) the Prepetition First Lien Secured Parties in the case of the Pari Passu Intercreditor Agreement, and (c) the Prepetition First Lien Secured Parties and Prepetition Second Lien Secured Parties in the case of the 1L/2L Intercreditor Agreement, and (iii) not be deemed to be amended, altered, or modified by the terms of this Interim Order unless expressly set forth herein or therein.

(v)    *Cash Collateral.*  Any and all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any banking, checking, or other deposit accounts by the Debtors, any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral or DIP Collateral after the Petition Date or deposited into the Debtors' banking, checking, or other deposit accounts after the Petition Date, and the proceeds

18

of any of the foregoing, wherever located, is the Prepetition Secured Parties' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").

        (vi)    *Bank Accounts*.  The Debtors acknowledge and agree that as of the Petition Date, none of the Debtors has either opened or maintains any bank accounts other than the accounts listed in the exhibit attached to any order authorizing the Debtors to continue to use the Debtors' existing cash management system.

        G.    *Findings Regarding the Term DIP Facility, the ABL DIP Facility, and Use of Cash Collateral*.

        (i)    Immediate Need for Financing; Irreparable Harm.  As set forth in the DIP Declaration and the First Day Declaration, the Debtors have an ongoing and immediate need to obtain the financing under the DIP Facilities and continue to use Cash Collateral (solely to the extent consistent with the Approved DIP Budget (subject to the Permitted Variances) in accordance with the terms and conditions of the DIP Facilities) to, among other things, (a) to pay reasonable and documented transaction and administrative costs, fees, and expenses that are incurred in connection with these Cases (including for funding the Carve Out and the payment of any Adequate Protection Payments, (b) for working capital and general corporate purposes of the Debtors, (c) for such other purposes as may be detailed in the Approved DIP Budget (subject to the Permitted Variances), and (d) in the case of the proceeds of the Term DIP Facility, to pay down Prepetition Asset-Based Loans under the Prepetition ABL Facility.  The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations through the DIP Facilities and the continued use of Cash Collateral is vital to the preservation and maintenance of the Debtors' going concern values, businesses, and successful reorganization.  The Debtors will not have sufficient sources of

working capital and financing to operate in the ordinary course of business throughout the Cases without access to the DIP Facilities and authorized use of Cash Collateral, and subject to the Carve Out as provided in this Interim Order.

(ii)     No Other Credit.  As set forth in the DIP Declaration and the First Day Declaration, the Debtors have been unable to obtain financing on more favorable terms from sources other than the Term DIP Lenders and the ABL DIP Lenders under the Term DIP Documents and the ABL DIP Documents, respectively, and are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Documents and the consensual use of Cash Collateral on more favorable terms without the Debtors granting, subject to the Carve Out in all respects, to the Term DIP Secured Parties and the ABL DIP Secured Parties, the DIP Liens (as defined below) and the DIP Superpriority Claims (as defined below), incurring the Adequate Protection Obligations, and incurring the Term DIP Commitment Premium (as defined below), the Term DIP Exit Premium (as defined below), and all other fees and expenses provided in the DIP Documents, under the terms and conditions set forth in this Interim Order and the DIP Documents.

(iii)     Good Faith.  Based on the Motion, the First Day Declaration, the DIP Declaration, and the record presented to the Court at the Interim Hearing, the terms of the DIP Facilities and the terms of the adequate protection as provided in this Interim Order are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, provide the Debtors reasonably equivalent value and fair consideration, have been negotiated in good faith and at arm's length among the Debtors and the

20

DIP Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facilities and the DIP Documents, including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents and all other obligations under the DIP Documents (with respect to the Term DIP Facility, the "Obligations" as defined in the Term DIP Credit Agreement, and hereinafter referred to herein as the "Term DIP Obligations," and, with respect to the ABL DIP Facility, the "Obligations" as defined in the ABL DIP Credit Agreement, and hereinafter referred to herein as the "ABL DIP Obligations," and, the Term DIP Obligations and the ABL DIP Obligations, collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Secured Parties in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  The DIP Obligations, the DIP Liens, and the DIP Superpriority Claims shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, and any liens or claims granted to, or payments made to, the Term DIP Agent, the ABL DIP Agent, the Term DIP Lenders, or the ABL DIP Lenders hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

(iv)     *Adequate Protection*.  Each of the Prepetition Secured Parties are entitled, pursuant to sections 105, 361, 362, and 363(e) of the Bankruptcy Code, to adequate protection of

their respective interests in the Prepetition Collateral, including Cash Collateral, for any diminution in the value thereof.

(v) _Sections 506(c) and 552(b); Marshaling_.  In light of the Prepetition Secured Parties' agreement, or deemed agreement, to subordinate their liens and superpriority claims to the DIP Obligations and the Carve Out and to permit the use of their Cash Collateral as set forth herein, effective as of the Petition Date but subject to entry of the Final Order, the Prepetition Secured Parties are entitled to (i) the rights and benefits of section 552(b) of the Bankruptcy Code, (ii) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code, (iii) a waiver of the provisions of section 506(c) of the Bankruptcy Code; and (iv) a waiver of the equitable doctrine of marshaling.

(vi) _Consent by ABL Agent_.  The ABL Agent and the Prepetition ABL Lenders have consented to, conditioned on the entry of this Interim Order, the Debtors' incurrence of the Term DIP Facility and the ABL DIP Facility and proposed use of Cash Collateral on the terms and conditions set forth in this Interim Order and the other DIP Documents, including, without limitation, the terms of the adequate protection provided for in this Interim Order, subject and subordinate in all respects to the Carve Out.

(vii) _Consent by Prepetition First Lien Term Loan Agent_.  The Prepetition First Lien Term Loan Agent (at the deemed direction of the Required Lenders (as defined in the Prepetition First Lien Term Loan Credit Agreement)), on behalf and for the benefit of each of the Prepetition First Lien Term Loan Secured Parties, has consented to, conditioned on the entry of this Interim Order, the Debtors' incurrence of the Term DIP Facility and the ABL DIP Facility and proposed use of Cash Collateral on the terms and conditions set forth in this Interim Order,

22

including, without limitation, the terms of the adequate protection provided for in this Interim Order, subject and subordinate in all respects to the Carve Out.

(viii)    *Consent by Prepetition KL Note Purchase Agreement Agent*. The Prepetition KL Note Purchase Agreement Agent (at the deemed direction of the Required Holders (as defined in the Prepetition KL Note Purchase Agreement)), on behalf and for the benefit of each of the Prepetition KL Note Purchase Agreement Secured Parties, has consented to, conditioned on the entry of this Interim Order, the Debtors' incurrence of the Term DIP Facility and the ABL DIP Facility and proposed use of Cash Collateral on the terms and conditions set forth in this Interim Order, including, without limitation, the terms of the adequate protection provided for in this Interim Order, subject and subordinate in all respects to the Carve Out.

(ix)    *Consent by Prepetition PVKG Note Purchase Agreement Agent*. The Prepetition PVKG Note Purchase Agreement Agent (at the deemed direction of the PVKG Lender), on behalf and for the benefit of each of the Prepetition PVKG Note Purchase Agreement Secured Parties, has consented to, conditioned on the entry of this Interim Order, the Debtors' incurrence of the Term DIP Facility and the ABL DIP Facility and proposed use of Cash Collateral on the terms and conditions set forth in this Interim Order, including, without limitation, the terms of the adequate protection provided for in this Interim Order, subject and subordinate in all respects to the Carve Out.

(x)    *Consent by Prepetition Second Lien Agent*.  The Prepetition Second Lien Agent (at the deemed direction of the Required Lenders (as defined in the Prepetition Second Lien Term Loan Credit Agreement)), on behalf and for the benefit of each of the Prepetition Second Lien Secured Parties, has consented to, conditioned on the entry of this Interim Order, the Debtors' incurrence of the Term DIP Facility and the ABL DIP Facility and proposed use of Cash Collateral

on the terms and conditions set forth in this Interim Order, including, without limitation, the terms of the adequate protection provided for in this Interim Order, subject and subordinate in all respects to the Carve Out.

H.     *Good Cause Shown; Best Interest*.  Good cause has been shown for entry of this Interim Order, and entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing business and enhance the Debtors' prospects for a successful reorganization.  Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.

I.     *Notice*.  Upon the record presented to this Court at the Hearing, and under the exigent circumstances set forth therein, notice of the Motion and the emergency relief requested thereby and granted in this Interim Order has been provided in accordance with Bankruptcy Rules 4001(b) and 4001(c)(1) and Local Rule 9013-1(m), which notice was appropriate under the circumstances and sufficient for the Motion.  No other or further notice of the Motion or entry of this Interim Order is required.

J.     *Arm's Length, Good Faith Negotiations*. The Term DIP Facility, the ABL DIP Facility, the use of Cash Collateral as authorized herein, and the terms of this Interim Order were negotiated in good faith and at arm's length between the Debtors, the DIP Lenders, and the Prepetition Secured Parties.  The Prepetition Secured Parties have acted in good faith in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the Debtors' incurrence of the Term DIP Facility, the ABL DIP Facility, and the use of Cash Collateral, including in respect of all of the terms of

this Interim Order, all documents related thereto, and all transactions contemplated by the foregoing.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      ***DIP Financing Approved***.  The Motion is granted on an interim basis as set forth herein, the financing described herein is authorized and approved, and the use of Cash Collateral and provision of adequate protection on an interim basis is authorized, subject to the terms of this Interim Order and the other DIP Documents.

2.      ***Objections Overruled***.  Any objections, reservations of rights, or other statements with respect to entry of the Interim Order, to the extent not withdrawn, waived, settled or otherwise resolved, are overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

3.      ***Authorization of the DIP Facilities and the DIP Documents***.

(a)      The Debtors are hereby immediately authorized and empowered to enter into, and execute and deliver, the DIP Documents, including the Term DIP Credit Agreement and the ABL DIP Credit Agreement, and such additional documents, instruments, certificates and agreements as may be necessary, or otherwise reasonably requested by the Term DIP Secured Parties or the ABL DIP Secured Parties, as applicable, to implement the terms or effectuate the purposes of this Interim Order and the DIP Documents, including to immediately effectuate the Interim ABL Roll-Up.

(b)      The DIP Documents have been negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties.  Upon entry of this Interim Order and until

execution and delivery of the DIP Credit Agreements and the other DIP Documents necessary, or otherwise reasonably requested by the Term DIP Secured Parties or the ABL DIP Secured Parties, as applicable, to implement the terms or effectuate the purposes of this Interim Order and the DIP Documents, (x) the Debtors and the DIP Secured Parties shall be bound by the terms and conditions and other provisions set forth in the other executed Term DIP Documents and ABL DIP Documents, respectively (including the fee letters executed in connection therewith), with the same force and effect as if duly executed and delivered to the Term DIP Agent and the ABL DIP Agent, as applicable, by the Debtors, and (y) this Interim Order and the other executed Term DIP Documents and ABL DIP Documents (including the fee letters executed in connection therewith) shall govern and control the Term DIP Facility and the ABL DIP Facility, respectively.   The Debtors and the DIP Secured Parties are hereby authorized to execute, and enter into each of their respective obligations under, the DIP Documents, subject to the terms and conditions set forth therein and this Interim Order.   Upon execution and delivery thereof, the DIP Documents shall constitute valid and binding obligations of the Debtors enforceable in accordance with the terms of this Interim Order and such DIP Documents.

(c)     Upon entry of this Interim Order, the Term DIP Borrower is hereby authorized to borrow, subject to the terms and conditions of the Term DIP Documents, and the DIP Guarantors are hereby authorized to guaranty, borrowings up to an aggregate principal amount of $215,000,000 of Term DIP Loans under the Term DIP Facility, of which $145,000,000 shall be available for borrowing upon entry of this Interim Order (plus interest, fees, indemnities, and other expenses and amounts provided for in the Term DIP Documents), subject to and in accordance with this Interim Order and the Term DIP Documents, without any further action by the Debtors or any other party; *provided*, that the full amount of the Term DIP Facility shall be deemed to be

drawn substantially concurrently with the entry of this Interim Order, with the Escrowed Amount held in escrow until the Second Draw is made; *provided*, *further*, that the Escrowed Amount associated with the Second Draw shall accrue interest and fees, commencing with the date of this Interim Order, as if the Second Draw were made on such date.

(d)    Upon entry of this Interim Order, subject to and in accordance with this Interim Order, without any further action by the Debtors or any other party and subject to the occurrence of the Closing Date (as defined in the ABL DIP Credit Agreement) (i) the ABL DIP Borrowers are hereby authorized to borrow, subject to the terms and conditions of the ABL DIP Documents, and the DIP Guarantors are hereby authorized to guaranty, borrowings under the ABL DIP Facility subject to the Borrowing Base (as defined in the ABL DIP Credit Agreement); (ii) all Letters of Credit (as defined in the Prepetition ABL Credit Agreement), Floorplan Advances (as defined in the Prepetition ABL Credit Agreement), Floorplan Approvals (as defined in the Prepetition ABL Credit Agreement) issued under the Prepetition ABL Credit Agreement shall automatically be deemed re-issued under the ABL DIP Facility as Letters of Credit (as defined in the ABL DIP Credit Agreement), Floorplan Advances (as defined in the ABL DIP Credit Agreement), and Floorplan Approvals (as defined in the ABL DIP Credit Agreement), respectively, and all such amounts shall constitute ABL DIP Obligations; and (iii) the ABL DIP Borrowers shall be authorized to effectuate the Interim ABL Roll-Up by repaying Prepetition Asset-Based Loans with Cash Collateral possessed or controlled by the Debtors after the Petition Date (but excluding any proceeds of ABL DIP Loans or Term DIP Loans (other than proceeds of the Term DIP Loans from the Initial Draw used to pay down Prepetition Asset-Based Loans under the Prepetition ABL Credit Agreement)), which repayments shall automatically, without further

Court order, result in a corresponding dollar-for-dollar increase in availability under the ABL DIP Commitments, subject to paragraph 16 of this Interim Order.

(e)      In accordance with the terms of this Interim Order and the DIP Documents, proceeds of the DIP Facilities shall be used solely for the purposes permitted under the DIP Documents and this Interim Order, and in accordance with the Approved DIP Budget, subject to the Permitted Variances as set forth in this Interim Order and the DIP Documents.  Attached as **<u>Exhibit A</u>** hereto and incorporated herein by reference is the initial budget prepared by the Debtors and approved by the Required Term DIP Lenders and the ABL DIP Agent.

(f)      In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby lifted to the extent necessary to perform all acts and to make, execute, and deliver all instruments, certificates, agreements, and documents (including, without limitation, the Term DIP Credit Agreement and the ABL DIP Credit Agreement, any security and pledge agreement, financing statements, and any mortgage to the extent contemplated thereby), and to pay all actual fees owing to the DIP Secured Parties under the DIP Documents, including, without limitation:

(1)      the execution, delivery of, and performance under, each of the DIP Documents, including, without limitation, the Term DIP Credit Agreement and the ABL DIP Credit Agreement, any security and pledge agreement, financing statements, and any mortgage to the extent contemplated thereby;

(2)      the execution and delivery of, and performance under, of one or more amendments, waivers, consents, or other modifications to and under the Term DIP Documents (in each case in accordance with the terms of the applicable Term DIP Documents and in such form as the Debtors, the Term DIP Agent, and the Required Term

DIP Lenders may agree), it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents, or other modifications to and under the Term DIP Documents or the Term DIP Obligations that do not shorten the maturity of the extensions of credit thereunder or modify the commitments, the rate of interest, or the amounts payable thereunder;

(3)     the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the ABL DIP Documents (in each case in accordance with the terms of the applicable ABL DIP Documents and in such form as the Debtors, the ABL DIP Agent, and the Required ABL DIP Lenders may agree), it being understood that no further approval of the Court shall be required for amendments, waivers, consents, or other modifications to and under the ABL DIP Documents or the ABL DIP Obligations that do not shorten the maturity of the extensions of credit thereunder or modify the commitments, the calculation of the Borrowing Base (as defined in the ABL DIP Credit Agreement) in a manner adverse to the Debtors, the rate of interest, or the amounts payable thereunder;

(4)     the repayment or cash collateralization of any existing Prepetition ABL Obligation, together with all accrued and unpaid interest, fees, costs, and other charges accrued and accruing thereon, upon entry of this Interim Order and in accordance with the ABL DIP Documents and this Interim Order;

(5)     the non-refundable payment to each of and/or on behalf of the DIP Secured Parties, as applicable, of the premiums or fees referred to in the DIP Documents, including (a) all fees and other amounts owed to the DIP Agents and the DIP Lenders, (b) a premium totaling 7.00% of the principal amount of the Term DIP Loans, payable in-kind

in the form of additional Term DIP Loans to all Term DIP Lenders on a *pro rata* basis, earned and payable upon entry of this Interim Order (the "Term DIP Commitment Premium"), (c) a premium totaling 3.00% of the principal amount of Term DIP Loans, payable in-kind in the form of additional Term DIP Loans to all Term DIP Lenders on a *pro rata* basis, earned upon entry of this Interim Order and payable upon, but immediately prior to the occurrence of, the earlier of the Maturity Date (as defined in the Term DIP Credit Agreement) or the effective date of a plan of reorganization (the "Term DIP Exit Premium"), and (d) all reasonable and documented costs and expenses as may be due from time to time, including, without limitation, the reasonable and documented fees and expenses of counsel and other professionals retained as provided for in the DIP Documents and this Interim Order (whether incurred before or after the Petition Date), including, for the avoidance of doubt, (v) Gibson, Dunn & Crutcher LLP (as counsel), PJT Partners (as financial advisor), Porter Hedges LLP (as local bankruptcy counsel), and any other professionals necessary to represent the interests of the ad hoc group of the Prepetition First Lien Lenders in their capacities as Term DIP Lenders (the "First Lien Group") in connection with the Cases (collectively, the "First Lien Advisors"); (w) Akin Gump Straus Hauer & Feld LLP and any local counsel necessary to represent the interests of the Prepetition KL Note Purchase Agreement Holders (collectively, the "KL Advisors"), subject to the KL Lender Advisor Cap (as defined in the RSA); (x) Latham & Watkins, LLP ("L&W") as counsel and Hunton Andrews Kurth LLP as local bankruptcy counsel to the PVKG Lender (collectively, the "PVKG Lender Advisors"); (y) ArentFox Schiff LLP as counsel to the Term DIP Agent (collectively, the "Term DIP Agent Advisors"); and (z) Otterbourg P.C. ("OPC") (as counsel), Bracewell LLP ("Bracewell") (as local bankruptcy

counsel), and M3 Advisory Partners, LP ("<u>M3</u>") (as financial advisor) and any other professionals necessary to represent the interests of the ABL DIP Agent (collectively, the "<u>ABL DIP Agent Advisors</u>"), which such fees and expenses shall not be subject to the approval of the Court, nor shall any recipient of any such payment be required to file with respect thereto any interim or final fee application with the Court, provided that any fees and expenses of a professional shall be subject to the provisions of paragraph 24 of this Interim Order; and

(6)     make the payments on account of the Adequate Protection Obligations provided for in this Interim Order; and

(7)     the performance of all other acts required under or in connection with the DIP Documents.

(g)     Upon entry of this Interim Order, the DIP Documents, the DIP Obligations, and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each Debtor party thereto in accordance with their respective terms and the terms of this Interim Order and the other DIP Documents for all purposes during the Cases, any subsequently converted Case of any Debtor to a case under chapter 7 of the Bankruptcy Code, or after the dismissal of any Case.  Except as permitted by this Interim Order, no obligation, payment, transfer, or grant of security under the Term DIP Credit Agreement, the ABL DIP Credit Agreement, the other DIP Documents, or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any defense, reduction,

31

setoff, recoupment, or counterclaim.  Subject to the Carve Out, all payments or proceeds remitted (a) to or on behalf of any DIP Agents, as applicable, on behalf of any DIP Secured Parties, as applicable, or (b) to or on behalf of the Prepetition Secured Parties, in each case, pursuant to the DIP Documents, the provisions of this Interim Order, or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability.

(h)     The DIP Guarantors hereby are authorized and directed to jointly, severally, and unconditionally guarantee, and upon entry of this Interim Order shall be deemed to have guaranteed, in full, all of the DIP Obligations of the DIP Borrowers.

4.     ***Budget and Variance Reporting; Liquidity***.

(a)     On or before the first Wednesday that is the first two full weeks after the Petition Date and every two weeks thereafter, the Debtors shall deliver to the Term DIP Agent, the Term DIP Agent Advisors, the ABL DIP Agent, the ABL DIP Agent Advisors, the First Lien Advisors, and the PVKG Lender Advisors a rolling 13-week cash flow forecast (the "DIP Budget"), which reflects on a line-item basis, the Debtors' (a) weekly projected cash receipts ("Budgeted Cash Receipts"), (b) weekly projected disbursements (including ordinary course operating expenses, capital expenditures, and bankruptcy related expenses) under the Cases ("Budgeted Disbursement Amounts"), and (c) the weekly projected liquidity of the Debtors.  Upon delivery of each updated DIP Budget, such updated DIP Budget shall modify and supersede any prior agreed DIP Budget unless the Required Term DIP Lenders, through counsel or otherwise, or the ABL DIP Agent, through counsel or otherwise, notifies the Debtors in writing that such proposed DIP Budget is not in form and substance satisfactory to the Required Term DIP Lenders or ABL DIP Agent within five (5) business days after receipt thereof, in which case the existing DIP Budget shall remain in effect until superseded by an updated DIP Budget in form and

substance satisfactory to the Required Term DIP Lenders and Required ABL DIP Lenders (as so approved, an "Approved DIP Budget").

(b)     On each Wednesday following each Variance Testing Period (as defined below) (beginning with the first Wednesday following the first Variance Testing Period), the Debtors shall deliver to the Term DIP Agent, the Term DIP Agent Advisors, the ABL DIP Agent, the ABL DIP Agent Advisors, the First Lien Advisors, and the PVKG Lender Advisors a variance report, which reflects for the applicable Variance Testing Period, (i) all variances, on a line item by line item basis and a cumulative basis, from the Budgeted Cash Receipts and the Budgeted Disbursement Amounts for such period as set forth in the Approved DIP Budget as in effect for such period, (ii) containing an indication as to whether each variance is temporary or permanent and analysis and explanations for all material variances; (iii) certifying compliance or non-compliance with the Permitted Variances, and (iv) including explanations for all violations, if any, of such covenants and, if any such violation exists, setting forth the actions that the Debtors have taken or intend to take with respect thereto (each such variance report, a "Variance Report"). "Variance Testing Period" shall mean, (x) initially, the two-week period ending on the Friday of the second calendar week occurring after the Petition Date, and (y) thereafter, each rolling two-week period ending on Friday of every second calendar week.

(c)     During any Variance Testing Period, the Debtors shall not permit: (i) the Debtors' aggregate disbursements (including ordinary course operating expenses, capital expenditures, and bankruptcy related expenses, but excluding professional fees and expenses and any costs or cash collateralization associated with surety bonds) for the Variance Testing Period to be greater than 115% of the Budgeted Disbursement Amounts for such Variance Testing Period (the "Permitted Disbursement Variances") or (ii) the Debtors' aggregate receipts for the Variance

Testing Period to be less than 85% of the Budgeted Cash Receipts for such Variance Testing Period (the "Permitted Receipt Variances" and, together with the Permitted Disbursement Variances, the "Permitted Variances").

(d)     In addition, the Debtors shall not permit minimum liquidity (which shall be defined as the sum of (i) all cash and cash equivalents of the Debtors plus (ii) Excess Availability (to be defined in a manner consistent with the Prepetition ABL Credit Agreement but excluding Qualified Cash (to be defined in a manner consistent with the Prepetition ABL Credit Agreement) from the calculation of Excess Availability) of $20,000,000.

5.     ***Access to Records***.  The Debtors shall provide the First Lien Advisors, Term DIP Agent Advisors, PVKG Lender Advisors, and ABL DIP Agent Advisors with all reporting and other information required to be provided to the Term DIP Agent and the ABL DIP Agent under the DIP Documents.  In addition to, and without limiting, whatever rights to access the DIP Secured Parties have under the DIP Documents, upon reasonable notice to Debtors' counsel (including via email) by any DIP Agent, the applicable DIP Secured Parties shall promptly be provided with access to such other financial reporting and information that are readily available to the Debtors and reasonably requested by the DIP Agent (for itself or on behalf of any applicable DIP Lender) (including, without limitation, monthly bookings and backlog reports), excluding any information for which confidentiality is owed to third parties, information subject to attorney client, work product, or similar privilege or doctrine, or where such disclosure would not be permitted by any applicable requirements of law.

6.     ***DIP Superpriority Claims***.  Pursuant to, and to the extent provided by, section 364(c)(1) of the Bankruptcy Code, and subject only to, and subordinated in all respects to, payment of the Carve Out, all of the DIP Obligations shall constitute allowed superpriority

administrative expense claims against each of the Debtors' estates (the "DIP Superpriority Claims") (without the need to file any proof of claim) with priority over any and all administrative expenses, adequate protection claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all Prepetition Collateral and DIP Collateral of the Debtors and all proceeds thereof (excluding claims and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or other federal law or applicable state law (collectively, the "Avoidance Actions"), but, subject to, and effective only upon, entry of the Final Order, including any proceeds related thereto or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement, or otherwise ("Avoidance Proceeds")), in accordance with the DIP Documents.

7.     Notwithstanding the foregoing, the DIP Superpriority Claims granted to the ABL DIP Agent (the "ABL DIP Superpriority Claims") for the benefit of the ABL DIP Lenders and the DIP Superpriority Claims granted to the Term DIP Agent (the "Term DIP Superpriority Claims") for the benefit of the Term DIP Lenders, respectively, shall be subject to the Intercreditor Agreements and shall have the same priorities and rights with respect to the DIP Collateral as they

had with respect to Prepetition Collateral of similar kind in the Intercreditor Agreements, in each case, as amended by and reflected in the Post-Petition Lien/Claim Priority Annex.  Except as set forth in this Interim Order, the Final Order, or the DIP Documents, no other superpriority claims shall be granted or allowed in these Cases without the consent of the Required Term DIP Lenders and the ABL DIP Agent, and the DIP Superpriority Claims shall not be made subject to or *pari passu* with any claim heretofore or hereinafter granted or created in any of the Cases or any Successor Cases (as defined below) without the consent of the Required Term DIP Lenders and the ABL DIP Agent, and shall be valid and enforceable against the Debtors (on a joint and several basis), their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Cases or any Successor Cases until such time as the DIP Obligations are paid in full.

8. ***DIP Liens***.  Subject only to Permitted Prior Liens and the Carve Out, as security for the DIP Obligations, immediately upon, and effective and perfected upon the entry of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Agents or any DIP Lender of, or over, any DIP Collateral, the DIP Agents, for the benefit of themselves and each of the other DIP Secured Parties, are hereby granted continuing, valid, binding, enforceable, nonavoidable, and automatically and properly perfected security interests in and liens on (collectively, the "DIP Liens") all DIP Collateral (subject to the priorities set forth in the Post-Petition Lien/Claim Priority Annex and the terms of this Interim Order) as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of all DIP Obligations.  Notwithstanding anything to the contrary in this Interim Order or the DIP Documents, the DIP Agents and DIP Lenders shall use commercially reasonable efforts to satisfy

any DIP Obligations owing to such parties from all other DIP Collateral prior to seeking recovery from Avoidance Proceeds.

        (a)      The term "<u>DIP Collateral</u>" means (i) the Debtors' interest in all assets and properties (whether tangible, intangible, real, personal, or mixed), whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless of where located, in each case to the extent such assets and properties constitute Prepetition Collateral; and (ii) property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected, and non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) (subject only to the Carve Out), including, without limitation, an equity pledge of all direct subsidiaries organized in the U.S. and all unencumbered assets of the Debtors, all prepetition property and post-petition property of the Debtors' estates, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including, without limitation, unencumbered cash (and any investment of such cash) of the Debtors (whether maintained with the DIP Agents or otherwise) all equipment, all goods, all accounts, cash, payment intangibles, bank accounts and other deposit or securities accounts of the Debtors (including any accounts opened prior to, on, or after the Petition Date), insurance policies and proceeds thereof, equity interests, instruments, intercompany claims, accounts receivable, other rights to payment, all general intangibles, all contracts and contract rights, securities, investment property, letters of credit and letter of credit rights, chattel paper, all interest rate hedging agreements, all owned real estate, real property leaseholds, fixtures, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, all

commercial tort claims, and all claims and causes of action, and any and all proceeds, products, rents, and profits of the foregoing, all products and proceeds of the foregoing, excluding Avoidance Actions but including, subject to entry of the Final Order, Avoidance Proceeds (collectively, the "Previously Unencumbered Property"); *provided* that DIP Collateral shall not include any Excluded Assets (as defined in the DIP Credit Agreements, which definition shall include equity interests in excess of 65% of the issued and outstanding equity interests of non-U.S. subsidiaries but shall exclude all owned real property of the Debtors) but shall include any and all proceeds and products of Excluded Assets, unless such proceeds and products otherwise separately constitute Excluded Assets.

(b)       Subject to the DIP Documents, (i) ABL Collateral (as defined in the ABL Intercreditor Agreement), all products and proceeds of ABL Collateral, Avoidance Proceeds (subject to entry of the Final Order), other Previously Unencumbered Property to the extent such Previously Unencumbered Property would have been considered ABL Collateral (as defined in the ABL Intercreditor Agreement) under the ABL Intercreditor Agreement and all products and proceeds of the ABL DIP Loans shall constitute "ABL DIP Priority Collateral," and (ii) Term Loan Collateral (as defined in the ABL Intercreditor Agreement), all products and proceeds of Term Loan Collateral, Avoidance Proceeds (subject to entry of the Final Order), other Previously Unencumbered Property to the extent such Previously Unencumbered Property would have been considered Term Loan Collateral (as defined in the ABL Intercreditor Agreement) under the ABL Intercreditor Agreement, all products and proceeds of the Term DIP Loans, and all other DIP Collateral that is not ABL DIP Priority Collateral shall constitute "Term DIP Priority Collateral."

(c)       Notwithstanding anything to the contrary contained herein, to the extent a DIP Lien cannot attach to DIP Collateral pursuant to applicable law, the DIP Liens granted pursuant to this

Interim Order shall attach to the Debtors' economic rights, including, without limitation, any and all proceeds of such DIP Collateral.

9. ***Priority of DIP Liens***. Pursuant to section 364(c) and 364(d) of the Bankruptcy Code, the DIP Liens securing the Term DIP Obligations (the "Term DIP Liens") are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral, except that the Term DIP Liens shall be subject to the Carve Out in all respects as set forth in this Interim Order and shall otherwise be subject to the priorities set forth in the Post-Petition Lien/Claim Priority Annex.  Pursuant to section 364(c) and 364(d) of the Bankruptcy Code, the DIP Liens securing the ABL DIP Obligations (the "ABL DIP Liens") are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the ABL DIP Liens shall be subject to the Carve Out in all respects as set forth in this Interim Order and shall otherwise be subject to the priorities set forth in the Post-Petition Lien/Claim Priority Annex.  Subject to the Carve Out and except as expressly set forth in this Interim Order, the DIP Liens: (i) shall not be made subject to or *pari passu* with (A) any lien or security interest heretofore or hereinafter granted in any of the Cases or any Successor Cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Cases or any Successor Cases and/or upon the dismissal of any of the Cases or any Successor Cases and (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code; and (ii) shall not be subject to sections 506(c), 510, 549, 550, or 551 of the Bankruptcy Code.

10. ***Adequate Protection for the Prepetition First Lien Secured Parties***.  Subject only to the Carve Out and the terms of this Interim Order, pursuant to sections 361, 363(e), and 364 of

the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), for any diminution in value of such interests from and after the Petition Date on a dollar-for-dollar basis (each such postpetition diminution, a "Postpetition Diminution in Value"), resulting from, among other things, the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay, the Prepetition First Lien Agents, for the benefit of themselves and the Prepetition First Lien Secured Parties, are hereby granted the following (collectively, the "First Lien Adequate Protection Obligations"):

(a)       First Lien Adequate Protection Liens.   As security for any Postpetition Diminution in Value, additional and replacement, continuing, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens on all DIP Collateral as of the date of this Interim Order (together, the "First Lien Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, including, subject to, and effective only upon, entry of the Final Order, Avoidance Proceeds, and with the priority set forth in the Post-Petition Lien/Claim Priority Annex.  Subject to the Carve Out, the DIP Liens, and the Post-Petition Lien/Claim Priority Annex, the First Lien Adequate Protection Liens shall otherwise be senior to all other security interests in, liens on, or claims against any of the DIP Collateral (including, for the avoidance of doubt, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code).

(b)     <u>First Lien Adequate Protection Superpriority Claims</u>.  As further adequate protection, and to the extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of the Cases senior to any and all other administrative expense claims in such Cases to the extent of any Postpetition Diminution in Value (the "<u>First Lien Adequate Protection Superpriority Claims</u>"), but junior to the Carve Out and the DIP Superpriority Claims and with the priority set forth in the Post-Petition Lien/Claim Priority Annex.  Subject to the Carve Out and the DIP Superpriority Claims in all respects, and in accordance with the priorities set forth in the Post-Petition Lien/Claim Priority Annex, the First Lien Adequate Protection Superpriority Claims will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and the First Lien Adequate Protection Superpriority Claims shall not be made subject to or *pari passu* with any claim heretofore or hereinafter granted or created in any of the Cases or any Successor Cases and shall be valid and enforceable against the Debtors (on a joint and several basis), their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Cases or any Successor Cases until such time as the Prepetition First Lien Obligations are paid in full.

(c)     <u>First Lien Adequate Protection Payments</u>.  As further adequate protection, the Debtors are authorized and directed to pay, in accordance with the terms of paragraph 24 of this Interim Order, (i) all reasonable and documented fees and expenses, whether incurred before or after the Petition Date, to the extent contemplated by the Restructuring Support Agreement

41

dated April 3, 2024 (the "RSA"), and not duplicative of any fees and/or expenses paid pursuant to paragraph 3(f)(5) hereof, of counsel and other professionals retained as provided for in the DIP Documents and this Interim Order, including, for the avoidance of doubt, of the First Lien Advisors, KL Advisors, and PVKG Lender Advisors; (ii) all reasonable and documented fees and expenses, whether incurred before or after the Petition Date, of Cahill Gordon & Reindel LLP ("Cahill"), as counsel to the Prepetition First Lien Term Loan Agent, and any local counsel, to the extent retained by the Prepetition First Lien Term Loan Agent; and (iii) all reasonable and documented fees and expenses, whether incurred before or after the Petition Date, of the Prepetition KL Note Purchase Agreement Agent, including those of Moses & Singer LLP ("Moses Singer"), as counsel to the Prepetition KL Note Purchase Agreement Agent, and any local counsel, to the extent retained by the Prepetition KL Note Purchase Agreement Agent (all payments referenced in this sentence, collectively, the "First Lien Adequate Protection Payments").  None of the First Lien Adequate Protection Payments shall be subject to separate approval by this Court or the U.S. Trustee Guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments.

(d)     Reporting Requirements. As additional adequate protection, the Debtors shall provide the Prepetition First Lien Secured Parties with the Monthly Reports (as defined in the Term DIP Credit Agreement), the Initial Budget, and any updated DIP Budget required to be provided to the Term DIP Agent and the ABL DIP Agent under the DIP Documents; *provided* that the Prepetition First Lien Term Loan Agent shall make any reporting and other information to be provided to the Prepetition First Lien Secured Parties under this paragraph 10(d) available to the Prepetition First Lien Term Loan Lenders by posting such reporting and other information on a

portion of the Platform (as defined in the Prepetition First Lien Term Loan Credit Agreement) designated "***Public Investor***".

(e)    <u>Right to Seek Additional Adequate Protection</u>.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition First Lien Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition First Lien Secured Parties is insufficient to compensate for any Postpetition Diminution in Value of their interests in the Prepetition Collateral during the Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition First Lien Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition First Lien Secured Parties against any Postpetition Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

(f)    <u>Miscellaneous</u>.  Subject to the Carve Out and except as otherwise provided in this Interim Order and the Intercreditor Agreements, the First Lien Adequate Protection Liens and First Lien Adequate Protection Superpriority Claims shall not be subject, junior, or *pari passu*, to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under the Bankruptcy Code, including, without limitation, pursuant to section 551 or otherwise, and shall not be subordinated to or made *pari passu* with any lien, security interest, or administrative claim under the Bankruptcy Code, including, without limitation, pursuant to section 364 or otherwise.

11.    **_Adequate Protection for the Prepetition ABL Secured Parties_**.  Subject only to the Carve Out and the terms of this Interim Order, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), solely to the extent of any Postpetition Diminution in Value, resulting from, among other things, the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay, the ABL Agent, for the benefit of itself and the Prepetition ABL Secured Parties, is hereby granted the following (collectively, the "ABL Adequate Protection Obligations"):

(a)    Prepetition ABL Adequate Protection Liens.  Subject to the Carve Out, as security for any Postpetition Diminution in Value, additional and replacement, continuing, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of this Interim Order (together, the "Prepetition ABL Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral and, subject to, and effective only upon, entry of the Final Order, Avoidance Proceeds, with the priority set forth in the Post-Petition Lien/Claim Priority Annex.  The Prepetition ABL Adequate Protection Liens shall be senior in priority to all other liens on the DIP Collateral subject to the Carve Out and the DIP Liens and with the priority set forth in the Post-Petition Lien/Claim Priority Annex.  Subject to the Carve Out and the rights and limitations set forth in paragraph 16, and except as otherwise provided in this Interim Order, the Prepetition ABL Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted or

created in any of the Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Cases or any Successor Cases.  No lien or interest avoided and preserved for the benefit of the estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition ABL Adequate Protection Liens.

(b)     <u>Prepetition ABL Adequate Protection Claims</u>.  As further adequate protection, and to the extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of the Cases or Successor Cases ahead of and senior to any and all other administrative expense claims in such Cases to the extent of any Postpetition Diminution in Value (the "<u>Prepetition ABL Adequate Protection Claims</u>"), but junior to the Carve Out, the DIP Superpriority Claims, and with the priority set forth in the Post-Petition Lien/Claim Priority Annex.  Subject to the Carve Out, the DIP Superpriority Claims in all respects, and in accordance with the priorities set forth in the Post-Petition Lien/Claim Priority Annex, the Prepetition ABL Adequate Protection Claims will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(d), 726, 1113, and 1114 of the Bankruptcy Code. The ABL Adequate Protection Superpriority Claim shall be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral in accordance with this Interim Order.  Except as provided in this Interim Order, the ABL Adequate Protection Superpriority Claim shall not be made subject to or *pari passu* with any claim heretofore or

hereinafter granted or created in any of the Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Cases or any Successor Cases until such time as the Prepetition ABL Obligations are paid in full.

(c)     Prepetition ABL Adequate Protection Payments.   The Debtors are authorized and directed to pay, in accordance with the terms of paragraph 24 of this Interim Order, all reasonable and documented fees and expenses, whether incurred before or after the Petition Date, to the extent not duplicative of any fees and/or expenses paid pursuant to paragraph 3(f)(5) hereof, of OPC (as counsel), Bracewell (as local bankruptcy counsel), and M3 to the ABL Agent (all payments referenced in this sentence, collectively, the "ABL Adequate Protection Payments"). None of the ABL Adequate Protection Payments shall be subject to separate approval by this Court or the U.S. Trustee Guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments.

(d)     Right to Seek Additional Adequate Protection.   This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition ABL Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition ABL Secured Parties is insufficient to compensate for any Postpetition Diminution in Value of their interests in the Prepetition Collateral during the Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition ABL Secured Parties that the adequate protection

granted herein does in fact adequately protect any of the Prepetition ABL Parties against any Postpetition Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

(e)      Miscellaneous.  Subject to the Carve Out and except as otherwise provided in this Interim Order and the Intercreditor Agreements, the Prepetition ABL Adequate Protection Liens granted to the Prepetition ABL Secured Parties shall not be subject, junior, or *pari passu*, to any lien or security interest or security interest that is avoided and preserved for the benefit of the Debtors' estates under the Bankruptcy Code, including, without limitation, pursuant to section 551 or otherwise, and shall not be subordinated to or made *pari passu* with any lien, or administrative claim under the Bankruptcy Code, including, without limitation, pursuant to section 364 or otherwise.

12.      ***Adequate Protection for the Prepetition Second Lien Secured Parties***.  Subject only to the Carve Out and the terms of this Interim Order, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection of their interests in the Prepetition Collateral (including Cash Collateral), solely to the extent of any Postpetition Diminution in Value, resulting from, among other things, the imposition of the priming DIP Liens on the Prepetition Collateral, the Carve Out, the Debtors' use of the Prepetition Collateral (including Cash Collateral), and the imposition of the automatic stay, the Prepetition Second Lien Agent, for the benefit of itself and the Prepetition Second Lien Secured Parties, is hereby granted the following (collectively, the "Second Lien Adequate

Protection Obligations" and, together with the First Lien Adequate Protection Obligations and ABL Adequate Protection Obligations, the ("Adequate Protection Obligations"):

(a)        Second Lien Adequate Protection Liens.  As security for any Postpetition Diminution in Value, additional and replacement, valid, binding, enforceable, non-avoidable, and effective and automatically perfected postpetition security interests in and liens as of the date of this Interim Order (together, the "Second Lien Adequate Protection Liens" and, together with the First Lien Adequate Protection Liens and Prepetition ABL Adequate Protection Liens, the "Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing), of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on all DIP Collateral with the priority set forth in the Post-Petition Lien/Claim Priority Annex.

(b)        Second Lien Adequate Protection Superpriority Claims.  As further adequate protection, and to the extent provided by sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, allowed administrative expense claims in each of the Cases senior to any and all other administrative expense claims in such Cases to the extent of any Postpetition Diminution in Value (the "Second Lien Adequate Protection Superpriority Claims" and, together with the First Lien Adequate Protection Superpriority Claims and Prepetition ABL Adequate Protection Claims, the "Adequate Protection Superpriority Claims"), but junior to the Carve Out and the DIP Superpriority Claims and with the priority set forth in the Post-Petition Lien/Claim Priority Annex. Subject to the Carve Out and the DIP Superpriority Claims in all respects, and in accordance with the priorities set forth in the Post-Petition Lien/Claim Priority Annex, the Second Lien Adequate Protection Superpriority Claims will not be junior to any claims and shall have priority over all administrative expense claims against each of the Debtors, now existing or hereafter arising, of

48

any kind or nature whatsoever, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and the Second Lien Adequate Protection Superpriority Claims shall not be made subject to or *pari passu* with any claim heretofore or hereinafter granted or created in any of the Cases or any Successor Cases and shall be valid and enforceable against the Debtors (on a joint and several basis), their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Cases or any Successor Cases until such time as the Prepetition Second Lien Obligations are paid in full.

        (c)      Second Lien Adequate Protection Payments.

        (1)      As further adequate protection, the Debtors are authorized and directed to pay, in accordance with the terms of paragraph 24 of this Interim Order, all reasonable and documented fees and expenses, whether incurred before or after the Petition Date, to the extent contemplated by the RSA, of the primary and local counsel, financial advisor, and other professionals of the ad hoc group of the Prepetition Second Lien Lenders (the "Second Lien Group"), including, for the avoidance of doubt, all reasonable and documented fees and expenses, whether incurred before or after the Petition Date, of Davis Polk and Wardwell LLP (as counsel), Guggenheim Securities, LLC (as financial advisor), and Haynes and Boone, LLP (as local bankruptcy counsel) (all payments referenced in this sentence, collectively, the "Second Lien Adequate Protection Payments" and, together with the First Lien Adequate Protection Payments and the ABL Adequate Protection Payments, the "Adequate Protection Payments"). None of the Second Lien Adequate Protection Payments shall be subject to separate approval by this Court or the U.S. Trustee Guidelines, and no recipient of any such payment shall be required to file any interim or final fee

application with respect thereto or otherwise seek the Court's approval of any such payments.

(2)     As further adequate protection, the Debtors are authorized and directed to pay, in accordance with the terms of paragraph 24 of this Interim Order, all reasonable and documented fees and expenses, whether incurred before or after the Petition Date, of Cahill, as counsel to the Prepetition Second Lien Agent, and any local counsel, to the extent retained by the Prepetition Second Lien Agent.  None of the fees and expenses described in the previous sentence shall be subject to separate approval by this Court or the U.S. Trustee Guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments.  For administrative convenience, and consistent with past practice, Cahill may invoice its fees and expenses in connection with its representation of the Prepetition First Lien Term Loan Agent and the Prepetition Second Lien Agent together.

(d)     <u>Right to Seek Additional Adequate Protection</u>.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Second Lien Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Second Lien Secured Parties is insufficient to compensate for any Postpetition Diminution in Value of their interests in the Prepetition Collateral during the Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Second Lien Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Second

Lien Secured Parties against any Postpetition Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral)

(e)     Miscellaneous.  Subject to the Carve Out and except as otherwise provided in this Interim Order and the Intercreditor Agreements, the Second Lien Adequate Protection Liens and Second Lien Adequate Protection Superpriority Claims shall not be subject, junior, or *pari passu*, to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under the Bankruptcy Code, including, without limitation, pursuant to section 551 or otherwise, and shall not be subordinated to or made *pari passu* with any lien, security interest, or administrative claim under the Bankruptcy Code, including, without limitation, pursuant to section 364 or otherwise.

13.     ***Carve Out.***

(a)     Carve Out.  As used in this Interim Order, the "Carve Out" means, without duplication, an amount equal to the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate; (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve-Out"); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees, disbursements, costs, and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtors' Professionals") and to the extent set forth in the DIP Budget as of the date of determination by the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtors' Professionals, "Professional Persons") at any time before or on the first business day following

delivery by the ABL DIP Agent or Term DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, <u>less</u> the amount of any retainers or other amounts held by any such Professional Person as of the Petition Date; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by the ABL DIP Agent or Term DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by email (or other electronic means) by the ABL DIP Agent or Term DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, counsel to any Official Committee, and the ABL DIP Agent and Term DIP Agent, as applicable, which notice may be delivered following the occurrence and during the continuation of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)      <u>Fee Estimates</u>.  Not later than 7:00 p.m. New York time on the Tuesday of each week starting with the first full calendar week following the Petition Date, each Professional Person shall deliver to the Debtors a statement setting forth a good-faith estimate of the amount of fees and expenses incurred during the preceding week by such Professional Person (through Saturday of such week, the "<u>Calculation Date</u>") (collectively, the "<u>Estimated Fees and Expenses</u>"), along with a good-faith estimate of the cumulative total amount of unreimbursed fees and expenses incurred through the applicable Calculation Date and a statement of the amount of such fees and expenses that have been paid to date by the Debtors (each such statement, a "<u>Weekly Statement</u>"); *provided*, that within one business day of the occurrence of the Termination Declaration Date, each Professional Person shall deliver one additional Weekly Statement (the "<u>Final Statement</u>") setting

forth a good-faith estimate of the amount of fees and expenses incurred during the period commencing on the calendar day after the most recent Calculation Date for which a Weekly Statement has been delivered and concluding on the Termination Declaration Date (and the Debtors shall cause such Weekly Statement and Final Statement to be delivered on the same day received to the ABL DIP Agent and Term DIP Agent). If any Professional Person fails to timely deliver a Weekly Statement within one business day after such Weekly Statement is due, such Professional Person shall not be entitled to any funds in the Carve Out Reserves with respect to the aggregate unpaid amount of Allowed Professional Fees for the applicable period(s) for which such Professional Person failed to deliver a Weekly Statement covering such period.  The ABL DIP Agent shall at all times maintain a Reserve (as defined in the ABL DIP Credit Agreement) in an amount equal to the Post-Carve Out Trigger Notice Cap, plus the aggregate amount of projected fees for all Professional Persons set forth in the Approved DIP Budget for the week subsequent to the date of determination for such Reserve; *provided*, that nothing set forth herein shall limit the ability of the ABL DIP Agent to increase such reserve if the ABL DIP Agent determines that the aggregate amount of Allowed Professional Fees are likely to exceed the amount set forth in the Approved DIP Budget for such week.

(c)     <u>Carve Out Reserves</u>.

(1)     On or before the Wednesday of each week, the Debtors shall utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the greater of (x) the aggregate amount of all Estimated Fees and Expenses reflected in the Weekly Statement delivered on the immediately prior Tuesday to the Debtors, ABL DIP Agent, and Term DIP Agent, and (y) the aggregate amount of Allowed Professional Fees contemplated to be incurred in the DIP Budget

during such week (the "Weekly Professional Fee Amount").  The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims, and all payments of Allowed Professional fees incurred prior to the Termination Declaration Date shall be paid first from such Pre-Carve Out Trigger Notice Reserve.  Upon the foregoing funding, the DIP Secured Parties and Prepetition Secured Parties shall have no further obligation to fund the Pre-Carve Out Trigger Notice Reserve and their liens and claims shall not be subordinate to any Allowed Professional Fees incurred through the Calculation Date for the most recent Weekly Statement required to be delivered in accordance with paragraph 13(b) herein.  For the avoidance of doubt, it shall be an immediate Event of Default if Debtors do not fund the full amount of the Weekly Professional Fee Amount into the Pre-Carve Out Trigger Notice Reserve on or before the Wednesday of each week.

(2)     On the day on which a Carve Out Trigger Notice is given by the ABL DIP Agent or by the Term DIP Agent, to the Debtors with a copy to counsel to any Official Committee and the Term DIP Agent or ABL DIP Agent, as applicable (the "Termination Declaration Date"), the Debtors shall utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund (A) the Pre-Carve Out Trigger Notice Reserve Account in an amount equal to the aggregate amount of all Estimated Fees and Expenses reflected in the Final Statements timely delivered to the Debtors, ABL DIP Agent, and Term DIP Agent, plus the amounts set forth in paragraph 13(a)(i) and 13(a)(ii) herein, and (B) after funding the Pre-Carve Out Trigger Notice Reserve Account, a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve

Out Reserves") prior to any and all other claims.  Upon the foregoing funding, the DIP

Secured Parties and Prepetition Secured Parties shall have no further obligation to fund the

Pre-Carve Out Trigger Notice Reserve or Post-Carve Out Trigger Notice Reserve and their

liens and claims shall not be subordinated to any portion of the Carve Out.

               (3)      All funds in the Pre-Carve Out Trigger Notice Reserve shall be used

first to pay the obligations set forth in paragraph 13(a)(i) through 13(a)(iii) herein (the "Pre-

Carve Out Trigger Amounts"), but not, for the avoidance of doubt, the Post-Carve Out

Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger

Notice Reserve has not been reduced to zero, to pay, subject to the Intercreditor

Agreements, (x) the ABL DIP Agent for the benefit of itself and the ABL Lenders until all

ABL DIP Obligations are paid in Full, and (y) the Term DIP Agent for the benefit of itself

and the Term Lenders, until all Term DIP  Obligations have been indefeasibly paid in full,

in cash, in which case any such excess shall be paid to the Debtors' creditors in accordance

with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out

Trigger Notice Reserve shall be used first to pay the obligations set forth in

paragraph 13(a)(iv) herein (the "Post-Carve Out Trigger Amounts"), and then, to the extent

the Post-Carve Out Trigger Notice Reserve Account has not been reduced to zero, to pay,

subject to the Intercreditor Agreement, (x) the ABL DIP Agent for the benefit of itself and

the ABL DIP Lenders until all ABL DIP Obligations are paid in full, and (y) the Term DIP

Agent for the benefit of itself and the Term DIP Lenders, until all Term DIP Obligations

have been indefeasibly paid in full, in cash, in which case any such excess shall be paid to

the Debtors' creditors in accordance with their rights and priorities as of the Petition Date.

Notwithstanding anything to the contrary in this Interim Order, in no way shall the

Approved DIP Budget be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.

(d)  <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out; *provided*, upon the funding of the Carve Out Reserves in accordance with paragraph 13(c) herein, the DIP Secured Parties and Prepetition Secured Parties shall have no further obligation to fund the Pre-Carve Out Trigger Notice Reserve or Post-Carve Out Trigger Notice Reserve and their liens and claims shall not be subordinated to any portion of the Carve Out.

(e)  <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  None of the DIP Secured Parties or Prepetition Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Cases or any Successor Cases.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Secured Parties or Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(f)  <u>Payment of Carve Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.

(g)  <u>Budget Not a Consent to Allowance of Professional Fees</u>.  Nothing herein, including the inclusion of line items in the Approved DIP Budget for Professional Persons, shall be construed as consent to the allowance of any particular professional fees or expenses of the

Debtors, of any Official Committee, or of any other person, or shall affect the right of the ABL DIP Agent or the Term DIP Agent to object to the allowance and payment of such fees and expenses. Furthermore, nothing in this Interim Order shall be construed: (i) to obligate the ABL DIP Agent or the Term DIP Agent in any way to pay compensation to or to reimburse expenses of any Professional Person, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; or (ii) to increase the Carve Out if Allowed Professional Fees and/or disbursements are higher in fact than the amounts subject to the Carve Out as set forth in this Interim Order.

14. ***Modification of Automatic Stay***. The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application or order of the Court to the extent necessary to permit the DIP Agents to perform any act authorized or permitted under or by virtue of this Interim Order and the DIP Documents, as applicable, including, without limitation, (i) to implement the postpetition financing arrangements authorized by this Interim Order, (ii) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (iii) to assess, charge, collect, advance, deduct and receive payments with respect to the ABL DIP Obligations and Term DIP Obligations (or any portion thereof), including, without limitation, all interests, fees, costs and expenses permitted under any of the DIP Documents and apply such payments to the Prepetition Obligations in accordance with the DIP Documents, and (iv) immediately following the expiration of the Remedies Notice Period (as defined below), unless stayed, and subject to paragraph 19 of this Interim Order, to take any action and exercise all rights and remedies provided to it by this Interim Order, the DIP Documents, or applicable law.

15.     ___Reservation of Rights of the DIP Secured Parties and the Prepetition Secured Parties___.  Subject in all cases to the Carve Out and any applicable obligations under the RSA, and notwithstanding any other provision in this Interim Order or the DIP Documents to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair:  (a) any of the rights of any of the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors including the right to seek additional adequate protection at and following the Final Hearing; *provided* that any such further or different adequate protection shall at all times be subordinate and junior to the Carve Out and the claims and liens of the DIP Secured Parties granted under this Interim Order and the DIP Documents; (b) any of the rights of the DIP Secured Parties or the Prepetition Secured Parties under any of the DIP Documents, the Prepetition Loan Documents, or the Intercreditor Agreements, or under the Bankruptcy Code or non-bankruptcy law (as applicable), including, without limitation, the right of any of the DIP Secured Parties or the Prepetition Secured Parties to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code solely in connection with the DIP Facility, (ii) request dismissal of any of the Cases, conversion of any of the Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Cases, (iii) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Secured Parties or the Prepetition Secured Parties.  The delay in or failure of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Secured Parties' or the Prepetition Secured Parties' rights and remedies. For all adequate protection purposes throughout the Cases, each of the Prepetition First Lien

Secured Parties, Prepetition Second Lien Secured Parties, and Prepetition ABL Secured Parties, to the extent applicable, shall be deemed to have requested relief from the automatic stay and adequate protection for any Postpetition Diminution in Value from and after the Petition Date. For the avoidance of doubt, such request will survive termination of this Interim Order.

16.        ***Reservation of Certain Official Committee and Third Party Rights and Bar of Challenges and Claims***.  Subject to the rights and limitations set forth in this paragraph 16, the Debtors' Stipulations, the ABL Roll-Up, and the releases set forth in paragraph 31 herein (the "Debtors' Releases") shall be binding upon the Debtors, their estates, and any of their respective successors in all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date. The Debtors' Stipulations, the ABL Roll-Up, and the Debtors' Releases shall be binding upon all other parties in interest, including any Official Committee and any other person acting on behalf of the Debtors' estates, unless and to the extent that a party in interest with proper standing granted by order of the Court (or other court of competent jurisdiction) has timely and properly filed an adversary proceeding or contested matter under the Bankruptcy Rules (i) before the earlier of (a) the deadline to object to confirmation of the Debtors' prepackaged plan of reorganization and (b) the earlier of (I) in the case of any such adversary proceeding or contested matter filed by any party other than any Official Committee, 75 calendar days after entry of the Interim Order, and (II) in the case of any such adversary proceeding or contested matter filed by any Official Committee, 60 calendar days after the appointment of such Official Committee (each such date of expiration of the Challenge Period, a "Challenge Period Termination Date"); *provided, however*, that (x) upon the filing by the Official Committee of a Challenge, including an appropriate standing motion, by the Challenge Period Termination Date, the Official Committee shall agree on a

Challenge litigation schedule that provides for a hearing or trial on any such Challenge to be sufficiently in advance of the confirmation hearing to be held in accordance with the RSA (subject to the availability of the Court), and (y) if the Cases convert to chapter 7 or if a chapter 11 trustee is appointed, then, in each such case, the Challenge Period Termination Date shall be extended by the time remaining until the existing Challenge Period Termination Date plus thirty (30) days; *provided, however*, that the Challenge Period Termination Date shall only be extended by thirty (30) days if the Challenge Period has not yet expired; (ii) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations regarding: (a) the validity, enforceability, extent, priority, or perfection of the mortgages, security interests, and liens of the Prepetition Agents or the Prepetition Secured Parties; or (b) the validity, enforceability, allowability, priority, secured status, or amount of the Prepetition Obligations (any such claim, a "Challenge"); and (iii) in which the Court enters a final order in favor of the plaintiff or movant sustaining any such Challenge in any such timely filed adversary proceeding or contested matter.   Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled): (a) any and all such Challenges by any party (including the Official Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any successor Case (any such case, a "Successor Case")) shall be deemed to be forever barred; (b) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in the Debtors' Cases and any Successor Cases; (c) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, and perfected secured claims, not subject to recharacterization, subordination, or avoidance; and (d) all of the Debtors'

stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity as to the Prepetition Secured Parties' claims, liens, and interests contained in this Interim Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in interest in these Cases and any Successor Cases.  If any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules and remains pending and the Cases are converted to chapter 7, the chapter 7 trustee may continue to prosecute such adversary proceeding or contested matter on behalf of the Debtors' estates.  Furthermore, if any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Official Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date.  Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including, without limitation, any Official Committee appointed in the Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation any challenges (including a Challenge) with respect to the Prepetition Loan Documents, the Prepetition Liens, and the Prepetition Obligations, and a separate order of the Court conferring such standing on any Official Committee or other party in interest shall be a prerequisite for the prosecution of a Challenge by such Official Committee or such other party in interest.

17.   ***DIP Termination Date***.   On the DIP Termination Date (as defined below), consistent with the Term DIP Credit Agreement and the ABL DIP Credit Agreement, unless

otherwise agreed to in writing by the requisite DIP Secured Parties under the applicable DIP Documents, (a) all DIP Obligations shall be immediately due and payable and the Carve Out Reserves shall be funded as set forth in this Interim Order; *provided*, *however*, that if the DIP Termination Date occurs solely on account of the occurrence of the effective date of a confirmed plan of reorganization that is consistent with the RSA and acceptable to the Required DIP Lenders, any Term DIP Obligations to be converted and exchanged on a cashless basis for new equity interests or into other obligations of the reorganized debtors pursuant to the terms of such plan shall not be immediately due and payable and shall instead be satisfied solely in accordance with the terms of such plan; *provided*, notwithstanding anything to the contrary herein, any ABL DIP Obligations shall be paid in full in cash, unless the ABL DIP Agent agrees in writing to other treatment of such ABL DIP Obligations; (b) all authority to use Cash Collateral shall cease; *provided*, *however*, that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral solely to fund the Carve Out and pay payroll and other expenses critically necessary to preserve the value of the Debtors' businesses and to administer the Debtors' estates in accordance with the Approved DIP Budget; and (c) the DIP Secured Parties shall be otherwise entitled to exercise rights and remedies under the DIP Documents in accordance with this Interim Order.

18.     ***Events of Default***.  Subject to any applicable grace period, the occurrence of any of the following events, unless waived, as applicable and in accordance with the terms of the applicable DIP Documents, by the Term DIP Agent (acting at the direction or authorization of the Required Term DIP Lenders in accordance with the terms of the Term DIP Documents), or by the ABL DIP Agent (acting at the direction or authorization of the Required ABL DIP Lenders in accordance with the ABL DIP Documents), shall constitute an event of default (each, an "Event

of Default" and collectively, the "Events of Default") under the Term DIP Facility and the ABL DIP Facility, as applicable:  (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order; or (b) the occurrence of an "Event of Default" under either the Term DIP Credit Agreement or the ABL DIP Credit Agreement, respectively.

19. ***Rights and Remedies Upon Event of Default***.  Subject to any applicable grace period, the terms of the applicable DIP Documents, and the Carve Out, immediately upon the occurrence and during the continuation of an Event of Default under the Term DIP Facility or the ABL DIP Facility, as applicable, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order and the Remedies Notice Period (as defined below), the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Term DIP Agent or the ABL DIP Agent (acting at the direction or authorization of the Required Term DIP Lenders or the Required ABL DIP Lenders, as applicable) to (i) deliver to the applicable DIP Borrower a notice declaring the occurrence of an Event of Default; (ii) declare (any such declaration, a "Termination Declaration" and the date on which a Termination Declaration is delivered, the "DIP Termination Date"), upon delivery by electronic mail (or other electronic means) to counsel to the Debtors, counsel to any Official Committee, counsel to the First Lien Group, counsel to the PVKG Lender, counsel to the other DIP Agent, and the U.S. Trustee, (a) all Term DIP Obligations or ABL DIP Obligations, as applicable, owing under the DIP Documents to be immediately due and payable, (b) the termination, reduction, or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the Term DIP Facility or the ABL DIP Facility, as applicable, (c) termination of the Term DIP Facility and the Term DIP Documents or the ABL DIP

Facility and the ABL DIP Documents, as applicable, as to any future liability or obligation of the DIP Agents and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (d) termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, and (e) that the Carve Out shall be triggered, through the delivery of the Carve Out Trigger Notice in accordance with paragraph 16 of this Interim Order; (iii) charge the default rate of interest under the applicable DIP Facility (which default rate of interest shall be charged automatically in accordance with the terms of the applicable DIP Documents); (iv) exercise any other right or remedy with respect to the DIP Collateral or the DIP Liens; and (v) take any other action or exercise any other right or remedy permitted under the applicable DIP Documents, this Interim Order, the Final Order, or applicable law; *provided*, *however*, that in the case of the enforcement of rights pursuant to clauses (iv)-(v) of this paragraph 19,  the Term DIP Agent or the ABL DIP Agent (acting at the direction or authorization of the Required Term DIP Lenders or Required ABL DIP Lenders, as applicable) shall provide counsel to the Debtors, counsel to any Official Committee, counsel to the First Lien Group, counsel to the PVKG Lender, counsel to the other DIP Agent, and the U.S. Trustee with five (5) business days' prior written notice (such period, the "Remedies Notice Period"). Immediately upon the expiration of the Remedies Notice Period, the Court shall hold an emergency hearing when the Court is available (the "Enforcement Hearing") at which the Debtors, any Official Committee, and/or any other party in interest shall be entitled to seek a determination from the Court solely as to whether an Event of Default has occurred, and at the conclusion of the Enforcement Hearing, the Court may fashion an appropriate remedy that is consistent with the terms of this Interim Order; *provided*, *further*, that during the Remedies Notice Period, the Debtors are permitted to use Cash Collateral solely to fund expenses critically necessary to preserve the value of the Debtors' businesses, as determined by the Required

DIP Lenders in their sole discretion. Except as set forth in this paragraph 19 or otherwise ordered by the Court prior to the expiration of the Remedies Notice Period, after the Remedies Notice Period, the Debtors shall waive their right to and shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Secured Parties under this Interim Order.  Notwithstanding anything to the contrary herein, no enforcement rights set forth in clauses (iv)-(v) of this paragraph 19 herein shall be exercised prior to the Court holding an Enforcement Hearing, subject to Court availability, and the expiration of the Remedies Notice Period, and the Remedies Notice Period shall not expire until the conclusion of the Enforcement Hearing and the issuance of a ruling by the Court if such Enforcement Hearing is conducted by the Court.

20.     ***Limitation on Charging Expenses Against Collateral***.  No expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from (a) the DIP Collateral (except to the extent of the Carve Out), the DIP Agents, or the DIP Lenders or (b) solely upon entry of the Final Order, the Prepetition Collateral (except to the extent of the Carve Out) or the Prepetition Secured Parties, in each case, pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity, without the prior written consent of the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties.

21.     ***Use of Cash Collateral***.  The Debtors are hereby authorized to use all Cash Collateral of the Prepetition Secured Parties, but solely for the purposes set forth in this

Interim Order and in accordance with the Approved DIP Budget, including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order, from the date of entry this Interim Order through and including the DIP Termination Date.

22.     ***Cash Management***.  Until such time as all DIP Obligations are paid in full, the Debtors shall also maintain the cash management system in effect as of the Petition Date, as modified by this Interim Order and any order of the Court authorizing the continued use of the cash management system that is acceptable to each of the Term DIP Agent (acting at the direction or authorization of the Required Term DIP Lenders) and the ABL DIP Agent (acting at the direction or authorization of the Required ABL DIP Lenders), in accordance with the Term DIP Credit Agreement and the ABL DIP Credit Agreement, respectively.  The Debtors shall not open any new deposit or securities account that is not subject to the liens and security interests of each of the DIP Secured Parties, and any such accounts shall be subject to the lien priorities and other provisions set forth in this Interim Order.

23.     ***Continuation of Prepetition Procedures***.  Except to the extent expressly set forth in the Prepetition ABL Documents and DIP Documents, all prepetition practices and procedures for the payment and collection of proceeds of the Prepetition ABL Collateral, the turnover of cash, the delivery of property to the ABL DIP Agent and the ABL DIP Lenders, including any lockbox or blocked depository bank account arrangements, are hereby approved and shall continue without interruption, subject to the terms of this Interim Order.

24.     ***Expenses and Indemnification***.

(a)     The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, payments, expenses, and other amounts required under the DIP Documents as such amounts become due and without need to obtain further Court

approval, including, without limitation, closing, arrangement, or commitment payments (including all payments and other amounts owed to the DIP Lenders under the DIP Documents), administrative agent's fees and collateral agent's fees (including all fees and other amounts owed to the DIP Agents under the DIP Documents), the reasonable and documented fees and disbursements of counsel and other professionals to the extent set forth in paragraphs 3(f)(5), 10(c), 11(c), and 12(c) of this Interim Order, whether or not such fees arose before or after the Petition Date, all to the extent provided in this Interim Order or the DIP Documents.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay on the Closing Date (as defined in the DIP Documents) all reasonable and documented fees, costs, and expenses set forth in the DIP Documents, including the fees and expenses of counsel to the DIP Lenders, the DIP Agents, the ABL Agent, the First Lien Group, the Second Lien Group, and the PVKG Lender incurred on or prior to such date without the need for any professional engaged by the DIP Lenders, the DIP Agents, the ABL Agent, the First Lien Group, the Second Lien Group, or the PVKG Lender to first deliver a copy of its invoice as provided for herein.

(b)    The Debtors shall be jointly and severally obligated to pay all fees and expenses described above, which obligations shall constitute the DIP Obligations.  The Debtors are authorized to and shall pay the reasonable and documented professional fees, expenses, and disbursements of professionals to the extent provided for in paragraphs 3(f)(5), 10(c), 11(c), and 12(c) of this Interim Order (collectively, the "Lender Professionals" and, each, a "Lender Professional") no later than five (5) business days (the "Review Period") after the receipt by counsel for the Debtors, any Official Committee, and the U.S. Trustee of each of the invoices therefor (the "Invoiced Fees") and without the necessity of filing formal fee applications or complying with the U.S. Trustee Guidelines, including such amounts arising before the Petition

Date (solely to the extent not previously satisfied). Invoiced Fees shall be in the form of an invoice summary for professional fees and categorized expenses incurred during the pendency of the Cases, and such invoice summary shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any work product doctrine, privilege or protection, common interest doctrine privilege or protection, any other evidentiary privilege or protection recognized under applicable law, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege, work product doctrine, privilege or protection, common interest doctrine privilege or protection, or any other evidentiary privilege or protection recognized under applicable law. The Debtors, any Official Committee, or the U.S. Trustee may dispute the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, a Debtor, any Official Committee, or the U.S. Trustee notifies the submitting party in writing setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with the Court, if necessary, of a motion or other pleading, with at least ten (10) days prior written notice to the submitting party of any hearing on such motion or other pleading). For avoidance of doubt, the Debtors shall promptly pay in full all Invoiced Fees other than any portion of the Invoiced Fees that constitute the Disputed Invoiced Fees.

(c)       In addition, the Debtors will indemnify each of the DIP Lenders, the DIP Agents, the Prepetition Secured Parties (in each case, to the extent set forth in the Prepetition Loan Documents), and each of their respective affiliates, successors, and assigns and the officers, directors, employees, agents, attorneys, advisors, controlling persons, and members of each of the foregoing (each an "Indemnified Person") and hold them harmless from and against all reasonable

and documented out of pocket costs, fees, and expenses (including the reasonable and documented legal fees and expenses), and liabilities arising out of or relating to the transactions contemplated hereby and any actual or proposed use of the proceeds of any loans made under the DIP Facilities; *provided* that no such person will be indemnified for costs, expenses, or liabilities to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have been incurred by reason of the bad faith, gross negligence, actual fraud, or willful misconduct of such person (or their related persons). No Indemnified Person shall have any liability (whether direct or indirect, in contract, tort, or otherwise) to the Debtors or any shareholders or creditors of the Debtors for or in connection with the transactions contemplated hereby, except to the extent such liability is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Person's bad faith, gross negligence, actual fraud, or willful misconduct or breach of their obligations under the DIP Facilities, and in no event shall any Indemnified Person be liable on any theory of liability for any special, indirect, consequential, or punitive damages.

25. ***No Third Party Rights***. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

26. ***Section 507(b) Reservation***. Subject to the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition First Lien Secured Parties, Prepetition Second Lien Secured Parties, or Prepetition ABL Secured Parties, to the extent applicable, is insufficient to compensate for any Postpetition Diminution in Value of their interests in the Prepetition Collateral during the Cases. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment

by any of the Prepetition First Lien Secured Parties, Prepetition Second Lien Secured Parties, or Prepetition ABL Secured Parties, to the extent applicable, that the adequate protection granted herein does in fact adequately protect any of the Prepetition First Lien Secured Parties, Prepetition Second Lien Secured Parties, or Prepetition ABL Secured Parties, to the extent applicable, against any Postpetition Diminution in Value of their respective interests in the Prepetition Collateral (including the Cash Collateral).

27.     ***Insurance***.   Until the DIP Obligations have been indefeasibly paid in full, at all times the Debtors shall maintain property, casualty, and loss insurance coverage for the Prepetition Collateral and DIP Collateral on the same basis as maintained prior to the Petition Date. To the extent that any of the Prepetition Agents is listed as loss payee and/or additional insured under the DIP Borrowers' or DIP Guarantors' insurance policies, the DIP Agents are also deemed to be a loss payee and/or additional insured under such insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, *first*, to the payment in full of the DIP Obligations subject to the priority set forth in the Post-Petition Lien/Claim Priority Annex (other than contingent indemnification obligations as to which no claim has been asserted), and *second*, to the payment of the Prepetition Obligations subject to the priority set forth in the Prepetition Lien Priority Annex.

28.     ***Power to Waive Rights***.

(a)     The ABL DIP Agent shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order that are in favor of ABL DIP Agent or the ABL DIP Lenders (the "ABL DIP Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any ABL DIP Lender Right(s).  Any waiver by ABL DIP Agent of any ABL DIP Lender Rights shall

ument 22   Filed in TXSB on 04/04/24   Page 130 of 150

not be or constitute a continuing waiver.  Any delay in or failure to exercise or enforce any ABL DIP Lender Right shall neither constitute a waiver of such ABL DIP Lender Right, subject ABL DIP Agent or any ABL DIP Lender to any liability to any other party, or cause or enable any party other than the Debtors to rely upon or in any way seek to assert such delay or failure as a defense to any obligation owed by the Debtors to ABL DIP Agent or any ABL DIP Lender.

(b)     The Term DIP Agent (at the direction of the Required Term DIP Lenders) shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order that are in favor of Term DIP Agent or the Term DIP Lenders (the "Term DIP Lender Rights"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Term DIP Lender Right(s).  Any waiver by Term DIP Agent of any Term DIP Lender Rights shall not be or constitute a continuing waiver. Any delay in or failure to exercise or enforce any Term DIP Lender Right shall neither constitute a waiver of such Term DIP Lender Right, subject the Term DIP Agent or any Term DIP Lender to any liability to any other party, or cause or enable any party other than the Debtors to rely upon or in any way seek to assert such delay or failure as a defense to any obligation owed by the Debtors to the Term DIP Agent or any Term Lender.

29.     ***No Waiver for Failure to Seek Relief***. The failure or delay of any of the DIP Agents or the applicable Required DIP Lenders to exercise rights and remedies under this Interim Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

30.     ***Perfection of the DIP Liens and Adequate Protection Liens***.

(a)     The DIP Agents and the Prepetition Agents are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, depository

account control agreements, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted hereunder.  Whether or not the DIP Agents or the Prepetition Agents shall (at the direction of the applicable required lenders) choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not, subject to any Challenges as provided in paragraph 16 of this Interim Order, subject to challenge, dispute, or subordination as of the date of entry of this Interim Order.  If the DIP Agents or the Prepetition Agents (at the direction of the applicable required lenders) determines to file or execute any financing statements, agreements, notice of liens, or similar instruments, the Debtors shall use commercially reasonable efforts to cooperate and assist in any such execution and/or filings as reasonably requested by the DIP Agents or the Prepetition Agents (at the direction of the applicable required lenders), and the automatic stay shall be modified solely to allow such filings as provided for in this Interim Order.

(b)     A certified copy of this Interim Order may, at the direction of the Required Term DIP Lenders or the ABL DIP Agent, as applicable, be filed with or recorded in filing or recording offices by the DIP Agents or the Prepetition Agents in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; *provided*, *however*, that notwithstanding the date of any such filing, the date of such perfection shall be the date of entry of this Interim Order.

(c)     Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell,

assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law.  Any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the Term DIP Credit Agreement, the ABL DIP Credit Agreement, or this Interim Order.

31.     ***Release***.  Subject to the rights and limitations set forth in paragraph 16 of this Interim Order, effective upon entry of the Final Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns, shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge each of the DIP Secured Parties and the Prepetition Secured Parties, and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to the DIP Obligations, DIP Liens, DIP

Documents, Prepetition Obligations, Prepetition Liens, or Prepetition Loan Documents, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Secured Parties and the Prepetition First Lien Secured Parties; *provided*, that nothing in this paragraph shall in any way limit or release any of the Debtors' claims or causes of action related to, or arising from, (x) any obligations of any DIP Secured Party under the DIP Documents or (y) any obligations pursuant to the RSA that any party may owe to the Debtors or their estates.

32.     ***Credit Bidding***.  Subject to section 363(k) of the Bankruptcy Code and the terms of the applicable DIP Documents, the Term DIP Agent or the ABL DIP Agent (acting at the direction or authorization of the Required Term DIP Lenders or the Required ABL DIP Lenders, as applicable) and the agents under the Prepetition First Lien Debt Agreements (acting at the direction or authorization of the applicable Required Lenders or Required Holders (as defined in the applicable Prepetition First Lien Debt Agreements)) shall have the right to credit bid (either directly or through one or more acquisition vehicles), all or any portion of the underlying lenders' respective claims, including, for the avoidance of doubt, the First Lien Adequate Protection Superpriority Claims, if any, in any sale of all or any portion of the Prepetition Collateral or the DIP Collateral including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under Bankruptcy Code section 1129(b)(2)(A)(ii)-(iii).

33.     ***Preservation of Rights Granted Under this Interim Order.***

(a)     Unless and until all DIP Obligations are indefeasibly paid in full, in cash, the Prepetition Secured Parties shall:  (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Prepetition Loan Documents or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against the DIP Collateral; and (ii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral, except as set forth in this paragraph 33.

(b)     In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the DIP Secured Parties or the Prepetition Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition Secured Parties shall be entitled to, and are hereby granted, all the rights, remedies, privileges, and benefits afforded in section 364(e) of the Bankruptcy Code.

(c)     Unless and until all DIP Obligations and Adequate Protection Payments are indefeasibly paid in full, in cash, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly: (i) except as permitted under the DIP Documents or, if not provided for therein, with the prior written consent of the DIP Agents (acting at the direction or authorization of the applicable Required DIP Lenders) and the Prepetition Agents (acting at the direction or authorization of the applicable required lenders under the Prepetition Loan Documents), (x) any modification, stay, vacatur, or amendment of this Interim Order, (y) a priority

claim for any administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Cases, *pari passu* with or senior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, or the Prepetition Obligations (other than any claim on account of the Carve Out), or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents (including the Carve Out), any lien on any of the DIP Collateral or the Prepetition Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens, or the Prepetition Liens, as applicable; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; (iv) except as set forth in the DIP Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Cases; (vi) an order appointing a chapter 11 trustee in any of the Cases; or (vii) an order appointing an examiner with enlarged powers in any of the Cases.

(d)     Notwithstanding any order dismissing any of the Cases entered at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Payments are indefeasibly paid in full in cash (and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Adequate Protection Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order, shall, notwithstanding such dismissal, remain binding on all parties in

interest); and (y) to the fullest extent permitted by law the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(e)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, (ii) the entry of an order approving the sale of any Prepetition Collateral or DIP Collateral pursuant to section 363(b) of the Bankruptcy Code, or (iii) the entry of an order confirming a chapter 11 plan in any of the Cases, subject to the terms of any such confirmed plan.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Cases, in any Successor Cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code.  The DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Adequate Protection Superpriority Claims, and all other rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Payments are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in accordance with the terms of a confirmed plan of reorganization or other manner agreed to by the Required DIP Lenders and the Term DIP Agent or the ABL DIP Agent (acting at the direction or

authorization of the Required Term DIP Lenders or the Required ABL DIP Lenders, as applicable)).

(f)     Other than as set forth in this Interim Order and in the Post-Petition Lien/Claim Priority Annex, subject to the Carve Out, neither the DIP Liens nor the Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the Cases or arising after the Petition Date, and neither the DIP Liens nor the Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

34.     ***Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral***. Notwithstanding anything to the contrary set forth in this Interim Order, none of the DIP Facilities, the DIP Collateral, the Prepetition Collateral, including Cash Collateral, or the Carve Out or proceeds thereof may be used:  (a) to investigate (including by way of examinations or discovery proceedings), initiate, assert, prosecute, join, commence, support, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other litigation of any type (i) against any of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such), and each of their respective affiliates, officers, directors, employees, agents, representatives, attorneys, consultants, financial advisors, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, any so-called "lender liability" claims and causes of action, or seeking relief that would impair the rights and remedies of the DIP Secured Parties or the Prepetition Secured Parties (each in their capacities as such) under the DIP Documents, the Prepetition Loan Documents, or this Interim Order, including, without limitation,

for the payment of any services rendered by the professionals retained by the Debtors or any Official Committee appointed in these Cases in connection with the assertion of or joinder in any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, adversary proceeding, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties to recover on the DIP Collateral or the Prepetition Collateral or seeking affirmative relief against any of the DIP Secured Parties or the Prepetition Secured Parties related to the DIP Obligations or the Prepetition Obligations; (ii) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the DIP Obligations or the Prepetition Obligations, or the DIP Agents', the DIP Lenders', and the Prepetition Secured Parties' liens or security interests in the DIP Collateral or Prepetition Collateral, as applicable; or (iii) for monetary, injunctive, or other affirmative relief against the DIP Secured Parties or the Prepetition Secured Parties, or the DIP Agents', the DIP Lenders', or the Prepetition Secured Parties' respective liens on or security interests in the DIP Collateral or the Prepetition Collateral that would impair the ability of any of the DIP Secured Parties or the Prepetition Secured Parties, as applicable, to assert or enforce any lien, claim, right, or security interest or to realize or recover on the DIP Obligations or the Prepetition Obligations, to the extent applicable; (b) for objecting to or challenging in any way the legality, validity, priority, perfection, or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Obligations, or by or on behalf of the DIP Agent and the DIP Lenders related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Avoidance Actions related to the DIP Obligations, the DIP Liens, the Prepetition

Obligations, or the Prepetition Liens; or (d) for prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of: (x) any of the DIP Liens or any other rights or interests of the DIP Agents or the DIP Lenders related to the DIP Obligations or the DIP Liens, or (y) any of the Prepetition Liens or any other rights or interests of any of the Prepetition Secured Parties related to the Prepetition Obligations or the Prepetition Liens; *provided* that no more than $50,000 of the proceeds of the Term DIP Facility, the ABL DIP Facility, the DIP Collateral, or the Prepetition Collateral, including the Cash Collateral, in the aggregate, may be used by the Official Committee solely to investigate, within the Challenge Period, the claims, causes of action, adversary proceedings, or other litigation against the Prepetition Secured Parties solely concerning the legality, validity, priority, perfection, enforceability or extent of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of each of the Prepetition Secured Parties related to the Prepetition Obligations.

35.     ***Disposition of Collateral***.  The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (including inventory), other than pursuant to the terms of this Interim Order, the DIP Documents, and any other order of this Court.

36.     ***Conditions Precedent***.  Except as provided for in the Carve Out, no DIP Lender shall have any obligation to make any DIP Loan under the respective DIP Documents unless all of the conditions precedent to the making of such extensions of credit under the applicable DIP Documents have been satisfied in full or waived in accordance with such DIP Documents.

37.     ***Intercreditor Provisions***. Pursuant to section 510 of the Bankruptcy Code, any applicable intercreditor or subordination provisions contained in any of the Prepetition Loan Documents (including, for the avoidance of doubt, the Intercreditor Agreements) shall remain in

full force and effect; *provided*, that nothing in this Interim Order shall be deemed to provide liens to any Prepetition Secured Party on any assets of the Debtors except as set forth herein.

38. ***Binding Effect; Successors and Assigns***.  The DIP Documents and the provisions of this Interim Order, including all findings herein, subject to paragraph 16 hereof, shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, any Official Committee appointed in these Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties and the applicable Prepetition Secured Parties; *provided* that, except to the extent expressly set forth in this Interim Order, the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

39. ***Limitation of Liability***.  Solely in determining to make any loan under the DIP Documents, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not, solely by reason thereof, be deemed in control of the operations of the Debtors; to owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates; or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability

Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Furthermore, nothing in this Interim Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agents, the DIP Lenders, or any Prepetition Secured Parties of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

40.     ***No Requirement to File Claim for DIP Obligations***.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, neither the DIP Agents nor any DIP Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations, all of which shall be due and payable in accordance with the DIP Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the DIP Agents' or any DIP Lender's rights, remedies, powers, or privileges under any of the DIP Documents, this Interim Order, or applicable law.  The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party in interest or their respective successors-in-interest.

41.    ***No Requirement for Prepetition Secured Parties or DIP Secured Parties to File Claims***.

(a)    Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, none of the Prepetition Secured Parties shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the Prepetition Obligations, to the extent applicable; and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the Prepetition Loan Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the Prepetition Secured Parties' rights, remedies, powers, or privileges under any of the Prepetition Loan Documents, this Interim Order, or applicable law.   The descriptions of the claims and liens in respect of the Prepetition Obligations set forth in this Interim Order are deemed to constitute proofs of claim in the Debtors' lead case on behalf of the applicable Prepetition Secured Parties. However, in order to facilitate the processing of claims, each Prepetition Agent is authorized, but not directed or required, to file a master proof of claim in the Debtors' lead case on behalf of the applicable Prepetition Secured Parties, which shall be deemed to have been filed against each applicable Debtor in each of the Cases.  The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party in interest or their respective successors-in-interest.

(b)    The DIP Agents and the DIP Lenders shall not be required to file proofs of claim in any of the Cases or any Successor Cases for any claim allowed herein. Any order entered

by the Court establishing a bar date in any of the Cases or any Successor Cases shall not apply to the DIP Agents or DIP Lenders; *provided*, notwithstanding any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Cases to the contrary, the DIP Agents or DIP Lenders, on behalf of themselves and the other DIP Secured Parties, may (but are not required) in their discretion file (and amend and/or supplement) a proof of claim and/or aggregate proofs of claim in each of the Cases or any Successor Cases for any claim allowed herein, and any such proof of claim may (but is not required to be) filed as one consolidated proof of claim against all of the Debtors, rather than as separate proofs of claim against each Debtor in each of the Cases. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party in interest or their respective successors-in-interest.

42.   ***Debtors' Waivers***.  Prior to payment of the DIP Facilities in full, (x) it shall be an Event of Default if the Debtors seek further authority, and (y) whether or not an Event of Default has occurred, the Debtors irrevocably waive any right that they may have: (a) to use Cash Collateral of DIP Agents and DIP Lenders under section 363 of the Bankruptcy Code other than as provided in this Interim Order, (b) to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code, other than as provided in this Interim Order or as may be otherwise expressly permitted pursuant to the DIP Documents, (c) to challenge the application of any payments authorized by this Interim Order as pursuant to section 506(b) of the Bankruptcy Code, (d) to propose, support or have a plan of reorganization or liquidation that is either inconsistent with the Ratification Agreement or RSA, or (e) to seek relief under the Bankruptcy Code, including without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights

and remedies of DIP Agents or DIP Lenders as provided in this Interim Order and the DIP Documents or DIP Agents' or DIP Lenders' exercise of such rights or remedies; *provided*, *however*, that DIP Agents may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by DIP Agents or DIP Lenders.

43.     **_No Marshaling_**.  The DIP Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds of the DIP Collateral shall be received and applied pursuant to this Interim Order and the DIP Documents, notwithstanding any other agreement or provision to the contrary, and effective as of the Petition Date but subject to entry of the Final Order and the terms thereof, the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral.

44.     **_Equities of the Case_**.  The DIP Secured Parties shall be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code with respect to proceeds, product, offspring, or profits of any of the DIP Collateral, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties with respect to proceeds, product, offspring, or profits of any of the DIP Collateral. The Prepetition Secured Parties shall be entitled to all the rights and benefits of section 552(b) of the Bankruptcy Code, and, effective as of the Petition Date but subject to entry of the Final Order and the terms thereof, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral.

45.     _**Conflicts**_.  To the extent there exists any conflict among the terms and conditions of the Motion, the DIP Documents, or this Interim Order, the terms and conditions of this Interim Order shall govern and control.

46.     _**Final Hearing**_.  The Final Hearing on the Motion shall be held on _____, 2024, at__:__ _.m., prevailing Central time.  Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Central time, on _____, 2024, and shall be served on:  (a) the Debtors; (b) proposed counsel to the Debtors, White & Case LLP, 111 S. Wacker Dr., Chicago, IL 60606, Attn. Bojan Guzina (bojan.guzina@whitecase.com), Andrew F. O'Neill (aoneill@whitecase.com), and Adam T. Swingle (adam.swingle@whitecase.com); (c) counsel to the First Lien Group, Gibson, Dunn & Crutcher LLP, 200 Park Ave., New York, NY 10166, Attn: Scott J. Greenberg (sgreenberg@gibsondunn.com), Steven A. Domanowski (sdomanowski@gibsondunn.com), and Keith Martorana (kmartorana@gibsondunn.com); (d) counsel to the Prepetition KL Note Purchase Agreement Holders, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn. Daniel I. Fisher (dfisher@akingump.com); (e) counsel to the PVKG Lender, Latham & Watkins LLP, 1271 Avenue of the Americas, New York, NY 10020, Attn: Keith A. Simon (keith.simon@lw.com); (f) counsel to the Second Lien Group, Davis Polk and Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, Attn: Adam L. Shpeen (adam.shpeen@davispolk.com) and Abraham Bane (abraham.bane@davispolk.com); (g) counsel to ABL DIP Agent, Otterbourg P.C., 230 Park Avenue, New York, NY 10169, Attn: Daniel F. Fiorillo (dfiorillo@otterbourg.com) and Chad B. Simon (csimon@otterbourg.com), and Bracewell LLP, 711 Louisiana Street, Suite 2300, Houston, TX 77002, Attn: Trey Wood (trey.wood@bracewell.com); (h) counsel to the Term DIP Agent, ArentFox Schiff LLP, 1301 Avenue of the Americas, New York, NY 10019, Attn:

Jeffrey R. Gleit (jeffrey.gleit@afslaw.com); (i) counsel to the Prepetition First Lien Term Loan Agent and the Prepetition Second Lien Agent, Cahill Gordon & Reindel LLP, 32 Old Slip, New York, NY   10005, Attn: Richard A. Stieglitz Jr. (rstieglitz@cahill.com); (j) counsel to the Prepetition KL Note Purchase Agreement Agent, Moses & Singer LLP, 405 Lexington Avenue New York, New York 10174, Attn: Andrew Oliver (aoliver@mosessinger.com) and Kent C. Kolbig (kkolbig@mosessinger.com); (k) the United States Trustee, 515 Rusk Street, Suite 3516, Houston, TX 77002, Attn: Jayson B. Ruff (jayson.b.ruff@usdoj.gov); and (l) counsel to any Official Committee.  In the event no objections to entry of the Final Order on the Motion are timely received, this Court may enter such Final Order without need for the Final Hearing.

47.    ***Effect of this Interim Order***.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution hereof, notwithstanding Bankruptcy Rules 6003 or 6004 or any other statute, rule, or provision to the contrary.

48.    ***Retention of Jurisdiction***.  This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

Dated: _____, 2024
Houston, Texas

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT A</u>**

**Approved DIP Budget**

**ConvergeOne**
**Initial Budget**

($ in thousands)

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | 13 Wk total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week #: | | | | | | | | | | | | | | |
| Week Ending: | 4/5 | 4/12 | 4/19 | 4/26 | 5/3 | 5/10 | 5/17 | 5/24 | 5/31 | 6/7 | 6/14 | 6/21 | 6/28 | 6/28 |
| Actual / Forecast: | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| **Receipts** | | | | | | | | | | | | | | |
| Existing AR Collections | 27,805 | 27,401 | 30,813 | 32,681 | 27,108 | 24,728 | 27,713 | 28,482 | 29,555 | 32,206 | 28,648 | 29,078 | 34,167 | 380,385 |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts, Net** | **27,805** | **27,401** | **30,813** | **32,681** | **27,108** | **24,728** | **27,713** | **28,482** | **29,555** | **32,206** | **28,648** | **29,078** | **34,167** | **380,385** |
| **Disbursements** | | | | | | | | | | | | | | |
| Vendor Payments | (55,300) | (18,300) | (19,300) | (19,300) | (28,324) | (23,324) | (18,324) | (18,324) | (18,324) | (15,546) | (15,546) | (25,546) | (25,546) | (301,002) |
| Payroll & Benefits | (10,200) | (1,681) | (10,566) | (1,681) | (16,616) | (1,681) | (10,566) | (1,681) | (16,616) | (1,681) | (10,566) | (1,681) | (16,616) | (101,832) |
| Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Payments | (447) | (447) | (447) | (447) | (447) | (447) | (447) | (447) | (447) | (447) | (447) | (447) | (447) | (5,808) |
| **Total Disbursements** | **(65,947)** | **(20,428)** | **(30,313)** | **(21,428)** | **(45,386)** | **(25,452)** | **(29,337)** | **(20,452)** | **(35,386)** | **(17,673)** | **(26,559)** | **(27,673)** | **(42,608)** | **(408,642)** |
| **OPERATING CASH FLOW** | **(38,142)** | **6,974** | **500** | **11,253** | **(18,278)** | **(724)** | **(1,624)** | **8,030** | **(5,831)** | **14,533** | **2,089** | **1,404** | **(8,441)** | **(28,257)** |
| **Non-Operating** | | | | | | | | | | | | | | |
| Pre-Petition ABL Interest and Fees | (3,687) | - | - | - | - | - | - | - | - | - | - | - | - | (3,687) |
| DIP Interest and Financing Fees | (5,249) | - | - | - | (4,210) | - | - | - | (3,160) | - | - | - | (2,745) | (15,364) |
| Other Bankruptcy Disbursements | - | - | (200) | - | - | - | - | - | - | - | - | - | - | (200) |
| Professional Fees (Restructuring) | (19,200) | - | - | - | - | (2,481) | - | (3,790) | - | - | (2,481) | - | (3,790) | (31,743) |
| **Total Disbursements** | **(28,136)** | **-** | **(200)** | **-** | **(4,210)** | **(2,481)** | **-** | **(3,790)** | **(3,160)** | **-** | **(2,481)** | **-** | **(6,535)** | **(50,993)** |
| **NET CASH FLOW** | **(66,278)** | **6,974** | **300** | **11,253** | **(22,488)** | **(3,205)** | **(1,624)** | **4,240** | **(8,991)** | **14,533** | **(392)** | **1,404** | **(14,976)** | **(79,250)** |
| **Liquidity** | | | | | | | | | | | | | | |
| Starting Funded ABL Loan Balance | 154,000 | 79,000 | 91,000 | 92,000 | 92,000 | 57,000 | 57,000 | 57,000 | 57,000 | 57,000 | 57,000 | 57,000 | 57,000 | 154,000 |
| Draw / (Repayment) | (75,000) | 12,000 | 1,000 | - | (35,000) | - | - | - | - | - | - | - | - | (97,000) |
| **Ending Funded ABL Loan Balance** | **79,000** | **91,000** | **92,000** | **92,000** | **57,000** | **57,000** | **57,000** | **57,000** | **57,000** | **57,000** | **57,000** | **57,000** | **57,000** | **57,000** |
| **ABL Line Cap** | **166,915** | **166,915** | **166,915** | **158,790** | **158,790** | **158,790** | **158,790** | **162,970** | **162,970** | **162,970** | **162,970** | **153,471** | **153,471** | **153,471** |
| Less: Revolving Loans | (79,000) | (91,000) | (92,000) | (92,000) | (57,000) | (57,000) | (57,000) | (57,000) | (57,000) | (57,000) | (57,000) | (57,000) | (57,000) | (57,000) |
| Less: Floorplan Advances | (42,619) | (43,787) | (44,954) | (51,430) | (50,996) | (50,296) | (55,170) | (54,470) | (53,770) | (62,359) | (62,315) | (62,270) | (62,226) | (62,226) |
| Less: L/Cs | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Excess Availability (excl. Cash) (A)** | **45,296** | **32,129** | **29,961** | **15,360** | **50,794** | **51,494** | **46,620** | **51,500** | **52,200** | **43,611** | **43,655** | **34,200** | **34,245** | **34,245** |
| Beginning Cash | 28,677 | 32,399 | 51,373 | 52,672 | 63,926 | 76,437 | 73,232 | 71,608 | 75,849 | 66,858 | 81,390 | 80,998 | 82,402 | 28,677 |
| Net Cash Flow | (66,278) | 6,974 | 300 | 11,253 | (22,488) | (3,205) | (1,624) | 4,240 | (8,991) | 14,533 | (392) | 1,404 | (14,976) | (79,250) |
| Term Loan DIP | 145,000 | - | - | - | 70,000 | - | - | - | - | - | - | - | - | 215,000 |
| Draw / (Repayment) of ABL | (75,000) | 12,000 | 1,000 | - | (35,000) | - | - | - | - | - | - | - | - | (97,000) |
| **Ending Cash** | **32,399** | **51,373** | **52,672** | **63,926** | **76,437** | **73,232** | **71,608** | **75,849** | **66,858** | **81,390** | **80,998** | **82,402** | **67,427** | **67,427** |
| Less: Professional Fees Carve Out Account | - | (1,184) | (2,369) | (3,553) | (4,738) | (5,685) | (6,633) | (3,790) | (4,738) | (5,685) | (6,869) | (8,054) | (5,448) | (5,448) |
| **Available Cash (B)** | **32,399** | **50,188** | **50,304** | **60,372** | **71,700** | **67,547** | **64,976** | **72,059** | **62,120** | **75,705** | **74,129** | **74,348** | **61,978** | **61,978** |
| **LIQUIDITY (A) + (B)** | **77,695** | **82,317** | **80,265** | **75,732** | **122,494** | **119,041** | **111,596** | **123,559** | **114,320** | **119,316** | **117,784** | **108,549** | **96,223** | **96,223** |

**<u>Annex A</u>**

**Prepetition Lien Priority Annex**

|  | **ABL Collateral** | **Term Loan Collateral** |
|---|---|---|
| **1.** | Prepetition ABL Liens | Prepetition First Lien Liens |
| **2.** | Prepetition First Lien Liens | Prepetition Second Lien Liens |
| **3.** | Prepetition Second Lien Liens | Prepetition ABL Liens |

**Annex B**

**Post-Petition Lien/Claim Priority Annex**

| Priority | DIP Collateral (other than Avoidance Action Proceeds) that constitutes ABL Priority Collateral or that would otherwise constitute ABL Priority Collateral | DIP Collateral (other than Avoidance Action Proceeds) that constitutes Term Loan Priority Collateral or that would otherwise constitute Term Loan Priority Collateral | DIP Collateral that constitutes Avoidance Action Proceeds |
|---|---|---|---|
| **1.** | Carve Out<br>Permitted Prior Liens | Carve Out<br>Permitted Prior Liens | Carve Out |
| **2.** | ABL DIP Liens<br>ABL DIP Superpriority Claims | Term DIP Liens<br>Term DIP Superpriority Claims | ABL DIP Liens and Term DIP Liens, on a *pari passu* basis<br>ABL DIP Superiority Claims and Term DIP Superpriority Claims, on a *pari passu* basis |
| **3.** | Prepetition ABL Adequate Protection Liens<br>Prepetition ABL Adequate Protection Claims | First Lien Adequate Protection Liens<br>First Lien Adequate Protection Superpriority Claims | Prepetition ABL Adequate Protection Liens and First Lien Adequate Protection Liens, on a *pari passu* basis<br>Prepetition ABL Adequate Protection Claims and First Lien Adequate Protection Superpriority Claims, on a *pari passu* basis |
| **4.** | Prepetition ABL Liens<br>Prepetition ABL Claims | Prepetition First Lien Liens<br>Prepetition First Lien Claims | N/A |
| **5.** | Term DIP Liens<br>Term DIP Superpriority Claims | Second Lien Adequate Protection Liens<br>Second Lien Adequate Protection Claims | N/A |
| **6.** | First Lien Adequate Protection Liens<br>First Lien Adequate Protection Superpriority Claims | Prepetition Second Lien Liens<br>Prepetition Second Lien Claims | N/A |
| **7.** | Prepetition First Lien Liens<br>Prepetition First Lien Claims | ABL DIP Liens<br>ABL DIP Superpriority Claims | N/A |
| **8.** | Second Lien Adequate Protection Liens<br>Second Lien Adequate Protection Claims | Prepetition ABL Adequate Protection Liens<br>Prepetition ABL Adequate Protection Claims | N/A |
| **9.** | Prepetition Second Lien Liens<br>Prepetition Second Lien Claims | Prepetition ABL Liens<br>Prepetition ABL Claims | N/A |